**FILED**

NOV 1 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOLANDA C. GIBSON-MICHAELS )
2210 Anvil Lane )
Temple Hills, Maryland 20748 )
(301) 630-5062 )
)
      Plaintiff, )
     v. )    Civil Action No._____
)
SHELIA C. BAIR )
CHAIRMAN, )
 FEDERAL DEPOSIT )
INSURANCE CORPORATION,
550 - 17th Street, N.W – MB-6028   CASE NUMBER  1:06CV01940
Washington, D.C. 20429
(202) 898-6974    JUDGE: Ricardo M. Urbina
    And
SECURIGUARD INCORPORATION  DECK TYPE: Employment Discrimination
6858 Old Dominion Drive – Suite 307
McLean, Virginia 22101    DATE STAMP: 11/14/2006
Patricia Del Marvil, Chairman CEO )
    And )
USEC CORPORAITON )
7531 Leesburg Pike – Suite 402 )
Falls Church, VA 22101 )
David L. Marvil, Chairman CEO )
**Registered Agent**: CT Corporation Systems )
1015 15th Street, N.W., - Suite 1000 )
Washington, D.C. 20005 )
    And )
Work Violence Research Institute )
Steve Kaufer )
1281 North Gene Autry Trail – Suite K )
Palm Springs, CA 92262 )
)

**RECEIVED**

OCT 1 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

<table>
<tr><td>And</td><td>)</td></tr>
<tr><td>Douglas R. Fahey</td><td>)</td></tr>
<tr><td>3716 Dalebrook Drive</td><td>)</td></tr>
<tr><td>Dumfries, Virginia 22015-1804</td><td>)</td></tr>
<tr><td>(703) 583-7528</td><td>)</td></tr>
<tr><td>And</td><td>)</td></tr>
<tr><td>Jenekia J. Johnson</td><td>)</td></tr>
<tr><td>1414 Colony Road</td><td>)</td></tr>
<tr><td>Oxon Hill, Maryland 20748</td><td>)</td></tr>
<tr><td>And 301-567-3040</td><td>)</td></tr>
<tr><td>Robert Feldman, Executive Secretary</td><td>)</td></tr>
<tr><td>FEDERAL DEPOSIT</td><td>)</td></tr>
<tr><td>INSURANCE CORPORATION,</td><td>)</td></tr>
<tr><td>550 - 17th Street, N.W</td><td>)</td></tr>
<tr><td>Washington, D.C. 20429</td><td>)</td></tr>
<tr><td>(202) 898-6974</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendants,</td><td>)</td></tr>
</table>

## COMPLAINT

### DISCRIMINATION IN EMPLOYMENT
### BASED ON TITLE VII, AGE, RACE, SEX, SEXUAL HARRASSMENT, GENDER, RELIGION, EEO RETALIATION, FAMILY AND MEDICAL LEAVE

## I.    INTRODUCTION

Now comes Yolanda C. Gibson-Michaels, Plaintiff (Prose) and brings this claim of

action against the Federal Deposit Insurance Corporation (hereinafter "FDIC"), Defendant for

trial *de novo*, as provided for under Title VII of the Civil Rights Act of 1964.

Title VII, as amended, 42 U.S.C. § 2000e et seq., specifically 42 U.S.C. § 2000e-5; 42

U.S.C. § 2000e-16 (c) and 29 C.F.R. § 1614.407, which provide for relief against

discrimination in federal employment on the basis of age, race, sex, sexual harassment, gender,

religion, EEO retaliation, disability, and intentional family medical leave act violations.

2

The statute allows Plaintiff to file suit in federal court against the head of a federal Government Corporation, for a trial *de novo*.

Plaintiff also brings this action for a *de novo* trial pursuant to 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 794, *et seq.* which prohibit discrimination in the federal government employment based on disability and handicap; 29 U.S.C. § 633a, which prohibits age discrimination in federal government employment; and 42 U.S.C. § 2000e-3(a), as amended, which prohibits retaliation against an employee for pursuing her rights.

Plaintiff filed several formal complaints against the FDIC based on race, age, gender and reprisal. FDIC continued its EEO retaliatory maltreatment against Plaintiff.

Plaintiff also brings this action pursuant to 29 U.S.C. § 2601, et seq. for violation of the Family and Medical Leave Act.

Plaintiff, age 47, black female, seeks injunctive and declaratory relief to secure the protection of and to redress the deprivation of rights granted to her by the laws of the United States of America. Plaintiff seeks compensatory damages, attorney's fees and costs for violations, pursuant to 42 U.S.C. §2000e-5 and 42 U.S.C. § 2000e-16, as amended.

Plaintiff is a former employee of the Federal Deposit Insurance Corporation ("FDIC"), has suffered intentional acts of egregious malice, invidious discrimination, intentionally infliction of emotional distress, violations of her rights.

The Federal Deposit Insurance willfully violated Plaintiffs rights governed by the Family Medical Leave Act, age, race, sexual harassment, religious beliefs violations, maltreatment, abuse, mental anguish and was forced to work in a pervasive hostile environment as a result of the actions of the defendant, its agents, contractors, and employees.

3

Plaintiff seeks **compensatory damages**.

1.      The aggregate of defendant's ("FDIC")outrageous and unlawful conduct caused grave physical, emotional, psychological harm and mental distress to Plaintiff, her family.  Moreover, the agency's willful effectuation of appellant's (removal) from civil service both in **January 21, 2005** and **March 31, 2006** has caused appellant intentional duress.

## II.      **FDICs INVOLUNTARY REMOVAL OF PLAINTIFF REVERSED**

Plaintiff was involuntary removed ("constructive discharge") from the Federal Deposit Insurance Corporation on **January 21, 2005**.  The MSPB ruled on **November 14, 2005** that Plaintiff's removal was involuntary.

The FDIC was ordered to cancel the Plaintiff's resignation and to reinstate her to her position as an Information Specialist, effective January 21, 2005. *See **Gibson-Michaels** v. **Federal Deposit Insurance Corporation**, **MSPB Docket No. DC-0752-05-0633-I-1**￼* (Initial Decision, Nov. 14, 2005). The initial decision became the final decision of the Board on **December 19, 2005**. FDIC effectuated Plaintiff's 2nd involuntary removal on **March 31, 2006**.

## III.      **JURISDICTION**

2.      Jurisdiction of this Court is invoked pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5; 42 U.S.C. §2000e-16; 28 U.S.C. 1343(3); 29 U.S.C. § 794 (a); 29 U.S.C. § 701, et seq. Sections 15 of the ADEA, 29 U.S.C. § 633a(c), 28 U.S.C. § 1331.

4

### IV.    **VENUE**

3.        Venue lies in the District of Columbia pursuant to 28 U.S.C. §1391 and 29

U.S.C. §633a(c). The headquarters of the Defendant Agency, named Defendants Chairman

Shelia Bair, and the Legal Division office of Corporation Legal Support Services and Outside

Counsel the Defendant Agency established and applied the policies and practices that harmed

Plaintiff age 47.

### V.    **PARTIES**

4.        **Plaintiff**, Yolanda C. Gibson-Michaels, who was born **April 1, 1959**, is a

citizen of the United States and is a resident of Prince Georges County (P.G) Maryland,

residing at 2210 Anvil Lane, Temple Hills, Maryland 20748.

5.        **Defendant(s)**, **Shelia Bair**, is the Chairman of the Federal Deposit Insurance

Corporation within the meaning of 42 U.S.C. §2000e-16. FDIC Chairman Shelia Bair accepted

nomination as the FDICs Chairman on May 2006.

Chairman Bair's predecessor is former Donald E. Powell. At all times relevant hereto, the

employees mentioned herein were employees, contractors, intern, and agents of the FDIC and

were acting within the scope and course of their employment.

(a) **SECURIGUARD INCORPORATION**, 6858 Old Dominion Drive – Suite 307

McLean, Virginia 22101. Patricia Del Marvil, Chairman CEO.

(b) **USEC CORPORAITON** 7531 Leesburg Pike – Suite 402 Falls Church, VA 22101

David L. Marvil, Chairman CEO.  Securiguard is listed as a subcontractor to USEC Corporation.

**Douglas R. Fahey** former unlicensed investigator (contractor) listed as paid by Securiguard and

USEC Corporation contracts paid by the Federal Deposit Insurance Corporation.

5

(c) **Steve Kaufer**, CEO, Work Violence Research Institute, 1281 North Gene Autry Trail – Suite K, Palm Springs, CA 92262. Plaintiff contacted Steve Kaufer at or around 1:25pm On September 9, 2005. Mr. Kauffer stated that the Work Violence Research Institute has **'relations'** with the FDIC. He stated he needed to contact the FDIC. Plaintiff requested, and Steve Kaufer provided his fax number. Plaintiff provided evidence ignored by Steve Kaufer and FDIC on **January 19, 2006** that **Douglas R. Fahey was not authorized to engage into an unauthorized interception of oral communications**. Steve Kaufer was non-responsive. Mr. Kaufer received, accepted, and provided controversial inflammatory, derogatory, degrading investigative report, comments, notes provided by an unlicensed investigator Douglas R. Fahey (**Acting Under the Color of Law**).

(d) **Douglas R. Fahey**, Securiguard Investigator (Acting under the color of law), 3716 Dalebrook Drive, Dumfries, Virginia 22015-1804, (703) 583-7528. Metropolitan police confirmed that Douglas R. Fahey was unlicensed DOJ Criminal Division confirmed that Fahey didn't have a Court or the FDIC didn't have a court Order, authority to engage into an interception of oral communications with the use of a tape recorder (Sony).

(e) **Jenekia J. Johnson**, 1414 Colony Road, Oxon Hill, Maryland 20748 a **25-year old intern involved in a Federal Theft** employed, hired, and paid (time/attendance) by her aunt JoAnn Williams private secretary to James T. Lantelme. Ms. Johnson admitted **she lied on tape**, submitted false affidavits, and willfully entrapped Plaintiff by pre-text in which she stated she LIED on April 14-15, 2004.

6

## VI. **ADMINISTRATIVE PROCEDURES**

6.    Since Plaintiff is entitled to a *de novo* **trial**, for background purposes and for purposes of showing that she has met the exhaustion requirements Plaintiff recounts, the following administrative procedures.   Pursuant to 29 C.F.R. § 1614 and Sec. 1614.201.

7.    Age Discrimination in Employment Act, Subpart B--Provisions Applicable to Particular Complaints which states, in part, that:(a) As an alternative to filing a complaint under this part, an aggrieved individual may file a civil action in a United States district court under the ADEA against the head of an alleged discriminating agency after giving the Commission not less than 30 days' notice of the intent to file such an action.

(a) When an individual has filed an administrative complaint alleging age discrimination that is not a mixed case, administrative remedies will be considered to be exhausted for purposes of filing a civil action:  (1) 180 days after the filing of an individual complaint **{if the agency has not taken final action}** individual has not filed an appeal or 180 days after the filing of a class complaint **if the agency has not issued a final decision.**

8.    Plaintiff exhausted all administrative remedies in accordance to **1614.201 Age Discrimination in Employment Act**. (a) As an alternative to filing a complaint under this part, **an aggrieved individual may file a civil action in a United States district court under the ADEA against the head of an alleged discriminating agency after giving the Commission not less than 30 days' notice of the intent to file such an action.** Plaintiff satisfied requirements setforth in accordance to **1614.201 Age Discrimination in Employment Act.**

7

9.      On **April 4, 2006**, Plaintiff by and through her former Counsel, Patrick Henry LLP submitted a request to withdraw her claims from the EEOC process to exercise her right to file directly in Federal Court.

10.     Plaintiff's request to file in Federal Court was **Granted** by Honorable Varice Henry, Administrative Law Judge, EEOC Washington Field Office on **April 5, 2006.**

11.     FDIC intercepted Plaintiff's right to file in Federal Court – reopened case; and willfully placed investigation case on hold on **October 3, 2006**. Plaintiff has a lawful right to pursue claims in Federal Court without interruption from FDIC.

## FDIC CONTINUOUS VIOLATIONS OF PLAINTIFF RIGHT TO SEEK RELIEF

FDIC established a pattern of continuing violations of age, disparate treatment, and Title VII violations of FDIC beginning 1995 to present. FDIC violated Plaintiff beginning 2002.

12.     James T. Lantelme, Assistant General Counsel fabricated that Plaintiff's position was surplus for the purpose of a reduction of force (RIF), ordered Plaintiff to train Ms. Terry Hopkins (Caucasian) in all aspects of Plaintiff's functions of her former position as Senior Information Specialist, CG-301-11. FDIC permitted a pattern of age discrimination practices against Plaintiff to continue. FDICs discriminatory action took place during the statute of limitations period of accepted claims with FDIC. Plaintiff was involuntary separated on **January 21, 2005** and **March 31, 2006** in violation of her age, race, sex, parental rights, EEO retaliation, protected disclosures (whistle-blowing) among other violations.

8

13.     On **April 27, 2005**, FDIC refused to accept Plaintiff's timely cancellation of an invalid forced (coercive) settlement agreement in violation of the ADEA (Older Worker's Benefit Act) FDICs willful discriminatory conduct was evidence of the FDICs **"continuing violation"** of behavior that led up to the ultimate discriminatory acts. The courts have noted that time-barred acts are sufficiently related to the timely conduct to recover for the earlier conduct. Plaintiff request that this Honorable Court award **treble damages** against FDIC's prior conduct in violation of the ADEA (Older Workers Benefit Act)  See *National R.R. Passenger Corp.* v. *Morgan*, 122 S. Ct. 2061 (2002)(resolving several circuit splits)

## VII.    SUMMARY BACKGROUND

Plaintiff merged from the former Federal Home Loan Bank Board (FSLIC on October 8, 1989, as a Secretary, GS-6, and accepted a reassignment to a Legal Technical position on January 14, 1990.  Plaintiff was temporarily promoted to a series of CG-7 Assistant positions during the period of October 1993 to January 1998.  Plaintiff was temporarily promoted to a CG-8 Information Specialist on December 19, 1999, and to a CG-9 on December 17, 2000. Plaintiff was permanently promoted to the CG-9 position on September 23, 2001, and then to the CG-11 on December 16, 2001.

Plaintiff's employment record reflects meritorious recognitions of a Suggestion Award of $500 on December 11, 2003.  Star awards on December 2, 2001, June 18, 2000, February 28, 1999, and September 15, 1996. Plaintiff received Special Act Awards on November 4, 2001, November 21, 1999, July 6, 1997, February 19, 1995, November 27, 1994, and December 2, 1990. Plaintiff has sustained superior and outstanding performance appraisals since September, 1981.

9

## VIII. <u>SUMMARY BACKGROUND SUPPORTED BY EVIDENCE</u>

Plaintiff's supervisory reporting chain were first-line supervisor former Jacquelyn E. Edwards, (retired) (2002), former second-line supervisor Carl Polivnale replaced by Stephen M. Hanas July 12, 2004; and second-line supervisor James T. Lantelme from 1998 to March 31, 2006.

14.    On **<u>September 11, 2002</u>** – Plaintiff wrote memorandum to (former FDIC manager deceased) re: record of incident – Frank Nigro's abusive, threatening behavior towards colleague Boanton. Frank Nigro displayed 8-9 years of unprovoked rages, outburst, and explosive temperament towards other employees. Legal Division managers and James Lantelme were non-responsive and ignored Mr. Nigro's behavior.

15.  On **<u>September, 2002</u>** – **<u>James T. Lantelme</u>** disapproved (denied) 3 cash awards submitted to his attention by Carl Polvinale on behalf of Plaintiff. Denied by James T. Lantelme without justification.

16.  On **<u>October 21, 2002</u>** - Plaintiff wrote memorandum to Erica (Cooper) Bovenzi on behalf of herself and colleague Freeman. Plaintiff provided truth regarding function, and complexity of job functions associated with outside counsel program. James T. Lantelme was ordered to: (1) apologize to Plaintiff, (2) retain Plaintiff and former colleague Sherry Freeman within core staffing, (3) remove both employees from the FDICs reduction of force (RIF) list; (4). Reassign both employees under Carl Polvinale, Senior Counsel.

17.  On December **4, 2002** – **James T. Lantelme** approved a 3-hour baby shower for a Bird. **James T. Lantelme** ordered all employees to attend. Plaintiff declined attendance of **BIRD SHOWER**, reported **James T. Lantelme's** abuse of power, and authority to FDICs OIG office.

18.  On **April 30, 2003** – Plaintiff request to occupy office space in accordance to the NETU (Union) contract was denied by **James T. Lantelme without justification}**

19.  On **July 1, 2003**, Plaintiff's shared drive files were removed, deleted and renamed without Plaintiff's permission. Documents located in files were destroyed the Plaintiff's work was sabotaged by other employees.

20.  On **December 9, 2003**, Carl Polvinale approved advanced sick leave for Plaintiff, in accordance to the Family Medical Leave Act (FMLA) to accommodate son's serious health condition.

21. On **January 28, 2004** - **Plaintiff submitted 2004** request under the FMLA act for advance sick leave for son's **"serious health condition"** approved by FDIC Carl Polvinale

22. On **February 17, 2004** – Plaintiff requested to move into another office due to the **Psychological** affects of having to visually walk pass an office formerly occupied by a former deceased colleague. Request **_denied_** by James T. Lantelme without justification.

23.  On **March 4, 2004** – James T. Lantelme wrote notation onto time and attendance Certification sheet. The note was addressed to JoAnn Williams (James Lantelme) personal secretary and time keeper. Notation read, "**_Perform S/L audit to correct balances" J.Lantelme_**" **_(Note: All Sick and Annual Leave was approved by FDIC)_**

11

24.    On **March 10, 2004** – James T. Lantelme questioned, interrogated, and alleged Plaintiff displayed a documented to fellow employees indicative of Plaintiff receipt of the FDIC Corporation Chairman Award. Plaintiff denied accusations. James T. Lantelme was unable to produce alleged documentation of impropriety.

25.    On **March 29, 2004** - Plaintiff received electronic confirmation of results from desk audit for upgrade to CG-12 level of position. Results of desk audit were provided to James Lantelme. J.Lantelme denied Plaintiff's her right to receive results of a desk audit certified and approved by Plaintiffs former supervisor Carl Polvinale. Report denied by James Lantelme.

26.    On **April 7-Apri 9, 2004** - Plaintiff returned to office on April 14, 2004 from spring break vacation.

27.    On **April 14, 2004** –Plaintiff submitted to immediate supervisor (Carl Polvinale) timesheet for signature and approval in accordance to the Family Medical Leave Act (FMLA) Plaintiff supervisor Carl Polvinale approved leave request for **32 Hours of advance sick leave**.

James T. Lantleme unlawfully tampered, scratched, and marked through an officially signed and approved leave slip. James T. Lantelme directed his personal secretary (JoAnn Williams) whom is also Jenekia Johnson's aunt (nepotism) to enter leave against accrued annual leave.

28.    On **April 14, 2004** –Plaintiff was approached by student intern KBeard and Jenekia J. Johnson. Both (student interns) willfully informed Plaintiff about a Federal theft of well over $500.00 dollars in cash. Both interns accused each other of the theft. **"Exodus 20:5 declares, "You shall not bow down to them or worship them; for I, the LORD your God, am a jealous God, punishing the children for the sin of the fathers to the third and fourth generation of those who hate me."**

29.    On **April 15, 2004** –Johnson approached Plaintiff and said, "**I want to tell you that, I LIED.**" Plaintiff was unaware that Jenekia J. Johnson was [**"wired" with a Sony tape-recorder inside her purse set for 90 minutes by Doug Fahey (contractor)**] Initiated by James T. Lantelme and approved by FDIC management (Erica Cooper Bovenzi, William Kmentz, J.R. Harris, Robert Wooding, Randi Mendolshon, James R. Lawrence et.al.

30.    On **April 19, 2004 (2:22pm)**–Plaintiff received an e-mail from Douglas Fahey (contractor).  Fahey requested investigative interview with Plaintiff regarding conversation she had with a 25- year old woman (FDIC student intern Johnson on April 14-15, 2004 which made the intern) **"Feel Threaten"**

31.    On **April 19, 2004 (4:04pm)** –Plaintiff sent e-mail to C. Polvinale regarding both interns alleged theft.  Plaintiff informed Polvinale that she cooperated and provided contractor Douglas Fahey with statement. Carl Polvinale stated that a **bible verse is not a threat**.

32.    On **April 20, 2004** –Plaintiff sent letter to the Office of Inspector General regarding Lantelme's alteration, marked through and falsification of her official time and attendance report. IG non-responsive declined to investigate. IG stated that, **"The matter was an employee/supervisor matter."**

33. On **April 21, 2004** –James T. Lantelme e-mailed and hand-carried a memorandum re: Mandatory attendance at Investigative Meeting. Lantelme stated, that: "*I direct you to meet with Mr. Fahey at his office, and I direct you to cooperate in the interview. 'Failure to attend the interview and cooperate will result in disciplinary actions being taken against you."* I was forced, directed; coerce to attend the investigative interview.

34. On **April 21, 2004 (3:49pm)** –Plaintiff e-mailed James T. Lantelme. Plaintiff requested FDICs rules, regulations, policies that ordered, threaten, and coerced employees to attend investigative interviews. Lantelme restated his demand.

35. On **April 22, 2004 (8:26am)**–Donna Schull (Union Representative) requested a delay in meeting. Ms. Schull requested a statement from intern which read: **"What was the charge against Plaintiff, or what specifically were the charges"** Douglas Fahey (contractor) didn't respond to the Union's request for clarity or charges.

36. On **April 22, 2004 (10:29am)** –James T. Lantelme responded to Plaintiff. James T. Lantelme wrote that: **"I have received your emailed, your request is duly noted"** James T. Lantelme threaten Plaintiff with disciplinary actions if she didn't meet with contract employee Douglas R. Fahey.

37. On **April 22, 2004 (3:02pm)** –Plaintiff e-mailed FDIC OIG Samuel Holland re: reinvestigation of Lantelme's alteration of her official leave record.

38. On April **26, 2004** –James T. Lantelme e-mailed and hand-carried a memorandum to Plaintiff with an order, threat of removal if she didn't meet, cooperates with contract employee Douglas Fahey on **April 28, 2004** re **investigative interview**. James Lantelme ending statement read: **"Failure to meet would result in disciplinary actions against you."**

39. On April **27, 2004** – Plaintiff filed EEO case against William Kmentz, Douglas R.Fahey, Jenekia J. Johnson, Gloria Penny Elgas, James T. Lantelme, William Strickler, and Mendolshen for disparate treatment.

40.    On **April 28, 2004** -Plaintiff e-mailed union officials regarding illegal

tape recording (Interception of Oral Communications 18 U.S.C. - 119, privacy act violations,

Identity Theft, etc.

41.    On **April 29, 2004** – Plaintiff e-mailed union re: Draft summary of investigative

interview. Discussed Johnson's recording her own self stating that **she lied on tape** (False

Statement), cheated on time and attendance (Federal Fraud); and engaged into a discussion of

how Johnson was prohibited to work directly for her "blood relative-nepotism"

42.    On **May 10, 2004** –James T. Lantelme placed time constraints on 8,000 file folder

archive project. Plaintiff worked beyond human abilities. Other women (**Caucasian**) were not

subjected to moving, lifting, and having to shuffled, stack, pack, and cart voluminous file folders,

box assembly.

43.    On **May 11 2004** –Plaintiff sent rebuttal to James Lantelme re: illegal tape recording.

Intern stated that she lied on tape, nepotism of intern working for aunt, defrauding the

government. Douglas R. Fahey (contractor) **expressed embarrassment as intern stated that**

**she lied which was said on tape "self-incrimination"**

44.    On **May 12, 2004** –Plaintiff requested from OIG Alessandrino that he investigate

fraud related to Lantelme's alteration of official time sheet. This was the 3rd request to FDICs

OIG Office. FDICs OIG offices has historically been non-responsive towards investigating

complaints from employees whom are considered minorities at FDIC.

45. On **May 21, 2004** –Plaintiff completed 8,000 file archive project. Plaintiff suffered

pull muscles and sciatica nerve.  OWCP claimed denied, challenged, and controvert by James T.

Lantelme via C. Polvinale immediate supervisor.

46. On **May 25, 2004** –Plaintiff received e-mail from C. Silcox, FDICs Safety/Occupational Health Manager per James T. Lantelme. J.Lantelme threaten to charge Plaintiff annual leave or leave without pay; instead of Continuation of Pay (COP).

47.    On **June 1, 2004** –Plaintiff sent letter via e-mail and hand-carried ltr to the FDICs OIG Patricia Black regarding violation of 18 U.S.C., Section 119-Interception of Oral Communication by summer intern and contractor; not Federal Agent as required under Omnibus Street Crime Act, Court Order, and purpose of Federal Crime; not bible verse. OIG was non-responsive.

48. On **June 3, 2004** –B.Howard, FDIC EEO office sent Plaintiff e-mail re: New Allegation. BHoward asked, **"Regarding Johnson wearing a wire that you indicated was approved by Lantelme and Fahey, which you believe was used to entrap you. Did you want me to add that to the allegations that I already have?"**

49.    On **June 8, 2004** –Penny Gloria Elgas, legal division sent e-mail to Plaintiff re: status of desk audit. **"Yolanda…is to inform you that the desk audit report prepared by S.Gibbons will not be issued. Because it contained factual inaccuracies regarding the duties performed."** (Note: Ms. Penny Elgas reports directly to James T. Lantelme, Assistant Director chain of command)(See desk audit certified true and correct by Polvinale; denied by J.Lantelme via P.Elgas.

50.    On **June 9, 2004** – Plaintiff informed Ms. Elgas that James T. Lantelme and Carl Polvinale **approved position description true and correct 1999**. Ms. Elgas responded that, ***"You are correct that the position description was certified true and correct but that certification was approximately five years ago."*** {Note: PDs Do Not Expire}

16

51.     On **June 9, 2004** –Plaintiff received ltr. **Re: OWCP injury leave controvert by James T. Lantelme**. The ltr read, **"It has been determined that you are not entitled to Continuation of Pay (COP) during your absence from work for the period beginning 5/24/04."**

52.     On **June 9, 2004** –Plaintiff received ltr. From James T. Lantelme **"Proposed 10-Day suspension from duty without pay"** James T. Lantelme initiated **"Feelings of Threat"** when he asked student intern if she **"Felt Threaten by Yolanda"** Plaintiff quoted a verse from the Bible.

53.     On **July 12, 2004** James **T. Lantelme** held a staff meeting with the Legal Support Services Unit and the Internal Review Unit.  During the meeting Stephen M. Hanas, Supervisory Counsel was introduced as the new supervisor to replace Plaintiff's former supervisor Carl Polvinale.

54.     On **June 15, 2004** –Plaintiff request status of FOIA request regarding desk audit report denied by James Lantelme. FOIA report was not available per Frederick Fisch whom reports directly to James T. Lantelme.

55.     On **June 28 2004** –Plaintiff received e-mail from L.Potucek re: status of desk audit "No final desk audit report has been issued." Results changed after J. Lantelme received report instead of Carl Polvinale.

56.     On **June 29, 2004** –Plaintiff sent letter to **Special Agent Baker re: illegal taping Case No: 4003351**. Plaintiff requested that Baker reopen illegal recording to include FDIC violations of Identity Theft Title 22, subtitle I, Chapter 32, and Subchapter III. Identity Theft and Assumption Deterrence Act, 18 U.S.C., section 1028.

57.    On **July 1, 2004** –Plaintiff received "Notice of Right to File a Formal Discrimination Complaint." FDICEO-040039.

58.    On **July 12, 2004** – Plaintiff filed a formal EEO complaint. Re: Disparate treatment, retaliation, race against FDIC **James T. Lantelme**, student intern Jenekia J. Johnson employed her aunt JoAnn Williams, Douglas Fahey, Penny Elgas.

59.    On  **July 21, 2004** – Plaintiff sent another ltr. (Hand carried) to the FDICs Office of Inspector General to initiate another investigation on her behalf in which she outlined FDICs criminal and civil violations of laws, Procedures for Lawful, Warrant less interception or monitoring of  verbal communications from Attorney General John Aschroft dated **May 30, 2002.** FDICs Office of Inspector General was non responsive.

60.    On  **August 3, 2004** – Plaintiff received ODEO Amendment of Formal Discrimination Complaint. FDICEO-040039.

61.    On  **August 13, 2004** –Plaintiff received revision of incident 2 to Formal Discrimination Complaint FDICEO-040039.

62.    On  **August 17, 2004** –Erica Cooper Bovenzi directed Plaintiff to report to her office. Erica Cooper Bovenzi presented to Plaintiff a memorandum re*:"Notice of Decision – Five (5) Calendar Day Suspension"*

63.    On  **August 19, 2004** –Plaintiff submitted occupational disease claim form CA-2 to Stephen Hanas. Stephen Hanas refused to accept Plaintiff form for processing.

64.    On  **August 19, 2004** –**James T. Lantelme** requested Plaintiff to complete

another leave audit of previously approved (December 2003) FDIC time and attendance

records from 2002, 2003, 2004.  Plaintiff's previously approved sick leave was ordered

reversed by **James T. Lantelme** pending receipt of duplicate medical documentation. James

Lantelme intentionally initiated a leave audit of previously approved time sheets for the sole

purposes of EEO harassment, reprisal, family medical leave act retaliation.

65.    On  **August 20, 2004** –Stephen Hanas formerly appointed supervision on July 12,

2004 (1 month) sent an e-mail to Plaintiff re: **time and attendance**. This is the beginning of

retaliation, reprisal and maltreatment from Stephen Hanas conspirator with James T.

Lantelme.

66.    On  **August 20, 2004** –Plaintiff provided Stephen Hanas with rebuttal re: time and

attendance. Plaintiff stated that, **"As I indicated during our meeting, my annual leave**

**balance is 200 hours or more. I currently have use/or loose"**.

67.    On  **August 31, 2004** –Plaintiff received **threat of physical harm** and **warnings to**

**watch her back from FDICs timekeeper Eyvonne Bryant**.

68.    On  **September 8, 2004** –FDIC ODEO provided Plaintiff with assignment of

FDICEO—040039 Investigator – Mr. Barry Cohen.

69.    On  **September 22, 2004** – Plaintiff amended ODEO case to add EEO

retaliation, oppression, race, color, gender against **James T. Lantelme**.

70.    On October **8, 2004** –The National Employee Treasury Union (NETU) submitted

Step **4 grievance** on behalf of Plaintiff to rescind Notice of Decision Suspension letter from E

Bovenzi.

71.  On **October 14, 2004** –Plaintiff received FOIA issued by Frederick Fisch.

Submittal of **10 FOIA** request were erroneously denied, circumvented, delayed processing, and deliberately subjected to superficial scrutiny by Mr. Federick Fisch whom reports directly to **James T. Lantelme**, Assistant Director. Mr. Fisch requested Plaintiff to resubmit, rewrite, reword, rephrase, and readdress each FOIA request. (i.e., Frederick Fisch requested that Plaintiff define, **"Disparate Treatment"** with statement that he didn't understand the word disparate.

72.  On **October 19, 2004** –Plaintiff received Notice to Right to File a Formal Discrimination Complaint from FDIC. Case no. **FDICEO-040056** from Ophelia Jones FDICs office of ODEO.

73.    On **October 20, 2004** –Plaintiff reported **verbal** and **physical assault by Stephen Hanas, supervisor** and **James T. Lantelme**. Statement provided to FDIC security office and to the Federal Protection Services. Cased number NCO4—5667 **assigned to Agent Baker (202) 619-9358. Investigation on-going.**

74.  On **October 21, 2004** –Plaintiff receives e-mail from O.Jones FDIC\EEO counselor. Ms. Jones states, that, **"Yolanda, please note that a reassignment has not been offered as a resolution to your EEO allegations. The new allegations that you raised in your e-mail on Oct. 20, 2004, will be handled as an amendment."**

75. On **October 22, 2004** –Plaintiff urgently requested a reassignment to another office within FDIC/assignment of security to 3rd floor to protect her physical safety from James T. Lantelme and Stephen M. Hanas. Request denied by Erica Cooper Bovenzi.

76. On October **22, 2004** –Plaintiff requested a copy of Federal Protective Services Police report re: **Criminal violations of illegal interception of oral communications on April 15, 2004 (intern), reported physical assault against Plaintiff by James T. Lantelme and verbal assault by Stephen Hanas reported on October 20, 2004**.

77. On **October 25, 2004** –Plaintiff received e-mail from William Kmetz, FDIC Chief of Security re: Reassignment to another office\Assignment of security to 3^rd floor. William Kmentz stated, in part, that:"**Reassignment to another office is not within my area of responsibility. This is the responsibility of Legal Division management."**

78. On October **27, 2004** –Plaintiff received request for FPS Police Report regarding physical assault charges against **James T. Lantelme**. Investigation on-going. Assigned to Agent Baker. Officer Christopher Yingling stated that, **"This case is being referred to the Criminal Investigations Division for further disposition."**

79. On **November 3, 2004** –Stephen Hanas unlawfully charged Plaintiff with AWOL Hanas confirmed speaking to Plaintiff on 11/3/04 prior to the AWOL charge. Plaintiff sent rebuttal and requested Union to intervene.

80. On **November 3, 2004** –Plaintiff faxed amendment to formal ODEO complaint to Ophelia Jones regarding reprisal, assault, abuse, retaliation.

81. On **November 4, 2004** – Plaintiff received FPS Police report from S.Moore regarding illegal interception of oral communication CCN: NO4003351.

82. On **November 4 2004** –Plaintiff provided Stephen Hanas with memorandum re: Flexible work schedule – change of reporting hours. Effective 11/8/04. Stephen Hanas disapproved Plaintiff's request to earn credit hours. Stephen Hanas approved other employees supervised request for leave. Plaintiff's request denied without justification.

83. On **November 18, 2004** –Plaintiff received e-mail from W.Kmentz re: Case Number 0-265. William Kmentz, states, that: **"I have discussed this request with Legal and have been advised that I have no authority to release this report to you. If you wish, you can make a request through the FIOA channels."**

84. On. **November 24, 2004** – Investigator **Cheryl Davis**, Homeland Security, contacted Plaintiff for listing of individual FDIC employees and management involved in the approval of illegal interception of oral communications on April 15, 2004. **Case originally assigned to Agent Baker**.

85. On **November 29, 2004** – Plaintiff affirmed EEO affidavit of **physical assault** and verbal assault charges against **James T. Lantelme** and Steve Hanas.

86. On **December 3, 2004** – Plaintiff affirmed EEO affidavit of physical assault and verbal assault charges against **James T. Lantelme** and S. Hanas. Rebuttal hand-delivered to Barry Cohen, EEO Investigator.

87. On **December 3, 2004** – Plaintiff contacted Homeland Security Agent Davis re Steven Hanas and **James T. Lantelme's** securities fraud, bank fraud. Sends facsimile regarding Hanas vice-president *"SunTrust Bank"*, RICO, financial statement fraud, Hanas signed as signatory (money lender)(Wackenhut) other co-conspirators.

88. On **December 13, 2004** – Plaintiff filed assault charges against Barry Leese, USEC Contractor sent to harass Plaintiff regarding cases against management. Contractor Leese attempted to question Plaintiff without counsel.

89. On **December 13, 2004** – Plaintiff sent e-mail of whistleblower disclosures to J.R. Harris (FDIC security, William Kmetz, Ophelia Jones, RFinkley, Betty Coll regarding daily abuse, harassment, illegal charges of AWOL, harassment from co-workers, supervisor reported as vice president of SunTrust and other banks. All request ignored by security and management.

90. On **December 13, 2004** – Plaintiff filed another EEO reprisal charge against FDIC, managers, deputies, and associates. (Disparate treatment, retaliation, reprisal, oppression, sexual harassment, race, color, hostile work environment, whistleblower retaliation.

91. On **December 14, 2004** – Plaintiff contacted the FBI (202) 278-2000 reported Douglas R. Fahey. Jenekia J. Johnson and Douglas R. Fahey were both reported on **April 30, 2004 for illegal interception of oral communications** (tape reordering), **reported for identity theft (biometric theft)**, and **fraud**. Fahey managed to work for the FBI September, 2004.

92. On **December 17, 2004** – Plaintiff hand-carried another copy of whistleblower disclosures to the attention of E.Bovenzi, Deputy General Counsel Legal Division, James R.Lawrence, and M.Collins, Director of EEO (FDIC), information re: S.Hanas as being the vice president of SunTrust Bank, Vice President of NationsBank of Florida, National Association, Vice President of Bank of Austria Creditanstalt Corporate Finance, Inc., Vice President of Bank-Leumi Le-Israel B.M.,  Miami Agency, Vice President of the Provident

Bank, Vice President of IBJ Whitehall Business Credit Corporation, Vice President Hamilton

Bank. James T. Lantelme, JoAnn Williams (Environtech) fraud.

Terry Hopkins contracts fraud provided to FDIC management. Provided information re:

Philip Houle, Attorney, Legal Division's receivership fraud and Mary AnnRichardson power

of attorney for Philip Houle.

93. On **December 17, 2004** – Plaintiff sent e-mail to the U.S. Representative, U.S.

Congress, U.S. Senate, U.S. Subcommittee to oversee, follow, and ensure illegal interception

of oral communications (wire) is prosecuted in accordance to law, omnibus act III, privacy

act, and patriot act. No politics, favoritism. Email sent December 21, 2004 3:45am

94. On **January 11, 2005** – EEO Specialist –Edith Murphy sent certified mail to Plaintiff

lawyer Nathaniel Johnson re: Assignment of Discrimination Complaint to Investigator

FDICEO-040056. Sexual harassment, retaliation, hostile work environment, abuse by Stephen

Hanas also reported for fraud, bank fraud, money laundering to **FBIs American Most**

**Wanted Ritan Eitan**.

95. On **January 11, 2005** - Plaintiff received telephone from NETU Union

representatives Donna Scholl and Betty Coll. NETU Union Officials Elizabeth Coll, President

and Donna Schull informed Plaintiff via teleconference that FDICs Mary Laverty (Labor

Relations) stated that FDIC  management informed NETU that, **"Yolanda should have kept**

**her mouth closed regarding bank, receivership, wire, and securities fraud."**

24

96. On **April 20, 2005** – Plaintiff received email from FDIC's Labor Relations point-of contact James Lawrence sent Plaintiff an email on behalf of agency.

**Subject:**     **Settlement Agreement**

**Date:**        **Wed, 20 Apr 2005 15:55:31 -0400**

**From:**        **"Lawrence, James R." <JLawrence@FDIC.gov> ⎵⎵Add to Address Book**

**To:**          **"Yolanda Gibson-Michaels" <ygmichaels@yahoo.com>, "Schull, Donna" <DSchull@FDIC.gov>**

**CC:**          **"Moran, Michael P." <MMoran@FDIC.gov>**

Ms. Gibson-Michaels:

This concerns the Settlement Agreement which was signed by you, NTEU and the FDIC on January 14, 2005.  As you know, all of your existing EEO complaints were withdrawn as a part of that Agreement. However, it has come to our attention that at least one of your complaints contained an age discrimination basis.

Due to the requirements of the ADEA, as amended by the Older Workers' Benefit Protection Act, you must be provided the right to cancel the Agreement within seven (7) days after you have signed it.  Since that right was not given to you at the time of your signature, we are providing that right to you now. You are advised to consult with an attorney, the Union or other personal representative before making this decision.

25

97. On **April 25, 2005** – Plaintiff acknowledged FDICs admission of the invalid contract: **"In response to your e-mail dated April 20, 2005, this certified letter serves to acknowledge FDICs admission of the breach of contractual settlement agreement as it relates to an EEOC mandatory requirement under the ADEA as amended by the Older Workers Benefit Protection Act (OWCB) (settlement agreement) dated January 14, 2004."**

98. On **April 27, 2005** – Plaintiff consulted with law firm of **Passman and Kaplan** re: FDICs ADEA Older Workers Benefit provisions. Attorney Einstein instructed Plaintiff to cancel the agreement with FDIC and send a bcc to his attention. Einstein stated the words "cancel" must be used and the agreement will be revoked.

99. On **April 27, 2005** – Plaintiff officially cancel the invalid agreement within the timeframe set by FDIC. "This serves to cancel the agreement."

100. On **April 27, 2005** – Plaintiff sent another email to FDIC to cancel the agreement 13:46pm

26

101. On **April 27, 2005** – at 17:34:34, the FDIC James Lawrence responded on behalf of the FDIC.

> Dear Ms. Gibson-Michaels:
>
> This will serve as your receipt that the FDIC has received your e-mail stating your request to cancel (rescind) the settlement agreement, and that your request was received prior to 5:00 on April 27, 2005.    I will be consulting with management about this situation and will provide a more detailed response in the next several days.
>
> Sincerely,
>
> James Lawrence

102. On **April 29, 2005** – Plaintiff sent certified mail to FDIC/EEO Specialist Michael Moran re: New Claims of EEO Reprisal, Retaliation, Age, Sex, Race, EEOC Whistleblower Retaliation against FDIC. Michael Moran has been non-responsive. Email was received from Ophelia Jones regarding **"Constructive Discharge"** Plaintiff informed Ophelia Jones that claim was referred to OSC for a decision.

103. On **May 2, 2005** – FDIC breached agreement to reinstate Plaintiff. The FDIC representative James Lawrence lied and stated that, "We didn't have a meeting of the minds." FDIC stated that Plaintiff will not be reinstated.

104. On **May 3, 2005** – Plaintiff sent U.S. EEO Commission a letter for assistance against FDICs failure activate EEO claims; reinstate status, and FDICs whistleblower retaliation against Plaintiff.

105. On **May 11, 2005** – Plaintiff received letter from EEOC Commissioner. EEO

stated that, **"You have apparently elected to cancel your settlement agreement, but no**

**decisions have been made with regard to your EEO complaint"** EEOC referred Plaintiff

to OSC for adjudication of FDICs failure to reinstate, activate EEO claims, and whistleblower

retaliation. FDICs Director Collins, Michael Moran, Susan Berman and other reported FDIC

EEO officials are aware that **James R. Lawrence, Labor Relations** is not **authorized** to

**administer** the FDICs ODEO program requirements, statute, ADEA statute or requirements

in accordance to the **Older Workers Benefit Act**.

106. On **June 21, 2005**, Plaintiff filed an IRA with the Merit System Protection

Board (MSPB) regarding the FDICs failure to cancel the involuntary invalid settlement

agreement.

107. On **October 27, 2005** – Plaintiff received via mail copy of EEOC

Acknowledgement and Order dated **October 26, 2005**. re: EEO claims against FDIC. (age,

race, sex, color, disparate treatment, sexual harassment, religion, reprisal, EEO retaliation,

physical assault, verbal abuse, hostile environment, FMLA interference, violations)

108. On **December 13, 2005** – Plaintiff received e-mail from FDICs Mary Laverty,

Labor Relations. Ms. Laverty under false pretenses (coerced) instructed Plaintiff to report for

duty on December 19, 2005 in which she (Mary Laverty) fabricated that FDIC was in

compliance to Judge Ben-Ami's order dated November 14, 2005.

28

109. On **December 19, 2005** – Plaintiff reported to her former place of employment per the request Mary Laverty, FDIC Labor Relations accompanied with NETU Union Official, Howard Matthews.

110. On **January 6, 2006** – Plaintiff's former counsel Patrick Henry sent letter to FDIC representative who confirmed health care high option medical coverage for self and family. FDIC has willfully omitted health coverage for Plaintiff severely autistic son with a seizure disorder. Counsel further stated that, **"Plaintiff does not owe any money to FDIC, and therefore is not indebted to the FDIC. As such, FDIC can not use the rules set forth in 5 U.S.C. 5514, et seq., the regulations in 5 C.F.R. part 550, subpart K or FDIC's own regulations in 12 C.F.R. section 313.40 et. seq., governing salary offset to withhold monies form Plaintiff salary.**

**FDIC must be in strict compliance with 12 C.F.R. 313.41." FDIC ignored Counsel and illegally deducted well over $34,000 dollars without due process, permission, notification, hearing or appeal rights."**

111. On **January 8, 2006** – Plaintiff received confirmation from **Senator Jay Rockeffer, Senate Intelligence Committee** of receipt re: FDICs bank, receivership, inside trading, money laundering. (**539 page Disk of protected disclosures provided**)

112. On **January 9, 2006** – FDICs counsel Tina Lamoreaux sent ltr to Plaintiff counsel Patrick Henry of FDICs blatant disregard for the ADEA (OWBA) laws and its willful deduction of well over **$34,000** dollars from Plaintiff back pay award.

113. On **January 19, 2006** – Plaintiff provided evidence to Mary Laverty, Human Resource Specialist and Henry Griffin, Counsel that Stephen Hanas and James T. Lantelme both executed false affidavits. Plaintiff's former immediate supervisor Stephen Hanas confirmed that he has had Plaintiff's approvals under the FMLA since December 2003.

114. On **March 23, 2006** – Plaintiff filed **NEW EEO CLAIMS** - Steven App, Lucille McCabe, Michael Collins, Stephen Hanas, James Lantelme deprivation of rights, illegal offset of salary.

115. On **March 31, 2006**. FDIC effectuated Plaintiff 2nd involuntary removal from Federal Services in violations of age, sexual harassment, FMLA, Whistleblowing, religion, Title VII, EEO Retaliation, among other claims filed against the FDIC.

## XI. **STATISTICAL PATTERN OF PRACTICE - FDIC DISCRIMINATION**

By show of statistical evidence in former and current FDIC age and discriminatory practices establishes a *prima facie* case of intentional employment discrimination in which the Federal Deposit Insurance Corporation ("FDIC") engaged into a willful Pattern of Practice. Statistics disclosed a disparity so great that it cannot reasonably be attributed to chance.

FDICs current class action Age Discrimination lawsuits and prior discrimination cases filed against the FDIC, provides clear and convincing evidence that the FDIC by {**plan and practice**} has discriminated against older FDIC employees in its promotion and other practices.

30

Documents filed by both former and current FDIC employees provides evidence that during board meetings with Board members and FDIC senior staff discussions were held (**from verbatim transcripts**) on "**How to get older workers to leave the FDIC due to the need to downsize the organization**."

Judges have ruled that the value of statistical evidence is to show that, given the distribution of employees that one would expect assuming a purely non-discriminatory employment process, deviations from this distribution cannot be attributed solely to innocuous or random factors. See *NAACP* v. *Town of East Haven*, 70 F.3d 219, 225 (2d Cir. 1995).

Also see prior and former age, race, class and individual discrimination cases filed against the Federal Deposit Insurance Corporation (FDIC) which affirms the FDICs patter of practice. **Chris J. Conanan et.al**, v. **FDIC** civil action no. 00-3091 **(May 16, 2001)**, **P.Egardo Tarrats**, **Ivan Riverra et.al**., v. **FDIC** 94-59 EEOC Hearing No. 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-X. **Barbara Aliotta, et al** v. FDIC **case no. 05CV02325**, **Mary E. Bass** v. **FDIC**, Civil Action No. 00-0115. **Jacqueline P. Taylor** v. **FDIC, No. 96-5267**, **Marvin Armstrong** vs. **FDIC** February 18, 2005 Case No. CV-03-0255C and **Gibson-Michaels** v. **Federal Deposit Insurance Corporation**, MSPB Docket No. DC-0752-05-0633-I-1 (Initial Decision, Nov. 14, 2005).

In Marvin Armstrong vs Donald Powell, Plaintiff provided evidence that the Federal Deposit Insurance Corporation (FDIC) established a pattern of practice of **Age Discrimination** since 1995.

31

As evidenced, the following excerpt provided that:

> **"The Board of Directors Adopted a Policy to Downsize The FDIC's Work Force by Targeting Older, Retirement-Eligible Employees. Throughout August and September of 1995, the FDIC's Board of Directors held a series of meetings to discuss downsizing the FDIC and reshaping it for the future by targeting older, "retirement eligible" employees for separation.**
>
> **At these meetings the Board learned that a corporate-wide analysis had concluded that in view of its decreasing workload, the FDIC had an excess staff of over 1,400 employees.**
>
> **The Board discussed various options to address the excess staffing issue and on September 26, 1995 voted to offer a "buyout" program to targeted employees. The buyout offer allowed employees to receive 50% of their compensation and was intended to induce employees to voluntarily leave the FDIC.**
>
> **The Board of Directors concluded that in order to induce targeted employees to accept the buyout offer, they had to create an unwelcome work environment that sent the message: "Older workers no longer have a future at the FDIC." At Board meetings, this policy was referred to as the "carrot and stick" or "Darth Vadar" approach. The strategy was to encourage targeted employees to leave with the buyout package -- that was the "carrot."**

32

To get high acceptance rates for the buyout, <u>targeted employees were threatened with a "stick" – threats that included a lower buyout offer in the future, involuntary "directed assignments" to undesirable locations, demotions, involuntary separations, and a possible reduction-in-force.</u> This strategy was discussed at numerous Board of Directors meetings. The FDIC's "carrot and stick" or "Darth Vadar" strategy that started as a means to force out older employees by creating a horrible work environment extended to a pattern and practice of intentional age discrimination in job selections. From 1996 through 2003, the FDIC promoted employees under the age of 40 at statistically significant higher rates than employees 40 years of age and older for jobs in grades 11, 12, 13, 14 and 15.

Division-level executives who selected and approved applicants for job positions during the <u>1996 to 2003</u> period were well aware of the FDIC's policy of targeting older employees for separation by creating a threatening and unwelcome work environment for them. In 2001 and 2002, these division-level officials attended weekly operating meetings when Chairman Powell openly stated his preference for the promotion of younger employees and said they were more valuable to the organization than older employees. Dr. Donald T. Gantz, a statistician, analyzed FDIC job selection data.

Dr. Gantz compared job selection rates of employees under the age of 40 with those of employees 40 years of age and older. He found that for FDIC employees in Grades 11-15 during the years 1996-2003, there was a *highly statistically significant* difference in selection rates that favored applicants under the age of 40.

Dr. Gantz found that during the years 1996-2003, for employees applying from Grades 11-15 to vacancies that were Higher, Mixed or same, there was an overall selection rate advantage for referred applicants who were under 40 years old. These selections rates are presented in Table A. Each possible comparison for which the percentage of applicants under 40 who were selected exceeds the percentage of applicants 40 years and older who were selected is marked by the symbol "Y."

### Table A (Comparison of Selection Rates)
*[Dr. Gantz Report]*

| | Higher | | | | | Mixed | | | | | | Same | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11 | 12 | 13 | 14 | | 11 | 12 | 13 | 14 | 15 | | 11 | 12 | 13 | 14 | 15 | | | |
| 96 | Y | Y | N | Y | ¾ | Y | Y | Y | Y | -- | 4/4 | Y | Y | Y* | Y* | Y* | 5/5 | 12/13 |
| 97 | N | N | Y* | Y | 2/4 | Y | Y* | Y* | N | Y | 4/5 | N | Y | Y* | Y* | Y* | 4/5 | 10/14 |
| 98 | N | N | Y | Y | 2/4 | N* | Y | Y | Y* | -- | 3/4 | T | Y | Y | N | -- | 2/3 | 7/11 |
| 99 | Y | Y | Y | N | ¾ | Y | N | N | -- | -- | 1/3 | T | Y | N | Y* | Y | 3/4 | 7/11 |
| 00 | Y | Y | Y | N | ¾ | N | Y | Y* | N | -- | 2/4 | -- | Y | Y | Y | Y | 4/4 | 9/12 |
| 0 | Y | Y | Y | N | ¾ | -- | Y | N | T | -- | 1/ | Y | Y | N | Y | Y | 4/ | 8/11 |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | * | | | | | | | | | 2 | | | | | | 5 | |
| 0 2 | — | N | Y | Y | 2/3 | — | — | — | Y | — | 1/1 | — | — | — | Y | Y | 2/2 | 5/6 |
| 0 3 | Y | Y* | Y | Y | 4/4 | N | Y | Y | — | — | 2/3 | — | Y | Y | Y | — | 3/3 | 9/10 |
| | 5 of 7 | 5 of 8 | 7 of 8 | 5 of 8 | 22 of 31 | 3 of 6 | 6 of 7 | 5 of 7 | 3 of 5 | 1 of 1 | 18 of 26 | 2 of 3 | 7 of 7 | 5 of 7 | 7 of 8 | 6 of 6 | 27 of 31 | 67 of 88 |

Dr. Gantz further found that for 14 of the 67 comparisons where the selection rate of applicants under 40 exceeded the selection rate of applicants 40 years and older, the difference in selection rates was *highly statistically significant* at the .05 level of statistical significance by a one-sided Fisher exact test. For these 14 comparisons, the symbol "Y" is followed by an asterisk in Table A, above.

The p-values showing statistical significance are summarized in the following table.

| Year | Grade | Type of Vacancy Applied To | P-Value |
|---|---|---|---|
| 1996 | 13 | Same | <.0004 |
| 1996 | 14 | Same | <.0001 |
| 1996 | 15 | Same | <.0001 |
| 1997 | 13 | Higher | .0092 |
| 1997 | 12 | Mixed | .0306 |
| 1997 | 13 | Mixed | <.0001 |
| 1997 | 13 | Same | .0015 |
| 1997 | 14 | Same | .0039 |
| 1997 | 15 | Same | .0339 |
| 1998 | 14 | Mixed | .0108 |
| 1999 | 14 | Same | .0488 |
| 2000 | 13 | Mixed | .0160 |
| 2001 | 12 | Higher | .0302 |
| 2003 | 12 | Higher | <.0001 |

Table A illustrates that, for instance, in the years 1999 through 2001 among applicants in grades 11, 12 and 13 to Higher Grade vacancies, all comparisons of selection rates show an advantage to persons under age 40.  Similarly, for 2003 among applicants in grades 11, 12, 13 and 14 to Higher Grade vacancies, all comparisons of selection rates show an advantage to persons under age 40.

Dr. Gantz found that for many of these blocks of comparisons there was a *highly statistically significant* overall difference in selection rates at the .05 level of statistical significance using the Cochran-Mantel-Haenzel test.

These finding are summarized in the following table.

| Applicants in the Combination of Comparisons | | | |
|---|---|---|---|
| Years | Vacancy Types | Grades | P-Value of Test |
| 1999-2001 | Higher | 11, 12 & 13 | 0.0017 |
| 1997-2003 | Higher | 13 | 0.0161 |
| 2003 | Higher | 11, 12, 13 & 14 | <.0001 |
| 1996-1997 | Mixed | 11, 12 & 13 | 0.0001 |
| 1996-1998 | Mixed | 12 & 13 | 0.0002 |
| 1996 | Mixed & Same | 11, 12, 13, 14 & 15 | <.0001 |
| 1996 | Same | 11, 12, 13, 14 & 15 | <.0001 |
| 1996-1997 | Same | 12, 13, 14 & 15 | <.0001 |
| 1996-2003 | Same | 12 | 0.0063 |
| 1996-2003 | Same | 15 | <.0001 |
| 2000 | Same | 11, 12, 13 & 14 | 0.0105 |

Dr. Gantz concluded that the separate selection rate comparisons that favored applicants under the age of 40 and the persistent patterns of higher selection rates for applicants under the age of 40 are consistent with the claims in this lawsuit that the FDIC discriminated against employees 40 years of age and older in job selections.   Dr. Gantz concluded that age 40 employees were demoted to a lower grade level or separated from the FDIC."

36

## XI. STATEMENT OF CLAIMS

**COUNT I -    DISCRIMINATION ON THE BASIS OF AGE, RACE, GENDER, RELIGION, FMLA AND DISPARATE TREATMENT IN VIOLATION OF TITLE VII**

116.    Plaintiff incorporates the allegations of paragraphs **1 through 115** and in addition avers that:

117.    The conduct of the defendant, as set forth above, constitutes the creation of a hostile and abusive working environment, disparate treatment based on gender and race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-et seq in the defendant made the plaintiff's work place intolerable.

**COUNT II-    DISCRIMINATION IN VIOLATION OF 29 U.S.C. SECTION 621 Et Seq. THE AGE DISCRIMINATION IN EMPLOYMENT ACT AS AMENDED**

118.    Plaintiff re-pleads and re-alleges Paragraphs **1 through 115** above as if fully set forth and in addition states that the facts as alleged above constitute discrimination, in violation of 29 U.S.C. § 621, et seq. which prohibits discrimination on the basis of age.

119.    At the time of the conduct of which plaintiff complains, plaintiff was over 40 years old and individuals who were younger were treated more favorable than individuals with injuries and disabilities; granting of overtime; filing internal worker's compensation claims, and the other discriminatory conduct of which plaintiffs complains.

**COUNT III - DISCRIMINATION ON THE BASIS OF DISABILITY?**

120.    Plaintiff re-alleges and incorporates the allegations of paragraphs **1 through 115** and, in addition avers that:

37

121.    The conduct of the defendant, as set forth above, constitutes discrimination on the basis of his disability in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 <u>et seq</u>. in that the defendant discriminated against the plaintiff with respect to her parental rights, and disability of her son, and treated the plaintiff differently because of her disability and her injury.

## COUNT IV - RETALIATION

122.    Plaintiff re-alleges and incorporates the allegations of paragraphs **1 through 115** and in addition avers that:

123.    The conduct of the defendant, as set forth above, constitutes retaliation in violation of §704 (a) of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e (3) (a). It also constitutes retaliation in violation of 42 U.S.C. §§ 701 and 794 (a) and 29 U.S.C. § 633 (a).

## COUNT V - RETALIATION

124.    Plaintiff re-alleges and incorporates the allegations of paragraphs **1 through 115** and in addition avers that:

125.    The conduct of the defendant, as set forth above, constitutes a violation of FMLA Act based on the defendant's refusal to grant Plaintiff leave to care for her disabled son.

126.    Defendant's conduct in subjecting plaintiff to on-going and continual discrimination was outrageous and caused plaintiff to suffer physical harm and severe emotional stress.

38

Defendant knew or should have known that its failure to correct the plaintiff's work environment would be harmful to plaintiff, but yet defendant refused to act and showed indifference to plaintiff's situation. Defendant's conduct constitutes negligent infliction of emotional distress.

127.    As a result of further and proximate result of the actions or omissions of the defendant or its agents as alleged above in paragraphs **1 through 112**, and the consequences proximately caused thereby, plaintiff has suffered emotional trauma, humiliation, loss of benefits, distress, mental anguish, medical expenses and other related costs.

128.    The intentionally acts and willful conduct of the defendant and its employees, senior directors, supervisory officials, and officers as alleged above in paragraphs **1 through 115**, taken towards the plaintiff were conspired, malicious, deliberate, vicarious, willful, intentional and were done to purposefully cause damage to the plaintiff's physical, psychological, spiritual well being and mental health.

129.    The intentionally well calculated acts as documented by the Plaintiff deprived her of her entitlements to lawful employment, deprived her son diagnosed with an extreme and very critical health benefits, life sustaining anticonvulsant medications; access to highly specialized (trained) pediatric neurologist, therapist, researchers in the field of Autistic Spectrum Syndrome not affordable or made available to low income or in the case of Plaintiff (no income) as she was involuntarily separated from the FDIC.

130.    The FDIC violated Plaintiff's age, race, sex, FMLA, Title VII, sexual harassment, parental rights violations and an array of well documented violations of plaintiff's Title VII and age since 2002.

39

131.    Plaintiff has been deprived of extensive health care and treatment, medical benefits for plaintiff's severely autistic son diagnosed by inclusive medical reports with a seizure disorder, and Defendant's intentionally with malice cause damages to plaintiff as she has permanent hair loss, migraines headaches, night sweats, mood swings, bulimia, permanent nerve damage (genital area), self-injuries behavior, panic disorders, nervous breakdowns, severe post-traumatic syndrome, privacy rights violations, defamed character of FDICs unwarranted barred entrance of Plaintiff from all FDIC.

132.    Plaintiff suffered intentional infliction of emotional duress initiated by James T. Lantelme, approved by FDIC, embarrassment, humiliation, false arrest, threaten into an investigative interview conducted by an **unlicensed contractor (3rd party)** without a court for 3 hours, denied due process, denied attorney requested repeatedly,  loss consortium (30 years of marriage), enjoyment of life, suffered two unwarranted involuntary Federal removals from a sustained outstanding Federal civil service career on **January 21, 2005** and on **March 31, 2006.**

Plaintiff deprived of annual salary $72,000.00 per year, retirement benefits, 401 K plan, forfeit Family insurance polices, victim of aggravated identity theft (Theft of voice Print on tape), privacy act violations, suspended from duty without pay, unlawful charges of AWOL, among other violations listed above.

### Plaintiff Established Prima Facia Case

Court have noted that a *prima facie* case of disparate impact can be established through the use of **statistical evidence** which discloses a disparity so great that it cannot reasonably be attributed to chance.

40

A showing that such a skewed distribution does in fact exist allows a court to infer that a given defendant's employment practices may indeed be corrupted in a discriminatory manner. Statistical data is the main evidentiary pillar upon which support claims of disparate impact under Title VII. See *Munoz* v. *Orr*, 200 F.3d 291, 300 (5th Cir. 2000); *Pottenger* v. *Potlach Corp.*, 329 F. 3d 740, (9th Cir. 2003)

## VII. PRAYER FOR RELIEF

**Wherefore,** Plaintiff prays for a judgment in her favor and against named defendant(s), and that the following relief is awarded to the plaintiff:

1)    Issue a declaratory judgment that defendant's intentional and willful acts, failure to adhered to policies, procedures, guidelines, practices to and including procedural errors in violation of Plaintiff's age, race, sex, family medical leave procedures.

2)    Plaintiff seeks the award of treble damages complained of herein in violation of plaintiff's rights as secured by Title VII of the Civil Rights Act of 1964, as amended; and The Rehabilitation Act of 1973, as amended, 29 U.S.C. §701, et seq.

3)    Issue a preliminary and permanent injunction:

(a)    Prohibiting defendant, its agents and employees and those acting in concert with it from engaging in any other acts or practices shown to discriminate against the plaintiff and similarly situated individuals.

4)    On Count I for discrimination in violation of the Civil Rights Act of 1964, compensatory damages in the amount of **$300,000**;

5)    On Count II for willful and intentional **age discrimination**, damages in an amount awarded by the Court.

41

6)      On Count III to award an additional **$34,186** to Plaintiff in compensation for the FDICSs willful and intentional deduction of **$34,186** dollars the agency withheld from Plaintiff's MSPB back pay awarded on **November 14, 2005** in violation of requirements of the ADEA that requires that an ADEA waiver is **"knowing and voluntary"**

7)      On Count IV for intentionally and willful disability discrimination compensatory damages in the amount **$300,000**;

8)      On Count VI for intentional and willful EEO retaliatory discrimination compensatory damages in the amount **$300,000**;

9)      On Count VII for intentional and willful EEO age reprisal discrimination compensatory damages in the amount **$300,000**;

10)     On Count VIII for intentional and willful violations of Plaintiff's approved Family Medical leave compensatory damages in the amount **$300,000**;

11)     On Count XV for intentional and willful violations of Plaintiff's parental rights to afford, provide, and have access to critical health care, benefits, medical treatment for Plaintiff's son diagnosed as severely autistic with a seizure disorder compensatory damages as awarded by the Court in the amount **$300,000.**

12)     **Punitive Damages** in the amount of **$50,000,000,00(Fifty million dollars).** Defendant's actions were malicious, intentional, willful, and vicarious to and including the FDICs use of an unlicensed contract employees, negligent hiring, assault, harassment with said use of contractors and student intern hired in violation of statutes which prohibits nepotism.

13)     Defendant's actions has caused irreparable harm and with intent, malice, and hatred endangered and continues to endanger the life of a severely handicap (disable) son.

14)    Plaintiff provided evidence at the FDICs unwarranted proposed removal

hearing of Plaintiff on **January 19, 2006** that her immediate reported supervisory officials

James T. Lantelme, Assistant Director Legal Services Unit (LSU) and Stephen Hanas, Senior

Counsel affidavits confirmed that both James T. Lantelme and Stephen Hanas had knowledge

that Plaintiff **repeatedly provided medical documentation** of her and her son's serious

health condition and other approved leave documentation since **December, 2003**.

15)    Defendant's intentionally, willfully and repeatedly subjected Plaintiff to

demanded request to reproduce, duplicate, and provide medical documentation confirmed

received by Stephen Hanas since December, 2003.

Defendant with knowledge of Plaintiff's previously submitted approved medical leave in

accordance to the Family Medical Leave Act (FMLA) ordered and force Plaintiff to complete

a three year time and attendance audit for year(s): 2002, 2003, 2004.

16)    The agency threaten to deduct previously approved annual leave if Plaintiff

didn't complete an audit **2 days before Thanksgiving 2004**.   The FDICs actions were

intentional willful, blatant and both James T. Lantelme and Stephen Hanas acted in malice

with the intention to further inflict emotional duress against Plaintiff.

17)    That the Plaintiff be reinstated to her position as Information Specialist, CG-

301-11 or a comparable position and be awarded treble backpay and other benefits to which

she is entitled;

18)    Grant plaintiff his attorney's fees and costs;

19)    Grant such additional relief as the Court deems just and proper.

43

## JURY TRIAL

Plaintiff hereby **demand** a jury trial on each and every count.

Respectfully submitted,

By: _____ 10/10/06

Yolanda C. Gibson-Michaels (Prose)
2210 Anvil Lane
Temple Hills, Maryland 20748
(301) 630-5062
**ygmichaels@yahoo.com**

44

## CERTIFICATE OF SERVICE

10th YCGm

I **HEREBY CERTIFY** that on this ⌀ **day of October 2006**, a true and exact copy

of the foregoing **EEO Complaint** was filed in the United States District Court, Washington,

D.C. on named Defendants identified herein this said Complaint.

Yolanda C. Gibson-Michaels (prose)
FDIC Information Specialist (Involuntary Removed)
2210 Anvil Lane
Temple Hills, Maryland 20748
(301) 630-5062

H
06-1940
RMU

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Yolanda C. Gibson-Michaels

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ~~2868~~ 0
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS  Shella C. Bair, etal

ADC, etal;

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

CASE NUMBER   1:06CV01940

JUDGE: Ricardo M. Urbina

DECK TYPE: Employment Discrimination

DATE STAMP: 11/14/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

Ⓧ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZEN
FOR PLAINTIFF

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☐ **E. General Civil (Other)** OR ☐ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

13.

| □ **G. Habeas Corpus/ 2255**<br><br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ **H. Employment Discrimination**<br><br>□ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ **I. FOIA/PRIVACY ACT**<br><br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | □ **J. Student Loan**<br><br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| □ **K. Labor/ERISA (non-employment)**<br><br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ **L. Other Civil Rights (non-employment)**<br><br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ **M. Contract**<br><br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ **N. Three-Judge Court**<br><br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding   □ 2 Removed from State Court   □ 3 Remanded from Appellate Court   □ 4 Reinstated or Reopened   □ 5 Transferred from another district (specify)   □ Multi district Litigation   □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 2000

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23   **DEMAND $** 0   Check YES only if demanded in complaint **JURY DEMAND:** □ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☒ YES □ NO   If yes, please complete related case form.

DATE 11.14.06   SIGNATURE OF ATTORNEY OF RECORD   NCD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

## U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### WASHINGTON FIELD OFFICE
#### 1801 L Street, N.W., Suite 100
#### Washington, D.C. 20005

YOLANDA C. GIBSON-MICHAELS,    )
                                    )
        Complainant,         )
                                    )
v.                               )EEOC No. 100-2005-00753X
                               )Agency Nos.  FDICEO-040039/56
DONALD E. POWELL,           )
Chairman                  )
Federal Deposit Insurance Corporation,  )
                                  )
        Agency.           )

### COMPLAINANT'S NOTICE OF INTENTION TO FILE SUIT

NOW COMES the Complainant, by counsel, and informs this Honorable

Commission of her intention to file suit in federal court, pursuant to 29 C.F.R. Part 1614.407.

Dated: April 4, 2006
       Annandale, Virginia

                     Respectfully submitted

                     YOLANDA GIBSON-MICHAELS

                     By Counsel
                     PATRICK HENRY LLP

By: _____
                   Richard E. Patrick, D.C. Bar #396571
                   PATRICK HENRY LLP
                   7619 Little River Turnpike
                   Suite 340
                   Annandale,  Virginia 22003
                   Tel:    (703) 256-7754
                   Fax:    (703) 256-7883
                   E-mail:rpatrick@patrickhenry.net

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Washington Field Office
#### 1801 L Street, N.W., Suite 200
#### Washington, D.C. 20507

| | |
|---|---|
| Yolanda C. Gibson-Michaels,<br>　Complainant,<br><br>　　　　　　v.<br><br>Donald E. Powell,<br>Chairman,<br>Federal Deposit Insurance Corporation,<br>　Agency. | ) EEOC No.  100-2005-00753X<br>)　　　　　100-2005-00035X<br>) Agency No. FDICEO-040039/040056<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Date:　April 5, 2006 |

## ORDER RE COMPLAINANT'S WITHDRAWAL OF HEARING REQUEST

On April 4, 2006, this office received Complainant's Withdrawal of her Hearing Request in the form of a letter from her representative  indicating that she wished to file her case in federal district court, thereby withdrawing this case from the EEOC's administrative hearings process.  Complainant's request to withdraw her case from EEOC's administrative hearings process is **GRANTED**.

A copy of the hearing record to date is enclosed for the Agency.  Further, we no longer return reports of investigation to agencies.  We will hold the report of investigation for sixty days, during which time the agency may arrange to pick it up by contacting Tanya Stanfield at (202) 419-0719.  If we do not hear from the agency within ten days, we will destroy our copy of the file.

It is so **ORDERED**.

Varice Tou Henry
Administrative Judge
EEOC Washington Field Office
1801 L St., NW, Ste. 200
Washington, D.C.  20005
tel.(202)  419-0717
fax (202) 419-0701 FAX

cc:

Yolanda C. Gibson-Michaels
2210 Anvil Lane
Temple Hills, MD 20748

Richard E. Patrick, Esq.
7619 Little River Turnpike, Ste. 340
Annandale, VA 22003

7-256-7754
7-256-7883 FAX

Tina A. Lamoreaux, Counsel
FDIC Legal Division
Legal Division, Corporate Affairs Division
3501 N. Fairfax Drive (Rm. VS-6116)
Arlington, VA 22226

7-562-2304
7-562-2482 FAX

Michael Moran
Chief, Complaints Processing Branch
FDIC
Office of Diversity & Economic Opportunity
3501 N. Fairfax Drive (Rm. 801-1231)
Arlington, VA 22226-3500

# FDIC

**Federal Deposit Insurance Corporation**
3501 Fairfax Drive, Room E-2070, Arlington, VA 22226-3500                    Office of Diversity and Economic Opportunity

June 16, 2006

<u>VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>
# 7000 1670 0000 0946 9425

Richard E. Patrick, Esq.
7619 Little River Turnpike, Suite 340
Annandale, VA 22003

|  |  |  |
|---|---|---|
| Agency Docket Nos.: | FDICEO - 040039 | FDICEO - 040056 |
| Dates Filed: | July 13, 2004 | November 4, 2004 |

Subject: <u>Resumption of Agency Processing, Withdrawal of Modified Acceptance Letter, Dated June 21, 2005, and Investigation of Stricken Claims and Bases</u>

Dear Mr. Patrick:

By Order, dated April 5, 2006, Varice Ted Henry, Administrative Judge, Equal Employment Opportunity Commission ("EEOC"), issued an Order granting the request of your client, Yolanda Gibson-Michaels, to withdraw her complaints, FDICEO - 040039 and FDICEO - 040056, from the EEOC administrative hearing process. Judge Henry's Order was based on your representation that Ms. Gibson-Michaels intended to file suit in Federal district court. She has not done so. Therefore, FDICEO - 040039 and FDICEO - 040056 are before the Agency for processing.

This withdraws the modified acceptance letter, dated June 21, 2005, issued regarding FDICEO - 040056, which dismissed Claims 1 and 3c as well as claims of discrimination based on race (African-American), color (black), sex (female), reprisal (prior Title VII activity), and sexual orientation (unspecified) pursuant to the Settlement Agreement entered into between Ms. Gibson-Michaels and the Agency on January 14, 2005. Because the Settlement Agreement was voided by an Initial Decision issued November 14, 2005, by Raphael Ben-Ami, Administrative Judge, Merit Systems Protection Board, the Agency is required to investigate the stricken claims and bases referenced above. Therefore, the Agency will conduct a supplemental investigation of these claims and bases, and issue a Final Agency Decision encompassing FDICEO - 040039 and FDICEO - 040056 at the conclusion of the investigation.

Resumption of Agency Processing, Gibson-Michaels, FDICEO-040039          Page 2 of 2
                                                    FDICEO-040056

Attached hereto and incorporated herein by reference by reference are Acceptance Letters issued
regarding FDICEO - 040056, dated November 19, 2004, December 7, 2004, and June 21, 2005.
If you have any questions regarding this matter, please contact me at (703) 562-6075.

                                        Sincerely,

                                        Susan L. Berman, Deputy Chief
                                        Complaints Processing Branch

Enclosures:  Acceptance Letter, dated November 19, 2004
             Amended Acceptance Letter, dated December 7, 2004
             Modified Acceptance Letter, dated June 21, 2005

cc:    Yolanda Gibson-Michaels (Complainant)
       2210 Anvil Lane
       Temple Hills, MD 20748
            VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
            # 7000 1670 0000 0946 9395

       Edith Murphy, EEO Specialist, Complaints Processing Branch, ODEO
       Amelia P. White, Program Assistant, Complaints Processing Branch, ODEO

**Date:**    **Tue, 03 Oct 2006 08:25:12 -0400**

**From:**    **"ELBERT BISHOP" <erbishop@verizon.net>**   View Contact Details
        Add Mobile Alert

**Subject:**    **Re: EEO Complaint of Yolanda Gibson-Michaels**

**To:**    **"Yolanda Gibson-Michaels" <ygmichaels@yahoo.com>**

**We consider the investigation to be on hold.**

**Elbert R. Bishop**
**Contract EEO Investigator**
**US Investigations Services - SIU**

Exhbit - 1



Faxed To
FISA Court
On 7/18/06
7/17/06 and
Sent certified
mail to r2n-
and WhiteHouse

INDEX 12/07/05 —

A 1 DUPLICATE B

RECORDING OF
ELECTRONIC EAVSDROP
Jan 04/15/04

DATE:

SUBJECT:

CERTRON

FDIC Lied to Federal Protection Service

Tapes were NOT Lost!!

Sony Corp Did not give my
permission to use or approve for
FDIC to use a SONY tape recorder.

Sony had no right to approve the
FDIC, Douglas Farbey or Jennifer
Johnson to enjoy in to illegal
intercepts of my oral communications
over a private verizon,

FDIC's Wrote
Description of
Illegal Intercepts
of oral communications

FDIC Refused to turn
over original illegal
tape recording intercept
by unlicensed contractor
w/ out any order
required by Law!!

Gibson Michaels supposed
run duty 5-Days based
on Bible Quotes inside
a closed box office,
(Reasonable expectations
of privacy established)

FILE NUMBER: WASHINGTON

*Security Breach unauthorized*

Incident Number: 0-0000000186 ✓

I would not do anything. She said that Jenekia should confess to taking Kristian's money and go to the Credit Union, withdraw $200 and give it to Kristian over two weeks. She said Jenekia would feel better if she confessed and then said that if she doesn't confess, her guilt will affect her child (Jenekia gave birth to a daughter a few months ago). Yolanda raised a possible affect on her child a number of times.

*Reported Official*
↓
*FDIC James Lantelme initiated coerced "Feelings of threat"*

I told her that she did the right thing by coming to me. I told her to write down everything that she told me; what happened, who said what and when. I told her to call the investigator right away and tell him all that she told me. I told her that Yolanda's comments were improper.

A bit later I called Jenekia and asked her if she felt threatened by Yolanda and she confirmed that she did. *Lantelme initiated "Feelings of threat"*
After she left, I called Bob Wooding and Randi Mendelsohn to tell them what I intended to do and to ask their advice for dealing with the situation. I then called Erica Bovenzi to tell her what had happened. I also left a message with Bill Kmetz to invoke the Management Response Team.

*Entrapment*

*Entrapment is illegal*

After a conference call around 2pm between Randi Mendelsohn, Bill Kmetz, Doug Fahey and me, I called Jenekia to tell her how we were addressing her concerns. I reiterated that it was important for her to write down all that she told me and send it to Mr. Fahey today. I also told her to avoid Yolanda Gibson-Michaels and to tell me if Yolanda further talked to her about anything related to her concerns. She then told me that around 1:30 pm Yolanda had asked her whether she had made any decisions about Yolanda's earlier conversation telling her what to do. Jenekia said she would not drop her charges and would continue to talk to the investigators. She said Yolanda told her she wouldn't be believed and would go to jail for up to 10 years and this would affect her ability to get any other federal job. She sounded upset over the phone while telling me this." (end of memo from LANTELME)

On 14 April 2004 at 15:43Hrs., JOHNSON *(Fahey wrote statement or Lantelme)* e-mailed me the following statement of facts *FMS fud* (ATTACHMENT A):

"Good Afternoon. Earlier this morning at 11:22am, I received a called from Yolanda Michael Gibson requesting me to come to her desk. Once I arrived she informed me that Kristian told her what took place Monday at the office, so she asked me to tell her my side of the story. After telling her the story she asked me to report with her to the project room. After being escorted and seated by Yolanda she stated she love me, I have and will do so much for you and Kristian, I care for you like my child. Next she stated I am not taking side but you know I got Kristian working here. After that she starts to tell me the story on her mistakes and how she asked God for forgiveness because she did not want anything to back firer on her disability child. After that she keep on repeatedly saying I took the money because I either needed it or didn't, after telling her so many times I do not have Kristian money, she finally told me that something bad is going to happen to me and if it doesn't it will happen to your daughter (Jayda). I told Yolanda that I was going to report it to Jim but she told me I shouldn't because he isn't going to do anything and she also keep on telling me that was the wrong thing to do, so leave it between us. Then repeatedly "Do you love you daughter" was all she kept on saying for like 3 minutes "God will forgive you. Next she kept on asking me to send an e-mail to Mr. Fahey, telling him a lye that Kristian and I found our money and to drop the case, and then she wanted me to go over to the credit union and take out a loan for Kristian in the amount of $300.00, or to pay Kristian $200 out of pp#7 and $100 out of pp#8. Then she says if I don't god will punish me. So she tells me to go back to my desk and think about it!

Yolanda calls back at 12:25pm on 4/14/04 to come over to her desk then she say and gives example of Kristian moving slow because of her pregnancy and being unable to open the cabinet our purses were in due to her belly. Then she states repeatedly Kristian could not have done it she moves to slow, and you to were the only one who new where the keys was, and since

2

*PB 3*

# File Number: WASHINGTON  7/  Incident Number: 0-0000000186

[AAM: FBI MR. ZACK]        410-277-6658 (FBO)

| | | |
|---|---|---|
| **Security Level** | FDIC Security | |
| **Category** | Threats | **Recorded in IRIMS** |
| **Subcategory** | By Employee | **FDIC Security** |
| **Type** | | **Washington, DC** |
| **Occurred From** | 4/14/2004 11:22:00 AM | |
| **Reported Date/Time** | 4/14/2004 11:59:00 AM | |
| **Reporting Person** | Fahey, Douglas ← | *Unlicensed (FAKE) contractor investigation.* |
| **Building/Site** | 1717 H St. NW | *Falsified credentials, DEFrauded FDIC, Illegally* |
| **Address** | | *intercepted Gibson-Michals email coming* |
| | | *18 USC code* |
| **Location** | 3rd Floor | |
| **Location Details** | | |
| **Loss/Damage Type** | | |
| **Incident Status** | Ref. to Management | |
| **Reported to Police** | No | |

**Incident Summary**

Intern felt threatened by words used by employee.    *I antylms inhaled feelings of threat*

**Person Involved**

**Person Name: Gibson-Michals, Valerie**

| | |
|---|---|
| **Person Type** | Employee |
| **Barring Notice** | No |
| **Person Details** | |
| **Sex** | Female    **Salutation** |
| **Employment Details** | |
| **Occupation** | Information Specialist |
| **User Defined Fields** | |

**Person Name: Johnson, Jamila**

| | |
|---|---|
| **Person Type** | ReportingPerson |
| **Barring Notice** | No |
| **Employment Details** | |
| **Occupation** | Intern |
| **User Defined Fields** | |

14

*Conspiracy thought by unlicensed investigator* (handwritten annotation)

**FILE NUMBER: WASHINGTON**          **Incident Number: 0-0000000186**

*Jenckns Johnson* (handwritten, right margin)

I again contacted JOHNSON and arranged to meet her in the lobby of 1717 H St. NW at 12:10Hrs. on 15 April 2004. We met at that time and then moved to vacant FDIC office space on the 1st floor. I placed a Sony cassette recorder with a 90 minute tape (45+ minutes per side) into her purse. I attached an omni directional power condenser microphone to the recorder and positioned the microphone so that it extended slightly, but unobtrusively from her purse. I suggested the way in which she could begin a conversation with GIBSON-MICHAELS might be to tell her she had been thinking about what she told her the day before. JOHNSON then advised me that just before coming downstairs to meet me in the lobby, she walked past GIBSON-MICHAELS' cube, and GIBSON-MICHAELS poked her head out and asked her if she had thought about what they talked about. JOHNSON told me she told GIBSON-MICHAELS no, that she was trying not to think about it. I then allowed JOHNSON to look at some notes I had handwritten on a piece of paper with potential ideas on how to begin a conversation with GIBSON-MICHAELS. After looking at the suggestions, JOHNSON came up with her own idea. She asked if she could just go to her and tell her that she felt threatened by her the day before. She said that was how she really felt. I agreed that expressing her true feelings would probably be the easiest way for her to succeed in beginning a dialogue. I turned the recorder to the "record" position and recorded a brief introduction, saying the date (April 15) and the time was 12:20Hrs. and that it was the beginning of the tape. At that time, JOHNSON left the room enroute to the 3rd floor of the building to locate GIBSON-MICHAELS. The tape subsequently revealed that approximately 10 minutes after leaving the room, JOHNSON located GIBSON-MICHAELS and began a conversation with her. The tape continued to run and record their conversation for approximately the next 37 minutes. I located JOHNSON at 13:20Hrs. on the third floor and accompanied her back to the 1st floor where I then recovered the recorder and tape from her purse. JOHNSON reported that the tape ended before their conversation did. She reported that at the end of the conversation, [off tape] GIBSON-MICHAELS hugged her. JOHNSON remarked that GIBSON-MICHAELS was "a lot nicer than yesterday." I asked JOHNSON if there were any witnesses to the conversation they just had and she stated, no.

On **15 April 2004**, at 13:44Hrs., GIBSON-MICHAELS sent JOHNSON and BEARD an e-mail with a subject, LIE DETECTOR TEST. The e-mail read:
        "This is a suggestion to get to the truth regarding your situation. Lie Detector test are 100 percent accurate. You both might want to consider taking a lie detector test; or volunteer since both of you are 100% certain that it wasn't you. Also, taking a lie detector to determine that it was someone else other than yourselves will give both of you a chance to resume your good friendship. Or the investigator might request that you are both tested regarding the facts surrounding your situation. The test only cost sometimes between $20.00 or $40.00 dollars.
        FDIC might be able to administer the test free. Since there is a possibility that there could have been someone other than yourselves; then you both should take the test together or separate and apart. If you are telling the **TRUTH**…then there shouldn't be a problem with taking a **LIE** detector test to save your friendship. (SMILE)… " (end of e-mail)

On **15 April 2004**, at 14:11Hrs., GIBSON-MICHAELS sent JOHNSON an internet link regarding polygraphs. The subject was, Information regarding the Polygraph (Lie Detector Test). JOHNSON forwarded that message to me on 19 April, stating that she wasn't able to review the link due to a virus warning.

On **16 April 2004**, at 10:20Hrs., I left a voice message for JOHNSON to call me. At 14:20Hrs., I had a telephone conversation with her. I asked her to reflect on the conversation she had with GIBSON-MICHAELS the day before and tell me how she was feeling about all of this. JOHNSON stated she wouldn't be as comfortable with GIBSON-MICHAELS from now on and

## MEMORANDUM

TO: Official File

FROM: Contract Investigator B. Cohen

SUBJECT: Investigatory Memorandum Regarding Efforts To Locate Mr. Doug Fahey

DATE: October 31, 2004

     During my interview with Mr. Kmetz, he informed me that Mr. Fahey was working with the FBI and undergoing training. Mr. Kmetz informed that Mr. Fahey had worked as a contractor for Securiguard. On October 12, 2004, I called Securiguard in an effort to locate Mr. Fahey. I was told that Mr. Fahey was not employed by Securiguard and was told to contact USEC Corporation. I contacted USEC Corporation and was told that Mr. Fahey was no longer employed by USEC Corporation and that USEC Corporation would not provide me with Mr. Fahey's home telephone number. I asked if USEC Corporation would forward a letter to Mr. Fahey. The USEC employee stated they would forward my letter to Mr. Fahey. On October 12, 2004, I sent the attached letter to USEC Corporation. On October 12, 2004, I sent the attached letter to Mr. Fahey at the Federal Bureau of Investigation.

     I was informed by a FDIC employee that she thought that Mr. Fahey lived in northern Virginia. There was a telephone listing for a Douglas Fahey in northern Virginia. I made two telephone calls to the number listed and left messages on an answering machine for Douglas Fahey.

     To date, Mr. Fahey has not responded to any of my inquiries.

2

Company Name



**IRIMS**

_Incident Number: 0-0000000016_    **_File Number: WASHINGTON_**    _Security Level: FDIC Security_

she will act out in a violent manner to cause harm to co-workers. However, if her current level of inappropriate behavior is allowed to continue it could well escalate into more serious behaviors.

Submitted,

Steve Kaufer, CPP
Co-Founder
Workplace Violence Research Institute

END OF KAUFER'S REPORT

No further information at this time.

**End of Report**

FDIC Approved for Douglas Fahey to
Input Negative data into FDICs Secured
Databases, Send Negative data to outside
Contractor (violation of Privacy Rights). The
FDIC unlawfully placed Gross-Michaels Inside
a Red Security Box Based on Fake contracts,
Illegal Records by A 25 year old Intern
Involved In A Federal THEFT. All evidence
Provided to Congress, Senate, FBI, Private
Attorneys

**Company Name** *FDIC Approved an unlicensed contractor to access FDIC's secure database victims of Identity theft FDIC employees reported 2005.*



Incident Number: 0-0000000018                    File Number: WASHINGTON                    Security Level: FDIC Security

On September 2, 2003, at 17:15Hrs., Ms. Gibson-Michaels sent a memo to Erica Cooper, and copied POLVINALE, LANTELME and me. In it, she requests an immediate reassignment to another section based on the unfair treatment that she believes she has received since allegations were unjustly filed against her. She again stated POLVINALE never counseled her regarding any type of behavior regarding the incident on August 12. She also makes note of her own morale issue within her group since she was unjustly placed on the FDIC surplus list, her father has been diagnosed with prostate cancer, her son is severely autistic with a seizure disorder and she is the only one left in her group which was formerly comprised of 4 other individuals who are no longer at FDIC. See her memo for full and complete information. [A-16]

On September 2, 2003, at 17:16Hrs., GIBSON-MICHAELS sent an e-mail to LANTELME, making comment on what she recognized as an inconsistency in the statement of HOPKINS concerning the use of the word, stupid. Refer to her memo for full and complete information. [A-11, pg.1]

On September 4, 2003, I received a memo from Paul Mitchell, whose office is located in front of GIBSON-MICHAELS' cubicle. MITCHELL stated although he didn't remember the date, he recalled that several weeks ago, as GIBSON-MICHAELS was walking past his office, he heard her say in an angry tone of voice - 'I told you not to ask me any more stupid questions!' He stated GIBSON-MICHAELS then went to her cubicle and he didn't hear anything more. He also wrote that he did not hear anything before her statement, but later learned from others that GIBSON-MICHAELS and HOPKINS had some sort of argument that day. Please refer to MITCHELL's memo [A-17]

On September 4, 2003, at 10:00Hrs., a MRT meeting was held regarding this matter. In attendance were Bill Kmetz, JR Harris, Mary Laverty and Doug Fahey. LAVERTY stated she would notify Bob Wooding to communicate with Carl Polvinale and insure that GIBSON-MICHAELS' behavior is monitored in the future. She also stated no corrective or disciplinary action would be warranted in this case as POLVINALE performed a counseling session with GIBSON-MICHAELS. It was also decided that the Workplace Violence Research Institute would be consulted to assess the incident.

On September 5, 2003, I contacted the Workplace Violence Research Institute and spoke with Steve Kaufer. I briefed Mr. Kaufer on this matter and advised I would send the case documentation for him to review and assess. On September 6, 2003, I e-mailed the documentation to Mr. Kaufer.

Case open pending review by the Workplace Violence Research Institute.


On 8 September 2003, GIBSON-MICHAELS requested that Sukari Smith, Rose Harley, and Alva Vaden be interviewed concerning their knowledge of this incident.

On 9 September 2003, in continuing this investigation, I spoke with and then received an e-mail from Sukari Smith. In her subsequent e-mail, (A18) SMITH stated she could not verify whether or not she was in her office between 10:00-10:30Hrs. on 8/12/03, but did say she did not hear anything aggressive above the normal hub of that area. SMITH informed me that she first found out about the incident on 9/8/03 when GIBSON-MICHAELS talked with her about it and asked her if she would talk with me and tell me she didn't hear anything that day.

On 9 September 2003, I spoke with and then received an e-mail from Rose Harley. In her subsequent e-mail, (A19), HARLEY provided her recollection of what she called the "discussion" that occurred on 8/12/03 between Terry Hopkins and Yolanda Gibson-Michaels. HARLEY stated it was sometime before lunch, that she heard someone way words to the effect, "I don't want to talk to you anymore." She stated she didn't recognize the voice at the time as Terry Hopkins' and in fact thought it was another employee who works on the third floor. She stated she did recognize Yolanda's voice when she said, "Well, you're insulting." She stated she would describe both voices as being agitated, but did not hear any yelling or screaming that would cause her to leave her office to see what was occurring.

On 9 September 2003, at 10:55Hrs., I spoke with Alva Vaden. VADEN stated she was at work and in her office with the door open on 8/12/03 between 10:00-10:30Hrs. and did not hear anything at all. She stated she found out about the incident when people talked about it in the staff meeting and people talking about it in the hallway. VADEN did not provide a written statement.

Company Name



On 10 September 2003, I was notified by Mary Laverty in an e-mail that after completing her review of the information in this report, it was then her understanding that no memo had been issued or formal counseling done with Yolanda Gibson-Michaels. She stated management had not taken corrective action regarding the August 12 incident and was awaiting the results of the investigation before determining what action, if any, to take.

On 10 September 2003, I received a call from Steve Kaufer with the Workplace Violence Research Institute. KAUFER stated it was his opinion, based on the reports I submitted to him, that GIBSON-MICHAELS' behavior was not acceptable and needed corrective action. He noted his believe that she may believe there is some kind of plot or conspiracy against her, and questioned whether a racial issue could be present. He believed there was a veiled threat present for GIBSON-MICHAELS to bring in her martial arts trophies and demonstrate the simulation of lethal karate moves. He stated however there was nothing in the material he reviewed that made him believe that GIBSON-MICHAELS would progress to behavior more serious, and if another incident were to occur, it would be on about the same plane as the current incident. KAUFER stated he would follow-up with a written report.

This case was referred to management for further review.


On 29 September 2003, I received a report from KAUFER as follows:
As you requested I reviewed the available reports and other information related to the concern over Ms. Gibson-Michael's behavior.

The behavior that brought Ms. Gibson-Michael to the attention of the MRT related to her response to an inquiry over leave slips that she requested that Terry Hopkins, her acting supervisor, sign. When questioned about the slips, Ms. Gibson-Michael reacted in a manner that caused Hopkins and others in the immediate area concern for their safety.

Your report clearly details this incident and other unwanted behavior by Ms. Gibson-Michael.

I have reviewed e-mails, statements of witnesses and supervisors, your report and all other documentation made available to me. Based on this review I find:

1. Whether in the context of workplace violence prevention or just common courtesy and civility, the behavior exhibited by Ms. Gibson-Michael on the occasion in question and others is not acceptable. When behavior of one employee causes others in the workplace to feel threatened and at-risk, clearly those actions must cease. Her actions, according to witnesses, included screaming and acting in a hostile and aggressive manner towards co-workers.
2. It appears that Ms. Gibson-Michael believes that actions taken by supervisors and co-workers are part of a larger "plot" against her. I found no evidence that any disciplinary or corrective actions or counseling singled her out.
3. Her comments regarding her black belt and discussion on which portions of a person's body that can be struck to kill them is troublesome. While under normal circumstances, showing off martial arts trophies would be viewed as a gesture of involvement with co-workers, however, given her prior behavior I view it as a veiled threat. She does not, according to information reviewed, have a close personal relationship with others in the office. The display of the trophies and discussion of injury or death that could be caused by martial arts I believe was done to intimidate co-workers. Again, under the FDIC's Workplace Violence Prevention Program, these actions and comments are not .cceptable.

While her actions, methods and language are unwanted and should likely result in corrective action, I don't believe

FILE NUMBER: WASHINGTON

Incident Number: 0-0000000186

After asking GIBSON-MICHAELS to explain some of the specific inconsistencies, THORSTEINSON stopped the interview at 12:55Hrs. and asked for my assurance that nothing from this interview would be used in any potential future criminal proceeding against GIBSON-MICHAELS. I was not able to give him that assurance and we all agreed to contact James LANTELME regarding that issue. I contacted LANTELME by telephone and put him on speakerphone. THORSTEINSON addressed this issue with LANTELME, who stated he would check with a labor relations attorney and call back. At 13:05Hrs., LANTELME called back and while on speakerphone, said that Jimmy LAWRENCE gave an assurance that nothing from this administrative interview would be used against GIBSON-MICHAELS in any future criminal proceeding. This assurance satisfied THORSTEINSON and the interview resumed.

In all, I addressed the following eleven questions from my interview with GIBSON-MICHAELS. Reference information as to where the relevant transcript information can be found on the tape is included. KEY: JJ = Jenekia Johnson; YGM = Yolanda Gibson-Michaels.

*Fahey and Johnson rehersed on 4/14/04*

40. Didn't she tell you she felt very threatened by you because you said that if nothing happens to her, then things would roll over to Jayda.
ANS: No.

Approximate tape reference information
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

*Illegal Interception 18USC 119*

Relevant Transcript:
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

*Bible verse*
*Everything Jesus heard play this before*

*5-DAY Suspensive Bible VERSES*

*Removed the Verses!*

DISCUSSION on QUESTION 40:
After listening to the tape, GIBSON-MICHAELS maintained her answer to the question was no, saying that JOHNSON said "believing me or not."

39. In fact Mrs. Gibson-Michaels, Ms. Johnson told you that she felt very threatened by you didn't she?
ANS: No. She never felt threatened by me. She said she felt threatened by her sins. I don't know what sins she was talking about.

Approximate tape reference information
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

Relevant Transcript:
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you

FILE NUMBER: WASHINGTON

Incident Number: 0-0000000186

*(handwritten margin notes: Bible verse; lay claim to in truths of trust)*

believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like, you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

DISCUSSION on QUESTION 39:
After listening to the tape, GIBSON-MICHAELS initially maintained her answer was still no to this question. She first said she believed JOHNSON told her she felt very threatened yesterday "by you believing me or not" instead of "believe it or not." After review of the tape, SCHULL believed JOHNSON said "believe it or not." GIBSON-MICHAELS subsequently changed her answer to, "Yes, she told me that."
NOTE: No where on the tape does JOHNSON talk about her sins or feeling threatened by anything or anyone other than GIBSON-MICHAELS.

31. Did you tell Ms. Johnson that you believed Hecht's could have been threatening her for the money she owed them?
ANS: No.

Approximate tape reference information
Tape Counter Number: 136 and 147
Time into tape: 14 minutes 28 seconds and 15 minutes, 29 seconds

Relevant Transcript (136):
YGM: I was thinking it could have been Hecht's. Cause sometimes people [indistinguishable] threaten people?
JJ: You mean Hecht's?
YGM: Yea, I was thinking. Maybe, I said maybe she had to pay her Hecht's? Cause I don't, Kristian was saying you owe six hundred dollars to Hecht's.

Relevant Transcript (147):
YGM: Okay but you know how everyone's going to look at things the way I look at things. I look at this in fact. The fact well the only thing I'm thinking well maybe you could've gotten into a situation where Hecht's was threatening you or something (indistinguishable)
JJ: No, cause I'm not, haven't been late on a payment and I have never, I haven't been in that situation.

DISCUSSION on QUESTION 31:
After listening to the tape, GIBSON-MICHAELS maintained her answer to that question was still no. She said the question wasn't worded properly; that I should have used the word "situation" in my question to her.

14. Did you suggest to Ms. Johnson that she take a $300 loan from the credit union and pay back Ms. Beard?
ANS: No.

Approximate tape reference information

THE NUMBER: WASHINGTON                           Incident Number: 0-0000000186

worries as far as thinking oh, something might happen to Jayda on her way to the babysitter (YGM: No I'm [indistinguishable] cause you never know) or something like that but that's the, that's the type of stuff that I was thinking maybe.. YGM: Please take, please take my forgiveness, humbly. [indistinguishable] to forgive me I said because I didn't, I don't have the power to curse anyone and I didn't want to make you feel uncomfortable...

DISCUSSION on QUESTION 42:
After listening to the tape, GIBSON-MICHAELS changed her answer to yes. I asked her to tell me why she initially answered, no. She said, "At that point it was no, it wasn't clear. It's clearer now after hearing the tape."

*Removed for Bible use*

43. Didn't you then apologize to Ms. Johnson for what you said by asking her to take your forgiveness, humbly?
ANS: No.

Approximate tape reference information
Tape Counter Number: 253
Time into tape: 25 minutes 11 seconds

*I asked for forgiveness not [illegible] company contract*

Relevant Transcript:
JJ: Well yesterday, well yesterday it really felt like you had power and you was trying to wish the harmest thing on Jayda and I (YGM: No [indistinguishable]) and I knew in my heart that I had nothing to worry about due to the fact that I didn't take anything so I knew I had no worries as far as thinking oh, something might happen to Jayda on her way to the babysitter (YGM: No I'm [indistinguishable] cause you never know) or something like that but that's the, that's the type of stuff that I was thinking maybe.. YGM: Please take, please take my forgiveness, humbly. [indistinguishable] to forgive me I said because I didn't, I don't have the power to curse anyone and I didn't want to make you feel uncomfortable...

*Frank nigro Assaulted Fire Employees [illegible] FBI-[illegible] Major Mitchell*

DISCUSSION on QUESTION 43:
After listening to the tape, GIBSON-MICHAELS changed her answer to yes. She said she forgot. I asked her why she initially answered no. She said she forgot. I asked her how she could forget something so material. She said, "I'm human." She also said that she believed every question was material. I asked her to tell me what she was apologizing for. GIBSON-MICHAELS stated she was apologizing for how JOHNSON felt.

35. Did you say that you didn't want this stolen money case to go up to the level of Jim Lantelme or Carl Polvinale?
ANS: No.

Approximate tape reference information
Tape Counter Number: 307 and 323
Time into tape: 29 minutes 40 seconds and 30 minutes 58 seconds

WASHINGTON

Incident Number: 0-0000000186

conversation, Yolanda asked "did I think about what she said to me the day before", this was to confess to something that I did not do. I also told her that I went home and tried to think nothing of it.

During a conversation that I had with you 10 minutes later, you asked me was there any contact with Yolanda, from the last time we had spoke. I told you then, that I had just ran into her before I met with you. You asked me what was said by her, and I told you then, that all she said was "did I think about what she said yesterday and I said No". You then gave me a piece of paper which had writing on it, on how you wanted me to approach Yolanda. While you were placing the wire in my purse, you asked me to think of another way of approaching Yolanda. My way was to say hello Yolanda, I'm sorry that I lied to you, and yes I did think about what you has said to me yesterday." (end of e-mail)

5th LIE!!

6th LIE

Therefore, in summary, the "lie" JOHNSON was referring to on the tape referenced her telling GIBSON-MICHAELS that she had not thought about their previous conversation, when in fact, she had thought about it.

The original tape recording and original statement by GIBSON-MICHAELS were stored as evidence in the Operations Center.

## CONCLUSION

There is evidence to suggest that GIBSON-MICHAELS did make inappropriate comments to JOHNSON, which supports her allegations that she felt threatened by GIBSON-MICHAELS. A copy of this report, a copy of the recorded tape, and a copy of GIBSON-MICHAELS' statement were provided to LANTELME on 3 May 2004.

*Bible verse vis/close door Office to A three empl by him pu is not a crime*

*FDIC IS NOT Approved For An Illegal Sceuvelence Program to Spy, Intercept, Wire tape Federal Civil Servant Employees inside A Closed door OFFICE because of A Bible verse. Gibson-Michaels was Suspected from duty without pay 5 days. Removed from FDIC on 1/22/05 And 3/31/06. Blew the whistle on FDIC's Fraud, money laundrying, inside Treasury Receivership Fraud!!*

From: Fahey, Douglas
Johnson, Jenekia
Sent: Thursday, April 15, 2004 8:01 AM
To: Fahey, Douglas
Cc: Lantelme, James; Johnson, Jenekia
Subject: Yolanda meeting with me in Project room

*Reasonable Expatio of privacy !!* (handwritten)

**ATTACHMENT B**

Good Morning,                                                      April 15, 2004

After proof reading I realized I had several mistakes and additional information I forgot to add. Yolanda did bring up Kristian needing the money more then me due to her maternity leave, and how it is crazy to believe Kristian will or can walk or move so fast to steal anything. Then she says if you don't drop the case she will bring up some notes she have on me days I did not attend work and put in no leave. *(Fahey wrote) (why did Johnson cc herself)* (handwritten)

*(Fahey wrote statemt)* (handwritten)

Good Afternoon,                                                   April 14, 2004

*throwed my personal he stomps But use* (handwritten, left margin)

Earlier this morning at 11:22am, I received a called from Yolanda Michael Gibson requesting me to come to her desk. Once I arrived she informed me that Kristian told her what took place Monday at the office, so she asked me to tell her my side of the story. After telling her the story she asked me to report with her to the project room. After being escorted and seated by Yolanda she stated she love me. I have and will do so much for you and Kristian, I care for you like my own child. Next she stated I am not taking side but you know I got Kristian working here. After that she starts to tell me the story on her mistakes and how she asked God for forgiveness because she did not want anything to back fire on her disability child. After that she kept on repeatedly saying I took the money because I either needed it or didn't, after telling her so many times I do not have Kristian money, she finally told me that something bad is going to happen to me and if it doesn't it will happen to your daughter (Jayda). I told Yolanda that I was going to report it to Jim, but she told me I should not because he is not going to do anything, and she also keep on telling me that was the wrong decision to make, so leave it between us. Then repeatedly "Do you love you daughter" was *a Lie* (handwritten) all she kept on saying for like 3 minutes "God will forgive you! Next she kept on asking me to send an e-mail to Mr. Fahey, telling him a lye that Kristian and I *(Fahey wrote)* (handwritten) found our money and to drop the case, and then she wanted me to go over to the credit union and take out a loan for Kristian in the amount of $300.00, or to pay Kristian $200 out of pp#7 and $100 out of pp#8. Then she says if I don't god will punish you. So she tells me to go back to my desk and think about it *(Fahey wrote)* (handwritten)

*Stories!!* (handwritten, right margin)
*Bible verso Read* (handwritten, right margin)
*Read!!* (handwritten, left margin)

*Conspiracy, Framed up, Fraud* [handwritten]

**Johnson, Jenekia**

| | |
|---|---|
| **From:** | Johnson, Jenekia |
| **Sent:** | Friday, May 21, 2004 11:38 AM |
| **To:** | Johnson, Jenekia |
| **Subject:** | FW: Recording conversation |

-----Original Message-----
**From:** Johnson, Jenekia
**Sent:** Wednesday, April 28, 2004 3:27 PM
**To:** Fahey, Douglas    *FBI AGENT, WASHINGTON DC Field office 202-278-2000* [handwritten]
**Cc:** Lantelme, James
**Subject:** Recording conversation

April 28, 2004

Good afternoon Mr. Fahey,

I am writing this e-mail to make clear of my statement of April 15th in a tape recording conversation between Yolanda Gibson-Michael and myself. In that conversation, I said "I did lie to you Yolanda", which I was referring to an earlier conversation between she and I. In that conversation, Yolanda asked "did I think about what she said to me the day before", this was to confess to something that I did not do. I also told her that I went home and tried to think nothing of it.    *18 USC. 1st False Statement* [handwritten]

During a conversation that I had with you 10 minutes later, you asked me was there any contact with Yolanda, from the last time we had spoke. I told you then, that I had just ran into her before I met with you. You asked me what was said by her, and I told you then, that all she said was "did I think about what she said yesterday and I said No". You then gave me a piece of paper which had writing on it, on how you wanted me to approach Yolanda. While you were placing the wire in my purse, you asked me to think of another way of approaching Yolanda. My way was to say hello Yolanda, I'm sorry that I lied to you, and yes I did think about what you has said to me yesterday.    *Framed up* [handwritten]    *Framed up* [handwritten]    *Conspiracy* [handwritten]

**Johnson, Jenekia**

From:      Johnson, Jenekia
Sent:      Friday, May 21, 2004 8:58 AM
To:        Fahey, Douglas
Subject:   Yolanda

May 21, 2004

I saw Yolanda Wednesday May 19, at 12:25pm, after leaving lunch. She stopped and said "Hi Jenekia Johnson"; I was so much in a shock she spoke to me so I just kept on walking as she stood their standing as though she was going to say something to me.

PS. I wasn't sure whether I should document this.

MS. Johnson was in shocked Because She Knows I was Framed-up!! Conspired Agast!! illegally taped recorded (intercepted oral conversation) because of her lying Federal Alledged Theft while employed beg her Aunt (James T. Cantone) Personal Private Secretary.

NETU Union Excerpts

by Ms. Gibson-Michaels comments but by what the investigation would uncover about herself. It is understood that Ms. Johnson decided then to go to Mr. Lantelme and tell him about the conversation from her point of view before Ms. Gibson-Michaels told him about their conversation and what may be uncovered in the investigation Mr. Fahey was going to pursue. Mr Lantelme also says that statements regarding harm coming to Ms. Johnson's baby or her were clearly unprofessional statements, meant to create fear and encourage Ms. Johnson to consider withdrawing her case with Mr. Fahey. [The only way Ms. Johnson could have perceived harm would come to her or her child was if she had something to hide from god. She said herself she knew she had no worries for her or Jayda as she didn't take the money. That the nature of the conversation was biblical and spiritual, and one that Ms. Johnson herself said she has heard many times, should not provoke fear from Ms. Gibson-Michaels but from a higher power.] The entire part of that conversation was discussing a biblical verse and what the bible says, and showing that if a parent does commit a sin, that in fact, that sin can transfer to their children and their children's children for three to four generations as written as the word of god. Why the repeating of something Ms. Johnson has heard so many times before, now she viewed as fearful because it came from Ms. Gibson-Michaels is unclear and makes no sense. If she was fearful, it was fearing for her physical safety, and if that was the case, then why did Ms. Johnson continue talking and privately meeting with Ms. Gibson-Michaels after Mr. Lantelme told her on the 14th of April not to? The pattern of events that followed that conversation on April 14th and April 15th do not show that fear or threatening of any kind were an element of concern to Ms. Johnson. Mr. Lantelme also states that Ms. Gibson-Michaels provided the investigator with inaccurate information. This was not

NETU UNION Excerpts

intentionally done.  Ms. Gibson-Michaels did not say anything she did not believe was true.  She answered everything truthfully and honestly.  43 questions were asked of her. Eleven questions were addressed and six were not answered to Mr. Fahey's satisfaction. These six questions are what has been previously addressed above.  Out of the six questions management is using to support the inaccurate information provided to an investigator charges, two of them were not clearly stated and she did not hear what he did.  Four of them have been explained.  We do not feel it is correct in saying that in not recalling a part of such a lengthy conversation it was done intentionally or to mislead the investigator.  Clearly that she did not remember saying those things at all.  We are asking that the proposed ten calendar day suspension not be granted as the employee was acting in a mentor capacity and no threat was issued by Ms. Gibson-Michaels to Ms. Johnson what so ever.  If there had been a physical threat, the MRT team would have reacted differently in dealing with the situation.  We formally are asking that these accusations be removed from the employees personnel file and an apology made to her for the irrational behavior from Mr. Lantelme and the inappropriate treatment of Mr. Fahey.

NETa UNioN Excerpts

intentionally done. Ms. Gibson-Michaels did not say anything she did not believe was true. She answered everything truthfully and honestly. 43 questions were asked of her. Eleven questions were addressed and six were not answered to Mr. Fahey's satisfaction. These six questions are what has been previously addressed above. Out of the six questions management is using to support the inaccurate information provided to an investigator charges, two of them were not clearly stated and she did not hear what he did. Four of them have been explained. We do not feel it is correct in saying that in not recalling a part of such a lengthy conversation it was done intentionally or to mislead the investigator. Clearly that she did not remember saying those things at all. We are asking that the proposed ten calendar day suspension not be granted as the employee was acting in a mentor capacity and no threat was issued by Ms. Gibson-Michaels to Ms. Johnson what so ever. If there had been a physical threat, the MRT team would have reacted differently in dealing with the situation. We formally are asking that these accusations be removed from the employees personnel file and an apology made to her for the irrational behavior from Mr. Lantelme and the inappropriate treatment of Mr. Fahey.

**Response to an Inquiry from
The Honorable Barbara A. Mikulski
On Behalf of Ms. Yolanda Gibson-Michaels**

**The following information is provided by the Federal Deposit Insurance Corporation's
Legal Division**

As noted in her letter, Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. Ms. Gibson-Michaels was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management.

The FDIC Legal Division reviewed the circumstances of the allegedly illegal interception and determined that the tape recording of a face-to-face conversation by a party to that conversation is lawful. Both the D.C. Code [§23-542] and Federal law [18 U.S.C. §2511] permit the recording of a conversation, with the consent of a party to the conversation.

As a result of management's findings that Ms. Gibson-Michaels had engaged in unprofessional and/or inappropriate behavior, the FDIC proposed that she be suspended without pay for ten days. On August 17, 2004, after reviewing the proposed suspension and its supporting evidence, the deciding official concluded that Ms. Gibson-Michaels's actions warranted disciplinary action. Based on her review of the record, and in consideration of Ms. Gibson-Michaels's employment record, the deciding official mitigated the proposed ten calendar day suspension to a five calendar day suspension from duty and pay beginning on August 23, 2004 and ending on August 27, 2004.

We would note that while the taping was not a violation of law nor of Ms. Gibson-Michaels's rights, the deciding official did not listen to the tape recording of the conversation nor did she rely on the portions of the transcript from the taped conversation contained in the record as she felt it was unnecessary in determining whether the underlying conduct took place.

Throughout the entire process, Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, to receive all evidence relied upon and to appeal the suspension decision under the grievance procedures contained in the negotiated agreement between the National Treasury Employees Union (NTEU) and the FDIC. She is being represented in this matter by the labor union for FDIC employees, the NTEU.

☆ FDIC Lied to Senator mikulski. Tape was used, listen to, and Relied upon by FDIC Against Gibson michaels. Read FDICs Response to Albert R. Wynn page 3.

Response to in inquiry from
**The Honorable Albert R. Wynn**
on behalf of Ms. Yolanda Gibson-Michaels

**The following information is provided by the FDIC's Legal Division**

As Ms. Gibson-Michaels notes in her letter, the Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. She was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. As a result of management's findings about Ms. Gibson-Michaels' misconduct, the FDIC has proposed to suspend her without pay for ten days. Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, and to receive all evidence relied upon. She is being represented in this matter by the labor union for FDIC employees, the National Treasury Employees Union (NTEU). If management decides to suspend Ms. Gibson-Michaels, she and NTEU may file a grievance and ultimately appeal the action to binding arbitration.

Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management. The conversation was recorded with the consent of a party to the conversation, as permitted by D.C. Code §23-542 and Federal law, 18 U.S.C. §2511. Nevertheless, Ms. Gibson-Michaels has objected to this as part of her reply to the proposed suspension.

*[handwritten right margin: FDIC Relied Upon Illegal Intercept]*

In addition to the process described above, on or about April 30, 2004, Ms. Gibson-Michaels contacted the FDIC's Office of Diversity and Economic Opportunity about many of the same events discussed in her letter to your office. She is being provided all the due process rights afforded to all federal employees in the pursuit of EEO claims.

Furthermore, on or about May 6, 2004, Ms. Gibson-Michaels also filed an unfair labor practice charge with the Federal Labor Relations Authority, essentially based upon the same incidents. The FLRA is currently conducting an investigation into her unfair labor practice charge allegations.

Finally, the FDIC Office of Inspector General (OIG) was an addressee on the letter Ms. Gibson-Michaels sent to you and she has asked OIG to conduct an inquiry into this matter. We will, of course, fully cooperate with any inquiry conducted.

*[handwritten at bottom: D.C. Law, Federal Law requires court order, sworn Affidavit, Federal crime (Not able Questions). Federal Agent or U.S. Federal Attorney to conduct a wire tap. Not Sorry Tape Recorder inside an Intern's purse!! Contractor was also Unlicensed Investigator CDC).]*

**AFFIDAVIT**

CITY OF WASHINGTON D.C. }

DISTRICT OF WASHINGTON D.C. }


**I, James T. Lantelme,** hereby solemnly swear that I am employed in the position of Assistant General Counsel, grade EM, Legal Division, Federal Deposit Insurance Corporation (FDIC), 550 17th Street, NW, Room H-3123, Washington D.C. 20429. My race is Caucasian, my color is white, my gender is male, my date of birth is November 10, 1953, and my religion is Lutheran. I have had prior EEO activities. I have undergone EEO training regarding the preventing, reporting and mitigating of harassment. My first line supervisor is Deputy General Counsel Erica Bovenzi.

I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

I have known Ms. Gibson-Michaels since 1998. Our relationship is purely professional. I am currently Ms. Gibson-Michaels' second line supervisor. I have had some contacts with Ms. Gibson-Michaels since she came to this section in 1998 including during an FDIC reduction-in-force during 2002 and 2003. I am aware that Ms. Gibson-Michaels is an African-American female, skin color black. I was not aware of Ms. Gibson-Michaels' age or religion or of any prior EEO activity by Ms. Gibson-Michaels until I was told about them during the course of this investigation. I learned of the specifics of Ms. Gibson-Michaels' EEO Complaint when I read the Investigator's Letter of Authorization during my interview on September 20, 2004.

Affiant's Initials _____

*Initiated by James Limbelme see Limbelme Stmt*

Regarding Accepted Issue One, I did initiate an FDIC administrative investigation against Ms. Gibson-Michaels on or about April 14, 2004 for allegedly threatening Student Intern Jenika Johnson.  On or about April 14, 2004, Ms. Johnson came to my office visibly upset.  Ms. Johnson stated, in substance, that approximately 15 minutes prior, Ms. Gibson-Michaels had threatened Ms. Johnson in connection with an investigation of a theft of her money on FDIC property.  Ms. Johnson stated that a few days prior she had reported a theft of money to FDIC Security and that a fellow FDIC Student Intern was a suspect.  Ms. Johnson indicated that Ms. Gibson-Michaels talked to her and urged her to drop the charges against the other Student Intern as well as give the other Student Intern money.   Ms. Gibson-Michaels had asked Ms. Johnson to do the right thing and indicated to Ms. Johnson that if she did not something bad could happen *Bible verse* to Ms. Johnson's child.  I asked Ms. Johnson to prepare a write-up of her conversation with Ms. Gibson- Michaels.

FDIC procedures indicate that when an employee receives a threat the FDIC Management Response Team (MRT) should be contacted. I contacted William Kmetz of FDIC Security and reported my conversation with Ms. Johnson.  I did take some notes of my conversation with Ms. Johnson which I believe that I gave to Investigator Douglas Fahey.   I am unaware who informed Ms. Gibson-Michaels that she was the subject of an administrative investigation.  To the best of my knowledge the resultant investigation was conducted by Investigator Fahey and Mr. Kmetz.  I was not involved in the resultant investigation or the investigative decisions made by Investigator Fahey and Ms. Kmetz.

I was aware that sometime later in April 2004, Investigator Fahey planned to have Ms. Johnson speak to Ms. Gibson-Michaels about the alleged threat.  Investigator Fahey

had asked Ms. Johnson to conceal an electronic recorder on her person in order to record the conversation between herself and Ms. Gibson-Michaels. The decision to employ a hidden electronic recorder on Ms. Johnson's person was made by either Investigator Fahey or Security Chief Kmetz. I did ask the FDIC Assistant Director for the Labor and Employee Relations Section Randi Mendelsohn about the use of the hidden electronic recorder. I was told that she was aware of and approved the use of the hidden electronic recorder.

After the completion of the investigation, I received a report on Ms. Gibson-Michaels' actions from the MRT. The report indicated that there was no likelihood of physical violence against Ms. Johnson by Ms. Gibson-Michaels. It was nonetheless plain to me that Ms. Gibson-Michaels had interfered with the FDIC theft investigation and had lied about it to the investigators. I proposed that Ms. Gibson-Michaels receive a ten day suspension. Subsequently, the deciding official reduced the ten day suspension to a five day suspension. Ms. Gibson-Michaels has served the five day suspension.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Two, on or about August 12, 2003, I did initiate an administrative investigation against Ms. Gibson-Michaels for allegedly threatening Ms. Terry Hopkins. On or about August 12, 2003, Ms. Hopkins came to my office and

Affiant's Initials

informed me that as an Acting Supervisor she had asked Ms. Gibson-Michaels questions about a leave slip that Ms. Gibson-Michaels had given to Ms. Hopkins. I believe that the initial conversation took place in Ms. Hopkins' office. Ms. Hopkins stated, in substance, that Ms. Gibson-Michaels had objected to Ms. Hopkins' questioning of a signature on the leave slip. Ms. Hopkins felt intimated and left her office. Ms. Hopkins stated that Ms. Gibson-Michaels had followed her down a hall berating Ms. Hopkins. I believe that FDIC Secretary Eyvonne Bryant witnessed Ms. Gibson-Michaels berating Ms. Hopkins.

I contacted the MRT and a subsequent investigation was conducted. The investigation resulted in a conclusion that there was no likelihood of violence. Subsequently, I did orally counsel Ms. Gibson-Michaels about her behavior toward Ms. Hopkins. I do not believe that I made a written comment about my counseling session with Ms. Gibson-Michaels.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, Ms. Gibson-Michaels has been treated differently than Mr. Frank Nigro. Mr. Nigro is no longer a FDIC employee. Mr. Nigro retired from FDIC in 2003. I have been told that Mr. Nigro did have an explosive temper. I believe Mr. Nigro received an official admonishment that if he did not retire he would have been subject to severe disciplinary action. I believe that Ms. Gibson-

Affiant's Initials _____

Michaels had complained to FDIC about Mr. Nigro's behavior. I was Mr. Nigro's fourth level supervisor and did not personally know Mr. Nigro. I believe that Mr. Nigro is a white Caucasian male. I do not know Mr. Nigro's religion. I assume Mr. Nigro's age is over 50 since he was able to retire from the FDIC.

I have no knowledge that Mr. Nigro's race, color, gender, age and religion played any role or influenced in any manner FDIC Officials' decisions and actions about Mr. Nigro's on the job behavior. I have no knowledge of any type of favorable treatment given to Mr. Nigro by FDIC Officials due to Mr. Nigro's race, color, gender, age, and religion.

I am unaware that the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job performance. I believe that Ms. Gibson-Michaels is performing her current duties in a competent manner. I have been asked the question of whether the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job opportunities. I am unaware of any such FDIC job opportunities for Ms. Gibson-Michaels. FDIC has been in the process of becoming smaller and losing positions.

In summary, I have no knowledge of any type of discrimination by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

I have nothing further to add to my affidavit.

I have reviewed this statement, which consists of five (5) pages, and hereby solemnly swear that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

Affiant's Initials_____

I declare under the penalty of perjury that the foregoing is true and correct. Executed this

_27th_ day of _September 2004_ (date)

James T. Lantelme

Sworn and Subscribed by _____     Barry Cohen, EEO Contract

Investigator, on _9/27/04_ (date).

Affiant's Initials _____

**AFFIDAVIT**

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**


    **I, William A. Kmetz,** hereby solemnly swear that I am employed in the position of Assistant Director, grade E-1, Security Management Section, Administration Division, Federal Deposit Insurance Corporation (FDIC), 1776 F Street, NW, Washington D.C. 20429.   My race is Caucasian, my color is white, my gender is male, and my date of birth is January 4, 1950, my religion is Roman Catholic.   My first line supervisor is Mr. Michael Rubino, Associate Director, Corporate Services Branch, Administration Division.   I have had routine FDIC training regarding the preventing, reporting and mitigating of harassment.

    I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint.   I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

    I am not sure how long I have known Ms. Gibson-Michaels.   I had seen her once or twice as a FDIC employee.   Our relationship is purely professional.   I am aware that Ms. Gibson-Michaels is an African-American female.   I do not know her age or her religion.   I have never supervised Ms. Gibson-Michaels. I have no knowledge of any prior EEO activity by Ms. Gibson-Michaels.   I learned of Ms. Gibson-Michaels's current EEO Complaint when I was interviewed on September 27, 2004.

    Regarding Accepted One, FDIC has a zero tolerance policy regarding allegations of work place violence.   I chair the FDIC Management Response Team (MRT).   The

Affiant's Initials _____

MRT is an informal group of FDIC Officials concerned with the prevention of work place violence at FDIC. On or about April 14, 2004, I believe that I did receive a telephone call from James Lantelme of the FDIC Legal Division informing me as a MRT member and as Assistant Director- FDIC Security that a Ms. Johnson, a Legal Division employee had been allegedly threatened by Ms. Gibson-Michaels. I do not remember the specifics of my telephone call with Mr. Lantelme. After my telephone call with Mr. Lantelme, I contacted Investigator Douglas Fahey and asked him to investigative and make contact with Ms. Johnson. Mr. Fahey was a contract investigator with the Securiguard Corporation. Mr. Fahey was in charge of investigation. Mr. Fahey conducted the interviews in connection with the alleged threat investigation.

Mr. Fahey's investigation was formalized in the FDIC's Investigations Resources Information Management System (IRIMS). IRIMS is data base that contains investigative and security reports conducted by FDIC Security. I have forwarded Mr. Fahey's IRIMS report of this investigation to the Legal Administration Division

I do remember Mr. Fahey consulting with me about the use of a small electronic tape recorder which was to place in Ms. Johnson's handbag in order to secretly record a conversation between Ms. Johnson and Ms. Gibson-Michaels about the alleged threats that Ms. Gibson-Michaels had made to Ms. Johnson. Mr. Fahey indicated that Ms. Johnson had agreed to the placing of the tape recorder in her handbag in order to record her conversation with Ms. Gibson-Michaels. Mr. Fahey stated that since Ms. Johnson had agreed to the recording of her conversation with Ms. Gibson-Michaels that the recording of the conversation was a normal investigative technique. I advised Mr. Fahey to consult with FDIC Labor Relations and Mr. Lantelme regarding the use of the tape

Affiant's Initials _____

*[Handwritten annotations in margins:]*
JAMES CANTELME framed me. JAMES CANTELME inform Falss of Threat Bob else

Facing of the inmate By JAMES LANK

Falso

Illegale without court order Not valid Bob else

Contrary formal up

recorder. I understand that this coordination was done, but I do not have any specific details. However, I believe that the participants agreed that since Ms. Johnson had given her permission to record her conversation with Ms. Gibson-Michaels that the use of the hidden recorder was permissible and legal.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

**False** Regarding Accepted Issue Two, I do not recall the specifics of the 2003 investigation involving an alleged threat made by Ms. Gibson-Michaels to Ms. Terry Hopkins. The investigation was assigned to Investigator Fahey. I believe the investigation was conducted in a routine manner and formalized in the FDIC IRIMS. The report for this investigation has been forwarded to FDIC Administration.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue Two constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, I have no recollection of any events regarding this issue. I do not know Mr. Frank Nigro. I do not recall any conversations or email

*Later, Read Email to Phil Trunk 9/12/07*

Page 3 of *[handwritten]*    Affiant's Initials *[handwritten]*    *FDIC Sent to FISA, Secret, FBI*

messages about Mr. Nigro's FDIC job behavior. I have no knowledge of any FDIC favorable treatment of Mr. Nigro based on his Caucasian race, white color, male gender, and such factors as his age and religion.

Mr. Fahey is no longer employed as a contract Investigator by FDIC. He is currently employed by the Federal Bureau of Investigation.

In summary, I have no knowledge of any type of discrimination or reprisal actions by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion. To the best of my knowledge Ms. Gibson-Michaels was treated as any other FDIC employee.

I have nothing further to add to my affidavit.

I have read the foregoing statement consisting of _____4_____ pages, each of which I initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement is made of my free will without any threat, promise of immunity, or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to interested parties.

_____
Signature

Subscribed and sworn before me in _Washington DC_

this ___8th___ day of ___October___, 2004

Investigator _Barry Cobe_

Page 4 of X

Affiant's Initials

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **FDIC** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **FDIC** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____     _____
Signature of Interviewer                    Signature of Witness (person providing statement)

Date: _10-8-04_

Place: _Washington, DC_

**FDIC**

**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500

Office of Diversity and Economic Opportunity

## NOTICE OF RIGHTS OF WITNESSES
## IN
## EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1.   To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2.   To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3.   To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4.   To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5.   To review your affidavit and make corrections or other changes prior to signing the affidavit.

I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.

WITNESS: _William H. Smith_          DATE: 9-27-04

*IGNORED LAW*

**Gibson-Michaels, Yolanda C.**

| From: | Lawrence, James R. |
|---|---|
| Sent: | Wednesday, June 02, 2004 5:33 PM |
| To: | Gibson-Michaels, Yolanda C. |
| Subject: | RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS |

Thanks for the information.    I enjoyed speaking with you.

-----Original Message-----
**From:** Gibson-Michaels, Yolanda C.
**Sent:** Wednesday, June 02, 2004 5:23 PM
**To:** Lawrence, James R.
**Subject:** FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

**Subject:** RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

Additional information...

# US federal wiretapping laws as of Jan. 2000

Contents:

- CRIMES:
  - 18 USC, PART I, CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS (includes 18 USC 2510-2522)
  - 18 USC, PART I, CHAPTER 121 - STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS (incl. 18 USC 2701-2711)
- CRIMINAL PROCEDURE:
  - 18 USC, PART II, CHAPTER 205 - SEARCHES AND SEIZURES (incl. 18 USC 3117, "Mobile tracking devices"; non-wiretapping sections elided)
  - 18 USC, PART II, CHAPTER 206 - PEN REGISTERS AND TRAP AND TRACE DEVICES (incl. 18 USC 3121-3127)
- TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAMS
  - 47 USC, CHAPTER 9 - INTERCEPTION OF DIGITAL AND OTHER COMMUNICATIONS (incl. 47 USC 1001-1021; most CALEA provisions are in this part)

# FDIC
**Federal Deposit Insurance Corporation**

Legal Division

April 21, 2004

**TO:**    Yolanda Gibson-Michaels
            Information Specialist

**FROM:**    James T. Lantelme
              Assistant General Counsel

**SUBJECT:**  <u>Mandatory Attendance at Investigatory Meeting</u>

Mr. Douglas Fahey, an investigator with the Division of Administration, notified you by an e-mail on Monday, April 19, 2004, of his need to meet with you for purposes of an investigative interview. Via return e-mail, you stated that "I will not subject myself to any form of investigatory interviews". Instead, you provided him with a written statement.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he has requested, and I direct you to cooperate in the interview. He is available on Friday, April 23rd at 2:00pm. I direct you to contact him to confirm the time for your appointment.

Failure to attend the interview and cooperate will result in disciplinary action being taken against you.

Cc: Douglas Fahey
     William Kmetz
     Robert Wooding
     Carl Polvinale

# FDIC

**Federal Deposit Insurance Corporation**

Legal Division

April 26, 2004

**TO:**      Yolanda Gibson-Michaels
           Information Specialist

**FROM:**    James T. Lantelme
           Assistant General Counsel

**SUBJECT:**  Mandatory Attendance at Investigatory Meeting

Due to an excused absence, you were unable to attend an investigative interview with Mr. Douglas Fahey, an investigator with the Division of Administration, scheduled for Friday, April 23rd at 2:00pm. Mr. Fahey has notified you by an e-mail on Friday, April 23, 2004, that he has rescheduled your interview to Wednesday, April 28th, 2004 at 9:30am at his office in the F Street building, room 1C27C.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he has requested, and I direct you to cooperate in the interview. I direct you to contact him to confirm the time for your appointment.

Failure to attend the interview and cooperate will result in disciplinary action being taken against you.

Cc: Douglas Fahey
    William Kmetz
    Robert Wooding
    Carl Polvinale

# MEMORANDUM

TO: Official File

FROM: Contract Investigator B. Cohen

SUBJECT: Investigatory Memorandum Regarding Efforts To Locate Mr. Doug Fahey

DATE: October 31, 2004

During my interview with Mr. Kmetz, he informed me that Mr. Fahey was working with the FBI and undergoing training. Mr. Kmetz informed that Mr. Fahey had worked as a contractor for Securiguard. On October 12, 2004, I called Securiguard in an effort to locate Mr. Fahey. I was told that Mr. Fahey was not employed by Securiguard and was told to contact USEC Corporation. I contacted USEC Corporation and was told that Mr. Fahey was no longer employed by USEC Corporation and that USEC Corporation would not provide me with Mr. Fahey's home telephone number. I asked if USEC Corporation would forward a letter to Mr. Fahey's home. The USEC employee stated they would forward my letter to Mr. Fahey. On October 12, 2004, I sent the attached letter to USEC Corporation. On October 12, 2004, I sent the attached letter to Mr. Fahey at the Federal Bureau of Investigation.

I was informed by a FDIC employee that she thought that Mr. Fahey lived in northern Virginia. There was a telephone listing for a Douglas Fahey in northern Virginia. I made two telephone calls to the number listed and left messages on an answering machine for Douglas Fahey.

To date, Mr. Fahey has not responded to any of my inquiries.

4d-47



October 12, 2004

Mr. Douglas Fahey
C/O USEC Corporation
7531 Leesburg Pike
Suite 402
Falls Church, VA
22043

Dear Mr. Fahey,

I am a Contract EEO Investigator who is investigating the EEO Complaint of FDIC employee Yolanda Gibson-Michaels. I am attaching my Letter of Authorization from FDIC to investigate Ms. Gibson-Michaels' Complaint. I would appreciate if I can speak to you about your role as a FDIC Contract Investigator regarding Accepted Issues One and Two in the Letter of Authorization. Ms. Gibson-Michaels has alleged that she was discriminated against due to her African-American race, black color, female gender, age and religion in connection with her Complaint. Without your statement the official record may be incomplete. My home number is ▓▓▓▓▓▓▓. Thank you for your cooperation.

Yours truly,

Barry Cohen

→ PAID Ret Emplid by LuriGard E    DylAs JrAh3y Pg. 2

**Federal Deposit Insurance Corporation**
**Division of Administration, Acquisition and Corporate Services Branch**
**1700 Pennsylvania Avenue, NW, Room 4104**
**Washington, DC 20006**

## MODIFICATION OF CONTRACT

| 1. Modification Number:  2 | 2. Effective Date:  See Block No. 6 below |
|---|---|

| Vendor's Name and Address:  Securiguard, Inc.  Attn: Fred Williamson  6858 Old Dominion Drive, Suite 307  McLean, Virginia  22101 | Modification of Contract/Order Number:  **Contract No. 99-00086-C-J3**  **("FDIC Security Services")**  Dated:  April 25, 1999 |
|---|---|

This Modification is Issued Pursuant To:

☐  Authority of the FDIC Contracting Officer.        ☑  Mutual Agreement of the Parties Hereto.

Description of Modification

The purpose of this Modification is to:

1) Change the names of the Key Personnel;
2) Re-incorporate the requirement for completing GSA Form 139; and
3) Confirm that incumbent Security Officers who have been certified in Adult CPR Initial Training are not required to re-certify prior to working on this Contract.

As a result, Contract No. 99-00086-C-J3 is modified as stated on the following pages.

☐  Contractor is not required to sign this document    ☑  Contractor is required to sign this document and return 2 copies to issuing office.

| 3. Contractor:  Securiguard, Inc.  By: _(signature)_  Name and Title (type or print).  Patricia De L. Marvil, Chairman/CEO  5. Date Signed: _June 25, 1999_ | 4. Federal Deposit Insurance Corporation:  By: _(signature)_  Name of Contracting Officer:  Carolyn Follin  6. Date Signed: 7/7/99 |
|---|---|

Modification No. 2
To Contract No. 99-00086-C-J3
Page 2 of 4

Contract No. 99-00086-C-J3 is modified as follows:

## *Changes to the Contract:*

1.  Article 3.1 (*"Key Personnel"*) is modified to change the names of the Key Personnel, as follows:

    ***Delete:***

    | <u>Name</u> | <u>Title</u> | <u>Effective Date</u> |
    |---|---|---|
    | J. Stephen Johnson | Project Manager | May 17, 1999 |

    ***Replace with:***

    | <u>Name</u> | <u>Title</u> | <u>Effective Date</u> |
    |---|---|---|
    | Douglas Fahey | Project Manager | June 1, 1999 |

## *Changes to the Statement of Work:*

2.  The FDIC is modifying the Statement of Work to re-incorporate the requirement for completing GSA Form 139. FDIC will revert back to relying on both Contractor's electronic personnel timekeeping system and the GSA Form 139's to verify Contractor Personnel time and attendance for billing purposes. As a result of this change, Sections 4.4.2, 5.1, 5.5.1, and 9.1 of the Statement of Work are modified as follows:

    A.  Section 4.4.2 (*"Records"*) is modified to add the words, "GSA Form 139". Therefore, the last sentence of this Section is deleted in its entirety and replaced with the following:

        "Records shall include but not be limited to: Incident Reports, Operations Logs, Patrol Officer Reports, TAS Reports, Weapons Inventory and Maintenance Forms, FDIC Equipment Inventory, GSA Form 1051, Visitor Logs, GSA Form 139 and Contractor Personnel data."

FDIC EEO Investigator confirmed Fahey was not employed by Securiguard. Fahey was paid by Securiguard and USGC

Modification No. 5
To Contract No. 99-00086-C-J3
Page 3 of 4

C.   Effective March 1, 2000, the FDIC hereby adds a new Investigator position to the Contract.
As a result, the Statement of Work is modified to include the following language as Section
10.3.9:

"Qualifications.  The Investigator shall have completed an accredited law enforcement academy
and possess a minimum of 3 years investigative experience.  The Investigator shall have a
private investigator (PI) license for Washington, DC and Virginia unless otherwise waived by
the FDIC Oversight Manager.

"Duties.  The Investigator's duties shall include, but not be limited to the following:

- Conduct long-term, short-term, and odd hour investigations;
- Conduct interviews;
- Develop and follow leads;
- Take statements;
- Gather information and facts;
- Research records;
- Analyze and evaluate information;
- Prepare narrative reports;
- Prepare statistical reports;
- Institute and maintain databases;
- Coordinate FDIC's security awareness day;
- Develop FDIC's security awareness program;
- Evaluate crime prevention programs;
- Develop and recommend changes to current FDIC programs; and
- Travel to FDIC field offices for investigative or information purposes, as requested by the
  FDIC Oversight Manager.

This is a plain clothes, unarmed position.  The Investigator shall carry a cell phone.  The
Investigator shall work 8 hours per day, 5 days per week, excluding holidays.

D.   Section 3.1 of the Contract ("Key Personnel") is modified to change the names of the Key
Personnel as follows:

Delete:

| "Name | Title | Effective Date |
|-------|-------|----------------|
| Douglas Fahey | Project Manager | June 1, 1999 |
| Archie Moses | Site Supervisor (Washington, DC location) | April 25, 1999 |
| Ernest Brooks | Site Supervisor (Arlington, VA location) | May 17, 1999 |
| Patrick Devine | Security Operations Center Supervisor | May 17, 1999" |

And replace with:

| "Name | Title | Effective Date |
|-------|-------|----------------|
| Charles Boring | Project Manager | October 6, 1999 |
| Joseph Ortman | Site Supervisor (Washington, DC location) | December 1, 1999 |
| Archie Moses | Site Supervisor (Arlington, VA location) | December 1, 1999 |
| Douglas Fahey | Investigator | March 1, 2000" |

[ NOT employed by securiguard ] pmo by sourcesoft usec contract

**Attachment 2 to Modification No. 5**

Securiguard, Inc.

**PRICING SCHEDULE
FOR
CONTRACT NO. 99-00086-C-J3
AS MODIFIED UNDER MODIFICATION NO. 5**

Contractor's hourly rates include any and all wages, overhead, general and administrative expenses and profit or fee. *The hourly rates below reflect a 3 cent increase in the rates specified in the original Contract for all security related labor categories, as authorized under Modification No. 5. The schedule below also includes hourly rates for the new Investigator position added to the Contract under Modification No. 5.*

| Labor Category | Initial Period (Years 1 & 2) Hourly Rate | Option Pd. 1 (Year 3) Hourly Rate | Option Pd. 2 (Year 4) Hourly Rate | Option Pd. 3 (Year 5) Hourly Rate |
|---|---|---|---|---|
| Project Manager | $ 29.92 | $ 31.26 | $ 32.46 | $ 32.43 |
| Site Supervisor | $ 21.17 | $ 21.41 | $ 22.03 | $ 22.01 |
| Security Operations Ctr. Technician | $ 20.27 | $ 20.48 | $ 20.48 | $ 20.48 |
| Security Operations Center Officer | $ 19.26 | $ 19.20 | $ 19.41 | $ 19.54 |
| Shift Commander | $ 20.27 | $ 20.48 | $ 20.48 | $ 20.48 |
| Security Officer (Guard II) | $ 19.26 | $ 19.20 | $ 19.41 | $ 19.54 |
| Secretary I | $ 17.62 | $ 17.40 | $ 17.41 | $ 17.40 |
| General Clerk III | $ 15.82 | $ 15.80 | $ 16.11 | $ 16.10 |
| Investigator | $ 33.33 | $ 34.17 | $ 35.18 | $ 36.12 |

Saved as:  u:\wp\Security\Mod-5-Rev-Price-Sch.doc

*"The instructors were very approachable and sincere in assisting students."*

Douglas Fahey, PCI          Corporate Security Investigator          FDIC

## PCI Review Program

**Registration Hours**

**Thursday, April 14, 2005**
5:00 pm - 6:30 pm

**Friday, April 15, 2005**
7:00 am - 8:00 am

**Program Advisor**

**Dennis Shepp, CPP**
Shepp Johnman Inc.
Edmonton, Alberta

**Faculty**

**James S Cawood, CPP, PCI, PSP**
President
Factor One
San Leandro, CA

**Fritz Weidner, PCI**
President & CEO
Weidner & Associates
Columbus, OH

*Faculty subject to change without notice.*

**Hotel Information**

April 15-16, 2005
Crowne Plaza Redondo Beach
300 N. Harbor Drive
Redondo Beach, CA 90277
800-368-9760 or 310-318-8888
Fax: 310-376-1930

*The Crowne Plaza Redondo Beach, Los Angeles, and accessible from and Long Beach. ASIS has a limit the rate of $144 single/double plu reservations by the deadline of M when making your reservations.*

## PROGRAM-AT-A-GLANCE
**Program March 14-16, 2005**

**8:00 am - 5:00 pm**

**Saturday, April 16, 2005**
8:00 am - 1:00 pm

## PROGRAM-A

**Registration Fees**
ASIS members: $685
Nonmembers:        $835

*Registration fees include continental breakfasts, a luncheon on the first day of the program, daily coffee/soda breaks, and all handout materials. Registration does not include hotel costs.*



*"The instructors were very approachable and sincere in assisting students."*

Douglas Foley, PCI    Corporate Security Investigator    FDIC

## PCI Review Program

**Registration Hours**

Thursday, April 14, 2005
5:00 pm–6:30 pm

Friday, April 15, 2005
7:00 am–8:00 am

## A-GLANCE

Thursday, April 14, 2005
8:00 am–5:00 pm

Saturday, April 16, 2005
8:00 am–1:00 pm

## Registration Fees

ASIS members: $685
Nonmembers:         $835

Registration fees include continental breakfasts, a luncheon on the first day of the program, daily coffee/soda breaks, and all handout materials. Registration does not include hotel costs.

## PROGRAM-A

**Program Advisor**
Dennis Shepp, CPP
Shepp Johnman Inc.
Edmonton, Alberta

**Faculty**

James S Cawood, CPP, PCI, PSP
President
Factor One
San Leandro, CA

Fritz Weidner, PCI
President & CEO
Weidner & Associates
Columbus, OH

*Faculty subject to change without notice.*

**Hotel Information**
April 15–16, 2005
Crowne Plaza, Redondo Beach
300 N. Harbor Drive
Redondo Beach, CA 90277
800-368-9760 or 310-318-8888
Fax: 310-376-1930

The Crowne Plaza Redondo Beach in Los Angeles, is a successful, upscale, and sophisticated hotel with a 1,600 foot long beach at the edge of the Pacific Ocean, with accommodations in the tradition of relaxation when making your reservations.

[Code of Federal Regulations]
[Title 5, Volume 1]
[Revised as of January 1, 2005]
From the U.S. Government Printing Office via GPO Access
[CITE: 5CFR4.2]

[Page 10]

### TITLE 5--ADMINISTRATIVE PERSONNEL

#### CHAPTER I--OFFICE OF PERSONNEL MANAGEMENT

PART 4_PROHIBITED PRACTICES (RULE IV)--Table of Contents

Sec. 4.2  Prohibition against racial, political or religious
discrimination.

    No person employed in the executive branch of the Federal Government
who has authority to take or recommend any personnel action with respect
to any person who is an employee in the competitive service or any
eligible or applicant for a position in the competitive service shall
make any inquiry concerning the race, political affiliation, or
religious beliefs of any such employee, eligible, or applicant. All
disclosures concerning such matters shall be ignored, except as to such
membership in political parties or organizations as constitutes by law a
disqualification for Government employment. No discrimination shall be
exercised, threatened, or promised by any person in the executive branch
of the Federal Government against or in favor of any employee in the
competitive service, or any eligible or applicant for a position in the
competitive service because of his race, political affiliation, or
religious beliefs, except as may be authorized or required by law.

[28 FR 10024, Sept. 14, 1963]

FDIC engaged into Prohibited personnel practices. I
was interrupted on April 28, 2004 by an unlicensed
investigator. Illegally taped. Suspended from work; questioned
regarding my Religion by and Approved by FDIC
FAKE investigator Douglas Fahey.

Ignored Procedures re: Religion The procedure
to Ignore all communications.



FDIC Legal Division
Legal Service Unit
550 Seventh St NW - Room H-3081
Washington, DC  20429-9990

W. Robinson & Green, P.C.
P.O. Box 908
Morrisville, VT 05661-0899

14 76

## Elgas, G. Penny

| | |
|---|---|
| **From:** | Kmetz, William A. |
| **nt:** | Wednesday, September 22, 2004 1:42 PM |
| | Elgas, G. Penny |
| **Cc:** | Harris, John (JR) |
| **Subject:** | EEO Investigation |
| **Sensitivity:** | Confidential |

Here is the information you requested. The original documents are on file in our Physical Security office. Mr Harris is my POC on this. He can be reached at X83615. As Mr. Harris indicated, contacting Mr. Fahey may be difficult due to his current assignment. Let me know if you have any questions. Thanks.

**Bill Kmetz**
**202-898-6850**


-----Original Message-----
**From:** Harris, John (JR)
**Sent:** Wednesday, September 22, 2004 10:22 AM
**To:** Kmetz, William A.
**Subject:** FW: 1 more item please - FW: EEO Investigation
**Sensitivity:** Confidential

FY review before I forward to Ms. Penny.

I have retrieved all transcripts from the audio recording concerning the below investigation conducted by Mr. Fahey. SMS `   ` es not have any files concerning Mr. Frank Nigro.

Mr. Fahey is willing to talk with the EEO investigator, but is requiring compensation for his time. SMS is unable to contact Mr. Fahey by phone due to his current job status and location with the FBI.

Mr. Fahey, has attended numerous training classes in in workplace violance and retired as a Captain from a New Jersey city police departement.

Mr. Fahey followed the rules of the Weingarten, Refs your inquiry "FDIC" rules, regulations, guidelines for interviewing employees. There are no specific rules within FDIC for this type of interview. Mr. Fahey was using a standard investigative technique when making the recording.

*Li'E*

Mr. Fahey, follow the rules of NTEU (Section-7) informing Ms. Yolanda Gibson-Michaels of Employees Right to UNION representation and obtain a signed FDIC 2600/02 (4-99) "Right to Union Representation" in accordance to Global Message issued 5/29/2002.


  

0-016.pdf (109 KB)   0-186.pdf (30 KB)     case 0-186
                                        .tachment.doc (136.


-----Original Message-----
From: Kmetz, William A.
Sent: Tuesday, September 21, 2004 4:27 PM

## Gibson-Michaels, Yolanda C.

**From:**    Lantelme, James

**Sent:**    Thursday, April 22, 2004 10:29 AM

**To:**    Gibson-Michaels, Yolanda C.

**Cc:**    Schull, Donna; Coll, Elizabeth A.; Matthews, Howard L.; Polvinale, Carl A.; Wooding, Robert A

**Subject:** RE: yg-minterview.doc

I have received your e-mail and your requests are duly noted. It is well established that employees are expected to follow supervisory orders and directions. For a basic overview on this, you may simply refer to the collective bargaining agreement at Article 3, Section 5. Please be advised that my prior orders remain in effect and you are, again, directed to appear and cooperate in an interview with Mr. Fahey tomorrow at 2:00.

> -----Original Message-----
> **From:** Gibson-Michaels, Yolanda C.
> **Sent:** Wednesday, April 21, 2004 3:49 PM
> **To:** Lantelme, James; Polvinale, Carl A.
> **Cc:** Schull, Donna; Coll, Elizabeth A.; Matthews, Howard L.
> **Subject:** yg-minterview.doc
>
> Jim, please provide me with FDICs policy, directive, guidelines, procedures that states that, " Attendance at this investigative interview is mandatory". Additionally, provide me with all statutory requirements, laws, rules and regulations which enables managers to threaten employees with disciplinary actions if the employee has already cooperated with an investigation by providing a written statement regarding the facts from each intern regarding the incident. The investigation surrounds two interns. I was not within the office during the incident. Please provide me with a copy and a carbon copy to Union Officials before the scheduled meeting on Friday, April 23rd, 2004.

April 21, 2004

**TO:**      Yolanda Gibson-Michaels
             Information Specialist

**FROM:**    James T. Lantelme
             Assistant General Counsel

**SUBJECT:**    Mandatory Attendance at Investigatory Meeting

Mr. Douglas Fahey, an investigator with the Division of Administration, notified you by an e-mail on Monday, April 19, 2004, of his need to meet with you for purposes of an investigative interview. Via return e-mail, you stated that "I will not subject myself to any form of investigatory interviews". Instead, you provided him with a written statement.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he



**Web**

ASIS training fdic investigator douglas fahey      Search

**Web**      Results 1 - 10 of about 30 for **ASIS**      fahey. (0.93 seconds)

File Format: PDF/Adobe Acrobat -
**Douglas Fahey**, PCI. Corporate Security **Investigator**. FDIC. PCI Review program.
Registration Hours ... fax: 703-519-6299, or e-mail: asis@asisonline.org. ...
www.asisonline.org/education/programs/fdic2005.pdf - Supplemental Result -

File Format: PDF/Adobe Acrobat -
taking time out of the office for. **training** may be difficult. **ASIS** has. an online
CPP review, ... **Douglas Fahey**, PCI. Corporate Security **Investigator**. FDIC ...
www.asisonline.org/images/store/programs/cert062005.pdf -

File Format: Microsoft Word 2000 -
**ASIS** International Announces New CPP, PCI and PSP Recipients. Alexandria, Va.
... **Douglas R Fahey**, PCI Patrick J Fanning, CPP. **FDIC** Walt Disney World ...
www.asisonline.org/newsroom/ pressReleases/041904cert.doc -
[                                    ]

... ASIC/system ASICGS-NET ASICs **ASIs** ASJ's ASK-QUESTION ASK/INGRES ASLD-LAN ...
Doubts-Young DougBell DoughtyJ **Douglas**-Home **Douglas**-Michaels DouglasBell ...
student.fil.ctuna.sk/sipr/2-wordlist/american - 510k -

File Format: Microsoft Excel -
Supplemental Result -

DUSK - Supplemental Result -

File Format: Microsoft Word -
Supplemental Result -

# Judge Rules Against Wiretaps

## *NSA Program Called Unconstitutional*

By DAN EGGEN and DAFNA LINZER
*Washington Post Staff Writers*

A federal judge in Detroit ruled yesterday that the National Security Agency's warrantless surveillance program is unconstitutional, delivering the first decision that the Bush administration's effort to monitor communications without court oversight runs afoul of the Bill of Rights and federal law.

U.S. District Judge Anna Diggs Taylor ordered a halt to the wiretap program, secretly authorized by President Bush in 2001, but both sides in the lawsuit agreed to delay that action until a Sept. 7 hearing. Legal scholars said Taylor's decision is likely to receive heavy scrutiny from the U.S. Court of Appeals for the 6th Circuit when the Justice Department appeals, and some criticized her ruling as poorly reasoned.

Ruling in a lawsuit brought by the American Civil Liberties Union and other advocacy groups in the Eastern District of Michigan, Taylor said that the NSA wiretapping program, aimed at communications by potential terrorists, violates privacy and free speech rights and the constitutional separation of powers among the three branches of government. She also found that the wiretaps violate the Foreign Intelligence Surveillance Act, the 1978 law instituted to provide judicial oversight of clandestine surveillance within the United States.

"It was never the intent of the framers to give the president such unfettered control, particularly where his actions blatantly disregard the parameters clearly enumerated in the Bill of Rights," Taylor wrote in her 43-page opinion. ". . . There are no hereditary Kings in America and no powers not created by the Constitution. So all 'inherent powers' must derive from that Constitution."

See SURVEILLANCE, A18, Col. 1

## HIDDEN CAMERAS

## HIDDEN MICROPHONES

At the Crossroads of Journalism, Ethics and the Law

◄ CONTENTS

---

| FEDERAL LAW |

Federal law makes it a crime to intentionally intercept, attempt to intercept or have someone else intercept on one's behalf any wire, oral or electronic communication. It is also prohibited to intentionally use, attempt to use or have someone else use "any electronic, mechanical, or other device" to intercept an oral communication when the device is affixed to or otherwise transmits a signal through radio or through "a wire, cable, or other like connection" used in wire communication.

It is also illegal to intentionally use or disclose any information concerning the substance, purport or meaning of such a communication if one knows or has reason to know the information was obtained illegally.

**Reasonable expectation of privacy**

The statute requires a reasonable expectation of privacy for oral communications. In other words, to be protected an oral communication must be uttered by a person exhibiting an expectation that the communication is not subject to interception, under circumstances that justify that expectation.

**Consent**

It is legal for a person to intercept a communication if the person is a party to the communication or if one of the parties to the communication has given *prior* consent to the interception, unless the communication is intercepted for the purpose of committing a criminal or tortious (wrongful) act.

It is legal to intercept a radio communication that is transmitted by any governmental, law enforcement, civil defense, private land mobile, or public safety communications system, including police and fire department communications, that is readily accessible to the general public. "Readily accessible" means, among other things, that the communication is not scrambled or encrypted. Interception of amateur, citizens band and general mobile radio services communications is also legal.

---

**At A Glance**

Consent of one party required.
■
Civil damages are available.
■
Cellular and cordless telephone communications are protected under federal law
■
FCC regulations also govern interception and recording.

---

*Handwritten marginal notes:*

FDIC approved contract to place illegal tape recording inside his purse. Sony cassette 90 min

FDIC continues to use Illegal tape, not evidence.

Apparent actual verse from the Bible. FDIC confirmed on tape

→ Bible verse not subject to sting operation by FDIC or contractors meeting in vacant offices to plot, plan, write down related scripts.

### Cellular and cordless telephone communications

The federal statute was revised in 1986 to include cellular telephone communications and in 1994 to include cordless telephone communications.

### Defenses

The U.S. Supreme Court has held that the First Amendment protects the publication of truthful information that is lawfully obtained. The federal interception statute, however, prohibits the disclosure or use of *illegally* obtained communications, when there is knowledge or reason to know that they were obtained illegally. Courts have upheld the media's right to publish the contents of communications that were obtained legally but have ruled that the media do not have a special First Amendment defense for publishing the contents of an illegally obtained communication.

Comments in the report of the Senate Judiciary Committee on the original federal statute show that Congress did not mean to prohibit the disclosure of the contents of an intercepted communication that had already become "public information" or "common knowledge." The committee did not, however, define those terms, nor are they in the language of the statute itself. "Public information" probably refers to an official, authorized disclosure, such as in court or in a public record. "Common knowledge" may mean enough people know the contents of the communication that further diminishment of the victim's privacy is negligible. This situation would include an instance in which a newspaper or other media outlet has already revealed the contents of a communication; further dissemination would not be a violation.

### Possession

It is illegal to possess a device if one knows or has reason to know that its design makes it "primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." A police scanner that scans public radio frequencies as well as cellular frequencies is not generally considered an illegal device, but a scanner that scans only the cellular frequencies would be considered "primarily useful" for unlawful purposes. Illegal devices will be seized and forfeited, and violators will be fined according to the statute's general terms, imprisoned for up to five years or both.

### Criminal and civil penalties

A violation of the statute is punishable by a prison

term of up to five years, a fine of up to $250,000 for individuals and $500,000 for corporations or both. Interception of the radio portion of a cellular or cordless telephone communication is punishable by a fine of from $500 to $250,000, but not incarceration.

Anyone whose communication is illegally intercepted, disclosed or used can sue for an injunction as well as to recover either actual damages plus any profits made by the violator or statutory damages, calculated at the rate of $100 per day of violation or $10,000, whichever is greater. Punitive damages, reasonable attorney's fees and court costs are also available.

A civil action must be brought within two years of the date the person had a reasonable opportunity to discover the violation.

## FCC rules

The Federal Communications Commission has adopted regulations that prohibit the use of certain transmitting devices, including wireless microphones, to overhear or record a "private conversation" unless authorized by all parties to the conversation. A "private conversation" is not one that takes place in a public or semipublic place.

Broadcast licensees are prohibited from recording a telephone conversation for broadcast without the consent of all parties. Notification must be given that the conversation will be broadcast before it can be broadcast live or taped. Consent may be presumed, however, as with callers to a talk-radio call-in program.

The FCC also restricts the recording of long-distance telephone calls. A call can be recorded if a beep tone is used, if all parties consent or if an announcement is made at the beginning of the call that it will be recorded. Enforcement of this regulation is the responsibility of telephone companies, and it is largely unenforced.

The FCC also prohibits broadcast stations from divulging the contents of police and fire department radio transmissions, although monitoring them is legal. It is legal to intercept and divulge a radio communication that is transmitted for the use of the general public and which relates to ships, aircraft, vehicles, or persons in distress or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

Violation of these provisions may result in forfeitures, criminal fines and possible adverse action regarding a broadcaster's license.

Exhibit — 2



### GOVERNMENT OF THE DISTRICT OF COLUMBIA
### METROPOLITAN POLICE DEPARTMENT
Security Officers Management Branch

January 11, 2005

Mrs. Yolanda C. Gibson-Michaels
1717 H Street Northwest  Room H-3081
Washington, D.C.  20001

Dear Mrs. Gibson-Michaels:

This letter will confirm your conversation on December 22, 2004, with Ms. Gray, staff member of the Security Officers Management Branch.  As previously stated, researching our files Mr. Douglass Fahey is not certified or pending certification through this branch as a Private Investigator.

It should also be noted that the Security Officers Management Branch has no jurisdiction on Federal contract sites.

If you have any additional questions or concerns, please feel free to contact a staff member on (202) 671-0500.

Sincerely,

Sergeant Peter C. McGrath
Assistant Branch Manager

Exhibit - 3

(*J*-*J*514-6177 (FAx)

November 9, 2005

D.C. Wire Tap Office
Washington, D.C.

Re: **Expedited FOIA Request – Wire tap on Yolanda Gibson-Michaels**

In accordance to the Freedom of Information Act (FOIA), immediately upon request, provide a copy of:

(1) The wire tap court order secured by Douglas Fahey, contract investigator hired by the Federal Deposit Insurance Corporation (FDIC); contract by Securiguard on **April 14, 2004** and **April 15, 2004** to conduct a wire tap against Yolanda C. Gibson-Michaels on April 15, 2004.

(2) Provide a copy of all wire tap request by Douglas Fahey, contractor with securiguard for years 2003, 2004, and 2005.

(3) All copies of wire tap request by Federal Deposit Insurance Corporation against Yolanda C. Gibson-Michaels on April 14, 2004 and April 15, 2004.

(4) Provide a copy of sworn (affidavit) statement of Douglas Fahey before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.

(5) Provide a copy of sworn (affidavit) statement of an Federal Deposit Insurance Corporation (FDIC) official before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.

Send request to the attention of   Yolanda.Gibson-Michaels
                                    2210 Anvil Lane
                                    Temple Hills, Maryland  20748
                                    301 630-5062



**U.S. Department of Justice**

Criminal Division

_Office of Enforcement Operations_                              _Washington, D.C. 20530_

CRM-200501151P

Ms. Yolanda Gibson-Michaels                         DEC  8 2005
2210 Anvil Lane
Temple Hills, Maryland 20748

Dear Ms. Gibson-Michaels:

    This is in response to your request of November 9, 2005, pursuant to the Privacy Act, for access to records concerning you and the wire tap request/order described in paragraphs 1-5 of your request.

    We did not find any Criminal Division records within the scope of your request.

    If you consider this response to be a denial of your request, you have a right to an administrative appeal of this determination. Department regulations provide that such appeals must be filed within sixty days of your receipt of this letter. 28 C.F.R. 16.45. Your appeal should be addressed to: Co-Director, Office of Information and Privacy, Flag Building, Suite 570, United States Department of Justice, Washington, D.C. 20530. Both the envelope and the letter should be clearly marked with the legend "FOIA Appeal." If you exercise this right and your appeal is denied, you also have the right to seek judicial review of this action in the federal judicial district (1) in which you reside, (2) in which you have your principal place of business, (3) in which the records denied are located, or (4) for the District of Columbia. If you elect to file an appeal, please include, in your letter to the Office of Information and Privacy, the Criminal Division file number that appears above your name in this letter.

    Sincerely,

    Thomas J. McIntyre
    by KMS

Thomas J. McIntyre, Chief
Freedom of Information/Privacy Act Unit