**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YOLANDA C. GIBSON-MICHAELS | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.**1:06CV01940** |
| | ) |
| SHELA C. BAIR, et.al. | ) |
| Defendants | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT STEVE KAUFER'S**
**MOTION TO DISMISS**

COMES NOW, Yolanda C. Gibson-Michaels (prose), Plaintiff in the above-entitled

action, and files an Opposition to Defendant's Motion to Dismiss by and through Steve Kaufer's

counsel of record Harvey A. Levin, Thompson Coburn, LLP.

As ground for this Motion, and support hereof, Plaintiff states the following:

Plaintiff properly stated claims on which relief can be granted against Steve Kaufer, Co-

Founder of the Workforce Violence Institute which is well pleaded throughout Plaintiff's

complaint against all named defendants.

**I.     JURISDICTION AND VENUE**

This Court has both subject matter jurisdiction over this action and personal jurisdiction

over Plaintiffs' claims pursuant to Electronic Communication Privacy Act of 1986, Pub. L. No.

99-508, 100 Stat. 1848, Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-

351, tit. III, §§ 801–804, 82 Stat. 211, 9-7.100 Authorization of Applications for Wire, Oral, and

Electronic Interception Orders; Privacy Act, 5 U.S.C. § 552a.

## II.    DEFENDANTS' MOTION TO DISMISS IS MOOT

A motion to dismiss under Rule 12(b) (6) should be granted only if it appears beyond doubt that "no relief could be granted under any set of facts that could be proved consistent with the allegations." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50 (1989).

Courts have ruled that the issue on a motion to dismiss "is not whether . . . plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims in which all allegations within her Complaint must be taken as true. See Scheuer, 416 U.S. at 236. Plaintiffs' complaint provides sufficient information to entitle her to pursue claims against **Steve Kaufer, Co-Founder of Workforce Violence Institute** (hereafter "WVRI").

Respectfully, Defendants' Motion to Dismiss must be denied to allow Plaintiff's constitutional right to pursue her claims the discovery phase.

Plaintiff has more than sufficiently demonstrated that her claims under the Administrative Procedure Act, 5 U.S.C. § 702 et seq. ("APA"), the Fifth Amendment to the United States Constitution and her assertion of a constitutional right to privacy, all will survive.

III.    **SUMMARY BACKGROUND – NEXUS TO ESTABLISHED RELATIONSHIP BETWEEN STEVE KAUFER, DOUGLAS R. FAHEY, SECURIGUARD, USEC, AND THE FEDERAL DEPOSIT INSRUANCE CORPORATION (FDIC), ET.AL.**

Defendant Steve Kaufer is the Co-Founder of the Workplace Violence Institute and ASIS

(American Society for Industrial Security) member.  Douglas R. Fahey, Securiguard CEO

Patricia Del Marvil, USEC  CEO David Marvil are members, affiliates, and colleagues closely

affiliated with named (unlicensed) contractor Douglas R. Fahey current ASIS member.

Counsel for Defendant Steve Kaufer states on page 3 of his complaint that:

**"Nothing in the Complaint or any attachment alleges, directly or by reasonable**

**inference, that Fahey was employed by, part of or in any way associated with WVRI**

**or Mr. Kaufter"**

Plaintiff provided evidence that <u>**Douglas R. Fahey is a member, affiliate, and associate**</u>

<u>**of the ASIS**</u>.  Steve Kaufer confirmed Plaintiffs' evidence on page 2 of 3 of his own profile under

Professional Affiliations that he is a member of ASIS (American Society for Industrial Security).

Mr. Kaufer confirmed that he is nationally recognized for his research and innovative approaches

combating occupational violence.  He has advised a wide range of companies, including those in

the Fortune 100.  With over 20 years in the security industry, he provides multi-faceted solutions

to complex workplace violence issues. **(See Tab 1)**

Mr. Kaufer alleged that Plaintiff was a threat based on evidence submitted by Douglas R.

Fahey (unlicensed) contractor.  There is no doubt in a reasonable persons mind that Plaintiff

clearly <u>quoted a bible verse from a King James version of the Bible inside a closed door office</u>

which did not rise to a level of a full blown 'sting operation' against Plaintiff.

Jenekia J. Johnson named defendant confirmed by her own sworn affidavit that she

heard the bible verse plenty of times before.

Plaintiff provided evidence to Mr. Kaufer of the fact that Douglas R. Fahey was unlicensed, didn't have a court order, and that Plaintiff in fact quoted a bible verse. Steve Kaufer's own hired counsel confirmed that Plaintiff contacted Mr. Kauffer on **September 9, 2005**.

Plaintiff properly identified Steve Kaufer and all named Defendants and co-conspirators whom willfully violated Plaintiff's rights under Title VII, age, race, parental rights, defamation of character, Federal Trade Commission Act (FTA), and 18 U.S.C. code violations while acting on behalf of the FDIC and named defendant Douglas R. Fahey.

**Steve Kaufer** willfully damaged Plaintiff's 25-year Federal Civil Services reputation when he provided, relied upon the use of an illegal tape recording, accepted evidence of the illegal recording from named ASIS defendant Douglas R. Fahey former FDIC unlicensed contractor, to and including the use of personal information regarding Plaintiff's family members i.e., father's highly personal medical condition (prostate cancer) and son's handicapping condition (severely autistic with a seizure disorder) were and remains documented in a investigative report developed, created, and sent to the attention of Steve Kaufer, Co-Founder of the Violence Workforce Institute.

Mr. Kaufer accepted false information without Plaintiff's permission. Provided a damaging unprofessional psychoanalysis of Plaintiff's character with a total disregard to whether information was true or untrue.

Steve Kaufer did not have **written permission**, a release from Plaintiff or Plaintiff's family members before the release of a bogus professional opinion of Plaintiff's character. Mr. Kaufer did not attempt to contact Plaintiff regarding the collection of or disclosure of private confidential information. Mr. Kaufer did not have a court order to collect, accept, or release the investigative report, tape recording, or transcript provided to him from his ASIS colleague and friend Douglas R. Fahey.

4

The report was relied upon by the FDIC on **January 21, 2005** and **March 31, 2006** in violation of Plaintiff's age, race, parental rights, EEO retaliation, whistleblower retaliation, and in violation of 18 U.S.C. – Section 119 which has strict guidelines; and requirements before the release, collection, and disclosures of the unlawful interception of an individuals oral communication without a Court order.

ASIS members **Douglas R. Fahey** and **Steve C. Kaufer** both engaged into unprofessional, conspired, atrocious acts of professional negligence. Mr. Kaufer is nationally known and recognized with well over 20 years of experience. Thus, his words, reports, personal opinions requires that he exercises a **higher standard of care**, **duty**, and **responsibility** with the release of his reports (**psychoanalysis**), and whether or not reports are accurate and true. Mr. Kaufer intentionally and willfully breached his professional standard of duty and care.

It is indisputable that Plaintiff quoted a bible verse to a 25-year old intern involved in a Federal Theft inside a closed door office. Thus, Plaintiff established that she had a reasonable expectation of privacy. Privacy ignored by Steve Kaufer.

Due to Steve Kaufer's unprofessional willful negligence, defamation of Plaintiff's character, and the release of his report to the FDIC and Douglas Fahey (unlicensed), she is now a victim of hatred, ridiculed, and labeled as a threat.

The Federal Deposit Insurance Corporation (FDIC) contracted with Steve Kaufer as a consultant, to design and administer its in-house workforce violence programs. Steve Kaufer was negligent in his consultation, opinions, comments, psychoanalysis of Plaintiff. FDIC with the use of Steve Kaufer's false report labeled Plaintiff as a threat because she quoted a bible verse inside a closed door office individually to interns involved in a Federal Theft of money.

Plaintiff is now innocently caught between two alleged thieves due to the defamation of her character by Steve Kauffer, Douglas R. Fahey, and FDIC.

Douglas R. Fahey provided Steve Kaufer with a false illegal investigative interview report and both Kaufer and Fahey co-conspired with FDIC officials in violations of Plaintiffs constitutional, civil liberties, Title VII, race, age, parental rights, and defamation of Plaintiff's character.

ASIS members Douglas R. Fahey and Steve Kaufer both willfully breached articles of the ASIS Code of Ethics. Douglas Fahey PCI engaged into unjust enrichment as a direct result of willful violations of Plaintiff's civil and constitutional liberties.

**Federal Privacy Laws** - The basic federal protection for the privacy of electronic communications is found in the Electronic Communication Privacy Act (ECPA), which encompasses federal wiretapping laws and federal laws prohibiting unauthorized access to communications in electronic storage. Under these federal statutes it is unlawful for anyone, including an employer, to intentionally intercept the content of a wire, oral or electronic communication.

**State Wiretapping Statutes Also Apply to Employer Monitoring** - Douglas Fahey, ASIS member ignored the law which states, in part, that: "When electronic monitoring reveals "private" employee communications stop the monitoring and obtain legal advice before continuing to monitor.

ASIS members Douglas R. Fahey and Steve C. Kaufer willfully engaged into despicable professional misconduct.

Therefore, in summary, WVRI is liable to Plaintiff.

IV.    **Corporate Liability: Sharing the Blame for Workforce Violence by Steve Kaufer, CCP**

Steve Kaufer by his own written article confirmed that he is in fact liable to Plaintiff by and through his own negligence of willful Professional liability.  Steve Kaufer clearly stated by his own writing that: **"Professional liability claims arise from a contracted serve, rather than a product or operation.   If the insured's (Workforce Violence Institute) business is providing a professional service coverage would be under a professional liability policy. Directors and Officers liability is also included in this resource area." (See Tab2)**

Steve Kaufer's, counsel of record, Attorney Harvey A. Levin, confirmed that Plaintiff contacted Mr. Kaufer <u>on September 9, 2005</u> by his own Motion to Dismiss.

<u>See Page 2 of Defendant Steve Kauffer's Motion to dismiss which reads, in part, that</u>:

> **"Steve Kaufer, CEO, Work Violence Research Institute, 1281 North Gene Autry Trail-Suite K, Palm Springs, CA  92262. Plaintiff contacted Steve Kaufer at or around 1:25pm on September 9, 2005, Mr. Kauffer stated that Work Violence Research Institute has 'relations' with the FDIC. He stated he needed to contact the FDIC. Plaintiff requested, and Steve Kaufer provided his fax number.  Plaintiff provided evidence ignored by Steve Kaufer and FDIC on <u>January 19, 2006</u> that Douglas R. Fahey was not authorized to engage into an unauthorized interception of oral communications.  Steve Kaufer was no-responsive.  Mr. Kaufer received, accepted, and provided controversial inflammatory, derogatory, degrading investigative report, comments, notes provided by an unlicensed investigator Douglas R. Fahey(Acting Under the Color of Law)."**

7

First Circuit Court of Appeals reversed a dismissal of a similar case stating that an investigative report would tend to hold [her] up to scorn, hatred, ridicule or contempt, in the minds of [a] considerable and respectable segment in the community. A reasonable reader could believe behavior described.   Thus, Steve Kaufer's report on behalf of is colleague Douglas R. Fahey and the FDIC describes Plaintiff as a threat, that Plaintiff poses a veil of threat.

Plaintiff is well known and featured throughout the FDIC community within its newsletters.  Plaintiff's reputation has been intentionally ruined by Steve Kaufer's defamatory report in support of his ASIS colleague friend Douglas R. Fahey by his written opinion as a nationally known highly respected consultant, researcher with 20 years of experience throughout the nation, Fortune 100 and throughout private and corporate America.

Defendants wish to exclude Plaintiff from constitutional protection on the basis that the various precedental decisions analyzing the existence of liberty interests do so primarily in the context of employment cases. See e.g., Roth, 408 U.S. 564; Codd v. Velger, 429 U.S.624 (1977); Doe, 753 F.2d 1092. It is true that the majority of liberty interest cases involve individuals already employed, but there is nothing within the Constitution or the case law that has arisen there from that creates the unnatural schism sought by the defendants. "In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed." Bolling v. Sharpe, 347 U.S. 497, 499-500; Roth, 408 U.S. at 572.

Plaintiff is entitled to due process and make whole remedies to correct damages to her reputation, future job offers in the wake of allegations that Defendants lied, falsely accused and portrayed Plaintiff as a "Threat" See Reeve Aleutian Airways, Inc. v. United States et al., 982 F.2d 594, 598 (D.C.Cir. 1993).

The law is clear that Plaintiff has a liberty interests when an individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, threats, alcoholism, disloyalty, Communism or subversive acts or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities.

Defendant, Steve Kaufer by and through his actions maliciously with intent labeled Plaintiff as a "threat" tarnished Plaintiffs former outstanding career, good name, reputation, honor and integrity when he subjective Plaintiff to a bogus investigative interview, made false statements while acting under the color of law.

**Courts have ruled that liability for negligence takes place when there is**:

1. A duty or obligation or care which requires a certain standard of conduct;

2. A failure to conform to that standard of conduct;

3. A reasonable causal connection between the failure to conform to that standard of conduct and

4. An actual loss or injury.

Plaintiff has established that Steve Kaufer is negligent to and including confirmation from Mr. Kaufer's own lawyer that Plaintiff provided evidence to Mr. Kaufer on **January 19, 2006** that his ASIS colleague Douglas R. Fahey was unlicensed and didn't have a court order. Mr. Kaufer has ample time to retract his report. Mr. Kaufer did not retract his report, apologize to Plaintiff, or Plaintiff's family members.

## V.    ARGUMENT

"**A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted.**" Doe v. United States Dept. of Justice, 753 F.2d 1092, 1102 (D.C.Cir. 1985).

For the purposes of such a motion, the facts alleged in the complaint must be accepted as true, and all factual inferences, ambiguities or doubts concerning the sufficiency of a claim are to be drawn in the plaintiff's favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1979) 753 F.2d at 1102.

The plaintiffs' prospects for retirement, employment, and reinstatement into the Federal Government after 25 years of sustained outstanding Federal services since 1981 have been irreparably harmed because of the defendants' malicious and outrageous conduct and actions while falsely acting under the color of law. Defendants' tactics were Orwellian in nature, unconstitutional, impermissible by statute and not in accordance to the rules of law.

## VI.    DUE PROCESS CLAUSE

The Due Process Clause of the Fifth Amendment forbids the federal government from depriving persons of "life, liberty, or property, without due process of law." "'Liberty' and 'property' are broad and majestic terms. They are among the '[g]reat [constitutional] concepts ... purposely left to gather meaning from experience....[T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged." Board of Regents v. Roth, 408 U.S. 564, 571 (1971).

The types of 'liberty' and 'property' protected by the Due Process Clause vary widely, and what may be required under that Clause in dealing with one set of interests which it protects may not be required in dealing with another set of interests." Arnett et al. v. Kennedy et al., 416 U.S. 134, 155 (1974).

The Supreme Court has emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government and private parties." County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 1716 (1998)(citation omitted). See also Collins v. Harker Heights, 503 U.S. 115, 126 (1992)(noting that the Due Process Clause was intended to prevent government officials "'from abusing [their] power, or employing it as an instrument of oppression'")(citation omitted). This is so "whether the fault lies in a denial of fundamental procedural fairness" or "in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." See Lewis, 118 S.Ct. at 1716.

\O

The Supreme Court's decision in Jenkins v. McKeithen, 395 U.S. 411 (1969) recognized that the public branding of an individual implicates either "liberty" or "property" interests, or that neither can be achieved by the government without following certain procedural safeguards to ensure the elimination of arbitrary or capricious actions.

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to her by use of a 3rd party contractor, notice and an opportunity to be heard are essential." Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).

The language above stems from the evolution centuries of holdings from our nation's highest court. The defendants would have this Court unjustly destroy the development of constitutional protections for individuals who have sought to do nothing more than devote their loyalties and service to the federal government. The defendants wish for this Court to isolate named defendants and rule that constitutional safeguards does not exist or apply to Plaintiff.

Under the defendants' theory, she is not worthy of protection as a prose litigant, Federal employee, individual, afro-American in violation of her age, race, and religion as were slaves prior to the Emancipation Proclamation in 1863. As such, she has no Fifth Amendment protection from the government and named defendants stripping away her liberty interests by branding her as "Threat" based on an innocent quotation of a bible verse from the King James Bible inside a 'closed-door' office.

Defendant Steve Kaufer imposed a stigma upon Plaintiff that will foreclose future employment opportunities by having placed derogatory information regarding the investigative interview, interception of Plaintiff's oral communication, privacy, unauthorized released of intercepted communication ('tape recording') to Douglas R. Fahey (3rd party contractor).

11

The Supreme Court decisions concerning the constitutional prohibition against government defamation to and including by third parties (contractors) does not alter or extinguish a right or status previously recognized by state law," id, citing Paul, 424 U.S. at 711, and the "government ['s] action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity." See Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 898 (1961). See also Carmi v. Metropolitan St. Louis Sewer District, 620 F.2d 672 (8th Cir)

The factual distinction between an employee and an applicant is irrelevant for the purposes of determining a constitutional liberty interest based on the analysis of the Supreme Court's guidance in Codd, Bishop and Roth.

Plaintiff established that she has proven impairment of a liberty interest by named defendant's false statements with the filing of evidence in the original complaint. See Codd, 429 U.S. at 627-28, and that the Defendant (unlicensed) and unauthorized collection of evidence, investigative interview, interception of oral communication were made public, thus harming by deprivation of property right, denied due process, good name, reputation, honor, and integrity of Plaintiff. See Bishop, 426 U.S. at 348.

Both requirements have been met by the plaintiffs, as detailed throughout her pleadings. Moreover, the D.C. Circuit has outright recognized the "right of a federal job applicant to seek injunctive relief from an agency's violation of his constitutional rights in general." Hubbard v. U.S. E.P.A. Admin., 809 F.2d 1, 11 (D.C.Cir. 1986).

Subsequently, defendants' acting by his own authority contradicts their argument. See Dziewior v. City of Marengo, 715 F.Supp. 1416, 1423 (N.D.Ill 1989)(noting Seventh Circuit in Perry, 759 F.2d 1271, 1276-82 (7th Cir. 1985) recognized liberty interests have been extended to applicants for governmental employment). The remaining cases cited by the defendants set forth the standards for determining whether a liberty interest has been violated, not whether the right exists.

This Court should explicitly hold that applicants possess Fifth Amendment liberty interest protections.

In its most recent pronouncement, the D.C. Court of Appeals has held that deprivation of a protected liberty interest may be shown either through an adverse employment action in "conjunction" with official defamation ("defamation plus) See O'Donnell v. Barry, 148 F.3d 1126, 1143-44 (D.C. Cir. 1998), citing Kartseva v. Department of State, 37 F.3d 1524, 1527-29 (D.C.Cir.1994).

Liberty interests arise if an employee is terminated in a manner that 'stigmatizes' them by impugning their reputations or foreclosing their future employment opportunities," Orange v. District of Columbia, 59 F.3d 1267, 1274 (D.C.Cir. 1995), citing Roth, 408 U.S. at 572-73, or, as explained above, when an applicant is denied employment. See e.g., Larry v. Lawler, 605 F.2d 954, 956 (7th Cir. 1978); Velger v. Cawley, 525 F.2d 334, 336 (2d Cir. 1975), rev'd on other grounds sub nom, Codd v. Velger, 429 U.S. 624 (1977); United States Civil Serv. Com'n, 483 F.Supp. at 570-71.

Plaintiffs established that she suffered the loss of a 25 year sustained outstanding Federal Government career, critical health benefits for her severely autistic son with a seizure disorder, future income, and loss of prospective Federal or private employment due to the defendant's malicious and defamatory allegations that she caused a "Feeling of Threat" or a "Veil of Threat" See Mosrie v. Barry, 718 F.2d 1151, 1161-62 (D.C.Cir. 1983).

First, it is indisputable the defamation originated from defendant Steve Kaufer's bogus psychoanalysis report against Plaintiff's character.

13

Second, there must be a tangible change of status vis-a-vis the government as a result of the stigma. Since the plaintiffs had her employment offers rescinded to and including suffered an involuntary removal from the Federal Government amid allegations of misconduct (i.e., Quotation of a Bible verse) she has been barred from the FDIC, picture has been placed inside a red security book with orders "DO NOT ENTER", embarrassed, ridiculed, shamed and precluded from re-employment with the FDIC and throughout the Federal Government had it not been for Steve Kaufer's report, findings, and professional nationally known defamation of Plaintiff's character.

Plaintiff's age, race and the inflammatory malicious defamatory label of causing or being a 'Threat' or 'Veil of Threat' as labeled by Steve Kaufer and other named defendants unorthodox investigative interview caused Plaintiff to not overcome the stigma placed upon her but for the willful actions of named Defendant Steve Kaufer and Douglas R. Fahey. Thus, tangible changes of status clearly exist, and the plaintiffs' allegations meet the standards set by this Court.

[T]he principal recent cases from this court in which a government-imposed stigma by its actions or actions of its agents or contractors it was found to have deprived the stigmatized person of a liberty interest involved either loss of employment or foreclosure of a right to be considered for government contracts in common with all other purposes. See Mosrie, 718 F.2d at 1161.

This alone permits the plaintiff to defeat the Defendant's Motion to Dismiss her liberty interest claim. The plaintiffs have clearly asserted that the stigmatizing fact of being labeled as a threat has mentally, physical, and spiritually caused severe damages to Plaintiff.

It does not require Einsteinium intelligence or even a stretch of the imagination to recognize the stigmatizing nature of an applicant failing a required Federal background investigative clearance examination, especially when failure is tantamount to an accusation of being a "Threat" in the workforce which clearly creates an "overwhelming potential for prejudice". Brown v. Darcy, 783 F.2d 1389, 1396 (9th Cir. 1986).

14

Defendant's collection and release of a private intercepted conversation conveyed false impressions among her former colleagues at the Federal Deposit Insurance Corporation (FDIC).

It is well noted that Plaintiff is feature throughout newsletters among the FDICs main office locations and regional offices as an outstanding employee.

For the purpose of this Motion, the Court must accept these allegations as true. Thus, the conclusory contradictory assertions of the defendants have absolutely no weight.

A threat is defined as "an expression of intention to inflict evil, injury, or damage" A personal discussion of Plaintiff's private life, a quote from the Bible in which <u>defendant Johnson confirmed she heard plenty of times before</u> did not give rise to defendant Steve Kaufer unprofessional opinion that Plaintiff presented a threat or veil of threat.

Defendants should not be permitted to redefine common concepts or words simply to suit its personal and financial interests. The meaning of being label as a 'threat' has been established in an investigative report, tape recorded, disseminated to other 3rd party contractor's i.e, Steve Kaufer CEO of the Workforce Violence Institute, colleague, and associate of Douglas R. Fahey whom are both members of the ASIS Institute.

Plaintiff has presented that these are all factual issues that are totally inappropriate to resolve in an initial <u>Motion to Dismiss,</u> especially before any discovery has taken place or a hearing before the district court. Therefore, the defendants' motion to dismiss is meaningless.

Defendant's argument is both legally and factually inaccurate on its face.        The Complaint clearly details the stigmatization that has taken place to foreclose employment opportunities against plaintiff with being labeled as a threat.

Plaintiff's complaint has set for several claims sufficient to defeat the defendant's Motion to Dismiss. See Kartseva, 37 F.3d 1524 (D.C.Cir. 1994); See also Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1506 (D.C.Cir. 1995).

/5

The concept of liberty protected by the due process clause has long included occupational liberty - 'the liberty to follow a trade, profession, or other calling.'" Wroblewski v. City of Washburn, 965 F.2d 452, 455 (7th Cir. 1992). Protected liberty interests are implicated "'where government or private contractor's action has operated to bestow [stigma] with an attendant foreclosure from other employment opportunity.'"

The D.C. Circuit endorsed a plaintiff's right to demonstrate to the Court, obviously after discovery, to what extent the stigmatizing reasons for discharge have been conveyed to the public or other government agencies and harmed future employment opportunities.

The public disclosure requirement is met because the defendants have caused Plaintiff to be labeled as a threat, barred from the FDIC, Federal employment; and caused negative defamatory information to be placed within the plaintiffs' employment files; and stored within an electronic database. Plaintiff federal personnel files are available, even on a limited basis, to prospective employers or government officials.

It should be noted that in advancing defenses to a Fifth Amendment argument defendants intentionally omitted a challenge to the plaintiffs' assertions that the defendants will continue to disclose results of the investigative interview to 3rd party security agencies, workforce violence institute, and throughout the FDIC community. See Fed.R.Civ.Proc.R.12(g). In any event, the law is clear that the publication requirement is satisfied due to the fact that the defendants have placed the information within the plaintiffs' files. See e.g. Kartseva, 37 F.3d at 1528 (availability of unfavorable information to future potential government employers constitutes status change of due process import).

16

## VII. **PLAINTIFF IS ENTITLED TO DISCOVERY**

Plaintiff has sufficiently demonstrated that the defendants' Motion to Dismiss should be denied, this Court should permit Plaintiff the opportunity to immediately commence discovery. Courts addressing the type of case set forth herein permit plaintiffs to commence discovery as a routine matter. See e.g., O'Donnell, 148 F.3d at 1139; Orange, 59 F.3d at 1275; Kartseva, 37 F.3d at 1530.

Furthermore, because most of the evidence relating to the plaintiffs' claims are "likely to be exclusively in the possession of the government, it would seem appropriate to accord [plaintiffs] the discovery necessary to this issue." Britt v. Naval Investigative Service, 886 F.2d 544, 551 (3d Cir. 1989).

**Wherefore**, Plaintiff has met standards for a decision against a decision under RULE 12(b)(6), MOTION TO DISMISS. It is this Plaintiff's understanding that courts do not in general favor Rule 12(b)(6) MOTIONS TO DISMISS, because the policy of the federal rules is to allow cases to proceed if there is any reasonable chance that the plaintiff is entitled to relief. Thus, the federal courts require the defendants' to make a very strong showing before a complaint may be dismissed for failure to state a claim.

**Wherefore**, a MOTION TO DISMISS, Rule 12(b)(6) motion tests whether, based only on what is said in the complaint, the plaintiff possibly could be entitled to relief. Courts do not determine whether the facts Plaintiff states are true, but instead assume the truth of Plaintiff's factual statements and decide whether Plaintiff may have a claim that could lead to relief.

**Wherefore**, the Ninth Circuit recently stated, when reviewing a Rule 12(b)(6) motion, a federal court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party." See, WARSHAW vs. XOMA, 74 F.3d 955, 957 (9th Cir. 1996).

17

**Wherefore**, Courts should not dismiss a pro se pleading unless it is absolutely clear that the deficiencies in the pleading cannot be cured by amendment. See, KARIM-PANAHI vs. LOS ANGELES POLICE DEPT., 839 F.2d 621 (9th Cir. 1988).   DETERMINING SUFFICIENCY OF COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE RULE 12(b)(6), MOTION TO DISMISS.

**Wherefore**, to survive a MOTION TO DISMISS under Fed. R. Civ. P. 12(b)(6), a complaint need only outline a recognized legal or equitable claim which sufficiently pinpoints the **TIME**, **PLACE**, and **CIRCUMSTANCES** of the alleged occurrence and which, if proven, will justify some form of relief. See, DOROTHY K. WINSTON & CO. vs. TOWN HEIGHTS DEVELOPMENT INC., 376 F. Supp. 1214 (D. DC 1974) later proceeding 68 FRD 431, 21 FR Serv2d 100 (D. DC 1975)

**Whereas**, Plaintiffs has demonstrated that she is legally entitled to proceed with her complaint before this Honorable Court for its consideration prior to any final judgment being issued.

Respectfully submitted,

_____
Yolanda C. Gibson-Michaels (prose)
2210 Anvil Lane
Temple Hills, Maryland  20748
(301) 630-5062

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th **day of January 2007**, a copy of the foregoing

Plaintiffs' Opposition to Defendants' Motion to Dismiss was filed with the U.S. District Court,

faxed and mailed to named defendants:

Copies to:

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, N.W. – Suite 600
Washington, DC 20006

David Zachary Kaufman, Esq.                     Scott D. Helsel (D
Kaufman Law Firm, A Professional Corporation    Walton & Adams, PC
11350 Random Hills Road – Suite 800             1924 Isaac Newton Square
Fairfax, Virginia 22030                         Reston, Virginia 20190
Counsel for Defendants Securiguard, Inc.
  and USEC Corporation

Shelia C. Bair
Federal Deposit Insurance Corporaiton (FDIC)
550 17th Street, N.W. MB-6029
Washington, D.C. 20429

Kathleen Gunning, Counsel and Tina Lamoreaux, Counsel
Federal Deposit Insurance Corporation (FDIC)
3501 North Fairfax Drive
Arlington, Virginia

 Jenekia J. Johnson, Prose Defendant
1414 Colony Road
Oxon Hill, Maryland 20748

Steve Kaufer
3716 Dalebrook Drive
Dumfries, Virginia 22015-1804

19

Patricia Del Marvil
Chairman CEO
Securiguard Incorporation
6858 Old Dominion Drive – Suite 307
McLean, Virginia 22101

David L. Marvil
Chairman CEO
USEC Corporation
7531 Leesburg Pike – Suite 402
Falls Church, Virginia 22101

Robert Feldman, Executive Secretary
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YOLANDA C. GIBSON-MICHAELS<br>Plaintiff, | )<br>)<br>) |
| v. | ) Civil Action No.1:06CV01940<br>) |
| SHELA C. BAIR, et.al.<br>Defendants | )<br>)<br>) |

## ORDER

It is upon consideration of **PLAINTIFFS' OPPOSITION TO DEFENDANT**

**STEVE KAUFER'S MOTION TO DISMISS** is hereby by <u>**Granted**</u> on this _____ day of

_____, 2006.

It is further, ORDERED, that Defendant's Motion to Dismiss is **DENIED**.

_____
Judge

<u>**Copies to:**</u>

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, N.W. – Suite 600
Washington, DC 20006

David Zachary Kaufman, Esq.                     Scott D. Helsel (D
Kaufman Law Firm, A Professional Corporation    Walton & Adams, PC
11350 Random Hills Road – Suite 800             1924 Isaac Newton Square
Fairfax, Virginia 22030                         Reston, Virginia 20190
Counsel for Defendants Securiguard, Inc.
  and USEC Corporation

Shelia C. Bair
Federal Deposit Insurance Corporation (FDIC)
550 17th Street, N.W. MB-6029
Washington, D.C. 20429

Kathleen Gunning, Counsel and Tina Lamoreaux, Counsel
Federal Deposit Insurance Corporation (FDIC)
3501 North Fairfax Drive
Arlington, Virginia

Jenekia J. Johnson, Prose Defendant
1414 Colony Road
Oxon Hill, Maryland  20748

Steve Kaufer
3716 Dalebrook Drive
Dumfries, Virginia  22015-1804

Patricia Del Marvil
Chairman CEO
Securiguard Incorporation
6858 Old Dominion Drive – Suite 307
McLean, Virginia  22101

David L. Marvil
Chairman CEO
USEC Corporation
7531 Leesburg Pike – Suite 402
Falls Church, Virginia  22101

Robert Feldman, Executive Secretary
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C.  20429

TAB 1








# WORKPLACE VIOLENCE RESEARCH INSTITUTE
1281 NORTH GENE AUTRY TRAIL, SUITE K, PALM SPRINGS, CA 92262
EMAIL: WRKVIOLENC@AOL.COM                    760.416.1476 OR 800.230.7302
WEBSITE: WWW.WORKVIOLENCE.COM                FAX 760.325.3785 OR 888.486.8996

**CONTACT US**    **WHO WE ARE**    **REFERENCES**    **RESOURCE MATERIALS**    **SERVICES**    **ARTICLES**

Contact Us
**Who We Are**
Services
References
Resource
Materials
Articles



Premises
Security and
Liability Manual

# WHO WE ARE

## Jurg W. Mattman, CPP
Co-Founder and Executive Director



**Services:**
Design and implementation of workplace violence prevention programs for private and public organizations. Administration of program related Confidential Information Collection and Evaluation Center. Management seminars on occupational violence prevention and employee workshops on symptom recognition and information collection procedures. Frequent guest speaker at conventions and professional meetings.

**Environments Served:**
Domestic and foreign corporations, partnerships, and privately owned businesses. City, county and federal government departments and agencies. Associations and promoters of sporting and other entertainment events.

**Experience:**
Mr. Mattman is one of the nation's leading experts on occupational violence. He has consulted on the subject of workplace violence prevention with businesses and public agencies over the past 15 years and has designed the violence prevention programs now in effect in many of America's corporations. Mr. Mattman co-authored *The Complete Workplace Violence Prevention Manual* which has become the standard for occupational violence prevention programs throughout the United States and Canada He also co-authored and co-edited *Premises Security and Liability... A Comprehensive Guide from the Experts*.

Mr. Mattman, a former federal agent with the United States Secret Services and the Department of Justice, has 18 years of international law enforcement experience in presidential

TAB 2



**WORKPLACE VIOLENCE RESEARCH INSTITUTE**
1281 NORTH GENE AUTRY TRAIL, SUITE K, PALM SPRINGS, CA 92262
EMAIL: WRKVIOLENC@AOL.COM                              760.416.1476 OR 800.230.7302
WEBSITE: WWW.WORKVIOLENCE.COM                   FAX 760.325.3785 OR 888.486.8996

     

CONTACT US    WHO WE ARE    REFERENCES    RESOURCE MATERIALS    SERVICES    ARTICLES

Contact Us
Who We Are
Services
References
Resource
Materials
Articles



Premises
Security and
Liability Manual

# ARTICLES

## Corporate Liability: Sharing The Blame for Workplace Violence

by Steve Kaufer, CPP

A furniture store advertised for a delivery man, then hired a large, muscular man whose application indicated a history of delivering furniture. The store hired him without checking the information on his application. Later, the man raped a customer in her home when he came to deliver furniture. The woman sued the store, charging negligent hiring because it failed to check out the man's past. Had it checked, it would have found that the man was fired from his last delivery job because he made suggestive remarks to a female customer. And, he was fired from the job before that because he touched a female customer in an inappropriate manner. Those incidents would have sent up a red flag had the last store owner taken the time to look.

Change the scenario a bit. Consider that the store hired the man, then received complaints about him. But the store owner decided to keep him on despite the fact that a problem might be brewing. The man later attacked the customer in her home. The store would then be open to a negligent retention lawsuit. In either case, the customer would likely win a huge award.

### LEGAL CONSEQUENCES

Negligent hiring and negligent retention are fodder for lawsuits when store management fails to screen the applicants it employs. The difference between the two is in the time the employer becomes aware that the employee is unfit for the job.

These kinds of cases have legal precedents dating back to 1911, while most such tort cases filed since the early 1980s have resulted in an average out-of-court settlement of $500,000 and a $3 million jury verdict, according to a 1993 study by liability expert Norman D. Bates.

Negligent hiring occurs when, prior to hiring, the employer knew or should have known that a particular applicant was not fit for the job. Failure to adequately screen applicants results in a liability for the employer. Negligent retention occurs when an employer becomes aware of an employee's unsuitability - or should be aware of it - and fails to act on that knowledge.

At least two other theories of law may become involved. They are "respondeat superior" and "negligent entrustment." Respondeat superior is the notion that a master/servant relationship exists between the employer and the employee, in which the employer may become liable for the behavior of the an employee acting as the employer's agent. Negligent entrustment is particularly pointed at guard firms. It generally involves the improper use of a weapon. The plaintiff must prove that the employer knew the employee or officer was incompetent or inexperienced in the use of the weapon, but failed to provide training to offset the employee's lack of knowledge.

A business may face challenges from more than one of these theories if involved in litigation.

Unlike the theory of respondeat superior, negligent hiring and retention allows the employer to be held liable for actions of employees outside the scope of their duties. It is only necessary to prove that the employer was negligent in hiring and retention practices.

Hiring and retention suits are not limited to employees who injure customers. Violence against fellow employees may also result in litigation. While such violence by a disgruntled worker may be viewed as a random, unpreventable act, the employer's failure to foresee the potential of that act may be called into play in a lawsuit. According to "Duty of Care Standards," an employer has a responsibility to provide a safe work environment.

In the landmark case *Tarasoff v. Regent of University of California* in 1976, the court identified the factors necessary for Duty of Care Standards to apply. These include: (1) foreseeability of harm; (2) connection between the incident and the injury sustained; (3) degree of injury; (4) blame attached to the defendant's conduct; and (5) policy of preventing future harm.

Foreseeability - an employer's knowledge of the potential for threats of violence - is an integral part of the organization's duty to protect. Conversely, the random killing of 21 customers at a McDonald's restaurant in the San Diego, Calif., area was held by the court in *Lopes v. McDonald's* (1987) to be the homicidal acts of a "maniacal suicidal person" and not foreseeable.

In an early negligent retention case, *Carr v. William Crowell Co.* (1946), the court ruled that the employer would be held responsible for another employee's intentional action that arose from the workplace. An employee attacked another worker with a hammer, an act the court ruled was not "personal" malice, because the victim and attacker were strangers outside of work. The court said the injury was a result of the employment.

## WARNING SIGNALS

Another landmark case in negligent hiring came in 1979 with a $750,000 award against Avis Rent-Car. Avis management failed to check the application of a man before hiring him. The employee subsequently raped a co-worker. Had Avis checked, it would have discovered that during the time the applicant listed as being in high school and college, he was actually serving a three-year prison sentence on a robbery conviction.

In another case, an Amtrak employee shot and seriously wounded his supervisor. The court awarded the supervisor $3.5 million from Amtrak. The action, *Smith v. Amtrak* (1987), was brought because of Amtrak's alleged failure to discipline the employee for previous action that indicated violent tendencies. Because the employee had attacked other employees, the court ruled that violence was foreseeable and held Amtrak responsible for negligent retention.

Negligent hiring and retention can also affect companies that contract for work independently. Generally, the company that hires a contractor such as a guard company is not liable for the contractor's acts.

But at least two exceptions exist. (1) The duties are inherently dangerous and cannot be delegated to independent contractors to relieve liability, and (2) intentional torts are not delegatable.

In *Dupree v. Piggly Wiggly* (1976), the court ruled that security work was not inherently dangerous but dependent on either the firm knowing it was dangerous or whether a "reasonably prudent man" would judge it so.

However, a case in which a guard company was held liable stemmed from the firing of an employee of Connor Peripherals of San Jose, Calif. The company notified the contract guards that the employee was not allowed back on the premises. The following day, the former employee returned through a normally secured entrance to the parking lot and shot a company executive in the back, permanently disabling him. According to testimony, guards had been advised of the ex-employee's presence on two occasions, but failed to remove him.

The award against the contract guard firm was $5.2 million.

While the defendant was the guard company, the company
employing the guard firm also could have been named in
litigation. This case shows the danger of the appearance of a
failure to take action and the extreme importance of
responding to warning signs and reports of threats from
current or former employees.

Increasingly, guard companies are being hit with lawsuits
based on negligent appointment, retention, assignment,
entrustment, the failure to train and supervise, and the failure
to detect.

### SELF-POLICING PROGRAM

To prove negligent hiring or retention, the plaintiff must prove
five factors:

1. The existence of an employment relationship.
2. The employee's incompetence.
3. The employer's actual or constructive knowledge of such
   incompetence.
4. The employee's act or omission causing the plaintiff's
   injuries.
5. The employer's negligence in hiring or retaining the
   employee as the proximate cause of the plaintiff's
   injuries.

A new federal law has increased employer liability for criminal
acts of employees. While it may have limited applicability in
workplace violence actions, the sentencing guidelines for
organizational defendants adopted by the U.S. Sentencing
Commission became law on Nov. 1, 1991. Aimed primarily at
environment regulation violations and fraud issues, it may be
used as a creative method of assessing liability in negligence
cases involving violent actions by employees that result in
serious injury or death.

Without proper self-policing, known in legal circles as
"corporate compliance," criminal charges as well as fines can
be levied against corporations and their officers. The
commission states in an application note that an "effective
program to prevent and detect violations of the law" means
that a program has been reasonably designed, implemented
and enforced so that it generally will be effective in preventing
and detecting criminal conduct.

The hallmark of an effective program is that the organization
exercises due diligence in seeking to prevent and detect
criminal conduct by its employees and other agents. Juries will
find corporations guilty of criminal conduct if the organization
knew or should have known of its employees' criminal intent.

On the other hand, an employer with a corporate compliance

program in place is in a better position to defend itself against
a lawsuit or criminal action by its employee.

## CORPORATE INITIATIVES

The court relies on at least seven factors in determining
whether a corporation tried to prevent and detect criminal
action by its employees. Among the questions to be answered
are:

1. Does the organization have policies defining the
   standards and procedures to be followed by its agents
   and employees?
2. Has a specific high-level person within the organization
   been designated and assigned overall responsibility to
   oversee compliance with those standards and
   procedures?
3. Has the organization used due care not to delegate
   significant discretionary authority to persons whom the
   organization knew, or should have known, had a
   propensity to engage in illegal activities?
4. Has the organization effectively communicated its
   standards and procedures to its agents and employees,
   e.g., by requiring participation in training programs and
   by disseminating pamphlets and handbooks?
5. Has the organization taken reasonable steps to achieve
   compliance with its standards, e.g., by utilizing
   monitoring and auditing systems designed to ferret out
   criminal conduct by its agents and employees and by
   having in place and publicizing a reporting system
   whereby agents and employees can report criminal
   conduct within the organization without fear of
   retribution?
6. Have appropriate standards been enforced consistently
   through appropriate disciplinary mechanisms?
7. After an offense was detected, did the organization take
   all reasonable steps to prevent further similar offenses?
   Such steps include any necessary modifications to the
   organization's program to prevent and detect the
   violations of law and appropriate discipline of individuals
   responsible for the failure to detect the offense.

The court may also consider the size of the organization in
determining whether it did its job in preventing workplace
violence, including its history and practices.

Moreover, employers have a responsibility to maintain an
environment safe from outside forces. In 1987 it was estimated
that some 1,600 people are murdered each year while at work.
Various studies reveal that certain industries are more prone to
violence than others. High-risk businesses include convenience
stores, restaurants and bars, service stations, taxi services,
and hotels, motels or inns. Mortality figures in these
occupations are higher than in police work, studies show.

Hospitals are also at risk, particularly from violence carried out by gang members.

Women are increasingly at risk. While comprising 43 percent of the workforce, women account for 53 percent of workplace homicides, according to a 1987 study. Many women work in the retail industry, which has the highest homicide rate, primarily from robberies.

While duty to protect is a broad concept, it stems from the belief that an employee is entitled to a safe environment. In a negligence case against an employer, the plaintiff must show that the employer had a duty, that it was breached and that the breach resulted in harm.

To avoid the problems that stem from negligent hiring, retention and failure to protect the workplace, employers must use every advantage afforded them. Screen all applicants with every means available. When a potential problem arises, seriously consider whether or not to retain that individual. An finally, make certain proper security methods are in place to provide a safe work environment.

Previous Article | **Main Articles Page** | Next Article
Download article in PDF format

Home | Back to Top
Contact Us | Who We Are | Services
References | Resource Materials | **Articles**

© 2001 Workplace Violence Research Institute
All rights reserved. Do not duplicate or redistribute in any form.

Security concerns follow investigation
Page 7 of 10
Case 1:06-cv-01940-RMU    Document 24-2    Filed 01/18/2007    Page 10 of 11

- E-mail

Font:

- *
- *
- *
- *

**Glenn Bohn, Vancouver Sun**

Published: Saturday, June 03, 2006

Darcy Kernaghan, president and chief executive officer of Securiguard, is also the chairman of the Association of Professional Security Agencies, the lobby group that represents private security agencies in B.C.

In an interview this week, Kernaghan confirmed his company and others are disputing the tickets.

Kernaghan said the audit finding that 75 per cent of the new employees were unlicensed is "absolutely shocking" and simply not true.

"There are no companies that are putting people out unlicensed," he said. "It's just not happening."

Neither Kernaghan nor a government official would discuss specifics of the alleged offences that triggered so many tickets, so it's not clear if the government is alleging that unlicensed employees were actually out in public doing security patrols, or whether the investigation uncovered unlicensed employees with criminal records.

Kernaghan would only say the tickets issued against Securiguard involve allegations that are not factually accurate.

"We would have paid the tickets immediately if we thought they had any validity to them, but we're challenging them," he said. "I really can't discuss the details because they're before the courts, but they're like a traffic ticket, issued by the inspectors that are constantly checking on our people and every company."

Kernaghan, who sits on a security services advisory board to the B.C. attorney-general, said B.C. has the strictest security licensing system in the world and other jurisdictions are trying to emulate it.

"No one has 60 hours of mandatory training," he said. "No one has the regulations, or the costs, that we have in B.C."

The rules are set out in the B.C. Private Investigators and Security Agencies Act, the provincial law that regulates companies and individuals in six kinds of businesses: security patrols, security consulting, security alarms, private investigators, locksmiths and armoured car services. There are different

requirements for the different jobs, but the people who guard properties or conduct surveillance need security licences.

Sajko is the public safety ministry official who can refuse to issue a security licence to someone or cancel an existing licence.

Sajko said the government has four inspectors who try to ensure that security-related companies comply with the law. She said that isn't a lot of inspectors for a business sector with more than 12,000 security employees, of which 7,000 do security patrols.

Sajko refused to discuss the alleged violations against the big security patrol firms, on the grounds the allegations are still before the courts.

But she confirmed the tickets allege the companies were employing people without security licences -- something she characterized as a "potential" problem.

"Employees need to have criminal record checks before they're put out to work, and they need to meet the minimum training requirements," she said. "These things are in place for a reason, because those people are in positions of trust. They have contact with the public, in potentially confrontational situations. Security patrols, in particular, need training about things such as citizens' rights and use of force."

- previous page
- 1
- 2
- 3
- 4
- next page

**Ads by Google**

**Canadian Rail Vacations**
Exclusively Canadian Rail Experts
Quality, Value, Choice, Customize