**RECEIVED**

FEB 1 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 FEB 10 PM 4:33

NANCY
MAYER WHITTINGTON
CLERK

| | |
|---|---|
| YOLANDA C. GIBSON-MICHAELS | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action Nos.**1:06CV01940** |
| | ) |
| SHELA C. BAIR, et.al. | ) |
| Defendants | ) |

**PLAINTIFFS RESPONSE TO STEVE KAUFER, CEO WORFORCE VIOLENCE**
**INSTITUTE REPLY TO PLAINTIFF'S OPPOSITION OF**
**MOTION TO DISMISS**

Now Comes, **Yolanda C. Gibson-Michaels (prose),** Plaintiff in the above-entitled

complaint and files a Response to Steve Kaufer, CEO, Workforce Violence Institute Reply to

Plaintiff's Opposition of Motion to Dismiss.

**I.    JURISDICTION AND VENUE**

This Court has both subject matter jurisdiction over this action and personal jurisdiction

over Plaintiffs' claims pursuant to Title VII, age, sexual harassment, EEO retaliation, gross and

willful negligence, and defamation of character, parental rights, age, and intentional negligent

misrepresentation among other violations of Plaintiff.

**II.    DEFENDANTS' MOTION TO DISMISS IS MOOT**

1.  Pursuant to Rule 12(b)(6)(6) a motion to dismiss under Rule 12(b)(6) should be

granted only if it appears beyond doubt that "no relief could be granted under any set of facts that

could be proved consistent with the allegations. See H.J., Inc. v. Northwestern Bell Tel. Co., 492

U.S. 229, 249-50 (1989).

2. Defendant's argument is baseless. Courts recognized that the use of the "to State a claim upon which relief could be granted" phraseology means to Provide Evidence upon which the Court can look upon and base relief upon.

## III.    ARGUMENT

3.    The summons that this Honorable Court issued were served and issued upon the correct parties in this suit, Steve Kaufer, CEO, Workforce Violence Institute and other named defendants.

4.    It is clear that Defendant's arguments are misplaced. Subject matter jurisdiction and capacity are different legal doctrines. In contrast to subject matter jurisdiction, which concerns the court's ability to consider a question . . . capacity to sue concerns a party's right to maintain any action." See Civ.R.Proc. 9- Pleading Special Matters. The two doctrines are independent of each other and a party's capacity to sue or lack thereof does not affect the parties' capacity to sue. Capacity to sue is not jurisdictional; unlike subject matter jurisdiction.

## A. Capacity

Capacity is a procedural issue concerning the personal qualifications of a party to litigate a case. See Summerhouse Condo. Ass'n v. Majestic Sav. & Loan Ass'n, 44 Colo. App. 495, 615 P.2d 71 (1980).

Federal Civil Rules of Procedure - Rule 9. Pleading Special matters, clearly states, that:

**"It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party, except to the extent required to show the jurisdiction of the court.**

**When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, the party desiring to raise the issue shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge."**

2

A challenge to a party's capacity is governed by Fed. R. Civ. P. (a)(1), which states in relevant part:

> "When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge, and on such issue the party relying on such capacity, authority, or legal existence, shall establish same on the trial."

5.    A partnership or other unincorporated association may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right. It is the facts alleged and the relief requested that decide the substance of a claim.

## IV. DEFENDANT'S FAILRUE TO STATE A CLAIM ARGUMENT IS MOOT

The purpose of F.R.C.P. 12(b) (6) is to test the legal sufficiency of the complaint. In evaluating a motion to dismiss under F.R.C.P. 12(b)(6), the court must accept as true all averments of material fact and must view the allegations of the complaint in the light most favorable to the plaintiff.

The **court may consider only matters stated in the complaint** and **must not go beyond the confines of the pleading**. See Fluid Tech., Inc. v. CVJ Axles, Inc., 964 P.2d 614, 616 (Colo. App. 1998); see also Medina v. State, 35 P.3d 443 (Colo. 2001). A party wishing to raise the issue of lack of capacity to sue or be sued must do so by a specific negative averment or it is waived. A specific negative averment is an allegation of some substantive fact, as opposed to the simple denial of an affirmative allegation. See Black's Law Dictionary 1031 (8th ed. 2004).

3

A motion to dismiss for failure to state a claim on which relief can be granted does not raise the issue of capacity. See Tex-Am Carriers, supra. In Northwest Development, Inc. v. Dunn, 29 Colo. App. 364, 368, 493 P.2d 1361, 1363 (1971), a division of this court held:

**"[N]either the legal existence of a party, nor its capacity to sue can be challenged by motion to dismiss for failure to state a claim. Such issue can be raised only by specific negative averment, and the issue, when so raised, becomes an issue to be settled on the trial of the matter."** The court agreed with the reasoning of Northwest Development and concluded that: "the legal existence of a party and its capacity to sue **cannot be challenged by motion to dismiss**."

## V.    GOVERNMENT CONTRACTOR DEFENSE IN OUTSOURCING

Defendants attempt to assert a "**governmental contractor defense**," is moot. See Scainetti v. United States, __ F.3d __, NYLJ Dec. 26, 2002, p. 32, cols. 1-3 (S.D.N.Y. 2002).

## B.    DEFENDANTS GOVERNMENT CONTRACTOR DEFENSE – IS MERITLESS

**General Rule**. Broadly defined, the "government contractor defense" dictates that "if a private party has contracted with the federal government to carry out a project on behalf of the government, the private party, like the federal government, is shielded from liability under the doctrine of sovereign immunity." *Norwood v. Esmor, Inc.*, 1997 WL 65913, *4 (S.D.N.Y. Feb. 13, 1997). As another court said, **"stripped to its essentials,"** the government contractor defense is to claim that **"[t]he Government made me do it."** The government contract defense was intended to shield the outsourcing service provider only from claims arising out of the provider's actions "where the government has exercised its discretion and judgment in approving the precise specifications to which the contractor must adhere." *Malesko v. Correctional Services Corp.*, 229 F.3d 374, 382 (2d Cir. 2000), *rev'd on other grounds*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456.(2001).

Courts have provided that, **government contractors** **may be held liable to third parties in various situations**:

    (a)  the government contractor exceeded the authority given to it by the federal government, sometimes referred to as **"abuse of power"** or "**breach of contract"**.

    (b)  the federal government's authority was not **validly conferred**. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, S.Ct. 412, 84 L.Ed. 554 (1940).\

    (c)  the government contractor is charged with not following the reasonably precise federal government specifications. *Scainetti v. United States*, __ F.3d __, NYLJ Dec. 26, 2002, p. 32, cols. 1-3 (S.D.N.Y. 2002) Government contractors **should not engage in activities that constitute a breach**.

Plaintiff provided evidence that defendants failed to follow hiring procedures, supervision, training of contract personnel. The Second Circuit, the Sixth Circuit has recognized a Bivens action against a private corporation. See Hammons v. Norfolk Southern Corp., 156 F.3d 701 (1998). By contrast, the D.C. Circuit overruled a pre-Meyer decision allowing such actions and held that Meyer precludes Bivens suits against private entities. See Kauffman v. Anglo-American School of Sofia, 28 F.3d 1223 (1994). The 2nd U.S. Circuit Court of Appeals, in Malesko v. Correctional Services Corp., 229 F.3d 374 (2000), noted that the defense "only shields a government contractor from claims arising out of its actions where the government has exercised its discretion and judgment in approving precise specifications to which the contractor must adhere. . . **"A contractor is liable where it "exceeded the authority given to it by the federal government," or "where the federal government's authority was not validly conferred."**

## VI.    8000 - FDIC MISCELLANEOUS STATUTES AND REGULATIONS ADMINISTRATIVE PROCEDURE - CHAPTER 5—SUBCHAPTER I GENERAL PROVISIONS - § 554. ADJUDICATIONS

Defendants violated section 554 Adjudications which reads in part, that:

"**An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case <u>may not</u>, in that or factually related case, <u>participate</u> or <u>advise in the decision, recommended decision,</u> or <u>agency review pursuant</u> to section 557 of this title, except as witness or counsel in public proceedings.**"

By enacting Title III in 1968, Congress prohibited private citizens from using certain electronic surveillance techniques. Douglas R. Fahey confirmed that he sent documentation to Defendant Steve Kaufer in which he (Kaufer) relied upon participated, provided his recommended decision, and advice provided to him by Douglas R. Fahey (unlicensed) contractor.

One of Title III's most restrictive provisions is the requirement that Federal investigative agencies submit requests for the use of certain types of electronic surveillance (<u>primarily the non-consensual interception of wire</u> and <u>oral communications</u>) to the <u>Department of Justice</u> for <u>review</u> and <u>approval before applications for such interception may be submitted to a court of competent jurisdiction for an order authorizing the interception</u>. Specifically, in <u>18 U.S.C. § 2516(1), Title III</u> explicitly assigns such review and approval powers to the Attorney General.

Plaintiff provided evidence to Steve Kaufer, FDIC, Securiguard, USEC Corporation et.al. that: (1) <u>Douglas R. Fahey was unlicensed</u>,  (2) <u>USEC Corporation confirmed that Douglas R. Fahey was not employed by Securiguard</u>, (3) <u>DOJ Criminal Division confirmed that Douglas R. Fahey did not have a Court order</u>, (4) <u>Metropolitan Police Department confirmed that Douglas R. Fahey was unlicensed</u>.

The Federal Deposit Insurance Corporation (FDIC) authority was "validly conferred" but failed to enforce and heed its own rules and regulations. Steve Kaufer, Douglas R. Fahey, Securiguard, and USEC Corporation were negligent, caused injury to Plaintiff and **cannot invoke the government contractor defense to shield itself from liability**.

Specifically, Congress added a new category of covered communications, i.e., "electronic communications," which would now be protected, and whose interception would be regulated, by **Title III. Electronic communications See 18 U.S.C. § 2510(12)**.

Congress has stated, in part, that: **"Because there are severe penalties for the improper and/or unlawful use and disclosure of electronic surveillance evidence, including criminal, civil, and administrative sanctions, as well as the suppression of evidence, it is essential that Federal prosecutors and law enforcement agents clearly understand when Departmental review and approval are required, and what such a process entails. See 18 U.S.C. §§ 2511, 2515, 2518(10), and 2520."**

## VII.    FDICs CONFLICT OF INTEREST PROHIBITIONS

(A) **CLARIFICATION OF STATUS OF CORPORATION**.--The Corporation is, and has been since its creation, an agency for purposes of title 18, United States Code.

(B) **TREATMENT OF CONTRACTORS**.--Any individual who, **pursuant to a contract** or **any other arrangement, performs functions** or **activities of the Corporation**, under the direct supervision of an officer or employee of the Corporation, **shall be deemed to be an employee of the Corporation for purposes of title 18, United States Code and this Act**.

(1) **REGULATIONS CONCERNING EMPLOYEE CONDUCT**.--The officers and employees of the Corporation and those individuals **under contract to the Corporation who are deemed**, under paragraph (1) (B), **to be employees of the Corporation for purposes of Title 18, United States Code, shall be subject to the ethics** and **conflict of interest rules** and **regulations issued by the Office of Government Ethics**, including those concerning **employee conduct, [F]inancial disclosure**, and post-employment activities.

7

## VIII.  CORPORATE LIABILITY: SHARING THE BLAME FOR WORKFORCE VIOLENCE BY STEVE KAUFER, CPP

## LEGAL CONSEQUENCES

"**Negligent hiring and negligent retention are fodder for lawsuits ....**" said Defendant

Steve Kaufer, CEO, Workforce Violence Institute.  Defendant Steve Kaufer further stated, in part,

that:

> These kinds of cases have legal precedents dating back to 1911, while most such tort cases filed since the early 1980s have resulted in an average out-of-court settlement of $500,000 and a $3 million jury verdict, according to a 1993 study by liability expert Norman D. Bates. Negligent hiring occurs when, prior to hiring, the employer knew or should have known that a particular applicant was not fit for the job. <u>Failure to adequately screen applicants results in a liability for the employer</u>.
>
> At least two other theories of law may become involved. They are "respondent superior" and "negligent entrustment." Respondent superior is the notion that a master/servant relationship exists between the employer and the employee, in which the employer may become liable for the behavior of the employee acting as the employer's agent. <u>Negligent entrustment is particularly pointed at guard firms</u>.
>
> <u>It is only necessary to prove that the employer was negligent in hiring and retention practices</u>....." According to "Duty of Care Standards," an employer has a responsibility to provide a safe work environment. . . ." "In the landmark case Tarasoff v. Regent of University of California in 1976, the court identified the factors necessary for Duty of Care Standards to apply. These include: (1) foreseeability of harm; (2) connection between the incident and the injury sustained; (3) degree of injury; (4) blame attached to the defendant's conduct; and (5) policy of preventing future harm.  Carr v. William Crowell Co. (1946)....."

Plaintiff agrees with Defendant Steve Kaufer, CEO, Workforce Violence Institute.  **Steve**

**Kaufer confirmed that he was negligent by his own personal analysis of his own failure to**

**exercise a 'duty of care'** when he (S.Kaufer) **received unauthorized documentation from an**

**unlicensed contractor Douglas R. Fahey**. (See Exhibit A)

8

**Wherefore**, Defendants Oppositions are moot in attempt to assert the: **"[t]he Government made me do it."** Defendant's Opposition is ludicrous. Plaintiff has demonstrated that she is legally entitled to precede with her complaint before this Honorable Court, entitled to relief, settlement, and all make whole remedies, punitive damages, back-pay, reinstatement of employment status.   FDIC and named Defendants (Contractors) history of contract, receivership, inside trading, money laundering, anti-kick backs were reported on **August 13, 1998** by NETU **Chapter 260, Gregory R. Haag, Steward**.  **(See Exhibit B)**

Respectfully submitted,

Yolanda C. Gibson-Michaels (prose)
2210 Anvil Lane
Temple Hills, Maryland  20748
(301) 630-5062

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that on this 10th **day of February 2007**, a copy of the foregoing

Plaintiffs Response to Steve Kaufer, CEO, Workforce Violence Institute Reply to Plaintiff's

Opposition of Motion to Dismiss was mailed by Certified Mail delivery to the following:

**Copies to**:

David Zachary Kaufman, Esq.
Kaufman Law Firm, A Professional Corporation
11350 Random Hills Road – Suite 800
Fairfax, Virginia 22030
Counsel for Defendants Securiguard, Inc.
  and USEC Corporation

Scott D. Helsel (D
Walton & Adams, PC
1924 Isaac Newton Square
Reston, Virginia 20190

Shelia C. Bair
Federal Deposit Insurance Corporaiton (FDIC)
550 17th Street, N.W. MB-6029
Washington, D.C. 20429

Kathleen Gunning, Counsel and Tina Lamoreaux, Counsel
Federal Deposit Insurance Corporation (FDIC)
3501 North Fairfax Drive
Arlington, Virginia

Jenekia J. Johnson, Prose Defendant
1414 Colony Road
Oxon Hill, Maryland 20748

Douglas R. Fahey
3716 Dalebrook Drive
Dumfries, Virginia 22015-1804

Patricia Del Marvil
Chairman CEO
Securiguard Incorporation
6858 Old Dominion Drive – Suite 307
McLean, Virginia 22101

David L. Marvil
Chairman CEO
USEC Corporation
7531 Leesburg Pike – Suite 402
Falls Church, Virginia 22101

Robert Feldman, Executive Secretary
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429

Mr. Wan Kim
Assistant Attorney General
Civil Rights Division
Office of the Assistant Attorney General
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Claire Whitaker
Assistant U.S. Attorney
555 4th Street, N.W. Room E-4204
Washington, D.C. 20530

Jeffery A. Taylor
Assistant U.S. Attorney
555 4th Street, N.W. Room E-4204
Washington, D.C. 20530

Rudolph Contreras
Assistant U.S. Attorney
555 4th Street, N.W. Room E-4204
Washington, D.C. 20530

Ex. A

Company Name



IRIMS

_Incident Number: 0-0000000016_          _File Number: WASHINGTON_          _Security Level: FDIC Security_

### Incident Details

| | | | |
|---|---|---|---|
| Category: | Complaints | Subcategory: | By Employee |
| Type: | Workplace Violence | Loss/DamageType: | |
| Security Level: | FDIC Security | Status: | Ref.to Management |
| Police File: | No | Police File Number: | |
| Occurred From Date: | 8/12/2003 | Occurred From Time: | 10:30:00AM |
| Occurred To Date: | | Occurred To Time: | |
| Reported Date: | 8/14/2003 | Reported Time: | 12:00:00AM |
| Reporting Person: | Fahey, Douglas | Supervisor: | |
| Org. Rollup 1: | | Org. Rollup2: | Org. Rollup3: |
| Building Name: | 1717 H Street | | |
| Legal Description: | | Number: | DC Area |
| Local Phone Number: | | | |
| Street Address: | FDIC | | |
| City: | Washington | State/Province: | District of Columbia |
| Country: | | Zip/Postal Code: | |
| Geo. Rollup1: | | Geo. Rollup2: | Geo. Rollup3: |
| Location: | 3rd Floor | | |
| Location Details: | | | |
| Incident Summary: | Employee felt threatened by the behavior of another employee. | | |

### Incident Persons

| | | | | | |
|---|---|---|---|---|---|
| Person Name: | Bryant, Eyvonne | Salutation: | | Person Status: | |
| Incident Person Type: | Employee | Company Employee: | No | Barring Notice: | No |
| Comments: | | | | | |

_Incident Person Details_          _(For more Person Details please see the Person Profile Report)_

| | | | | |
|---|---|---|---|---|
| Sex/Gender: | F | Date of Birth: | | Age: |
| Home Address: | | | | |
| City: | | State/Province: | | |
| Country: | | Zip/Postal Code: | | |
| Home Phone: | | Business Phone: | | |
| Clothing Type: | | Clothing Description: | | |
| Feature Type: | | Feature Description: | | |
| Injured: | No | Hospitalized: | No | |
| Injury Type: | | Injury Description: | | |
| Hospital Name: | | Treated By: | | |
| First Aid: | | Cause: | | |
| Work Time Lost From: | | Work Time Lost To: | | |

3

Company Name


IRIMS

---

**Incident Number: 0-0000000016**          **File Number: WASHINGTON**          **Security Level: FDIC Security**

On September 2, 2003, at 17:15Hrs., Ms. Gibson-Michaels sent a memo to Erica Cooper, and copied POLVINALE, LANTELME and me. In it, she requests an immediate reassignment to another section because of the unfair treatment that she believes she has received since allegations were unjustly filed against her. She again stated POLVINALE never counseled her regarding any type of behavior regarding the incident on August 12. She also makes note of her own morale issue within her group since she was unjustly placed on the FDIC surplus list, her father has been diagnosed with prostate cancer, her son is severely autistic with a seizure disorder and she is the only one left in her group which was formerly comprised of 4 other individuals who are no longer at FDIC. See her memo for full and complete information. [A-16]

On September 2, 2003, at 17:16Hrs., GIBSON-MICHAELS sent an e-mail to LANTELME, making comment on what she recognized as an inconsistency in the statement of HOPKINS concerning the use of the word, stupid. Refer to her memo for full and complete information. [A-11, pg.1]

On September 4, 2003, I received a memo from Paul Mitchell, whose office is located in front of GIBSON-MICHAELS' cubicle. MITCHELL stated although he didn't remember the date, he recalled that several weeks ago, as GIBSON-MICHAELS was walking past his office, he heard her say in an angry tone of voice - 'I told you not to ask me any more stupid questions!' He stated GIBSON-MICHAELS then went to her cubicle and he didn't hear anything more. He also wrote that he did not hear anything before her statement, but later learned from others that GIBSON-MICHAELS and HOPKINS had some sort of argument that day. Please refer to MITCHELL's memo [A-17]

On September 4, 2003, at 10:00Hrs., a MRT meeting was held regarding this matter. In attendance were Bill Kmetz, JR Harris, Mary Laverty and Doug Fahey. LAVERTY stated she would notify Bob Wooding to communicate with Carl Polvinale and insure that GIBSON-MICHAELS' behavior is monitored in the future. She also stated no corrective or disciplinary action would be warranted in this case as POLVINALE performed a counseling session with GIBSON-MICHAELS. It was also decided that the Workplace Violence Research Institute be consulted to assess the incident.

On September 5, 2003, I contacted the Workplace Violence Research Institute and spoke with Steve Kaufer. I briefed Mr. Kaufer on this matter and advised I would send the case documentation for him to review and assess. On September 6, 2003, I e-mailed the documentation to Mr. Kaufer.

Case open pending review by the Workplace Violence Research Institute.

On 8 September 2003, GIBSON-MICHAELS requested that Sukari Smith, Rose Harley, and Alva Vaden be interviewed concerning their knowledge of this incident.

On 9 September 2003, in continuing this investigation, I spoke with and then received an e-mail from Sukari Smith. In her subsequent e-mail, (A18) SMITH stated she could not verify whether or not she was in her office between 10:00-10:30Hrs. on 8/12/03, but did say she did not hear anything aggressive above the normal hub of that area. SMITH informed me that she first found out about the incident on 9/8/03 when GIBSON-MICHAELS talked with her about it and asked her if she would talk with me and tell me she didn't hear anything that day.

On 9 September 2003, I spoke with and then received an e-mail from Rose Harley. In her subsequent e-mail, (A19), HARLEY provided her recollection of what she called the "discussion" that occurred on 8/12/03 between Terry Hopkins and Yolanda Gibson-Michaels. HARLEY stated it was sometime before lunch, that she hear someone way words to the effect, "I don't want to talk to you anymore. You're insulting." She stated she didn't recognize the voice at the time as Terry Hopkins' and in fact thought it was another employee who works on the third floor. She stated she did recognize Yolanda's voice when she said, "Well, you're insulting." She stated she would describe both voices as being agitated, but did not hear any yelling or screaming that would cause her to leave her office to see what was occurring.

On 9 September 2003, at 10:55Hrs., I spoke with Alva Vaden. VADEN stated she was at work and in her office with the door open on 8/12/03 between 10:00-10:30Hrs. and did not hear anything at all. She stated she found out about the incident when people talked about it in the staff meeting and people talking about it in the hallway. VADEN did not provide a written statement.

---

Company Name


IRIMS

On 10 September 2003, I was notified by Mary Laverty in an e-mail that after completing her review of the information in this report, it was then her understanding that no memo had been issued or formal counseling done with Yolanda Gibson-Michaels. She stated management had not taken corrective action regarding the August 12 incident and was awaiting the results of the investigation before determining what action, if any, to take.

On 10 September 2003, I received a call from Steve Kaufer with the Workplace Violence Research Institute. KAUFER stated it was his opinion, based on the reports I submitted to him, that GIBSON-MICHAELS' behavior was not acceptable and needed corrective action. He noted his believe that she may believe there is some kind of plot or conspiracy against her, and questioned whether a racial issue could be present. He believed there was a veiled threat present for GIBSON-MICHAELS to bring in her martial arts trophies and demonstrate the simulation of lethal karate moves. He stated however there was nothing in the material he reviewed that made him believe that GIBSON-MICHAELS would progress to behavior more serious, and if another incident were to occur, it would be on about the same plane as the current incident. KAUFER stated he would follow-up with a written report.

This case was referred to management for further review.

On 29 September 2003, I received a report from KAUFER as follows:
As you requested I reviewed the available reports and other information related to the concern over Ms. Gibson-Michael's behavior.

The behavior that brought Ms. Gibson-Michael to the attention of the MRT related to her response to an inquiry over leave slips that she requested that Terry Hopkins, her acting supervisor, sign. When questioned about the slips, Ms. Gibson-Michael reacted in a manner that caused Hopkins and others in the immediate area concern for their safety.

Your report clearly details this incident and other unwanted behavior by Ms. Gibson-Michael.

I have reviewed e-mails, statements of witnesses and supervisors, your report and all other documentation made available to me. Based on this review I find:

1. Whether in the context of workplace violence prevention or just common courtesy and civility, the behavior exhibited by Ms. Gibson-Michael on the occasion in question and others is not acceptable. When behavior of one employee causes others in the workplace to feel threatened and at-risk, clearly those actions must cease. Her actions, according to witnesses, included screaming and acting in a hostile and aggressive manner towards co-workers.
2. It appears that Ms. Gibson-Michael believes that actions taken by supervisors and co-workers are part of a larger "plot" against her. I found no evidence that any disciplinary or corrective actions or counseling singled her out.
3. Her comments regarding her black belt and discussion on which portions of a person's body that can be struck to kill them is troublesome. While under normal circumstances, showing off martial arts trophies would be viewed as a gesture of involvement with co-workers, however, given her prior behavior I view it as a veiled threat. She does not, according to information reviewed, have a close personal relationship with others in the office. The display of the trophies and discussion of injury or death that could be caused by martial arts I believe was done to intimidate co-workers. Again, under the FDIC's Workplace Violence Prevention Program, these actions and comments are not acceptable.

While her actions, methods and language are unwanted and should likely result in corrective action, I don't believe

**Company Name**



she will act out in a violent manner to cause harm to co-workers. However, if her current level of inappropriate behavior is allowed to continue it could well escalate into more serious behaviors.

Submitted,

Steve Kaufer, CPP
Co-Founder
Workplace Violence Research Institute

END OF KAUFER'S REPORT

No further information at this time.

**End of Report**

Ex. B

Hand Delivered

Grievance

| | |
|---|---|
| Date: | August 13, 1998 |
| Chapter: | 260 |
| Grievant: | NTEU Chapter 260 |
| Step One/Two Official: | Kenneth Gorham |
| | Regional Manager |
| Division of Administration | |
| Oral Presentation: | At the Option of the FDIC |
| Union Representative: | Gregory R. Haag, Steward |
| Specific Article/Law/ | Agreement with NTEU Article 18 Sections 1 & 3 |
| Rule/Regulation Violated: | 5 USC 7114,7102,7116(a) |
| | FDIC Circular 3700.17 |
| | FDIC Acquisition Policy Manual 1.E.6 & Exhibit 3 |
| | Chief Financial Officers Act |

Service Contract Act and 29CFR4
Agreement with NTEU Article 3 Section 1

Through its course of conduct in connection with contracting, the FDIC has
circumvented or ignored federal law, FDIC Policy, the agreement with
NTEU (Agreement), good internal controls and good business practices,
in order to replace FDIC workers with contractor employees. The acts are
particularly attributable to the Division of Administration (DOA) and the
Division of Information Resource Management (DIRM). Among the
consequences of this course of conduct are the following:

* Certain contractors have been enriched at expense of the FDIC mission,
FDIC workers, and the contractors' employees.
* Experienced FDIC employees have lost their jobs and will lose their jobs, to
be replaced by inexperienced workers.
* A severe morale problem exists among both FDIC workers and managers
and the contract workers due to the disparity in wages and disparity in experience.
* The public's image of and confidence in the FDIC may be undermined.
* Relations between FDIC management and workers have been damaged significantly.

GENERAL VIOLATIONS

1. The FDIC's course of conduct, through its aggressive and improper
contracting out of traditional bargaining unit jobs, via the specific acts
described in detail below, constitute an unfair labor practice under 5 USC
7102 and violates the Agreement (Article 3 Section 1), which prohibit
reprisals for being a member of a labor organization. DOA and DIRM

Footnote 11

bargaining unit employees have lost, and are losing, their jobs by not having term appointments extended and not having equivalent new positions posted, while their positions are replaced by non-union contractor employees.

2. Additionally, the unfair replacement of bargaining unit employees by contractor employees has severely discouraged union membership in both DOA and DIRM, which is an unfair labor practice under 5 USC Section 7116 (a) (1).

Remedies requested:

A. All employees losing their positions in DIRM or DOA during the next 12 months should receive fair compensation for loss of their positions plus penalties that may apply.

B. All employees whose positions were unfairly replaced by contractor employees due to the acts described in Specific Violations should receive compensation for loss of their positions plus penalties that may apply.

C. This grievance be amended for any reason, to include but not be limited to: (1) other related grievances and remedies which are uncovered as a result of the information received pursuant to the Information Requests dated June 19, 1998 and July 23, 1998, (2) subsequent related information requests, and (3) the investigation recommended in the violation 7.

D. NTEU requests reimbursement of "bank" official time spent on all this grievance as well as reimbursement of legal fees, should they be necessary.

E. Any other remedies deemed appropriate by the arbitrator, including equitable compensation of those effected employees in other divisions of the FDIC.

SPECIFIC VIOLATIONS:

3. Non-notification of NTEU concerning DIRM and DOA contracts. NTEU received no notification of the DIRM contract signed on or about June 30, 1998 with Affiliated Computer Services affecting about 80 positions nationwide. Notification is required under either Article 18 Section 3 of the Agreement with NTEU (Agreement) or FDIC Circular 3700.17 (which applies for contracts with 10 or more employees). Additionally, NTEU believes that other DOA or DIRM service contracts may have been signed without notification to NTEU, but cannot determine this until the FDIC responds to the information requested. Other information concerning this violation will be provided as soon as the FDIC provides the information requested by NTEU. This information was requested on June 17, 1998 and again on July 23, 1998.

Remedies requested:

A. The FDIC will comply with the union notification and fact finding provisions of the Agreement (Article 18 Section 3) if fewer than ten employees are effected.

B. The FDIC will comply with the notification terms of Circular 3700.17 (if applicable to ten or more employees).

C. No bargaining unit employees will be replaced by contractor employees for any DIRM or any other service contract where NTEU is not notified.

D. All current and former employees identified to have been replaced due to no notification or untimely notification shall be compensated.

E. Additionally, NTEU requests any other remedies as deemed appropriate by the arbitrator.

4. Non-Compliance with the McNamara-O'Hara Service Contract Act of 1965 (The Act) and related regulations contained in 29 CFR 4. The FDIC has agreed with NTEU to comply with all contracting laws (Agreement Article 18 Section 1). The FDIC's course of conduct has had the effect of assisting contractors to submit bids which are somewhat lower than the FDIC cost of employment by allowing contractors to underpay their workers and by paying almost all of the contractors other expenses e.g. offices, equipment, supervision, and training. This is done by allowing contractors to use wage determinations for positions which do not reflect the prevailing wage for the FDIC positions being replaced and through not providing the Department of Labor the correct information. The FDIC sets wages to reflect prevailing wage conditions in the labor market. The Act requires that the contractor pay the prevailing wages and benefits to its workers and that wages and benefits for each class of workers if Federally employed be provided to the Department of Labor. The FDIC's course of conduct has had the effect of assisting service contractors in circumventing The Act, in order to circumvent the cost benefit test performed under FDIC Circular 3700.17 for contracts involving ten or more employees. Please note the following specific violations of The Act and related regulations contained in 29CFR4.

i We have been advised by FDIC management, that no "Notice of Intent to Make a Service Contract" (Form 98) or Form 98 Attachment A was filed with the Department of Labor for: the current solicitation by DOF (Field Finance Center Proposal No. 98-11177-C-RI), the Petersen Consulting Contract, and the McGladrey Garcia contract. Regulation 29CFR4.4 requires that this information be sent in at least 60 days prior to any invitations for bids or requests for proposals.

ii The FDIC has provided false, misleading, or incomplete wage and benefit information to the Department of Labor for the following contracts, either by failing to file or filing inappropriate information with the filing. Specifically, these comments relate to forms required to be filed under 29CFR4.4: Form 98 "Notice of Intent to Make a Service Contract and Response to Notice" and Form 98 Attachment A (required by 29 CFR 4.4) . Regulation 29 CFR 4.4(b)(2) states that the following information is to be filed on or with Attachment A:

"A listing of those classes of service employees expected to be employed under the contract which, if employed by the agency, would be subject to the wage provisions of 5 USC 5341 or 5 USC 5332, together with a specification of the rates of wages and fringe benefits, that would be paid by the Government to employees of each such class if such statute were applicable to them."

These forms are also required to be filed by the FDIC Acquisition Policy Manual (Section 1.E.6 and Exhibit 3). A synopsis of The Act along with the relevant FDIC Policy Manual excerpts was given to The Regional Manager of DOA, Ken Gorham, at a meeting on July 20, 1998. This document is attached. NTEU representatives also frankly discussed the suspected violations of law and FDIC policy with Mr. Gorham. The wages for contractor workers is significantly below that of FDIC workers for the contracts listed below. As the Department of Labor wage determinations are required to be made part of the contract and requests for proposals,

3

the FDIC would have knowledge of those employee wages and benefits. The specifics of the violations are as yet to be determined but will be provided when the FDIC provides the information requested by NTEU.

None of the following contracts would have been let, if the contractor had been required to pay wages and benefits required under The Act:

(a) MWEDS Contractor (DOF)
(b) Facilities Service Contracts (DOA)
(c) Mail Room Contract (DOA)
(d) Service Contracts (for EDP and LAN service employees) including the national contract which was let on or around June 30, 1998 to Affiliated Computer Services (DIRM)
(e) Iron Mountain  Contract (DOA)
(f) Brenda Pejovich Contracts (DOA & DRR)
(g) Pierce-Lahey Contract (DOA)

Remedies requested:

A. The FDIC will fully comply with The Act and provide correct and complete wage determination information for the Department of Labor to use in setting wage determinations in a timely manner.
B. The FDIC will provide the Department of Labor Wage and Hour Division with a copy of the Agreement with NTEU and such other wage and benefit information pertinent to the Department of Labor's determination of prevailing wages for the positions being contracted out.
C. Wages and benefits of contractor workers will be posted in the workplace as required by The Act.
D. The FDIC will perform or request that the Department of Labor Wage and Hour Division perform a wage and hour audit of the contractors listed.
E. The FDIC will request new wage determinations for all of the contracts listed.
F. All of the contracts listed above will be reevaluated for the cost-benefit tests under Circular 3700.17 as soon as they expire, and no renewals of these contracts will occur before that is accomplished.
G. Other remedies deemed appropriate by the arbitrator, including compensation of those employees who lost their jobs as a result of non-compliance with The Act.

5. Incomplete copies of contracts and bid proposals were provided to NTEU with respect to the contractors wages and benefits, the qualifications of contractors workers, and representations made to the Department of Labor concerning classification of employees and FDIC workers wages and benefits. The missing information would have lead NTEU representatives to question the benefit of the proposed contract, due to the potentially significant additional costs to the FDIC of reimbursing the contractor for back wages and benefits paid as a result of corrected wage determinations. A copy of the contract and proposals is required to be delivered to NTEU in Article 18 Section 3 of the Agreement and in FDIC Circular 3700.17.

4

Remedy requested:

A. The FDIC will provide full and complete copies of all service contracts and proposals to NTEU.

6. The FDIC has not provided the information requested on both June 19, 1998 and July 23, 1998.

These information requests are attached. As stated in the requests, this information is critical to determining the exact nature of the grievance and the information requested. This is a violation of 5 USC 7114.

Remedy requested:

A. The FDIC will provide all requested information within five working days.

7. Non-Compliance with the Chief Financial Officer's Act. The FDIC has agreed to comply with applicable laws in the Agreement (Article 18 Section 1). The Chief Financial Officers Act requires each agency to institute good internal controls. FDIC management has ignored allegations of poor internal controls, questionable or unethical acts, and poor business practices, with respect to service contractors, in order to continue using service contractors instead of hiring workers. The tolerance of poor contracting internal controls, tolerance of questionable or unethical acts, and tolerance of poor contracting business practices, when they give unfair advantage to service contractors or their non-bargaining unit employees, are indicative of a poor internal control environment which serves to eliminate or reduce the size of the FDIC bargaining unit by systematically replacing BUE's with contractor employees. These acts constitute an unfair labor practice under 5 USC 7102 and violate the Agreement (Article 3 Section 1) because they have the effect of seeking reprisal for being a member of a labor union.

The following allegations have been made by workers which illustrate the serious lack of internal controls over service contractors tolerated by the FDIC to the detriment of the bargaining unit:

(a) Use of core staffing studies and subsequent reorganizations to mask takeover of bargaining unit employee work, particularly by contractors in DOA and DIRM.
(b) Allowing use of ex-RTC contractors and other contractors to take over bargaining unit work beyond the scope of the contract.
(c) Splitting work among several contracts or several locations in order to circumvent the review requirements of FDIC circular 3700.17.
(d) Use of vague statements of work to allow one contractor to assume another's duties or to takeover BUE jobs as BUE terms expire, without re-bidding the contract or offering the contract to FDIC workers.
(e) Favoritism shown in the bid solicitation process by providing more information to favored contractors.
(f) Allowing FDIC personnel to supervise contractor employees due to inadequate supervision provided by the contractor.
(g) Providing training to contractor employees at FDIC expense.
(h) Tolerating poor internal controls over performance of work and time and attendance.
(i) Violation of FDIC contracting policies to award contracts to specific contractors.

5

(j) Using contractors to employ workers or friends who would not otherwise qualify for FDIC employment.

(k) Use of vague performance standards which enable the contractor to under-perform.

(l) Allowing the contractor to inflate the position description of certain contractor employees so the contractor can bill the FDIC at a higher rate as allowed in the contract.

(m) Pervasive use of vague or lax qualification requirements in the service contracts for contractor personnel, which enable the contractor to hire workers with less skills and experience.

(n) Use of FDIC bargaining unit employees to "fill in" for absent contractor workers.

(o) Violation of USOPM rules by not offering new work to FDIC employees.

(p) Use of contractor workers for work totally unrelated to the contract.

(q) Lack of controls to ensure that contractors adequately screen their employees for felony convictions and for citizenship.

(r) Inadequate investigation of managers rumored to have taken gifts from contractors.

(s) Lack of controls to ensure that contractors provide workmen's compensation insurance, unemployment insurance, social security taxes, and other benefits required by law.

(t) Inadequate controls to ensure that the contractor employees are equivalent to FDIC workers. The current FDIC policy for joint review by FDIC and NTEU assumes that workers hired by contractors will be equivalent in training and experience to FDIC workers. As it is, the review process does not consider that workers paid half of what FDIC workers are paid may not be as competent, or that as soon as they get the experience they will leave for a better paying job.

(u) Promulgation of contracts which broaden the scope of work as "successor contracts" in order to annex additional bargaining unit jobs.

(v) Lack of contractor wage and benefit audits of service contractors where suspected abuses occur.

NTEU does not have either the resources or access to records to properly investigate these allegations. Therefore, we request that the FDIC institute an independent in-depth investigation of service contracting practices in order to provide an independent and unbiased evaluation of these alleged acts. The workers who have made these allegations fear that certain FDIC managers may seek reprisal against them but would be forthcoming if an independent investigation were instituted.

Remedies requested:

A. An independent and thorough investigation of service contracting will be instituted by the FDIC. However, the investigation should be conducted independently of the FDIC by persons who have significant training and experience in this type of work. NTEU offers to assist these investigators by encouraging workers that have knowledge of these acts come forward and provide information.

B. The FDIC will take appropriate action to improve internal controls and other appropriate actions when the investigator's report is received.

Offer to Resolve this Dispute

*[Handwritten annotations in right margin:]*
*FDIC used Fake contractor Douglas 1st Mary as Fake Investigator Paid under Fake Contract.*

*Fahey*
*Fahey*

*6*

NTEU offers its full cooperation in order to resolve the above issues in an orderly manner in the spirit of partnership with the FDIC management. We recommend that a task force, comprised of FDIC managers who have no contracting responsibilities and NTEU representatives, be formed to recommend a resolution of these issues, to recommend the selection of appropriate investigators, investigation firms, or investigation authorities, and to oversee the progress of the investigation. We request that the information requests be made a priority issue and that the resources of the FDIC be employed to ensure that further delays do not result in further loss of either experienced workers or the ability of the FDIC to serve the public.

Respectfully Submitted,

Gregory R. Haag, Steward

cc:      Michael Jones
         Sharon Davis
         Laura Campbell

Attachments:

1. Information Request dated June 23, 1998
2. Information Request dated June 19, 1998
3. Information for Meeting dated July 20, 1998 which includes
Summary of The Act
FDIC Acquisition Policy Manual Excerpt
FDIC Acquisition Policy Manual Attachments (Form 98 and Form 98A)
Notice of Intent to Solicit Services - Newspaper Advertisement

7

**The National Treasury Employees Union**

NTEU

User Name
Password
Forgot User/PWD?    Not yet registered?
Member Log-in

Home

NTEU

Members Only

Press Room
About NTEU

☒ Press Releases

Union Office

External Organizing

Member Benefits

TEPAC Information

FEEA

Join NTEU

Union Member Rights

Search Site

**Press Kits**
**Press Release**

SELECT another press release

For Immediate Release: Monday, February 5 2007
Contact: (202) 572-5500

Public Relations Department

Click Here for MS Word format printer friendly document (Click 'Save' Button OR Click 'Open' Button then 'OK' Button)

*Statement of President Colleen M. Kelley On New York Times Article About Federal Contracting*

I am pleased to see the significant attention paid in a lengthy Sunday New York Times article to the serious issue of runaway federal contracting, and I look forward to the remaining articles promised in this series. NTEU has long been the leader in the fight to keep the work of the federal government in the hands of trained, professional and dedicated federal employees. Among other problems it causes, this administration's relentless drive to turn over the work of the American people to the unaccountable private sector serves to erode the extensive knowledge base developed over many years by the federal workforce. It is particularly disheartening to see the growth in the contracting of what is clearly inherently governmental work—as illustrated by the Internal Revenue Service hiring private sector debt collectors. This reckless and costly program not only is a waste of public money, it puts at serious risk of disclosure and misuse taxpayers' personal and sensitive information. The IRS case is a particularly egregious example because this sensitive work was simply handed over to contractors without even giving IRS employees a chance to show they could do perform the work better and at a lower cost. In continuing to strenuously oppose this misguided IRS effort, NTEU will make the case with Congress and the public for increased IRS staffing and resources to allow that critical agency to do the job Americans expect and demand of it.

1750 H Street, N.W., Washington, D.C. 20007 - (202) 572-5500
© 2007 National Treasury Employees Union. All rights reserved.
If you have any questions about this website, please contact Webmaster



HOME   DEPOSIT INSURANCE   CONSUMER PROTECTION   INDUSTRY ANALYSIS   REGULATION & EXAMINATIONS   ASSET SALES   NEWS & EVENTS   ABOUT FDIC

FDIC > News & Events > Press Releases

## Press Releases

## FDIC ANNOUNCES PROGRAM TO REDUCE STAFFING LEVEL

**FOR IMMEDIATE RELEASE**
**PR-69-95 (11-9-95)**

The Federal Deposit Insurance Corporation (FDIC) today announced a program to reduce its staff by offering many career employees incentives to retire or to seek other employment voluntarily.

"The incentive program is the first of several steps the FDIC will take to adjust the size of its staff to levels justified by its workload," said FDIC Chairman Ricki Helfer. "We increased staff significantly to address the thrift and banking crises of the late 1980s and early 1990s. In the last few years we have experienced steep declines in our workload because the health of the financial system has improved dramatically, which has resulted in a sharp reduction in the number of failing institutions. We expect our workload to continue to decline over the next few years. For all those reasons, we must reduce the number of staff positions."

Bank failures declined from 207 in 1989 to 13 in 1994. Six commercial banks have failed thus far this year. Assets under liquidation at the FDIC have declined from $28 billion at the end of 1993 to less than $12 billion.

"Our goal is to meet our fiduciary obligations to the insurance funds by reducing costs that cannot be justified by the Corporation's workload, while at the same time being fair and humane to all of you, our FDIC colleagues," Chairman Helfer said in a memorandum to all FDIC employees announcing the program.

The National Treasury Employees Union, which represents 56 percent of FDIC employees nationwide, agreed to the incentive program.

The FDIC estimates that the program could save the insurance funds as much as $64.4 million when compared to the costs of a Corporate-wide reduction-in-force (RIF), depending upon the number of employees who accept the buyout offer. By law and under FDIC policy, a RIF cannot take place until

FDIC: Press Releases (PR-69–11-9-95)

early 1997. Dennis F. Geer, FDIC Chief Operating Officer, noted that a reduction-in-force of some magnitude in 1997 remains certain.

"We have too many employees for the number of positions necessary to do our job," he said. "Projections indicate that the excess is approximately 1,500 career employees at our core staffing levels, which we will reach in two to three years after we liquidate the remaining assets of banks and thrifts that failed during the banking and thrift crises and after we put into place management reforms that will make our operation more efficient. That 1,500 does not include the approximately 6,200 temporary employees at the FDIC and the Resolution Trust Corporation (RTC) whose contracts will lapse either on December 31, 1995, or during 1996."

He added: "We will continue to downsize consistently during the next two to three years until we reach the staffing level that is commensurate with the work of the agency. We cannot, however, today predict precisely what that number will be. We believe that, if a sufficient number of acceptances are received from the voluntary buyout, we will be able to limit the scope of a subsequent reduction-in-force."

Under the program, employees who voluntarily end their employment with the FDIC will receive 50 percent of their total annual compensation and continuation of their health insurance benefits for 6 months at the regular employee/employer sharing of cost. Last year, the FDIC offered comparable incentives to employees facing relocation.

The Office of Thrift Supervision and the Tennessee Valley Authority have offered comparable incentive programs to reduce the size of their staffs.

Employees at the RTC who have reemployment rights at the FDIC -- currently about 1,000 -- will also be offered the incentive program. By law, permanent employees of the RTC are not eligible for a reduction-in-force until 1997 and, in the interest of fairness, similar protection was extended to all FDIC career employees as well. These RTC employees will be put back to the FDIC when the RTC closes at the end of the year, along with an estimated $8 billion to $10 billion in assets of failed savings and loan associations, which the FDIC is required to liquidate.

FDIC and RTC employees offered the incentives have until January 31, 1996, to make their decision of whether to accept the offer.

To date, the number of staff at the FDIC has declined one-third from its peak of 15,611 in mid-1993, generally through the nonrenewal of contracts under which temporary staff have worked.