## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOLANDA C. GIBSON-MICHAELS)
   Plaintiff,   )
        )
   v.    ) Civil Action: **06CV01940 (RMU)**
        )
SHELA C. BAIR, et.al.  )
   Defendants  )

### PLAINTIFFS' MOTION TO PERMANENTLY SUPPRESS
### EVIDENCE and MOTION FOR INJUCTIVE RELIEF

Comes Now, Yolanda C. Gibson-Michaels (prose), Plaintiff in the above-entitled action and moves this Honorable Court to permanently suppress the Federal Deposit Insurance Corporation (hereafter "FDIC") and named Defendants Pre-trial discovery, use, duplication and disclosure, of evidence in violation of 18 U.S.C. – 119, 18 U.S.C. § 1028 to **knowingly transfer** or **use, without lawful authority**; and in violation of the Omnibus Crime Control and Safe Streets Act of 1968, Title III, §§ 801–804, 82 Stat. 211, 9-7.100 Authorization of Applications for Wire, Oral, and Electronic Interception Orders; Privacy Act, 5 U.S.C. § 552a, **§ 2518. Procedure for interception of wire, oral, or electronic communications.**

# RECEIVED

MAR **2 6** 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



# I.    United States District Court, Washington, D.C. Court Ruling(s)

1.    The D.C. Circuit has outright recognized the **"right of a federal job applicant to seek injunctive relief from an agency's violation of his constitutional rights in general**." See Hubbard v. U.S. E.P.A. Admin., 809 F.2d 1, 11 (D.C.Cir. 1986).

2.    The D.C. Court of Appeals has held that deprivation of a protected liberty interest may be shown either through an adverse employment action in "conjunction" with official defamation ("defamation plus") See O'Donnell v. Barry, 148 F.3d 1126, 1143-44 (D.C. Cir. 1998), citing Kartseva v. Department of State, 37 F.3d 1524, 1527-29 (D.C.Cir.1994). A liberty interests arise if an employee is terminated in a manner that **'stigmatizes'** them by impugning their reputations or foreclosing their future employment opportunities," Orange v. District of Columbia, 59 F.3d 1267, 1274 (D.C.Cir. 1995), See Velger v. Cawley, 525 F.2d 334, 336 (2d Cir. 1975.

3.    In the case of Bartnicki et al. *v.* Vopper, aka Williams, et al, Supreme Court of the United States, Argued December 5, 2000 - Decided May 21, 2001. Petitioners filed a damages suit under both federal and state wiretapping laws, alleging, among other things, that their conversation had been surreptitiously intercepted.

4.    The District Court concluded that, under the statutory language, **an individual violates the federal Act by intentionally disclosing the contents of an electronic communication when he or she knows or has reason to know that the information was obtained through an illegal interception, even if the individual was not involved in that interception.**

5.    The Court held that: **"[t]he First Amendment protects the disclosures made by respondents in this suit. (a) Title III of the Omnibus Crime Control and Safe Streets Act of 1968. As amended, prohibits the interception of wire, electronic, and oral communications. Title 18 U.S.C. § 2511(1) (a) applies to the person who willfully intercepts such communications and subsection (c) to any person who, knowing or having reason to know that the communication was obtained through an illegal interception, willfully discloses its contents. Accordingly, the disclosures violated the statutes."**

6.    The United States District Court, Washington, D.C. Wiretap records confirmed that **Year 2004** there were no **Reported Use of Wiretap**, and **No Orders Authorized**; Department of Justice (DOJ) Criminal Division confirmed that Douglas Fahey didn't have, apply, or posses a Court order, the Metropolitan Police Department confirmed that Douglas R. Fahey was unlicensed.

## II.  **JURISDICTION AND VENUE**

This Court has both subject matter jurisdiction over this action and personal jurisdiction over Plaintiffs' claims, Motion to Suppress Evidence and Injunctive Relief, pursuant to Omnibus Crime Control and Safe Streets Act of 1968, Title III, §§ 801–804, Privacy Act, 5 U.S.C. § 552a, § 2518 Procedure for interception of wire, oral, or electronic communications.

## III.  **Wiretap-Act Claim**

Defendants violated the Wiretap statute when they acquired a face to face interception of Plaintiffs oral communication on April 14-15, 2004, relied upon, used, duplicated, stored, and released stored contents outside the Federal Deposit Insurance Corporation to 3rd party named defendant Steve Kaufer, CEO, Workforce Violence Institute. The Wiretap Act was enacted in 1968 to prohibit the unauthorized interception of wire and oral communications.

The Act defined "wire communications" as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable or other connection." Intercept was the "the aural acquisition of the See United States v. Turk, 526 F.2d 654, 658 (5th Cir. 1976).

4

## IV.  **STATUTE**

Whenever any **wire** or **oral communication** has been intercepted**, no part of the contents of such communication** and no **evidence derived there from may be received in evidence in any trial**, **hearing**, or **other proceeding in or before any court**, **grand jury**, **department**, **officer**, **agency**, **regulatory body**, **legislative committee**, or other **authority** of the United States, a State, or **a political subdivision** thereof if the disclosure of that information would be in violation of the statute.

## V. **CAUSE OF ACTION**

A party to a communication may sue a person who: (1) intercepts, attempts to intercept, or employs or obtains another to intercept or attempt to intercept the communication; (2) uses or divulges information that he knows or reasonably should know was obtained by interception of the communication; or (3) as a landlord, building operator, or communication common carrier, either personally or through an agent or employee, aids or knowingly permits interception or attempted interception of the communication.

5

## VI.  PROHIBITION OF USE AS EVIDENCE WIRE OR ORAL COMMUNICATION U.S.C. TITLE 18, SECTION 119 CRIMES AND CRIMINAL PROCEDURE

Year 2004, 2005, 2006, and 2007 the Federal Deposit Insurance Corporation (FDIC) and named Defendants relied upon, received into evidence, used, duplicated tape recordings and developed investigative reports of an unlawful interception of Plaintiffs oral communication in violation of Sec. 2515. Prohibition of use as evidence of intercepted wire or oral communications.

## VII.  ***BACKGROUND***

1.      On April 14-15, 2004, Plaintiff was approached by named defendant Jenekia J. Johnson. The 25-year old intern, employed, supervised, and hired by her aunt (**nepotism**) is involved in an alleged Federal Theft. Plaintiff had no knowledge that Ms. Johnson concealed a hidden tape placed inside her purse by Douglas R. Fahey (unlicensed security guard), while **acting under the color of law.**

2.      The Agency relied upon the use of the interception of Plaintiff's oral communication and evidence derived there from to unlawfully effectuate Plaintiff on January 21, 2005, and March 32, 2006.

6

3.      Defendant Douglas R. Fahey (unlicensed) impersonator, interrogated Plaintiff for 3 hours, relied upon evidence intercepted, developed an investigative interview report from the contents of the illegal wire, distributed reports among FDIC senior managers, security personnel and sent a copy outside the FDIC to Steve Kaufer, CEO, Workforce Violence Institute, named defendants. See **18 U.S.C. Section 913 - Impersonator Making Arrest or Search "Whoever falsely represents himself to be an officer, agent, or employee of the United States**, and in **such assumed character arrests** or **[detains any person]**; or in any manner searches the person, buildings, or other property of any person, shall be fined under the title or imprisoned not more than three years, or both. See also **Section 912. Officer or employee of the United States.**

4.      Plaintiffs request for **a permanent injunction** is warranted. Plaintiff has incurred irreparable damages because of the continued **existence, use**, and the Defendants unauthorized reliance upon evidence intercepted in violation of the Patriot Act, DOJUSAM, Privacy Act, and strict requirements in accordance to U.S.C. §119 of title 18, which was enacted by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510-2521 (2000 & West Supp. 2005), is often referred to as "Title III."

7

5.      Historically Courts have argued that: ***"A court itself must determine whether the circumstances are appropriate for the claim of privilege, and yet do so without forcing a disclosure of the very thing the privilege is designed to protect. Reynolds, See 345 U.S. at 8."***

6.      In another case, Courts reversed *Ellsberg v. Mitchell*, 709 F.2d 51 (D.C. Cir.1983) on appeal in the District of Columbia Circuit with respect to the plaintiffs' claims regarding the Government's admitted wiretaps, **because there was no reason to "suspend the general rule that the burden is on those seeking an exemption from the Fourth Amendment warrant requirement to show the need for it.**" See *Ellsberg*, 709 F.2d at 68.  The United States Supreme Court concluded that such an exemption is not to be lightly invoked. The privilege may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, {sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.  See *Ellsberg*, 709 F.2d at 56*."  Courts have ruled that: "A plaintiff's case may proceed based on evidence not covered by the privilege."

8

## VIII.  <u>Attorney General Alberto Gonzales – Wiretap Rules</u>

7.    At a briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence, *held on* <u>Dececember19, 2005</u> confirmed by Attorney Gonzales own statement that: **"The purpose of these <u>intercepts is to establish an early warning system to detect and prevent another</u> <u>catastrophic terrorist attack on the United States</u>. Although FISA generally requires judicial approval of <u>electronic surveillance</u>, FISA also contemplates that <u>Congress</u> <u>may authorize such surveillance by a statute other than FISA</u>.** *See* **50 U.S.C. § 1809(a) [<u>prohibiting any person from intentionally "engag[ing] . . . in electronic</u> <u>surveillance under color of law except as authorized.</u>** District Court Judge Vaughn Walker found that the **Government** had admitted confirmed by United States Attorney that It monitors **"<u>contents of communications</u> <u>where * * * one party to the communication is outside the United States</u> and the <u>government has a reasonable basis to conclude that one party to</u> <u>the communication is a member of al Qaeda, affiliated with al Qaeda, or</u> <u>a member of an organization affiliated with al Qaeda, or working in</u> <u>support of al Qaeda</u>."** Plaintiff is certainly not <u>Al Qaeda.</u>

9

8.    The United States Attorney General confirmed that after 911 that the [*one party to a conversation rule applies to*]: "**....communications where one party to the communication is outside the United States, and the government has a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda.**"

9.    Plaintiff provided evidence to the Agency on April 14-15, 2004, 2005, 2006 and 2007 that her personal conversation was held inside a closed-door office at the location of **1717 H Street, N.W., Washington, D.C**. which is **not** a communication outside the United States of America, she quoted a bible verse that the Defendant stated she heard plenty of times before, Plaintiff is a United States citizen, and is certainly not a member or affiliated with **al Qaeda**; and or a **terrorist**.

## IX.    **Plaintiff established a *prima facie* case**

10.    Plaintiff has shown that because of the existence of the unauthorized interception of her oral communication, duplications of the tape recording, creation of an investigation interview report disclosure of tapes, transcripts, medical documentation regarding Plaintiff's family that Plaintiff is entitled to a suppression of evidence, injunctive relief.

11.    The law is clear that Plaintiff has a liberty interests when an individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, threats, alcoholism, disloyalty, Communism or subversive acts or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities.

12.    Courts have ruled that liability for negligence takes place when there is: (a) A duty or obligation or care which requires a certain standard of conduct; (b) A failure to conform to that standard of conduct; (c) A reasonable causal connection between the failure to conform to that standard of conduct and (d) An actual loss or injury.  Plaintiff established liability on behalf of the FDIC and named defendants which further warrant issuance of an Injunctive Relief on behalf of Plaintiff.

## X.    DUE PROCESS CLAUSE

13.    The Due Process Clause of the Fifth Amendment forbids the federal government from depriving persons of "life, liberty, or property, without due process of law." "'Liberty' and 'property' are broad and majestic terms. See County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 1716 (1998), this is so "whether the fault lies in a denial of fundamental procedural fairness" or "in the exercise of power without any reasonable justification in the service of a legitimate governmental

objective." See Lewis, 118 S.Ct. at 1716. Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to her by use of a 3rd party contractor, notice and an opportunity to be heard are essential. See Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).

## XI. <u>Plaintiff Established Standing</u>

14.    It is well established that Article III of the U.S. Constitution limits the federal court's jurisdiction to "cases" and "controversies". *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have a genuine case or controversy, the plaintiff must establish standing. "[T]he core component of standing is essential an unchanging part of the case-or-controversy requirement of Article III." See *Lujan v. Defenders of Wildlife*.

15.    To establish standing under Article III, a plaintiff must satisfy the following three requirements: (1) "**<u>the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is</u>** (a) **<u>concrete</u>** and **<u>particularized</u>**, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560-561.

16.    Courts have argued that to determine whether a Plaintiff has standing to challenge a warrnatless intercept or the the constitutionality thereof it must examine the nature of the injury-in-fact which they have alleged. The injury must be ...'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.'" *National Rifle Association of America v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997) (citing *Allen v. Wright,* 468 U.S 737, 751 (1982)).

17.    Plaintiff has provided evidenced that she was a former outstanding Federal Deposit Insurance Corporation employee, at CG-11, with an annual salary of $72,000.00, 401k, retirement benefits, social security, thrift savings, medical, dental, life insurance and 25-year civil service employee.

18.    The Federal Deposit Insurance Corporation (FDIC) and named Defendants acts of intentional malice, unauthorized interception of oral communication, duplication, release, reliance upon evidence collected since 2004, has deprived Plaintiff of her property rights, civil rights, and gravely interfered with Plaintiffs ability to achieve employment, benefits, and **{secure life sustaining medical and health benefits for her severely autistic son with a seizure disorder}.**

13

19.   As stated, in **December 2005**, the President publicly acknowledged that intercepts are only warranted in communications as to which there are reasonable grounds to believe that: (1) **the communication originated or terminated outside the United States**, (2) **a party to such communication is a member of al Qaeda, a member of a group affiliated with al Qaeda, or an agent of al Qaeda or its affiliates.**

20.   Plaintiff undeniably have earlier cited to distinct, palpable, and substantial injuries that have resulted from the Federal Deposit Insurance Corporation (FDIC) and named Defendants unlawful intrusion of Plaintiffs privately held conversation inside a closed door office and **conspired,** a warrant less **interception of an oral communication** . Plaintiff has established that her injuries are "**concrete** and **particularized**", and not "abstract or conjectural."

21.   The **extremely strict** guidelines which govern intercepts and wiretaps were admittedly reinstituted after **September 11, 2001**, and have been **[reauthorized by only the authority of the United States President]** not by the authority of the **Federal Deposit Insurance Corporation, an unlicensed contractor** or **25-year old intern involved in a Federal theft**.

14

22.    The FISA defines a **"United States person"** to include Plaintiff herein and requires **a prior warrant for any domestic international interception of communications**.    Only for various exigencies, exceptions are made.  i.e., **Congressional Declaration of War within which it may conduct intercepts before application for an order**.

23.    It is also upon certification by the Attorney General, and seventy-two hours for other defined exigencies. See 3650 U.S.C. § 1805(f) 3750 U.S.C. § 1805(e) (1) 3850 U.S.C. § 1806(c) 3950 U.S.C. § 1804(a) (7) (E) (ii), § 1805(a) (5) 4050 U.S.C. § 1805(b) 4150 U.S.C § 1803 4250 U.S.C § 1805 27.36.  Delays clearly reflect Congressional effort to balance executive needs against the **privacy rights of United States persons**, Government for intelligence information and the **protected rights of our citizens**. *U.S. v. U.S. District Court*, **407 U.S. at 322-323**.

24.    The Act was subsequently found to meet **Fourth Amendment requirements constituting a reasonable balance between Governmental needs and the protected rights of our citizens**, in *United States v. Cavanagh*, 807 F.2d 787 (9th Cir. 1987), and *United States v. Duggan*,743, F.2d 59 (2d Cir.1984).

25.    A requirement of 'probable cause' instructs a magistrate judge that **baseless searches shall not proceed**. See *U.S. v. U.S. District Court*, 407 U.S. at 316. The Fourth Amendment was adopted to assure that **Executive abuses of the power to search would not continue in our new nation**. See *United States v. Karo*, 468 U.S. 705 (1984). It also **requires prior warrants for any reasonable search**, based upon **prior-existing probable cause**, as well as particularity as to persons, places, and things, and the interposition of a neutral magistrate between Executive branch enforcement officers and citizens. '**A governmental action to regulate speech may be justified only upon showing of a compelling governmental interest**' See *Clark v. Library of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984).

26.    FISA explicitly **admonishes that "... No United States person may be considered ... an agent of a foreign power solely upon the basis of activities protected by the First Amendment to the Constitution of the United States." 50 U.S.C. §1805(a) (3) (A). See also *United States v. Falvey*, 540 F. Supp. at 1310.**

*16*

### *Conclusion*

For all of the reasons outlined above, Plaintiff petitions this Honorable court to grant Plaintiff's Motion to Permanently Suppress evidence in the possession, collected, used, duplicated, released by the Federal Deposit Insurance Corporation (FDIC) and named Defendants.

It is well-settled that a plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.* 126 S.Ct. 1837, 1839 (2006).

**Wherefore**, Courts have recognized that, **"[a] party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer "continuing irreparable injury" for which there is no adequate remedy at law."** *Women's Medical Professional Corp. v. Baird,* 438 F.3d 595, 602 (6th Cir. 2006). 43.

17

**Wherefore**, Plaintiff pleas this Honorable Court to issue an Order to permanently suppress evidence in violation of D.C. Code 23-541-23-556, criminal code under section U.S.C. Tile 18, section 119, 2518, 2519; and grant injunctive relief and assessment of penalties in violation of the statute.

**Wherefore**, Plaintiff has demonstrated that she is legally entitled to proceed with her complaint before this Honorable Court for its consideration prior to any final judgment being issued.

Respectfully submitted,

Yolanda C. Gibson-Michaels (prose)
2210 Anvil Lane
Temple Hills, Maryland  20748
(301) 630-5062

Evidence:   Excerpt of intercept
            Sworn Affidavits from FDIC
            FDIC submission of ease drop tape recording
            Ltr. From Metropolitan Police Department
            Ltr. From DOJ Criminal Division
            Memorandum from FDIC James T. Lantelme,
            Assistant Director
            U.S. District Court – Wiretap Report
            18 U.S.C Code- Guidelines for Intercept and Disclosure
            Ltrs. To Congress etc.

18

## CERTIFICATE OF SERVICE

I herby Certify that on this **26th day of March 2007**, a copy of the

foregoing **Plaintiff's Motion to Permanently Suppress Evidence** and

**Motion for Injunctive Relief** was mailed to named defendants:

**Copies to:**

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, N.W. – Suite 600
Washington, DC  20006

Scott D. Helsel
Walton & Adams,
1924 Isaac Newton Square
Reston, Virginia  20190

David Zachary Kaufman, Esq.
Kaufman Law Firm
11350 Random Hills Road – Suite 800
Fairfax, Virginia  22030
Securiguard, Inc.
  and USEC Corporation

Claire Whitaker, U.S. Attorney
555 4th Street, N.W. E-4204
Washington, D.C.  20530

19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOLANDA C. GIBSON-MICHAELS )
           Plaintiff, )
                     )
                     )
           v. )  Civil Action: **06CV01940 (RMU)**
                     )
SHELA C. BAIR, et.al. )
          Defendants )

## ORDER

It is upon consideration of **PLAINTIFFS' MOTION TO**

**PERMANENTLY SUPPRESS EVIDENCE** and **MOTION FOR**

**INJUCTIVE RELIEF** are hereby by **Granted** on this _____ day of

_____, 2007.


_____
Judge

**Copies to:**

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, N.W. – Suite 600
Washington, DC  20006

David Zachary Kaufman, Esq.
Kaufman Law Firm
11350 Random Hills Road – Suite 800
Fairfax, Virginia  22030
Securiguard, Inc./USEC Corporation

Scott D. Helsel
Walton & Adams,
1924 Isaac Newton Square
Reston, Virginia  20190

Claire Whitaker, U.S. Attorney
555 4th Street, N.W. E-4204
Washington, D.C.  20530

EVIDANCE



**Table 1**

**Jurisdictions With Statutes Authorizing the Interception
of Wire, Oral, or Electronic Communications
Effective During the Period January 1 Through December 31, 2004***

| Jurisdiction | Statutory Citation** | Reported Use of Wiretap in 2004 | Number of Orders Authorized in 2004 |
|---|---|---|---|
| Federal | 18:2510 - 2520 | Yes | 730 |
| Alaska | 12.37 | No | - |
| Arizona | ARS 13-3010 - 13-3018 | Yes | 10 |
| California | Penal Code Sections 629.50-629.98 | Yes | 180 |
| Colorado | 16-15-102 | No | - |
| Connecticut | 54-41a - 54-41t | No | - |
| Delaware | 11 Del.C.Chap.24 | Yes | 4 |
| District of Columbia | 23-541 - 23-556 | No | - |
| Florida | 934.01 - 934.10 | Yes | 72 |
| Georgia | 16-11-64 | Yes | 38 |
| Hawaii | 803-41 - 803-48 | No | - |
| Idaho | 18-6701 - 18-6710 | No | - |
| Illinois | 720 ILCS SEC.5/108B | Yes | 21 |
| Indiana | 35-33.5-3-1 | No | - |
| Iowa | 808B.1 - 808B.9 | No | - |
| Kansas | 22-2514 - 22-2516 | No | - |
| Louisiana | Act No. 121 3B No.233 15:1308(A)(2) | No | - |
| Maine | 15 M.R.S.A. Sec 709 et seq. | No | - |
| Maryland | 10-401 - 10-411 | Yes | 34 |
| Massachusetts | 272.99 | Yes | 23 |
| Minnesota | 626A.01 - 626A.21 | Yes | 1 |
| Mississippi | 41-29-501 | Yes | 3 |
| Missouri | 33-542.400 - 542.424 | No | - |
| Nebraska | 86-290 - 86-294 | No | - |
| Nevada | 179.410 - 179.515, NRS 200.620 | Yes | 8 |
| New Hampshire | 570-A:1 - A:11 | Yes | 13 |
| New Jersey | 2A-156A-1 - 156A-34 | Yes | 144 |
| New Mexico | 30-12-2 - 30-12-11 | No | - |
| New York | CPL Article 700 | Yes | 347 |
| North Carolina | N.C.G.S. 15A-286 | No | - |
| North Dakota | 29-29.3 | No | - |
| Ohio | 2933.51 - 2933.66 | Yes | 1 |
| Oklahoma | 13 O.S. 176.1 - 176.14 | Yes | 16 |
| Oregon | ORS 133.721 - 133.739 | No | - |
| Pennsylvania | 18 Pa.C.S. Sec 5701-5728 | Yes | 32 |
| Rhode Island | 12-5.1-1 - 12-5.1-16 | No | - |
| South Carolina | SC Code Section 17-30-10 et seq. | No | - |
| South Dakota | 23A - 35A | No | - |
| Tennessee | 40-6-301 - 40-6-311 | Yes | 38 |
| Texas | Crim. Proc. Sec. 18.20 | No | - |
| Utah | 77-23a-1 - 77-23a-16 | No | - |
| Virgin Islands | 5 V.I.C. Sec 4101-4107 | No | - |
| Virginia | 19.2-61 | No | - |
| Washington | 9.73 | No | - |
| West Virginia | 62-1D-11 | No | - |
| Wisconsin | 968.27 - 968.38 | Yes | 2 |
| Wyoming | 7-3-701 - 7-3-712 | No | - |

\* Pursuant to provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2516.

\*\* Includes only those jurisdictions that enacted legislation during or before calendar year 2004.

## FEDERAL LAW

Federal law makes it a crime to intentionally intercept, attempt to intercept or have someone else intercept on one's behalf any wire, oral or electronic communication. It is also prohibited to intentionally use, attempt to use or have someone else use "any electronic, mechanical, or other device" to intercept an oral communication when the device is affixed to or otherwise transmits a signal through radio or through "a wire, cable, or other like connection" used in wire communication.

It is also illegal to intentionally use or disclose any information concerning the substance, purport or meaning of such a communication if one knows or has reason to know the information was obtained illegally.

**At A Glance**

- Consent of one party required.
- Civil damages are available.
- Cellular and cordless telephone communications are protected under federal law
- FCC regulations also govern interception and recording.

FDIC Approved contract to place illegal tape recording inside handbag purse. Sony cassette 90 min

FDIC continues to use illegal wire, as evidence.

### Reasonable expectation of privacy

The statute requires a reasonable expectation of privacy for oral communications. In other words, to be protected an oral communication must be uttered by a person exhibiting an expectation that the communication is not subject to interception, under circumstances that justify that expectation.

Applicant quoted verse ~~from~~ the Bible. FDIC confirmed on Tape

→ Bible verse not subject to sting operation by FDIC or conducting meeting in vacant offices to plot, plan, write criminal Read scripts.

### Consent

It is legal for a person to intercept a communication if the person is a party to the communication or if one of the parties to the communication has given *prior* consent to the interception, unless the communication is intercepted for the purpose of committing a criminal or tortious (wrongful) act.

It is legal to intercept a radio communication that is transmitted by any governmental, law enforcement, civil defense, private land mobile, or public safety communications system, including police and fire department communications, that is readily accessible to the general public. "Readily accessible" means, among other things, that the communication is not scrambled or encrypted. Interception of amateur, citizens band and general mobile radio services communications is also legal.

**Cellular and cordless telephone communications**
The federal statute was revised in 1986 to include cellular telephone communications and in 1994 to include cordless telephone communications.

**Defenses**
The U.S. Supreme Court has held that the First Amendment protects the publication of truthful information that is lawfully obtained. The federal interception statute, however, prohibits the disclosure or use of *illegally* obtained communications, when there is knowledge or reason to know that they were obtained illegally. Courts have upheld the media's right to publish the contents of communications that were obtained legally but have ruled that the media do not have a special First Amendment defense for publishing the contents of an illegally obtained communication.
Comments in the report of the Senate Judiciary Committee on the original federal statute show that Congress did not mean to prohibit the disclosure of the contents of an intercepted communication that had already become "public information" or "common knowledge." The committee did not, however, define those terms, nor are they in the language of the statute itself. "Public information" probably refers to an official, authorized disclosure, such as in court or in a public record. "Common knowledge" may mean enough people know the contents of the communication that further diminishment of the victim's privacy is negligible. This situation would include an instance in which a newspaper or other media outlet has already revealed the contents of a communication; further dissemination would not be a violation.

**Possession**
It is illegal to possess a device if one knows or has reason to know that its design makes it "primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." A police scanner that scans public radio frequencies as well as cellular frequencies is not generally considered an illegal device, but a scanner that scans only the cellular frequencies would be considered "primarily useful" for unlawful purposes. Illegal devices will be seized and forfeited, and violators will be fined according to the statute's general terms, imprisoned for up to five years or both.

**Criminal and civil penalties**
A violation of the statute is punishable by a prison

term of up to five years, a fine of up to $250,000 for individuals and $500,000 for corporations or both. Interception of the radio portion of a cellular or cordless telephone communication is punishable by a fine of from $500 to $250,000, but not incarceration.

Anyone whose communication is illegally intercepted, disclosed or used can sue for an injunction as well as to recover either actual damages plus any profits made by the violator or statutory damages, calculated at the rate of $100 per day of violation or $10,000, whichever is greater. Punitive damages, reasonable attorney's fees and court costs are also available.

A civil action must be brought within two years of the date the person had a reasonable opportunity to discover the violation.

*Discord Fisher 2005 (unicaped)*
*2005 No cantordn*

**FCC rules**

The Federal Communications Commission has adopted regulations that prohibit the use of certain transmitting devices, including wireless microphones, to overhear or record a "private conversation" unless authorized by all parties to the conversation. A "private conversation" is not one that takes place in a public or semipublic place.

Broadcast licensees are prohibited from recording a telephone conversation for broadcast without the consent of all parties. Notification must be given that the conversation will be broadcast before it can be broadcast live or taped. Consent may be presumed, however, as with callers to a talk-radio call-in program.

The FCC also restricts the recording of long-distance telephone calls. A call can be recorded if a beep tone is used, if all parties consent or if an announcement is made at the beginning of the call that it will be recorded. Enforcement of this regulation is the responsibility of telephone companies, and it is largely unenforced.

The FCC also prohibits broadcast stations from divulging the contents of police and fire department radio transmissions, although monitoring them is legal. It is legal to intercept and divulge a radio communication that is transmitted for the use of the general public and which relates to ships, aircraft, vehicles, or persons in distress or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

Violation of these provisions may result in forfeitures, criminal fines and possible adverse action regarding a broadcaster's license.

*[Handwritten marginal note:]* Fahey was discud 2005 by metropolitan police / DOJ. Repr confirmed Fishi was Acting Under the color of Law. Aided & Abetted by 25 year old H/A employed by her Aunt Jo Ann Williams Private Search to James T. Ly.

**LII / Legal Information Institute**

# U.S. Code collection

Prev | Next

**TITLE 18 > PART I > CHAPTER 119 > § 2519**

## § 2519. Reports concerning intercepted wire, oral, or electronic communications

*How Current is This?*

Search
this title:

Notes
Updates
Parallel
authorities
(CFR)
Your
comments

(1)  Within thirty days after the expiration of an order (or each extension thereof) entered under section 2518, or the denial of an order approving an interception, the issuing or denying judge shall report to the Administrative Office of the United States Courts—

    (a)  the fact that an order or extension was applied for;

    (b)  the kind of order or extension applied for (including whether or not the order was an order with respect to which the requirements of sections 2518 (1)(b)(ii) and 2518 (3)(d) of this title did not apply by reason of section 2518 (11) of this title);

    (c)  the fact that the order or extension was granted as applied for, was modified, or was denied;

    (d)  the period of interceptions authorized by the order, and the number and duration of any extensions of the order;

    (e)  the offense specified in the order or application, or extension of an order;

    (f)  the identity of the applying investigative or law enforcement officer and agency making the application and the person authorizing the application; and

    (g)  the nature of the facilities from which or the place where communications were to be intercepted.

(2)  In January of each year the Attorney General, an Assistant Attorney General specially designated by the Attorney General, or the principal prosecuting attorney of a State, or the principal prosecuting attorney for any political subdivision of a State, shall report to the Administrative Office of the United States Courts—

    (a)  the information required by paragraphs (a) through (g) of subsection (1) of this section with respect to each application for an order or extension made during the preceding calendar year;

    (b)  a general description of the interceptions made under such order or extension, including

        (i)  the approximate nature and frequency of incriminating communications intercepted,

        (ii)  the approximate nature and frequency of other communications intercepted,

        (iii)  the approximate number of persons whose communications were intercepted,

**LII / Legal Information Institute**

# U.S. Code collection

Prev | Next

TITLE 18 > PART I > CHAPTER 119 > § 2518

## § 2518. Procedure for interception of wire, oral, or electronic communications

*How Current Is This?*

Search
this title:

Notes
Updates
Parallel
authorities
(CFR)
Your
comments

(1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including

(i) details as to the particular offense that has been, is being, or is about to be committed,

(ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted,

(iii) a particular description of the type of communications sought to be intercepted,

(iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

**Response to in inquiry from**
**The Honorable Albert R. Wynn**
**on behalf of Ms. Yolanda Gibson-Michaels**

**The following information is provided by the FDIC's Legal Division**

As Ms. Gibson-Michaels notes in her letter, the Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. She was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. As a result of management's findings about Ms. Gibson-Michaels' misconduct, the FDIC has proposed to suspend her without pay for ten days. Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, and to receive all evidence relied upon. She is being represented in this matter by the labor union for FDIC employees, the National Treasury Employees Union (NTEU). If management decides to suspend Ms. Gibson-Michaels, she and NTEU may file a grievance and ultimately appeal the action to binding arbitration.

Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management. The conversation was recorded with the consent of a party to the conversation, as permitted by D.C. Code §23-542 and Federal law, 18 U.S.C. §2511. Nevertheless, Ms. Gibson-Michaels has objected to this as part of her reply to the proposed suspension.

*[handwritten right margin: FDIC Relied Upon Illegal Intercept]*

In addition to the process described above, on or about April 30, 2004, Ms. Gibson-Michaels contacted the FDIC's Office of Diversity and Economic Opportunity about many of the same events discussed in her letter to your office. She is being provided all the due process rights afforded to all federal employees in the pursuit of EEO claims.

Furthermore, on or about May 6, 2004, Ms. Gibson-Michaels also filed an unfair labor practice charge with the Federal Labor Relations Authority, essentially based upon the same incidents. The FLRA is currently conducting an investigation into her unfair labor practice charge allegations.

Finally, the FDIC Office of Inspector General (OIG) was an addressee on the letter Ms. Gibson-Michaels sent to you and she has asked OIG to conduct an inquiry into this matter. We will, of course, fully cooperate with any inquiry conducted.

*[handwritten at bottom: * D.C. Law, Federal Law requires court order, Sworn Affidavit, Federal crime (not able custodian). Federal Agent or U.S. Federal Attorney to conduct a wiretap not Sony Tape Recorder inside an Intern's purse!! Contract with Also Unlicensed Investigator (DC).]*

2



**Response to an Inquiry from**
**The Honorable Barbara A. Mikulski**
**On Behalf of Ms. Yolanda Gibson-Michaels**

**The following information is provided by the Federal Deposit Insurance Corporation's**
**Legal Division**

As noted in her letter, Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. Ms. Gibson-Michaels was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management.

The FDIC Legal Division reviewed the circumstances of the allegedly illegal interception and determined that the tape recording of a face-to-face conversation by a party to that conversation is lawful. Both the D.C. Code [§23-542] and Federal law [18 U.S.C. §2511] permit the recording of a conversation, with the consent of a party to the conversation.

As a result of management's findings that Ms. Gibson-Michaels had engaged in unprofessional and/or inappropriate behavior, the FDIC proposed that she be suspended without pay for ten days. On August 17, 2004, after reviewing the proposed suspension and its supporting evidence, the deciding official concluded that Ms. Gibson-Michaels's actions warranted disciplinary action. Based on her review of the record, and in consideration of Ms. Gibson-Michaels's employment record, the deciding official mitigated the proposed ten calendar day suspension to a five calendar day suspension from duty and pay beginning on August 23, 2004 and ending on August 27, 2004.

We would note that while the taping was not a violation of law nor of Ms. Gibson-Michaels's rights, the deciding official did not listen to the tape recording of the conversation nor did she rely on the portions of the transcript from the taped conversation contained in the record as she felt it was unnecessary in determining whether the underlying conduct took place.

Throughout the entire process, Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, to receive all evidence relied upon and to appeal the suspension decision under the grievance procedures contained in the negotiated agreement between the National Treasury Employees Union (NTEU) and the FDIC. She is being represented in this matter by the labor union for FDIC employees, the NTEU.

*FDIC Lied to senator mikulski. Tape was used, listen to, and Relied upon by FDIC Against Gibson-michaels. Read Fdics Response to Albert R. Wynn page 2.*

1

FILE NUMBER WASHINGTON                    Incident Number: 0-0000000186

I would not do anything. She said that Jenekia should confess to taking Kristian's money and go to the Credit Union, withdraw $200 and give it to Kristian over two weeks. She said Jenekia would feel better if she confessed and then said that if she doesn't confess, her guilt will affect her child (Jenekia gave birth to a daughter a few months ago). Yolanda raised a possible affect on her child a number of times.

*[handwritten left margin: reported offical → DTC JAMES]*

I told her that she did the right thing by coming to me. I told her to write down everything that she told me; what happened, who said what and when. I told her to call the investigator right away and tell him all that she told me. I told her that Yolanda's comments were improper.

*[handwritten left margin: Lantelme indicated "sealed feelings of threat"]*

A bit later I called Jenekia and asked her if she felt threatened by Yolanda and she confirmed that she did. *[handwritten: Lantelme initiated "Feelings of threat"]* *[handwritten right: 1 Entrapment]*

After she left, I called Bob Wooding and Randi Mendelsohn to tell them what I intended to do and to ask their advice for dealing with the situation. I then called Erica Bovenzi to tell her what had happened. I also left a message with Bill Kmetz to invoke the Management Response Team.

*[handwritten left margin: Entrapment is illegal]*

After a conference call around 2pm between Randi Mendelsohn, Bill Kmetz, Doug Fahey and me, I called Jenekia to tell her how we were addressing her concerns. I reiterated that it was important for her to write down all that she told me and send it to Mr. Fahey today. I also told her to avoid Yolanda Gibson-Michaels and to tell me if Yolanda further talked to her about anything related to her concerns. She then told me that around 1:30 pm Yolanda had asked her whether she had made any decisions about Yolanda's earlier conversation telling her what to do. Jenekia said she would not drop her charges and would continue to talk to the investigators. She said Yolanda told her she wouldn't be believed and would go to jail for up to 10 years and this would affect her ability to get any other federal job. She sounded upset over the phone while telling me this." (end of memo from LANTELME)

On 14 April 2004 at 15:43Hrs., JOHNSON e-mailed me the following statement of facts. (ATTACHMENT A) *[handwritten: Fahey asked Lantelme (several words illegible) Falsified]*

"Good Afternoon, Earlier this morning at 11:22am, I received a called from Yolanda Michael Gibson requesting me to come to her desk. Once I arrived she informed me that Kristian told her what took place Monday at the office, so she asked me to tell her my side of the story. After telling her the story she asked me to report with her to the project room. After being escorted and seated by Yolanda, she stated she love me, I have and will do so much for you and Kristian; I care for you like my child. Next she stated I am not taking side but you know I got Kristian working here. After that she starts to tell me the story on her mistakes and how she asked God for forgiveness because she did not want anything to back fire on her disability child. After that she keep on repeatedly saying I took the money because I either needed it or didn't, after telling her so many times I do not have Kristian money, she finally told me that something bad is going to happen to me and if it doesn't it will happen to your daughter (Jayda). I told Yolanda that I will report it to Jim but she told me I shouldn't because he isn't going to do anything about it. She keep on telling me that was the wrong thing to do, so leave it between us. Then repeatedly "Do you love you daughter" was all she kept on saying for like 3 minutes "God will forgive you. Next she kept on asking me to send an e-mail to Mr. Fahey, telling him a lye that Kristian and I found our money and to drop the case, and then she wanted me to go over to the credit union and take out a loan for Kristian in the amount of $300.00, or to pay Kristian $200 out of pay and $100 out of pay#. Then she says if I don't god will punish me. So she tells me to go back to my desk and think about it!

Yolanda calls back at 12:25pm on 4/14/04 to come over to her desk then she say and gives example of Kristian moving slow because of her pregnancy and being unable to open the cabinet our purses were in due to her belly. Then she states repeatedly Kristian could not have done it she moves to slow, and you to were the only one who new where the keys was, and since

*[handwritten bottom right: TAB 3]*

After asking GIBSON-MICHAELS to explain some of the specific inconsistencies, THORSTEINSON stopped the interview at 12:55Hrs. and asked for my assurance that nothing from this interview would be used in any potential future criminal proceeding against GIBSON-MICHAELS. I was not able to give him that assurance and we all agreed to contact James LANTELME regarding that issue. I contacted LANTELME by telephone and put him on speakerphone. THORSTEINSON addressed this issue with LANTELME, who stated he would checked with a labor relations attorney and call back. At 13:05Hrs., LANTELME called back and while on speakerphone, said that Jimmy LAWRENCE gave an assurance that nothing from this administrative interview would be used against GIBSON-MICHAELS in any future criminal proceeding. This assurance satisfied THORSTEINSON and the interview resumed.

In all, I addressed the following eleven questions from my interview with GIBSON-MICHAELS. Reference information as to where the relevant transcript information can be found on the tape is included. KEY: JJ = Jenekia Johnson; YGM = Yolanda Gibson-Michaels.

*40. Didn't she tell you she felt very threatened by you because you said that if nothing happens to her, then things would roll over to Jayda.*
ANS: No.

**Approximate tape reference information**
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

*Private Bible Discussion inside a closed door OFFICE*

**Relevant Transcript:**
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

**DISCUSSION on QUESTION 40:**
After listening to the tape, GIBSON-MICHAELS maintained her answer to the question was no, saying that JOHNSON said "believing me or not."

*39. In fact Mrs. Gibson-Michaels, Ms. Johnson told you that she felt very threatened by you didn't she?*
ANS: No. She never felt threatened by me. She said she felt threatened by her sins. I don't know what sins she was talking about.

**Approximate tape reference information**
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

**Relevant Transcript:**
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you

18

believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like, you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

## DISCUSSION on QUESTION 39:

After listening to the tape, GIBSON-MICHAELS initially maintained her answer was still no to this question. She first said she believed JOHNSON told her she felt very threatened yesterday "by you believing me or not" instead of "believe it or not." After review of the tape, SCHULL believed JOHNSON said "believe it or not." GIBSON-MICHAELS subsequently changed her answer to, "Yes, she told me that."

NOTE: No where on the tape does JOHNSON talk about her sins or feeling threatened by anything or anyone other than GIBSON-MICHAELS. .

*31. Did you tell Ms. Johnson that you believed Hecht's could have been threatening her for the money she owed them?*

ANS: No.

## Approximate tape reference information

Tape Counter Number: 136 and 147
Time into tape: 14 minutes 28 seconds and 15 minutes, 29 seconds

Relevant Transcript (136):

YGM: I was thinking it could have been Hecht's. Cause sometimes people [indistinguishable] threaten people?

JJ: You mean Hecht's?

YGM: Yes, I was thinking. Maybe, I said maybe she had to pay her Hecht's? Cause I don't, Kristian was saying you owe six hundred dollars to Hecht's.

Relevant Transcript (147):

YGM: Okay but you know how everyone's going to look at things the way I look at things. I look at this in fast. The fact well the only thing I'm thinking well maybe you could've gotten into a situation where Hecht's was threatening you or something (indistinguishable)

JJ: No, cause I'm not, haven't been late on a payment and I have never, I haven't been in that situation.

## DISCUSSION on QUESTION 31:

After listening to the tape, GIBSON-MICHAELS maintained her answer to that question was still no. She said the question wasn't worded properly; that I should have used the word "situation" in my question to her.

*14. Did you suggest to Ms. Johnson that she take a $300 loan from the credit union and pay back Ms. Beard?*

ANS: No. .

## Approximate tape reference information

**FILE NUMBER: WASHINGTON**              Incident Number: 0-0000000186

I again contacted JOHNSON and arranged to meet her in the lobby of 1717 H St. NW at 12:10Hrs. on 15 April 2004. We met at that time and then moved to vacant FDIC office space on the 1st floor. I placed a Sony cassette recorder with a 90 minute tape (45+ minutes per side) into her purse. I attached an omni directional power condenser microphone to the recorder and positioned the microphone so that it extended slightly, but unobtrusively from her purse. I suggested the way in which she could begin a conversation with GIBSON-MICHAELS might be to tell her she had been thinking about what she told her the day before. JOHNSON then advised me that just before coming downstairs to meet me in the lobby, she walked past GIBSON-MICHAELS' cube, and GIBSON-MICHAELS poked her head out and asked her if she had thought about what they talked about. JOHNSON told me she told GIBSON-MICHAELS no, that she was trying not to think about it. I then allowed JOHNSON to look at some notes I had handwritten on a piece of paper with potential ideas on how to begin a conversation with GIBSON-MICHAELS. After looking at the suggestions, JOHNSON came up with her own idea. She asked if she could just go to her and tell her that she felt threatened by her the day before. She said that was how she really felt. I agreed that expressing her true feelings would probably be the easiest way for her to succeed in beginning a dialogue. I turned the recorder to the "record" position and recorded a brief introduction, saying the date (April 15) and the time was 12:20Hrs. and that it was the beginning of the tape. At that time, JOHNSON left the room enroute to the 3rd floor of the building to locate GIBSON-MICHAELS. The tape subsequently revealed that approximately 10 minutes after leaving the room, JOHNSON located GIBSON-MICHAELS and began a conversation with her. The tape continued to run and record their conversation for approximately the next 37 minutes. I located JOHNSON at 13:20Hrs. on the third floor and accompanied her back to the 1st floor where I then recovered the recorder and tape from her purse. JOHNSON reported that the tape ended before their conversation did. She reported that at the end of the conversation, [off tape] GIBSON-MICHAELS hugged her. JOHNSON remarked that GIBSON-MICHAELS was "a lot nicer than yesterday." I asked JOHNSON if there were any witnesses to the conversation they just had and she stated, no.

On 15 April 2004, at 13:44Hrs., GIBSON-MICHAELS sent JOHNSON and BEARD an e-mail with a subject, LIE DETECTOR TEST. The e-mail read:

"This is a suggestion to get to the truth regarding your situation. Lie Detector test are 100 percent accurate. You both might want to consider taking a lie detector test; or volunteer since both of you are 100% certain that it wasn't you. Also, taking a lie detector to determine that it was someone else other than yourselves will give both of you a chance to resume your good friendship. Or the investigator might request that you are both tested regarding the facts surrounding your situation. The test only cost sometimes between $20.00 or $40.00 dollars.

FDIC might be able to administer the test free. Since there is a possibility that there could have been someone other than yourselves; then you both should take the test together or separate and apart. If you are telling the TRUTH...then there shouldn't be a problem with taking a LIE detector test to save your friendship. (SMILE)... " (end of e-mail)

On 15 April 2004, at 14:11Hrs., GIBSON-MICHAELS sent JOHNSON an internet link regarding polygraphs. The subject was, Information regarding the Polygraph (Lie Detector Test). JOHNSON forwarded that message to me on 19 April, stating that she wasn't able to review the link due to a virus warning.

On 16 April 2004, at 10:20Hrs., I left a voice message for JOHNSON to call me. At 14:20Hrs., I had a telephone conversation with her. I asked her to reflect on the conversation she had with GIBSON-MICHAELS the day before and tell me how she was feeling about all of this. JOHNSON stated she wouldn't be as comfortable with GIBSON-MICHAELS from now on and

4

by Ms. Gibson-Michaels comments but by what the investigation would uncover about herself. It is understood that Ms. Johnson decided then to go to Mr. Lantelme and tell him about the conversation from her point of view before Ms. Gibson-Michaels told him about their conversation and what may be uncovered in the investigation Mr. Fahey was going to pursue. Mr Lantelme also says that statements regarding harm coming to Ms. Johnson's baby or her were clearly unprofessional statements, meant to create fear and encourage Ms. Johnson to consider withdrawing her case with Mr. Fahey. The only way Ms. Johnson could have perceived harm would come to her or her child was if she had something to hide from god. She said herself she knew she had no worries for her or Jayda as she didn't take the money. That the nature of the conversation was biblical and spiritual, and one that Ms. Johnson herself said she has heard many times, should not provoke fear from Ms. Gibson-Michaels but from a higher power. The entire part of that conversation was discussing a biblical verse and what the bible says, and showing that if a parent does commit a sin, that in fact, that sin can transfer to their children and their children's children for three to four generations as written as the word of god. Why the repeating of something Ms. Johnson has heard so many times before, now she viewed as fearful because it came from Ms. Gibson-Michaels is unclear and makes no sense. If she was fearful, it was fearing for her physical safety, and if that was the case, then why did Ms. Johnson continue talking and privately meeting with Ms. Gibson-Michaels after Mr. Lantelme told her on the 14th of April not to? The pattern of events that followed that conversation on April 14th and April 15th do not show that fear or threatening of any kind were an element of concern to Ms. Johnson. Mr. Lantelme also states that Ms. Gibson-Michaels provided the investigator with inaccurate information. This was not

36

intentionally done. Ms. Gibson-Michaels did not say anything she did not believe was true. She answered everything truthfully and honestly. 43 questions were asked of her. Eleven questions were addressed and six were not answered to Mr. Fahey's satisfaction. These six questions are what has been previously addressed above. Out of the six questions management is using to support the inaccurate information provided to an investigator charges, two of them were not clearly stated and she did not hear what he did. Four of them have been explained. We do not feel it is correct in saying that in not recalling a part of such a lengthy conversation it was done intentionally or to mislead the investigator. Clearly that she did not remember saying those things at all. We are asking that the proposed ten calendar day suspension not be granted as the employee was acting in a mentor capacity and no threat was issued by Ms. Gibson-Michaels to Ms. Johnson what so ever. If there had been a physical threat, the MRT team would have reacted differently in dealing with the situation. We formally are asking that these accusations be removed from the employees personnel file and an apology made to her for the irrational behavior from Mr. Lantelme and the inappropriate treatment of Mr. Fahey.

**FDIC**
Federal Deposit Insurance Corporation

Case 1:06-cv-01940-RMU    Document 42-2    Filed 03/26/2007    Page 16 of 60

*Inreation to incriminate self refuse*
*right to M. Fahey*

Legal Division

April 21, 2004

**TO:**        Yolanda Gibson-Michaels
               Information Specialist

**FROM:**      James T. Lantelme
               Assistant General Counsel

**SUBJECT:**   <u>Mandatory Attendance at Investigatory Meeting</u>

Mr. Douglas Fahey, an investigator with the Division of Administration, notified you by an e-mail on Monday, April 19, 2004, of his need to meet with you for purposes of an investigative interview. Via return e-mail, you stated that "I will not subject myself to any form of investigatory interviews". Instead, you provided him with a written statement.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he has requested, and I direct you to cooperate in the interview. He is available on Friday, April 23rd at 2:00pm. I direct you to contact him to confirm the time for your appointment.

Failure to attend the interview and cooperate will result in disciplinary action being taken against you.

Cc: Douglas Fahey
    William Kmetz
    Robert Wooding
    Carl Polvinale

# FDIC
**Federal Deposit Insurance Corporation**

April 26, 2004

**TO:**     Yolanda Gibson-Michaels
            Information Specialist

**FROM:**   James T. Lantelme
            Assistant General Counsel

**SUBJECT:**  <u>Mandatory Attendance at Investigatory Meeting</u>

Due to an excused absence, you were unable to attend an investigative interview with Mr. Douglas Fahey, an investigator with the Division of Administration, scheduled for Friday, April 23rd at 2:00pm. Mr. Fahey has notified you by an e-mail on Friday, April 23, 2004, that he has rescheduled your interview to Wednesday, April 28th, 2004 at 9:30am at his office in the F Street building, room 1C27C.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I <u>direct</u> you to meet with <u>Mr. Fahey</u> at his office for purposes of the interview he has requested, and I <u>direct</u> you to cooperate in the interview. I <u>direct</u> you to contact him to confirm the time for your appointment.

Failure to attend the interview and cooperate will result in disciplinary action being <u>taken against</u> you.

Cc: Douglas Fahey
    William Kmetz
    Robert Wooding
    Carl Polvinale

*[handwritten: ATTN: FBI MR. ZACK  410-277-6658 (FBI)]*

| | | |
|---|---|---|
| Security Level | FDIC Security | |
| Category | Threats | Recorded in IRIMS |
| Subcategory | By Employee | FDIC Security |
| Type | | Washington, DC |
| Occurred From | 4/14/2004 11:22:00 AM | |
| Reported Date/Time | 4/14/2004 11:59:00 AM | |
| Reporting Person | Fahey, Douglas | *[handwritten: Unlicensed (FAKE) contractor investigator.* |
| Building/Site | 1717 H St. NW | *Falsified credentials, Defrauded FDIC, Illegally* |
| Address | | *intercepted Gibson- methods and coming* |
| | | *18 USC code* |
| Location | 3rd Floor | |
| Location Details | | |
| Loss/Damage Type | | |
| Incident Status | Ref.to Management | |
| Reported to Police | No | |

████████████████████████████████████████████

████ felt threatened by words used by employee.  *[handwritten: I entertain initiated feelings of threat]*

████████████████████████████████████████████

████████████████████████████████

| | |
|---|---|
| Person Type | Employee |
| Barring Notice | No |
| Person Details | |
| Sex | Female | Salutation |
| Employment Details | |
| Occupation | Information Specialist |
| User Defined Fields | |

████████████████████████████████

| | |
|---|---|
| Person Type | ReportingPerson |
| Barring Notice | No |
| Employment Details | |
| Occupation | Intern |
| User Defined Fields | |

*[handwritten: 14]*

| | |
|---|---|
| **From:** | Johnson, Jenekia |
| **Sent:** | Friday, May 21, 2004 8:58 AM |
| **To:** | Fahey, Douglas |
| **Subject:** | Yolanda |

May 21, 2004

I saw Yolanda Wednesday May 19, at 12:25pm, after leaving lunch. She stopped and said "Hi Jenekia Johnson"; I was so much in a shock she spoke to me so I just kept on walking as she stood their standing as though she was going to say something to me.

PS. I wasn't sure whether I should document this.

MS. JOHNSON was in shocked Because she Knows I was Framed-up!! Conspired Against!! illegally taped recorded (intercepted oral conversations) because of her lying Federal Alledged theft while employed by her Aunt (James T. Cantone) personal private Security.

**From:** Bovenzi, Erica F.
**To:** Gibson-Michaels, Yolanda C.
**Sent:** Monday, June 21, 2004 4:57 PM
**Subject:** Read: FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

Your message

**To:** Bovenzi, Erica F.
**Subject:** FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS
**Sent:** 6/9/2004 3:20 PM

was read on 6/21/2004 4:57 PM.

1

## Gibson-Michaels, Yolanda C.

**From:** Gibson-Michaels, Yolanda C.

**Sent:** Tuesday, May 11, 2004 5:41 PM

**To:** Lantaime, James

**Cc:** Schull, Donna; Coll, Elizabeth A.; Matthews, Howard L.; Polvinale, Carl A.; Wooding, Robert A; Fahey, Douglas; Harris, John (JR); Kmetz, William A.; Howard, Bill

**Subject:** RE: yg-minterview.doc (For the Record)

**Tracking:**

| Recipient | Read |
|---|---|
| Lantaime, James | Read: 5/12/2004 8:31 AM |
| Schull, Donna | Read: 5/12/2004 6:57 AM |
| Coll, Elizabeth A. | Read: 5/12/2004 9:07 AM |
| Matthews, Howard L. | Read: 5/12/2004 7:31 AM |
| Polvinale, Carl A. | |
| Wooding, Robert A | Read: 5/12/2004 6:55 AM |
| Fahey, Douglas | Read: 5/12/2004 6:16 AM |
| Harris, John (JR) | Read: 5/12/2004 6:58 AM |
| Kmetz, William A. | Read: 5/12/2004 10:13 AM |
| Howard, Bill | Read: 5/12/2004 6:17 AM |
| Wilt, Beth A. | Read: 5/12/2004 7:59 AM |

Jim,

As you are aware, on April 28th, 2004, I participated in the Weingarten interview as you directed and I cooperated with Doug Fahey, contractor as you ordered. Mr. Fahey expressed his *embarrassment* and *disbelief* when he played a tape recording of a conversation (in which I had no knowledge) by an alleged victim of a theft (Ms. Johnson) that she had LIED. The opening comment on the recording in Ms. Johnson's own voice is: *"I want to tell you that, I LIED."*

> Doug Fahey played the illegal recording in which myself, Donna Schull, Doug Fahey, (securiguard contract investigator), NETU National representative, and Fahey's assistant are witnesses to Ms. Johnson's opening statement from the illegal recording in which she stated, "I want to tell you that, I LIED" Instead of immediately apologizing to me, I was forced to answer open-ended questions in which the recording was used to phrase the questions before the investigative interview. <u>Ms. Johnson and Ms. Beard case regarding the theft has been ignored; despite Ms. Johnson's admission???</u>

## FACT:

I was out on official leave caring for myself and my severely autistic son with a seizure disorder during the time of this incident.

I was approached by Ms. Johnson and Ms. Beard for advice, counseling, and my opinion regarding their alleged theft as they have done so in the past which is documented throughout my "Outstanding" performance appraisals, work-related documents, and concurred by my immediate supervisor (Carl Polvinale) and my former supervisor (Jacqueline Edwards) that I have done exceptionally well for the past 5 years as serving as a team leader, role model, mediator of disputes, disagreements, advice, and

TAB 6

guide dance to all the interns whom currently work or formerly work for the legal services unit (Angel McCorkle, Denise Johnson, Jenekia Johnson, Kristian Beard, Kiana Hawkins, and Beth ?)  Thus, it wasn't unusual for Ms. Johnson to approach me with her concerns.

Ms. Johnson was instructed by Doug Fahey not to talk to anyone.  She ignored his instruction, solicited me for advice, then lied about "feeling threaten" as she recorded herself on tape. *Either she lied about the theft, lied about feeling threaten, or lied about both. A lie is a lie.*  Ms. Johnson's own taped recorded admission is conclusive, clear, and confirmed. There are no ambiguities that exist, the facts are clear.

*Conspiracy, Framedup, Fraud*

**From:** Johnson, Jenekia
**Sent:** Friday, May 21, 2004 11:38 AM
**To:** Johnson, Jenekia
**Subject:** FW: Recording conversation

-----Original Message-----
**From:** Johnson, Jenekia
**Sent:** Wednesday, April 28, 2004 3:27 PM
**To:** Fahey, Douglas    *FBI AGENT, Washington DC Field office 202-278-2000*
**Cc:** Lantelme, James
**Subject:** Recording conversation

April 28, 2004

Good afternoon Mr. Fahey,

I am writing this e-mail to make clear of my statement of April 15th in a tape recording conversation between Yolanda Gibson-Michael and myself. In that conversation, I said "I did lie to you Yolanda", which I was referring to an earlier conversation between she and I. In that conversation, Yolanda asked "did I think about what she said to me the day before", this was to confess to something that I did not do. I also told her that I went home and tried to think nothing of it.

During a conversation that I had with you 10 minutes later, you asked me was there any contact with Yolanda, from the last time we had spoke. I told you then, that I had just ran into her before I met with you. You asked me what was said by her, and I told you then, that all she said was "did I think about what she said yesterday and I said No". You then gave me a piece of paper which had writing on it, on how you wanted me to approach Yolanda. While you were placing the wire in my purse, you asked me to think of another way of approaching Yolanda. My way was to say hello Yolanda, I'm sorry that I lied to you, and yes I did think about what you has said to me yesterday.

*Framed up →*   *← Framed up*

*Conspiracy*

June 9, 2004

MEMORANDUM TO:     Yolonda C. Gibson-Michaels
                   Information Specialist

FROM:              James Lantelme
                   Assistant General Counsel

SUBJECT:           Notice of Proposed Ten (10) Calendar Day Suspension

I propose that you be suspended from work without pay for ten (10) calendar days under the provisions of 5 U.S.C. §§ 7501 through 7504 and 5 C.F.R. §§ 752.101 through 752.203, in order to promote the efficiency of the Federal service. I am proposing your suspension for unprofessional and/or inappropriate behavior and for providing inaccurate information to an FDIC investigator. If a decision is made to suspend you, it will not be effected earlier than 10 workdays from the date you receive this letter.

You have been counseled in the past concerning your conduct in the work place. In August 2003 Mr. Polvinale, your first-line supervisor, counseled you concerning your unprofessional and intimidating behavior concerning an incident with an acting supervisor. Based on recent incidents concerning your behavior, this action is proposed for the following reasons.

The reasons for proposing this suspension stem from your actions relative to Jenekia Johnson, a student intern assigned to your section. Ms. Johnson has stated that as a result of conversations you had with her on April 14 and April 15, 2004, she felt threatened by you. On April 14, 2004, Ms. Johnson contacted Douglas Fahey, an FDIC investigator, to report statements you allegedly made to her concerning an investigation that she had initiated into the disappearance of money from a cabinet in your section work area. Ms. Johnson stated that you were trying to get her to confess to taking money that presumably belonged to Kristian Beard, another student intern assigned to your section. According to Ms. Johnson, you told her that if she did not confess God would punish her and her daughter, Jayda.

Mr. Fahey has stated, that after meeting with the Management Response Team (MRT) on April 14, 2004, it was decided that an investigation would be initiated regarding the statement you allegedly made to Ms. Johnson.

On April 15, 2004, Ms. Johnson had a conversation with you and this conversation was taped. During an interview on April 28, 2004 with Mr. Fahey, you were asked several questions concerning these statements to Ms. Johnson.

*Ignored Law*

**Gibson-Michaels, Yolanda C.**

| | |
|---|---|
| **From:** | Lawrence, James R. |
| **Sent:** | Wednesday, June 02, 2004 5:33 PM |
| **To:** | Gibson-Michaels, Yolanda C. |
| **Subject:** | RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS |

Thanks for the information.   I enjoyed speaking with you.

-----Original Message-----
**From:** Gibson-Michaels, Yolanda C.
**Sent:** Wednesday, June 02, 2004 5:23 PM
**To:** Lawrence, James R.
**Subject:** FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

**Subject:** RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

Additional information...

# US federal wiretapping laws as of Jan. 2000

Contents:

- CRIMES:
  - 18 USC, PART I, CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS (includes 18 USC 2510-2522)
  - 18 USC, PART I, CHAPTER 121 - STORED WIRE AND ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL RECORDS ACCESS (incl. 18 USC 2701-2711)
- CRIMINAL PROCEDURE:
  - 18 USC, PART II, CHAPTER 205 - SEARCHES AND SEIZURES (incl. 18 USC 3117, "Mobile tracking devices"; non-wiretapping sections elided)
  - 18 USC, PART II, CHAPTER 206 - PEN REGISTERS AND TRAP AND TRACE DEVICES (incl. 18 USC 3121-3127)
- TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAMS
  - 47 USC, CHAPTER 9 - INTERCEPTION OF DIGITAL AND OTHER COMMUNICATIONS (incl. 47 USC 1001-1021; most CALEA provisions are in this part)

**Gibson-Michaels, Yolanda C.**

| | |
|---|---|
| **From:** | Bovenzi, Erica F. |
| **To:** | Gibson-Michaels, Yolanda C. |
| **Sent:** | Monday, June 21, 2004 4:57 PM |
| **Subject:** | Read: FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS |

Your message

   **To:**     Bovenzi, Erica F.
   **Subject:**  FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL
            COMMUNICATIONS
   **Sent:**    6/9/2004 3:20 PM

was read on 6/21/2004 4:57 PM.

Title 5 U.S.C. 82302 (B)(S) violations. (1) Violation of law, rule or regulation (2) gross mismanagement (3) gross waste of funds (4) Abuse of authority, (5) a substantial and specific danger to public health or waste.

FDIC approved for an unlicensed contractor to illegally tape record my conversation when the contractor (Douglas Fahey) placed a sony cassette recorder inside the purse of Jerelkia Jonhson. Illegal recording IS a violation covered under Title 5 U.S.C. 2302 (B)(S)

1

## AFFIDAVIT

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**


I, **James T. Lantelme,** hereby solemnly swear that I am employed in the position

of Assistant General Counsel, grade EM, Legal Division, Federal Deposit Insurance

Corporation (FDIC), 550 17th Street, NW, Room H-3123, Washington D.C. 20429. My

race is Caucasian, my color is white, my gender is male, my date of birth is November

10, 1953, and my religion is Lutheran. I have had prior EEO activities. I have undergone

EEO training regarding the preventing, reporting and mitigating of harassment. My first

line supervisor is Deputy General Counsel Erica Bovenzi.

I have read the Investigator's Letter of Authorization with the Accepted Issues

regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the

Notice of Rights of Witnesses in EEO Investigations form.

I have known Ms. Gibson-Michaels since 1998. Our relationship is purely

professional. I am currently Ms. Gibson-Michaels' second line supervisor. I have had

some contacts with Ms. Gibson-Michaels since she came to this section in 1998 including

during an FDIC reduction-in-force during 2002 and 2003. I am aware that Ms. Gibson-

Michaels is an African-American female, skin color black. I was not aware of Ms.

Gibson-Michaels' age or religion or of any prior EEO activity by Ms. Gibson-Michaels

until I was told about them during the course of this investigation. I learned of the

specifics of Ms. Gibson-Michaels' EEO Complaint when I read the Investigator's Letter

of Authorization during my interview on September 20, 2004.

Regarding Accepted Issue One, I did initiate an FDIC administrative investigation against Ms. Gibson-Michaels on or about April 14, 2004 for allegedly threatening Student Intern Jenika Johnson.  On or about April 14, 2004, Ms. Johnson came to my office visibly upset.  Ms. Johnson stated, in substance, that approximately 15 minutes prior, Ms. Gibson-Michaels had threatened Ms. Johnson in connection with an investigation of a theft of her money on FDIC property.  Ms. Johnson stated that a few days prior she had reported a theft of money to FDIC Security and that a fellow FDIC Student Intern was a suspect.  Ms. Johnson indicated that Ms. Gibson-Michaels talked to her and urged her to drop the charges against the other Student Intern as well as give the other Student Intern money.   Ms. Gibson-Michaels had asked Ms. Johnson to do the right thing and indicated to Ms. Johnson that if she did not something bad could happen to Ms. Johnson's child.  I asked Ms. Johnson to prepare a write-up of her conversation with Ms. Gibson- Michaels.

*[handwritten right margin: James Lambtline initiated A Feeling of Threat]*

FDIC procedures indicate that when an employee receives a threat the FDIC Management Response Team (MRT) should be contacted. I contacted William Kmetz of FDIC Security and reported my conversation with Ms. Johnson.  I did take some notes of my conversation with Ms. Johnson which I believe that I gave to Investigator Douglas Fahey.  I am unaware who informed Ms. Gibson-Michaels that she was the subject of an administrative investigation.  To the best of my knowledge the resultant investigation was conducted by Investigator Fahey and Mr. Kmetz.  I was not involved in the resultant investigation or the investigative decisions made by Investigator Fahey and Ms. Kmetz.

*[handwritten left margin: Mr. Lambtine Libol]*

I was aware that sometime later in April 2004, Investigator Fahey planned to have Ms. Johnson speak to Ms. Gibson-Michaels about the alleged threat.  Investigator Fahey

*[handwritten bottom: See memos dated 4/26/04 After Reading Affidavit]*

Affiant's Initials _____

had asked Ms. Johnson to conceal an electronic recorder on her person in order to record the conversation between herself and Ms. Gibson-Michaels. The decision to employ a hidden electronic recorder on Ms. Johnson's person was made by either Investigator Fahey or Security Chief Kmetz. I did ask the FDIC Assistant Director for the Labor and Employee Relations Section Randi Mendelsohn about the use of the hidden electronic recorder. I was told that she was aware of and approved the use of the hidden electronic recorder.

After the completion of the investigation, I received a report on Ms. Gibson-Michaels' actions from the MRT. The report indicated that there was no likelihood of physical violence against Ms. Johnson by Ms. Gibson-Michaels. It was nonetheless plain to me that Ms. Gibson-Michaels had interfered with the FDIC theft investigation and had lied about it to the investigators. I proposed that Ms. Gibson-Michaels receive a ten day suspension. Subsequently, the deciding official reduced the ten day suspension to a five-day suspension. Ms. Gibson-Michaels has served the five day suspension.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Two, on or about August 12, 2003, I did initiate an administrative investigation against Ms. Gibson-Michaels for allegedly threatening Ms. Terry Hopkins. On or about August 12, 2003, Ms. Hopkins came to my office and

informed me that as an Acting Supervisor she had asked Ms. Gibson-Michaels questions about a leave slip that Ms. Gibson-Michaels had given to Ms. Hopkins. I believe that the initial conversation took place in Ms. Hopkins' office. Ms. Hopkins stated, in substance, that Ms. Gibson-Michaels had objected to Ms. Hopkins' questioning of a signature on the leave slip. Ms. Hopkins felt intimated and left her office. Ms. Hopkins stated that Ms. Gibson-Michaels had followed her down a hall berating Ms. Hopkins. I believe that FDIC Secretary Eyvonne Bryant witnessed Ms. Gibson-Michaels berating Ms. Hopkins.

I contacted the MRT and a subsequent investigation was conducted. The investigation resulted in a conclusion that there was no likelihood of violence. Subsequently, I did orally counsel Ms. Gibson-Michaels about her behavior toward Ms. Hopkins. I do not believe that I made a written comment about my counseling session with Ms. Gibson-Michaels.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, Ms. Gibson-Michaels has been treated differently than Mr. Frank Nigro. Mr. Nigro is no longer a FDIC employee. Mr. Nigro retired from FDIC in 2003. I have been told that Mr. Nigro did have an explosive temper. I believe Mr. Nigro received an official admonishment that if he did not retire he would have been subject to severe disciplinary action. I believe that Ms. Gibson-

Affiant's Initials _____

Michaels had complained to FDIC about Mr. Nigro's behavior. I was Mr. Nigro's fourth level supervisor and did not personally know Mr. Nigro. I believe that Mr. Nigro is a white Caucasian male. I do not know Mr. Nigro's religion. I assume Mr. Nigro's age is over 50 since he was able to retire from the FDIC.

I have no knowledge that Mr. Nigro's race, color, gender, age and religion played any role or influenced in any manner FDIC Officials' decisions and actions about Mr. Nigro's on the job behavior. I have no knowledge of any type of favorable treatment given to Mr. Nigro by FDIC Officials due to Mr. Nigro's race, color, gender, age, and religion.

I am unaware that the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job performance. I believe that Ms. Gibson-Michaels is performing her current duties in a competent manner. I have been asked the question of whether the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job opportunities. I am unaware of any such FDIC job opportunities for Ms. Gibson-Michaels. FDIC has been in the process of becoming smaller and losing positions.

In summary, I have no knowledge of any type of discrimination by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

I have nothing further to add to my affidavit.

I have reviewed this statement, which consists of five (5) pages, and hereby solemnly swear that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

Affiant's Initials _____

I declare under the penalty of perjury that the foregoing is true and correct. Executed this

_27th_ day of _September 2004_ (date)

James T. Lantelme

Sworn and Subscribed by _____    Barry Cohen, EEO Contract

Investigator, on ___9/20/04___ (date).

Affiant's Initials ___JL___

## AFFIDAVIT

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**

I, **William A. Kmetz,** hereby solemnly swear that I am employed in the position of Assistant Director, grade E-1, Security Management Section, Administration Division, Federal Deposit Insurance Corporation (FDIC), 1776 F Street, NW, Washington D.C. 20429. My race is Caucasian, my color is white, my gender is male, and my date of birth is January 4, 1950, my religion is Roman Catholic. My first line supervisor is Mr. Michael Rubino, Associate Director, Corporate Services Branch, Administration Division. I have had routine FDIC training regarding the preventing, reporting and mitigating of harassment.

I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

I am not sure how long I have known Ms. Gibson-Michaels. I had seen her once or twice as a FDIC employee. Our relationship is purely professional. I am aware that Ms. Gibson-Michaels is an African-American female. I do not know her age or her religion. I have never supervised Ms. Gibson-Michaels. I have no knowledge of any prior EEO activity by Ms. Gibson-Michaels. I learned of Ms. Gibson-Michaels's current EEO Complaint when I was interviewed on September 27, 2004.

Regarding Accepted One, FDIC has a zero tolerance policy regarding allegations of work place violence. I chair the FDIC Management Response Team (MRT). The

Page 1 of 4    Affiant's Initials _____

MRT is an informal group of FDIC Officials concerned with the prevention of work place violence at FDIC. On or about April 14, 2004, I believe that I did receive a telephone call from James Lantelme of the FDIC Legal Division informing me as a MRT member and as Assistant Director- FDIC Security that a Ms. Johnson, a Legal Division employee had been allegedly threatened by Ms. Gibson-Michaels. I do not remember the specifics of my telephone call with Mr. Lantelme. After my telephone call with Mr. Lantelme, I contacted Investigator Douglas Fahey and asked him to investigative and make contact with Ms. Johnson. Mr. Fahey was a contract investigator with the Securiguard Corporation. Mr. Fahey was in charge of investigation. Mr. Fahey conducted the interviews in connection with the alleged threat investigation.

Mr. Fahey's investigation was formalized in the FDIC's Investigations Resources Information Management System (IRIMS). IRIMS is data base that contains investigative and security reports conducted by FDIC Security. I have forwarded Mr. Fahey's IRIMS report of this investigation to the Legal Administration Division

I do remember Mr. Fahey consulting with me about the use of a small electronic tape recorder which was to place in Ms. Johnson's handbag in order to secretly record a conversation between Ms. Johnson and Ms. Gibson-Michaels about the alleged threats that Ms. Gibson-Michaels had made to Ms. Johnson. Mr. Fahey indicated that Ms. Johnson had agreed to the placing of the tape recorder in her handbag in order to record her conversation with Ms. Gibson-Michaels. Mr. Fahey stated that since Ms. Johnson had agreed to the recording of her conversation with Ms. Gibson-Michaels that the recording of the conversation was a normal investigative technique. I advised Mr. Fahey to consult with FDIC Labor Relations and Mr. Lantelme regarding the use of the tape

Page 2 of 4

Affiant's Initials _____

recorder. I understand that this coordination was done, but I do not have any specific details. However, I believe that the participants agreed that since Ms. Johnson had given her permission to record her conversation with Ms. Gibson-Michaels that the use of the hidden recorder was permissible and legal.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

FALSE Regarding Accepted Issue Two, I do not recall the specifics of the 2003 investigation involving an alleged threat made by Ms. Gibson-Michaels to Ms. Terry Hopkins. The investigation was assigned to Investigator Fahey. I believe the investigation was conducted in a routine manner and formalized in the FDIC IRIMS. The report for this investigation has been forwarded to FDIC Administration.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue Two constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, I have no recollection of any events regarding this issue. I do not know Mr. Frank Nigro. I do not recall any conversations or email

Lisa, Read
Email to BM
knew
9/18/02

FDIC Sent TO
FISD, SirAc, FBI

Page 3 of 4 [initials]     Affiant's Initials ___[initials]___

messages about Mr. Nigro's FDIC job behavior. I have no knowledge of any FDIC favorable treatment of Mr. Nigro based on his Caucasian race, white color, male gender, and such factors as his age and religion.

Mr. Fahey is no longer employed as a contract Investigator by FDIC. He is currently employed by the Federal Bureau of Investigation.

In summary, I have no knowledge of any type of discrimination or reprisal actions by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion. To the best of my knowledge Ms. Gibson-Michaels was treated as any other FDIC employee.

I have nothing further to add to my affidavit.

I have read the foregoing statement consisting of ____ pages, each of which I initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement is made of my free will without any threat, promise of immunity, or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to interested parties.

_____
Signature


Subscribed and sworn before me in _____

this ____ day of _____, 2004

Investigator _____


Page 4 of X          Affiant's Initials _____

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to FDIC activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of FDIC employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____          _____
Signature of Interviewer            Signature of Witness (person providing statement)

Date: _10-8-04_____

Place: _Washington, DC_____



**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500

Office of Diversity and Economic Opportunity

## NOTICE OF RIGHTS OF WITNESSES
## IN
## EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statement of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1.  To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2.  To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3.  To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4.  To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5.  To review your affidavit and make corrections or other changes prior to signing the affidavit.

**I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.**

WITNESS: _William H. Kinet_    DATE: _9-27-04_

TAB E

## AFFIDAVIT

CITY OF WASHINGTON D.C. }

DISTRICT OF WASHINGTON D.C. }

I, **Jenekia J. Johnson,** hereby solemnly swear that I am employed in the position of Student Intern, grade four, Legal Division, Federal Deposit Insurance Corporation (FDIC), 550 17th Street, NW, Washington D.C. 20429. My race is African-American, my color is light brown, my gender is female, my date of birth is January 17, 1982, and my religion is Christian Baptist. My first line supervisor is Catherine Spenser.

I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

I have known Ms. Gibson-Michaels approximately five years. I met Ms. Gibson-Michaels when I started working at FDIC at the FDIC 1717 H Street building. Our relationship has been both social and professional. Ms. Gibson-Michaels befriended me and helped me with my work and various duties. I believe that Ms. Gibson-Michaels had befriended other Student Interns and helped them with their work and various duties. I have not socialized with Ms. Gibson-Michaels outside of FDIC. I am aware that Ms. Gibson-Michaels is an African-American female, skin color black. I am not aware of Ms. Gibson-Michaels age or her religion. I was unaware of Ms. Gibson-Michaels' EEO Complaint until my interview on September 20, 2004.

Regarding Accepted Issue One, On Monday, April 12, 2004, I had socialized and gone to bank with FDIC Student Intern Kristian Beard. At the bank, I discovered that

*Read* ✓

Affiant's Initials _JJJ_

*(handwritten notes in top margin)* Jordan ... Left $80.00. 10/4/04 Jordan Claim I saw co. Bal so w !!

$100 was missing from a total of $120 I had in envelope. When I got home, I made a telephone call to FDIC Security reporting a theft of $100 to FDIC Security. I believed that Ms. Beard was possibly responsible theft of $100 since my envelope containing the $120 had been locked inside my cubicle and that Ms. Beard had access to the key.

At approximately 11:00 AM, on April 14, 2004, Ms. Gibson-Michaels called me in the office and informed that Kristian had come to see her and told her about what had happened on Monday. Ms. Gibson-Michaels was aware of my reporting the theft of $100 and my belief that Ms. Beard was responsible for the theft. Ms. Gibson told me that she would like to hear my side of the story. Ms. Gibson-Michaels asked me to come to her desk. Ms. Gibson-Michaels and I had a conversation in the project room. There were no witnesses to our conversation. Ms. Gibson-Michaels stated, in substance, that she had a degree as a Paralegal. Ms. Gibson-Michaels said that she believed that I was lying about the missing money and that she believed that I still had the missing money. I responded that I believed that Kristian took the money. Ms. Gibson-Michaels responded by stating that she did not believe that Kristian took the money since Kristian was in a high risk pregnancy. Ms. Gibson-Michaels continued by stating if Kristian had taken the money, Kristian was in more need of the money than I was, since Kristian did not have any maternity leave left. Ms. Gibson-Michaels stated that she believed that I took the money and made a false report to FDIC. Ms. Gibson-Michaels continued by stating that God does not like ugly and how would I like my daughter to grow up without a mother. Ms. Gibson-Michaels stated that I was going to get ten years in jail. Ms. Gibson-Michaels stated that if God skips punishing me, he will punish Jayda, my infant daughter. Ms. Gibson-Michaels asked me to send an e-mail to Investigator Douglas Fahey and tell him

Affiant's Initials *(signature)*

that Kristian and I had found the money and that the case should be dropped. Ms. Gibson-Michaels wanted me to take out a loan from the Credit Union for Kristian. Ms. Gibson-Michaels told me to go back to my desk and think about it.

Ms. Gibson- Michaels made several additional telephone calls to me during the afternoon of April 14, 2004, regarding the theft investigation.

I was very upset about my conversations with Ms. Gibson-Michaels and went to Mr. Lantelme's office to report Ms. Gibson-Michaels' threats against me and my infant daughter. Mr. Lantelme asked me to prepare a write-up regarding my conversations with Ms. Gibson-Michaels on April 14, 2004. I did prepare a write-up regarding my conversations with Ms. Gibson-Michaels on April 14, 2004. On April 14, 2004, I e-mailed the write-up to Investigator Douglas Fahey. After proof reading the write-up, I sent an e-mail message with the corrected write-up to Mr. Fahey on April 15, 2004. I have given a copy of the e-mail message, dated April 15, 2004 that I sent to Mr. Fahey to the Investigator.

During the morning of April 15, 2004, I was interviewed by Investigator Fahey about the theft and my conversations with Ms. Gibson-Michaels. He asked me to take a hidden electronic recorder with me and engage in a conversation with Ms. Gibson-Michaels about her threats to me. He stated that if I did not take a hidden electronic recorder with me when I spoke to Ms. Gibson-Michaels, it would be Ms. Gibson-Michaels' word against mine regarding Ms. Gibson-Michaels' threats. I agreed to take the hidden electronic recorder with me when I spoke to Ms. Gibson-Michaels. Mr. Fahey cautioned me not to speak to Ms. Gibson-Michaels until he obtained the electronic recorder. After speaking to Mr. Fahey, I ran into Ms. Gibson-Michaels in the office. Ms.

*B, B2 verse not threat* [handwritten annotation]

Affiant's Initials

Gibson-Michaels asked me if I had thought about what she had said previously. Not knowing what to reply, I replied in the negative.

In the afternoon of April 14, 2004, I met with Mr. Fahey. Mr. Fahey was not happy that I had bunked into Ms. Gibson-Michaels. Mr. Fahey placed the electronic recorder in my handbag and told me that tape would last approximately 40 minutes. I went to see Ms. Gibson-Michaels. Not knowing how to justify our conversation, I stated to Ms. Gibson-Michaels that I was sorry that I had lied to you because I did think about what she had said to me previously. Ms. Gibson-Michaels said that God did take me and that I was fool to confess. Ms. Gibson-Michaels stated that I should give Kristian a $300 loan that should come from my paychecks. Ms. Gibson-Michaels stated that Kristian would forgive me if I ask for forgiveness. I was so upset and nervous that I did not continue with the conversation.

Subsequently, Mr. Fahey recovered the electronic recording device from my handbag. I believe that the tape had run out.

Regarding Accepted Issue One, I have no knowledge of any type of discrimination or reprisal by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion. I have no knowledge that Ms. Gibson-Michaels was treated any differently than other FDIC employee by FDIC Officials regarding the threat investigation.

Regarding Accepted Issues Two and Three, there was talk in the office about alleged FDIC racism, but I have no personal or first hand knowledge of any type of discrimination or reprisal by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

Affiant's Initials

I have nothing further to add to my affidavit.

I have reviewed this statement, which consists of 5 pages, and hereby solemnly swear ( X ) affirm (    ) that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this _4th_ day of _October_ (date).

_Jenekia Johnson_

Jenekia J. Johnson

Sworn and Subscribed by _____    Barry Cohen, EEO Contract

Investigator, on _10/4/04_ (date).

Affiant's Initials _JJJ_

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **FDIC** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **FDIC** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____
Signature of Interviewer

_Jenekia Johnson_
Signature of Witness (person providing statement)

Date: _10/4/04_

Place: _Washington D.C_

**FDIC**

**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500

Office of Diversity and Economic Opportunity

## NOTICE OF RIGHTS OF WITNESSES
## IN
## EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1.  To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2.  To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3.  To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4.  To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5.  To review your affidavit and make corrections or other changes prior to signing the affidavit.

I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.

WITNESS: _Jennifer Johnson_    DATE: _9/20/04_

TAB E

# AFFIDAVIT

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**

I, **Randi L. Mendelsohn**, hereby solemnly swear that I am employed in the position of Assistant Director, Human Resources Branch HR Strategy and Labor/Employee Relations, grade E-I, Division of Administration, Federal Deposit Insurance Corporation (FDIC), 1730 Pennsylvania Ave, NW, Washington D.C. 20429. My race is Caucasian, my color is white, my gender is female, my date of birth is February 7, 1960, and my religion is Jewish. I have had routine FDIC and other Federal training regarding the preventing, reporting and mitigating of harassment.

I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

I first met Ms. Gibson-Michaels in my role as Assistant Director-Strategy and Labor/Employee Relations during the oral hearing in June 2004. The oral hearing involved a proposed ten day suspension of Ms. Gibson-Michaels. I do not supervise Ms. Gibson-Michaels. Since meeting Ms. Gibson-Michaels at the oral hearing, I am now aware that Ms. Gibson-Michaels is an African-American female. I am not aware of Ms. Gibson-Michaels' age or her religious domination. I have no knowledge regarding any prior EEO activity by Ms. Gibson-Michaels. I did not learn of the specifics issues and

Page 1 of 5            Affiant's Initials _____ *RLM*

details of Ms. Gibson-Michaels' EEO Complaint until I was interviewed on October 8, 2004.

Regarding Accepted Issue One, I recall that in approximately April 2004, I was involved in a three way telephone call between James Lantelme of the Legal Division and Doug Fahey, an investigator with the FDIC Security Division. Mr. Lantelme had initially called me and informed me that FDIC-Security had been conducting an investigation involving the theft of money from a FDIC employee. He informed me that Ms. Gibson-Michaels had allegedly threatened the reporting FDIC employee regarding the theft investigation. Mr. Lantelme and Mr. Fahey contacted me to ask if there was a concern from a Human Resources perspective, regarding the proposed use of a secret electronic recorder that was to be placed on the person of the FDIC employee involved in the theft investigation who would then engage Ms. Gibson-Michaels in a conversation regarding Ms. Gibson-Michaels' alleged threat.

I remember that during the subsequent three way telephone call, Mr. Fahey had indicated, in substance, that the lawful use of a secret electronic recorder required of only the consent of one party to the conversation. Mr. Fahey stated that the use of a secret electronic recorder with the consent of one party to the proposed conversation had been used on prior occasions by FDIC-Security. Based upon Mr. Fahey's assurances that the use of the secret electronic recorder was legal, I stated, in substance, that from a Human Resources' viewpoint, that I did not see any objections regarding the use of the secret electronic recorder in the investigation.

After the phone call with Mr. Lantelme and Mr. Fahey, I mentioned to Mary Laverty, a Sr. Employee Relations Specialist on my staff about the use of secret

Page 2 of 5          Affiant's Initials _____

electronic recorder during an investigation. I cannot recall the specifics or any of the details of this conversation, but I do remember that she informed me that a tape recorder had been used in at least one prior FDIC investigation of which she was aware.

I was not involved in the initiation of alleged threat investigation involving Ms. Gibson-Michaels. Other than my three way telephone call with Mr. Lantelme and Mr. Fahey, I was not involved in any of the other investigative activities or decisions involving the alleged threat investigation involving Ms. Gibson-Michaels.

Subsequently, I do recall reviewing the Report of Investigation involving the alleged threats made by Ms. Gibson-Michaels. Based on the Report of Investigation and all other facts pertaining to this case, Mr. Lantelme had decided to issue Ms. Gibson-Michaels a proposed letter of a ten day suspension. Mr. Robert Wooding of my staff prepared the ten day proposed suspension letter for Mr. Lantelme.

I attended the oral hearing regarding the proposed ten day suspension of Ms. Gibson-Michaels to address any Human Resources questions that might be raised. The Deciding Official at the oral hearing was Ms. Erica Bovenzi. I was to advise Ms. Bovenzi or Ms. Gibson-Michaels or her representatives should any Human Resource questions arise. Subsequently, Ms. Bovenzi issued her decision over the proposed suspension and reduced the proposed ten day suspension to a five day suspension. Ms. Gibson-Michaels was suspended by the FDIC for five days for her misconduct as demonstrated in this case.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection

Affiant's Initials _____

with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels.

To the best of my knowledge, Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation and subsequent disciplinary action, given the same set of facts that existed in this case.

Regarding Accepted Issues Two and Three, I have no knowledge regarding these issues and was unaware of these issues until I read the Investigator' Letter of Authorization,

In summary, I have no knowledge of any type of discrimination or reprisal by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

I have nothing further to add to my affidavit.

I have read the foregoing statement consisting of ___5___ pages, each of which I initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement is made of my free will without any threat, promise of immunity, or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to interested parties.

_____
Signature

Subscribed and sworn before me in ___Washington DC___

**Page 4 of 5**          Affiant's Initials ___RLM___

this ___15th___ day of ___October___, 2004

_____
Investigator

Affiant's Initials _____

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **FDIC** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **FDIC** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____  _____

Signature of Interviewer     Signature of Witness (person providing statement)

Date: 10/15/04

Place: Washington DC



**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500

Office of Diversity and Economic Opportunity

## NOTICE OF RIGHTS OF WITNESSES
## IN
## EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1.    To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2.    To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3.    To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4.    To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5.    To review your affidavit and make corrections or other changes prior to signing the affidavit.

**I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.**

WITNESS: _____    DATE: _10-8-04_

Elgas, G. Penny

| | |
|---|---|
| **From:** | Kmetz, William A. |
| **Sent:** | Wednesday, September 22, 2004 1:42 PM |
| **To:** | Elgas, G. Penny |
| **Cc:** | Harris, John (JR) |
| **Subject:** | EEO Investigation |
| | |
| **Sensitivity:** | Confidential |

Here is the information you requested. The original documents are on file in our Physical Security office. Mr Harris is my POC on this. He can be reached at X83615. As Mr. Harris indicated, contacting Mr. Fahey may be difficult due to his current assignment. Let me know if you have any questions. Thanks.

**Bill Kmetz**
**202-898-6850**

-----Original Message-----
**From:** Harris, John (JR)
**Sent:** Wednesday, September 22, 2004 10:22 AM
**To:** Kmetz, William A.
**Subject:** FW: 1 more item please - FW: EEO Investigation
**Sensitivity:** Confidential

FY review before I forward to Ms. Penny.

I have retrieved all transcripts from the audio recording concerning the below investigation conducted by Mr. Fahey. SMS does not have any files concerning Mr. Frank Nigro.

Mr. Fahey is willing to talk with the EE0 investigator, but is requiring compensation for his time. SMS is unable to contact Mr. Fahey by phone due to his current job status and location with the FBI.

Mr. Fahey, has attended numerous training classes in in workplace violance and retired as a Captain from a New Jersey city police departement.

Mr. Fahey followed the rules of the Weingarten, Refs your inquiry "FDIC" rules, regulations, guidelines for interviewing employees. There are no specific rules within FDIC for this type of interview. Mr. Fahey was using a standard investigative technique when making the recording.

Mr. Fahey, follow the rules of NTEU (Section-7) informing Ms. Yolanda Gibson-Michaels of Employees Right to UNION representation and obtain a signed FDIC 2600/02 (4-99) "Right to Union Representation" in accordance to Global Message issued 5/29/2002.

  

0-016.pdf (109 KB)  0-186.pdf (30 KB)    case 0-186
                                         :tachment.doc (136.



-----Original Message-----
**From:** Kmetz, William A.
**Sent:** Tuesday, September 21, 2004 4:27 PM

1



October 12, 2004

Mr. Douglas Fahey
C/O USEC Corporation
7531 Leesburg Pike
Suite 402
Falls Church, VA
22043

Dear Mr. Fahey,

I am a Contract EEO Investigator who is investigating the EEO Complaint of FDIC employee Yolanda Gibson-Michaels. I am attaching my Letter of Authorization from FDIC to investigate Ms. Gibson-Michaels' Complaint. I would appreciate if I can speak to you about your role as a FDIC Contract Investigator regarding Accepted Issues One and Two in the Letter of Authorization. Ms. Gibson-Michaels has alleged that she was discriminated against due to her African-American race, black color, female gender, age and religion in connection with her Complaint. Without your statement the official record may be incomplete. My home number is ████████. Thank you for your cooperation.

Yours truly,

Barry Cohen

# MEMORANDUM

TO: Official File

FROM: Contract Investigator B. Cohen

SUBJECT: Investigatory Memorandum Regarding Efforts To Locate Mr. Doug Fahey

DATE: October 31, 2004

During my interview with Mr. Kmetz, he informed me that Mr. Fahey was working with the FBI and undergoing training. Mr. Kmetz informed that Mr. Fahey had worked as a contractor for Securiguard. On October 12, 2004, I called Securiguard in an effort to locate Mr. Fahey. I was told that Mr. Fahey was not employed by Securiguard and was told to contact USEC Corporation. I contacted USEC Corporation and was told that Mr. Fahey was no longer employed by USEC Corporation and that USEC Corporation would not provide me with Mr. Fahey's home telephone number. I asked if USEC Corporation would forward a letter to Mr. Fahey's home. The USEC employee stated they would forward my letter to Mr. Fahey. On October 12, 2004, I sent the attached letter to USEC Corporation. On October 12, 2004, I sent the attached letter to Mr. Fahey at the Federal Bureau of Investigation.

I was informed by a FDIC employee that she thought that Mr. Fahey lived in northern Virginia. There was a telephone listing for a Douglas Fahey in northern Virginia. I made two telephone calls to the number listed and left messages on an answering machine for Douglas Fahey.

To date, Mr. Fahey has not responded to any of my inquiries.

2



# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## METROPOLITAN POLICE DEPARTMENT
### Security Officers Management Branch

January 11, 2005

Mrs. Yolanda C. Gibson-Michaels
1717 H Street Northwest  Room H-3081
Washington, D.C.  20001

Dear Mrs. Gibson-Michaels:

This letter will confirm your conversation on December 22, 2004, with Ms. Gray, staff member of the Security Officers Management Branch.  As previously stated, researching our files Mr. Douglass Fahey is not certified or pending certification through this branch as a Private Investigator.

It should also be noted that the Security Officers Management Branch has no jurisdiction on Federal contract sites.

If you have any additional questions or concerns, please feel free to contact a staff member on (202) 671-0500.

Sincerely,

Sergeant Peter C. McGrath
Assistant Branch Manager

November 9, 2005


D.C. Wire Tap Office
Washington, D.C.

Re: **Expedited FOIA Request – Wire tap on Yolanda Gibson-Michaels**

In accordance to the Freedom of Information Act (FOIA), immediately upon request, provide a copy of:

(1) The wire tap court order secured by Douglas Fahey, contract investigator hired by the Federal Deposit Insurance Corporation (FDIC); contract by Securiguard on **April 14, 2004** and **April 15, 2004** to conduct a wire tap against Yolanda C. Gibson-Michaels on April 15, 2004.


(2) Provide a copy of all wire tap request by Douglas Fahey, contractor with securiguard for years 2003, 2004, and 2005.

(3) All copies of wire tap request by Federal Deposit Insurance Corporation against Yolanda C. Gibson-Michaels on April 14, 2004 and April 15, 2004.

(4) Provide a copy of sworn (affidavit) statement of Douglas Fahey before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.

(5) Provide a copy of sworn (affidavit) statement of an Federal Deposit Insurance Corporation (FDIC) official before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.


Send request to the attention of    Yolanda Gibson-Michaels
                                     2210 Anvil Lane
                                     Temple Hills, Maryland 20748
                                     301 650-5062



**U.S. Department of Justice**

**Criminal Division**

_____

_Office of Enforcement Operations_                                    _Washington, D.C. 20530_

CRM-200501151P

Ms. Yolanda Gibson-Michaels                    DEC  8 2005
2210 Anvil Lane
Temple Hills, Maryland 20748

Dear Ms. Gibson-Michaels:

     This is in response to your request of November 9, 2005,  pursuant to the Privacy Act, for
access to records concerning you and the wire tap request/order described in paragraphs 1-5 of
your request.

     We did not find any Criminal Division records within the scope of your request.

     If you consider this response to be a denial of your request, you have a right to an
administrative appeal of this determination. Department regulations provide that such appeals
must be filed within sixty days of your receipt of this letter. 28 C.F.R. 16.45. Your appeal
should be addressed to:  Co-Director, Office of Information and Privacy, Flag Building, Suite
570, United States Department of Justice, Washington, D.C. 20530.  Both the envelope and the
letter should be clearly marked with the legend "FOIA Appeal." If you exercise this right and
your appeal is denied, you also have the right to seek judicial review of this action in the federal
judicial district (1) in which you reside, (2) in which you have your principal place of business,
(3) in which the records denied are located, or (4) for the District of Columbia. If you elect to
file an appeal, please include, in your letter to the Office of Information and Privacy, the
Criminal Division file number that appears above your name in this letter.

                      Sincerely,

                      Thomas J. McIntyre, Chief
                      Freedom of Information/Privacy Act Unit



Faxed TO FISA Court on 7/18/06 (7/17) in red and certified mail to FBR and WhiteHse

INDEX  12/07/15
[A] Duplicate [B]
Records of
Electronic EavsDrop
Feb 24/15/04

SUBJECT:

DATE:

CERTRON

FDIC's wrote Description of Illegal Intentional of Oral Communications.

FDIC Refused to turn over Original illeg tape recording intercepts by unlicensed contracts w/out by order Required by law!!

Gibson Michaels Suspected fowl duty 5-days Bread On Bible Ditto inside a Closed box Office. (Resonable expectations of privacy established)

FDIC Lied to Federal Probation Service. Tapes were NOT Lost!!

Sony Corp Did not grant permission to use or reproduce FDIC to use A-Sony tape recorded.

Sony had no right to approve the FDIC, Douglas Rohrer or Deven Kit Johnson to engage into illegal intercepts of my oral communications over a Bible Verse!!