## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOLANDA C. GIBSON-MICHAELS )
        Plaintiff,       )
                   )
         v.         ) Civil Action: **06CV01940 (RMU)**
                   )
SHELA C. BAIR, et.al.     )
        Defendants    )

## PLAINTIFFS' OPPOSITION TO DEFENDANTS OPPOSITION TO PLAINTIFF'S MOTION TO PERMANELTY SUPPRESS EVIDENCE AND MOTION FOR INJUNCTIVE RELIEF

Comes Now, Yolanda C. Gibson-Michaels (prose), Plaintiff in the above-entitled in opposition to the Federal Deposit Insurance Corporation hereafter "Defendants" or "FDIC"), oppose **Defendants Opposition to Plaintiff's Motion to Permanently Suppress Evidence and for Injunctive Relief.** See Nardone v. United States, 302 U.S. 379, ruled that Section 605 **prohibited all telephone wiretapping, even when done by Federal Government officers**. Also See *Katz v. United States, 389 U.S. 347.*

I.    **Legal Standard for Due Process** - Plaintiff's motion to suppress evidence and injunctive relief is warranted. The Federal Deposit Insurance Corporation (FDIC) et.al., denied Plaintiff **due process**, **procedural due process**, 1st, 2nd, 4th, 5th Amendments, **Miranda rights**, **Denied Counsel**; detained (false arrest) Plaintiff.

On **page 2**, FDIC James Lantelme's initial statement read: ["**I told her that Yolanda's comments were improper.**]" In attempt to incriminate Plaintiff, James Lantelme's 2nd sentence reads: **"A BIT LATER, I CALLED JENEKIA AND ASKED HER IF "SHE FELT THREATEN" BY YOLANDA AND SHE CONFIRMED THAT SHE DID."** James Lantelme's hatred towards Plaintiff **intentionally** and **maliciously manifested** a **"Feeling of Threat"** in attempt to entrap, incriminate, and frame-up Plaintiff. See **18 U.S.C 241 Conspiracy Against Rights, 18 U.S.C. 242, 18 U.S.C 246 - Deprivation Of Relief Benefit.**

On **October 8, 2004**, William Kmetz, stated on **page 4** of his sworn affidavit that: **"On or about April 14, 2004, I believe that I did receive a telephone call from James Lantelme of the FDIC Legal Division informing me as a MRT member and as Assistant Director – FDIC Security that a Ms. Johnson, a Legal Division employee had been allegedly [threatened] by Ms. Gibson-Michaels."**

On **September 27, 2004**, James T. Lantelme, Assistant Director, by sworn affidavit to EEO Investigator, Barry Cohen, stated on page **2 of 6** of that:"**Ms. Gibson-Michaels had [threatened] Ms. Johnson in connection with an investigation of a theft of her money on FDIC property."** See **18 U.S.C 241 Conspiracy Against Rights, 18 U.S.C. 242, 18 U.S.C 246 - Deprivation Of Relief Benefit**

Courts apply the **Fourth Amendment ["Fruit of the poisonous tree Doctrine**. See **U.S. v. Smith**, 155 F.3d 1051, 1060 (9th Cir. 1998) and the **Fourth Amendment search-and-seizure jurisprudence.** Section 2515 rule applies to all **court proceedings**, **Federal** and **State, administrative agencies**, **legislatures**. See United States v. Janis, 428 U.S. 433 (1976), See United States v. Calandra, 414 U.S. 338 (1974).

## II.   BACKGROUND

The Supreme Court described the exclusionary rule as: **"A protection for 'the victim of an unlawful invasion of privacy' §2515 serves not only to protect the privacy of communications, [but also to ensure that the courts do not become partners to illegal conduct] the evidentiary prohibition was enacted also to protect the integrity of court and administrative proceedings….excludes all derivative evidence."**

4

Plaintiff's **Motion to Suppress Evidence** is applicable to all claims and Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII). Amended under **42 of the United States Code, Section 2000e**. Title VII as admended, prohibits employment discrimination based on **race**, **color**, **religion**, **sex** and **national**. The statute under **section 1977 (42 U.S.C. 1981),** provides for the recovery of **compensatory** and **punitive damages** of **intentional violations of Title VII**.

## III.    STATUTORY FRAMEWORK TO LAWFUL INTERCEPT

The statutory framework relies upon the **United States Department of Justice (DOJ)** procedures approved by **United States Attorney strict** guidelines to Assistant U.S. Attorneys, Federal Investigative agencies **_must_** adhere regarding intercepts of oral communications.

The **Department of Justice (DOJ)** policy on the use of electronic surveillance is governed by the Federal electronic surveillance statutes (commonly referred to collectively as **"Title III"**) are codified at **_18 U.S.C. § 2510, et seq_**. Because of the well-recognized intrusive nature of many types of electronic surveillance, especially "**wiretaps**" and **"bugs,"** and the **Fourth Amendment implications of the government's use of these devices in the course of its investigations**.

5

The Department of Justice (DOJ) guidelines **provide restrictions**, the requirement that a **high-level Department official specifically approve** the use of these types of electronic surveillance **[prior to an Assistant United States Attorney obtaining a court order authorizing interception]** as well as **emergency interception procedures** and **restrictions on the disclosure** and **evidentiary use of information obtained through electronic surveillance**. By enacting **Title III in 1968, [Congress prohibited private citizens]** from using certain electronic surveillance techniques.

The Metropolitan Police Department for the District of Columbia confirmed that Douglas Fahey didn't have a license; and the DOJ Criminal Division confirmed that Fahey didn't have or obtain a required Court Order by the U.S. District of Columbia. See 18 U.S.C. § 2511.

The Wire and Electronic Communications Interception and Interception of Oral Communications Act (formally known as the "Title III" Wiretap Act, 18 U.S.C §§ 2510-2520,), **requires a court order issued by a judge who must decide that there is probable cause to believe that a crime has been, is being or is about to be committed**. Defendants are not able to aver; arguments are **moot**.

**A.    Authorization of Wire, Oral, and Electronic Interception**

DOJ USAM Section 9-7.100 **require restrictions** upon the use of electronic surveillance by **law enforcement agents** enacted in recognition of the **restrictions against unlawful searches** and **seizures** contained in the **Fourth Amendment** to the United States Constitution. *See, e.g., Katz v. United States*, 389 U.S. 347 (1967).

**B.    One of Title III's most restrictive provisions** is the requirement that **Federal investigative agencies submit requests for the use of certain types of electronic surveillance (primarily the non-consensual interception of wire and oral communications).** The Department of Justice **must review** and **approval before applications for such interception may be submitted to a court of competent jurisdiction for an order authorizing the interception.**

Specifically, in 18 U.S.C. § 2516(1), Title III explicitly **assigns such review and approval powers to the Attorney General.** Because there are **[severe penalties for the improper]** and/or **unlawful use** and **disclosure of electronic surveillance evidence, including criminal, civil,** and **administrative sanctions**, as well as the **suppression of evidence.**

7

**C.    9-7.110 Format for the Authorization Request**

An affidavit of an "**investigative** or **law enforcement officer**" of the United States who is empowered by law to conduct investigations of, or to make arrests for, offenses enumerated in 18 U.S.C. § 2516(1) or (3). Defendants willful and continuous acts are prohibited in accordance to 18 United States Code violations: **18 U.S.C. §287 - 18 U.S.C. § 1001, 18 U.S.C. §242 – Acting Under the Color of Law**, 18 U.S.C. § 247 - **obstruction of persons in the free exercise of religious beliefs**, 18 U.S.C. §208 - **Acts affecting a personal financial interest**, 18 U.S.C. § 2511- **Interception** and **disclosure of wire, oral,** or **electronic**, 18 U.S.C. § 402, 18 U.S.C. § 912 – **Officer or employee of the United States** 8 U.S.C. 24(a)(1)(A)(iv)(b)(iii), 12 C.F.R. Part 366, **Minimum Standards of Integrity and Fitness** (Contractor), 18 U.S.C. §247, 18 U.S.C. § 1030(a)(2) –**FTCA**), 18 U.S.C. §1028 – **Identity Theft Fraud**, 18 U.S.C – 241 **Conspiracy Against Rights**, 18 U.S.C. 242 **Deprivation Of Rights Under Color Of Law**, 18 U.S.C. 245 **Federally** Protected Activities, 18 U.S.C 246 - **Deprivation Of Relief Benefits**, 18 U.S.C 2701 through 2703 **Stored Wire and Electronic Transactional Records.**

8

DOJ requires that an affidavit must set forth the facts of the investigation that establish the basis for those probable cause (and other) **statements required by Title III to be included in the application**.

**D.** The application by any United States Attorney authorized by law to prosecute or participate in the prosecution of offenses enumerated in 18 U.S.C. § 2516(1) or (3) that provides the basis for the court's jurisdiction to **sign an order authorizing the requested interception of wire**, **oral**, and/or electronic communications; and **A set of orders to be signed by the [court authorizing the government to intercept]**, or approval of the interception of the wire, oral, that are the subject of the application as defined in 18 U.S.C. § 2510(15)).

## IV.    **Exclusion From Evidence**

The Wiretap Act provides **broad** and **sweeping exclusionary rules 18 U.S.C. §2515 provides**:  Whenever any **wire** or **oral communication** has been intercepted, **no part of the contents of such communication** and **[no evidence derived there from may be received in evidence in any trial]**, **[hearing]**, or **]other proceeding in]** or **[before any court]**, **[grand jury]**, **department**, **officer**, **agency**, **regulatory body**, **legislative committee**, or **other authority of the United States**, **a State**, or **a political subdivision** thereof disclosure of that information would be in violation.

The amended Wiretap Act prohibits the **[unauthorized interception"** **of oral**, **wire** and **electronic communications]** The Wiretap Act protects the privacy of three types of communications which are statutorily defined as **"oral communications," "wire communications"** and **"electronic communications."** 18 U.S.C. §2510. See U.S.C. §2701(a) and 18 U.S.C. §2510 (15). **Oral Communications**: An "**oral communication**" is "any oral communication **uttered by a person exhibiting an expectation that such communication is not subject to interception.** See 18 U.S.C. §2510(2). The communication needs to be something **"uttered" by a human being**. The communication must be (a) **be made under circumstances which objectively justify an expectation of privacy** and (b) **_must be made by a person who has an actual expectation of privacy_**. See, Key v. City of Rowlett, 247 F.3d 206, 211 (11th Cir., 2001) (applying essentially the same "**reasonable expectation of privacy test**" that is used for Fourth Amendment purposes); U.S. v. Longoria, 177 F.3d 1179, 1181 (10 th Cir. 1999). Plaintiff's conversation was held inside a closed door office **(project room)** See Supreme Court in Katz v. United States."); Dorris v. Absher, 179 F.3d 420 (6th Cir. 1999)**(coworkers in a small office had a reasonable expectation of privacy);** See the Matter of John Doe Trader Number One,894 F.2d 240 (7thCir. 1990).

10

The Wiretap Act defines **"aural transfer"** as **"a transfer containing the human voice at any point between and including the point of origin and the point of reception."** 18 U.S.C. §2510(18). Section 18 U.S.C. §2511(1) provides that, except as authorized by the Wiretap Act itself **no person may intentionally** Intercept, **endeavor to intercept**, or **procure any other person to intercept**, any wire, oral or electronic communication, §2511(1)(a), or **use**, or **endeavor to use** the **contents of any wire, oral** or **electronic communication, knowing** having reason to know information was obtained by interception in violation of the Act, §2511(1)(d).

The FDIC, in writing, confirmed to U. S. Senate and U.S. Congress that: **"Ms. Gibson-Michaels specifically complaint about one of her conversations with a co-worker** being tape-recorded by that co-worker and **relied upon by management."** See Dorris v. Absher, 179 F.3d 420 (6th Cir. 1999)(**coworkers in a small office had a reasonable expectation of privacy).**

The statute also prohibits the use of **certain electronic, mechanical** and **other devices to intercept oral communications, §2511(1)(b),** See §2511(1)(e).

11

Accordingly, 18 U.S.C. §2511(1)(d) prohibits the **"USE"** of the contents of **any wire**, **oral** or **electronic communication by any person**, **knowing** or **having reason to know that the information was obtained through by interception in violation of the [Wiretap] Act**.

In one case, **during discovery**, an **[Attorney]** **who wrote to opposing counsel suggesting that he might introduce telephone conversations that his client illegally recorded was held liable for damages**. See **Leach** v. **Bryam, 68 F.Supp.2d 1072 (D.Minn, 1999)**.  See **Rodgers** v. **Wood, 910 F.2d 444** (7th Cir. 1990). An attorney who used tapes of illegally intercepted communications to **frame deposition questions** and **[later introduced them in a court hearing was criminally convicted]**. See U.S. v. **Wuliger, 981 F.2d 1497 (6th Cir. 1992)(reversing conviction due to improper jury instructions)**.   See **Bess** v. **Bess**, 929 F.2d 1332 (8th Cir. 1991).

The **statutes of limitation does not require a claimant have actual knowledge of the violation**; it demands only that the claimant have had a reasonable opportunity to discover it. See **Davis** v. **Zirkelbach, 149 F.3d 614, 618(7th Cir. 1998)**.

12

## V.    **Criminal Penalties**

The statute, constitution, and cases cited involve [***attorneys who used***], [**endeavor to use in discovery**], or **disclosed illegally intercepted communications**. **These attorneys were sued**, **held liable for statutory damages**, **criminally prosecuted** and **suspended** or **disbarred from practice**. The Wiretap Act provides a range of penalties depending on the type of violation. 18 U.S.C. §2511(4); most violations are punishable by a maximum of five years in prison plus a fine.

The Stored Communications Act contains very different and broader language: **"Any person aggrieved by an violation of [the Stored Communications Act] in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity which engaged in that violation 18 U.S.C. §2707(a)"**

**Disclosing the contents of an illegally intercepted communication to another person is also prohibited**. See 18 U.S.C. §2511(1)(c). See e.g., **Rogers** v. **Wood**, 910 F.2d 444 (7th Cir, 1990); **Leach** v. **Bryam**, 68 F.Supp. 1079 (D. Minn. 1999). This provisions is applicable to Steve Kaufer, CEO, Workforce Violence Institute, et.al.(Defendant).

13

The D.C. Circuit has outright recognized the **"right of a federal job applicant to seek injunctive relief from an agency's violation of his constitutional rights in general**." See **Hubbard** v. **U.S. E.P.A. Admin**., 809 F.2d 1, 11 (D.C.Cir. 1986). See **O'Donnell** v. **Barry**, 148 F.3d 1126, 1143-44 (D.C. Cir. 1998), citing **Kartseva** v. **Department of State**, 37 F.3d 1524, 1527-29 (D.C.Cir.1994).

June 2004, on behalf of Plaintiff, Donna Schull, The National Treasury Employees Union (NETU), former FDIC Union Representative, oral argument (on record) confirmed requirements of a lawful wiretap in the District of Columbia. Ms. Schull stated that, in part, that: **"I would like the record to show that in speaking with two attorneys that practice law in the District of Columbia, it is against the law for anyone to tape record a conversation without a subpoena.  A phone conversation may be taped with only one parties conversation without a subpoena. A phone conversation may be taped with only one party's knowledge, but not a conversation between two people without a subpoena being issue, however, but not a conversation between two people without a subpoena being issued, however a video surveillance tape can be used without sound to record the dealings of two people." (See Exhibit B)**

14

## VI.    **Conclusion**

The Wiretap Act provides **broad** and **sweeping exclusionary rules**

**18 U.S.C. §2515 provides**:  Whenever any **wire** or **oral communication**

has been intercepted, **no part of the contents of such communication** and

no evidence derived there from may be received in evidence in any trial. No

evidence would include all events on **April 14, 2004**, **April 15, 2004**,

**January 21, 2005**, **December 19, 2005, March 31, 2006**, and **2007**.

**Wherefore**, Plaintiff has a right to suppress evidence and injunctive

relief in violation of Defendant's malfeasance, negligence, attempted frame-

up, obstruction of justice, Denial of Due Process, Procedural Due Process,

Title VII violations, and other 18 U.S.C violations enumerated above.

**Wherefore**, a **Pre-trial discovery with the use, duplication and**

**disclosure of evidence in violation of 18 U.S.C. 119, 18 U.S.C. § 1028 to**

**knowingly transfer** or **use**, **without lawful authority**; in clear violation of

the **Omnibus Crime Control and Safe Streets Act of 1968, Title III, §§**

**801–804, 82 Stat. 211, 9-7.100.**

Respectfully submitted,

Yolanda C. Gibson-Michaels (prose)
2210 Anvil Lane
Temple Hills, Maryland  20748
(301) 630-5062

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **13th day of April 2007**, copies

were mailed to:

**Copies to:**

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, N.W. – Suite 600
Washington, DC  20006

David Zachary Kaufman, Esq.
Kaufman Law Firm
11350 Random Hills Road – Suite 800
Fairfax, Virginia  22030
Securiguard, Inc./USEC Corporation

Scott D. Helsel
Walton & Adams,
1924 Isaac Newton Square
Reston, Virginia  20190

Claire Whitaker, U.S. Attorney
555 4th Street, N.W. E-4204
Washington, D.C.  20530

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOLANDA C. GIBSON-MICHAELS    )
           Plaintiff,    )
                v.    )    Civil Action: **06CV01940 (RMU)**
                    )
SHELA C. BAIR, et.al.    )
           Defendants    )

## <u>ORDER</u>

It is upon consideration of Plaintiff's Opposition To Defendant's

Opposition To Plaintiff's Motion to Permanently Suppress Evidence and

Motion for Injunctive Relief on this _____ day of _____, 2007 is

Granted.

                           _____
                                  Judge

**<u>Copies to</u>:**

Harvey A. Levin
Thompson Coburn LLP
1909 K Street, N.W. – Suite 600
Washington, DC  20006

David Zachary Kaufman, Esq.
Kaufman Law Firm
11350 Random Hills Road – Suite 800
Fairfax, Virginia  22030

Scott D. Helsel
Walton & Adams,
1924 Isaac Newton Square
Reston, Virginia  20190

Claire Whitaker, U.S. Attorney
555 4th Street, N.W. E-4204
Washington, D.C.  20530

17

Exhibit A

**FDIC**

**Federal Deposit Insurance Corporation**
550 17th Street NW, Washington, DC 20429

Office of Legislative Affairs

December 15, 2004

Honorable Barbara A. Mikulski
United States Senator
1629 Thames Street, Suite 400
Baltimore, Maryland 21231

Dear Senator Mikulski:

Thank you for your most recent letter on behalf of Ms. Yolanda Gibson-Michaels, an Information Specialist in the Federal Deposit Insurance Corporation's Legal Division.

We asked the Legal Division to again address the issues raised by Ms. Gibson-Michaels. Enclosed is the Legal Division's response.

We appreciate your interest in this matter and hope this information proves helpful. If you have further questions, the Office of Legislative Affairs can be reached at (202) 898-7055.

Sincerely,

Alice C. Goodman
Director
Office of Legislative Affairs

Enclosure

### Response to in inquiry from
### The Honorable Albert R. Wynn
### on behalf of Ms. Yolanda Gibson-Michaels

## The following information is provided by the FDIC's Legal Division

As Ms. Gibson-Michaels notes in her letter, the Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. She was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. As a result of management's findings about Ms. Gibson-Michaels' misconduct, the FDIC has proposed to suspend her without pay for ten days. Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, and to receive all evidence relied upon. She is being represented in this matter by the labor union for FDIC employees, the National Treasury Employees Union (NTEU). If management decides to suspend Ms. Gibson-Michaels, she and NTEU may file a grievance and ultimately appeal the action to binding arbitration.

Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management. The conversation was recorded with the consent of a party to the conversation, as permitted by D.C. Code §23-542 and Federal law, 18 U.S.C. §2511. Nevertheless, Ms. Gibson-Michaels has objected to this as part of her reply to the proposed suspension.

In addition to the process described above, on or about April 30, 2004, Ms. Gibson-Michaels contacted the FDIC's Office of Diversity and Economic Opportunity about many of the same events discussed in her letter to your office. She is being provided all the due process rights afforded to all federal employees in the pursuit of EEO claims.

Furthermore, on or about May 6, 2004, Ms. Gibson-Michaels also filed an unfair labor practice charge with the Federal Labor Relations Authority, essentially based upon the same incidents. The FLRA is currently conducting an investigation into her unfair labor practice charge allegations.

Finally, the FDIC Office of Inspector General (OIG) was an addressee on the letter Ms. Gibson-Michaels sent to you and she has asked OIG to conduct an inquiry into this matter. We will, of course, fully cooperate with any inquiry conducted.

*[Handwritten annotations in margins:]*

*Left margin: Telephone by Federal Agent*

*Right margin: FDIC Relied Upon Illegal Intercept "USC" Disclosure Duplication 18 USC violations — The LAW must Govern*

*Bottom handwritten note:* D.C. Law, Federal Law requires court order, Sworn Affidavit, Federal crime (not cable Question). Federal Agent or U.S. Federal Attorney to conduct a WIRE TAP NOT Sony TAPE Recorder inside an Intern's PURSE!! Contracts was Also unlicensed Investigator CDC.). Wire tap by Telephone only by Fed. Agent - Not unlicensed contractor or intern private citizens

Response to an Inquiry from
The Honorable Barbara A. Mikulski
On Behalf of Ms. Yolanda Gibson-Michaels

The following information is provided by the Federal Deposit Insurance Corporation's
Legal Division

As noted in her letter, Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. Ms. Gibson-Michaels was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management.

*FDIC Relied upon, Used, (clear) and Duplicant Evidence* [handwritten note in right margin]

The FDIC Legal Division reviewed the circumstances of the allegedly illegal interception and determined that the tape recording of a face-to-face conversation by a party to that conversation is lawful. Both the D.C. Code [§23-542] and Federal law [18 U.S.C. §2511] permit the recording of a conversation, with the consent of a party to the conversation.

As a result of management's findings that Ms. Gibson-Michaels had engaged in unprofessional and/or inappropriate behavior, the FDIC proposed that she be suspended without pay for ten days. On August 17, 2004, after reviewing the proposed suspension and its supporting evidence, the deciding official concluded that Ms. Gibson-Michaels's actions warranted disciplinary action. Based on her review of the record, and in consideration of Ms. Gibson-Michaels's employment record, the deciding official mitigated the proposed ten calendar day suspension to a five calendar day suspension from duty and pay beginning on August 23, 2004 and ending on August 27, 2004.

We would note that while the taping was not a violation of law nor of Ms. Gibson-Michaels's rights, the deciding official did not listen to the tape recording of the conversation nor did she rely on the portions of the transcript from the taped conversation contained in the record as she felt it was unnecessary in determining whether the underlying conduct took place.

Throughout the entire process, Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, to receive all evidence relied upon and to appeal the suspension decision under the grievance procedures contained in the negotiated agreement between the National Treasury Employees Union (NTEU) and the FDIC. She is being represented in this matter by the labor union for FDIC employees, the NTEU.

*FDIC Lied to Senator Mikulski Tape was used, listen to, and Relied upon by FDIC Against Gibson michaels. Read FDICs Response to Albert R. Wynn Page 2.* [handwritten note at bottom]

**FILE NUMBER   WASHINGTON**                    **Incident Number: 0-0000000186**

I would not do anything. She said that Jenekia should confess to taking Kristian's money and go to the Credit Union, withdraw $200 and give it to Kristian over two weeks. She said Jenekia would feel better if she confessed and then said that if she doesn't confess, her guilt will affect her child (Jenekia gave birth to a daughter a few months ago). Yolanda raised a possible affect on her child a number of times.

I told her that she did the right thing by coming to me. I told her to write down everything that she told me; what happened, who said what and when. I told her to call the investigator right away and tell him all that she told me. I told her that Yolanda's comments were improper.

A bit later I called Jenekia and asked her if she felt threatened by Yolanda and she confirmed that she did.

After she left, I called Bob Wooding and Randi Mendelsohn to tell them what I intended to do and to ask their advice for dealing with the situation. I then called Erica Bovenzi to tell her what had happened. I also left a message with Bill Kmetz to invoke the Management Response Team.

After a conference call around 2pm between Randi Mendelsohn, Bill Kmetz, Doug Fahey and me, I called Jenekia to tell her how we were addressing her concerns. I reiterated that it was important for her to write down all that she told me and send it to Mr. Fahey today. I also told her to avoid Yolanda Gibson-Michaels and to tell me if Yolanda further talked to her about anything related to her concerns. She then told me that around 1:30 pm Yolanda had asked her whether she had made any decisions about Yolanda's earlier conversation telling her what to do. Jenekia said she would not drop her charges and would continue to talk to the investigators. She said Yolanda told her she wouldn't be believed and would go to jail for up to 10 years and this would affect her ability to get any other federal job. She sounded upset over the phone while telling me this." (end of memo from LANTELME)

On 14 April 2004 at 15:43Hrs., JOHNSON e-mailed me the following statement of facts (ATTACHMENT A):

"Good Afternoon, Earlier this morning at 11:22am, I received a called from Yolanda Michael Gibson requesting me to come to her desk. Once I arrived she informed me that Kristian told her what took place Monday at the office, so she asked me to tell her my side of the story. After telling her the story she asked me to report with her to the project room. After being escorted and seated by Yolanda she stated she love me, I have and will do so much for you and Kristian, I care for you like my child. Next she stated I am not taking side but you know I got Kristian working here. After that she starts to tell me the story on her mistakes and how she asked God for forgiveness because she did not want anything to back firer on her disability child. After that she keep on repeatedly saying I took the money because I either needed it or didn't, after telling her so many times I do not have Kristian money, she finally told me that something bad is going to happen to me and if it doesn't it will happen to your daughter (Jayda). I told Yolanda that I was going to report it to Jim but she told me I shouldn't because he isn't going to do anything, and she also keep on telling me that was the wrong thing to do, so leave it between us. Then repeatedly "Do you love you daughter" was all she kept on saying for like 3 minutes "God will forgive you. Next she kept on asking me to send an e-mail to Mr. Fahey, telling him a lye that Kristian and I found our money and to drop the case, and then she wanted me to go over to the credit union and take out a loan for Kristian in the amount of $300.00, or to pay Kristian $200 out of pp#7 and $100 out of pp#8. Then she says if I don't god will punish me. So she tells me to go back to my desk and think about it!

Yolanda calls back at 12:25pm on 4/14/04 to come over to her desk then she say and gives example of Kristian moving slow because of her pregnancy and being unable to open the cabinet our purses were in due to her belly. Then she states repeatedly Kristian could not have done it she moves to slow, and you to were the only one who new where the keys was, and since

2

**AFFIDAVIT**

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**


  **I, James T. Lantelme,** hereby solemnly swear that I am employed in the position of Assistant General Counsel, grade EM, Legal Division, Federal Deposit Insurance Corporation (FDIC), 550 17th Street, NW, Room H-3123, Washington D.C. 20429. My race is Caucasian, my color is white, my gender is male, my date of birth is November 10, 1953, and my religion is Lutheran. I have had prior EEO activities. I have undergone EEO training regarding the preventing, reporting and mitigating of harassment. My first line supervisor is Deputy General Counsel Erica Bovenzi.

  I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

  I have known Ms. Gibson-Michaels since 1998. Our relationship is purely professional. I am currently Ms. Gibson-Michaels' second line supervisor. I have had some contacts with Ms. Gibson-Michaels since she came to this section in 1998 including during an FDIC reduction-in-force during 2002 and 2003. I am aware that Ms. Gibson-Michaels is an African-American female, skin color black. I was not aware of Ms. Gibson-Michaels' age or religion or of any prior EEO activity by Ms. Gibson-Michaels until I was told about them during the course of this investigation. I learned of the specifics of Ms. Gibson-Michaels' EEO Complaint when I read the Investigator's Letter of Authorization during my interview on September 20, 2004.

Affiant's Initials _____

Regarding Accepted Issue One, I did initiate an FDIC administrative investigation

*James Lankline Lied on Ms. Johnson*

against Ms. Gibson-Michaels on or about April 14, 2004 for allegedly threatening

Student Intern Jenika Johnson.  On or about April 14, 2004, Ms. Johnson came to my

office visibly upset.  Ms. Johnson stated, in substance, that approximately 15 minutes

*FDIC James Lankl initiated A Feeling of threat Fraudulent Entrapment by Federal Gov't is Duff Inducement Actor A Both*

*Lankline coerced Feeling of Threat*

prior, Ms. Gibson-Michaels had threatened Ms. Johnson in connection with an

investigation of a theft of her money on FDIC property.  Ms. Johnson stated that a few

days prior she had reported a theft of money to FDIC Security and that a fellow FDIC

Student Intern was a suspect.  Ms. Johnson indicated that Ms. Gibson-Michaels talked to

her and urged her to drop the charges against the other Student Intern as well as give the

*LIE!! Quoted Bible verse to a the F!! employed here by Ant. Supervisor her Aunt. (Nepotism)*

other Student Intern money.   Ms. Gibson-Michaels had asked Ms. Johnson to do the

right thing and indicated to Ms. Johnson that if she did not something bad could happen

to Ms. Johnson's child.  I asked Ms. Johnson to prepare a write-up of her conversation

with Ms. Gibson- Michaels.

*Initiated by James Lankline*

FDIC procedures indicate that when an employee receives a threat the FDIC

Management Response Team (MRT) should be contacted. I contacted William Kmetz of

FDIC Security and reported my conversation with Ms. Johnson.  I did take some notes of

my conversation with Ms. Johnson which I believe that I gave to Investigator Douglas

*Mr. Lankline Lied Lankline Approved!! illegally*

Fahey.  I am unaware who informed Ms. Gibson-Michaels that she was the subject of an

administrative investigation.  To the best of my knowledge the resultant investigation was

conducted by Investigator Fahey and Mr. Kmetz.  I was not involved in the resultant

investigation or the investigative decisions made by Investigator Fahey and Ms. Kmetz.

I was aware that sometime later in April 2004, Investigator Fahey planned to have

*un licensed contractor no authority "Acting Under color OF LAW"*

Ms. Johnson speak to Ms. Gibson-Michaels about the alleged threat.  Investigator Fahey

*See memo dated 9/26/04 After Reading Affidavit)*

*FDIC confirmed*
*Unhired Contractor Daughter*
*Made Decisions*
*Judgment No*

had asked Ms. Johnson to conceal an electronic recorder on her person in order to record the conversation between herself and Ms. Gibson-Michaels. The decision to employ a hidden electronic recorder on Ms. Johnson's person was made by either Investigator Fahey or Security Chief Kmetz. I did ask the FDIC Assistant Director for the Labor and Employee Relations Section Randi Mendelsohn about the use of the hidden electronic recorder. I was told that she was aware of and approved the use of the hidden electronic recorder.

After the completion of the investigation, I received a report on Ms. Gibson-Michaels' actions from the MRT. The report indicated that there was no likelihood of physical violence against Ms. Johnson by Ms. Gibson-Michaels. It was nonetheless plain to me that Ms. Gibson-Michaels had interfered with the FDIC theft investigation and had lied about it to the investigators. I proposed that Ms. Gibson-Michaels receive a ten day suspension. Subsequently, the deciding official reduced the ten day suspension to a five day suspension. Ms. Gibson-Michaels has served the five day suspension.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Two, on or about August 12, 2003, I did initiate an administrative investigation against Ms. Gibson-Michaels for allegedly threatening Ms. Terry Hopkins. On or about August 12, 2003, Ms. Hopkins came to my office and

informed me that as an Acting Supervisor she had asked Ms. Gibson-Michaels questions about a leave slip that Ms. Gibson-Michaels had given to Ms. Hopkins. I believe that the initial conversation took place in Ms. Hopkins' office. Ms. Hopkins stated, in substance, that Ms. Gibson-Michaels had objected to Ms. Hopkins' questioning of a signature on the leave slip. Ms. Hopkins felt intimated and left her office. Ms. Hopkins stated that Ms. Gibson-Michaels had followed her down a hall berating Ms. Hopkins. I believe that FDIC Secretary Eyvonne Bryant witnessed Ms. Gibson-Michaels berating Ms. Hopkins.

I contacted the MRT and a subsequent investigation was conducted. The investigation resulted in a conclusion that there was no likelihood of violence. Subsequently, I did orally counsel Ms. Gibson-Michaels about her behavior toward Ms. Hopkins. I do not believe that I made a written comment about my counseling session with Ms. Gibson-Michaels.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, Ms. Gibson-Michaels has been treated differently than Mr. Frank Nigro. Mr. Nigro is no longer a FDIC employee. Mr. Nigro retired from FDIC in 2003. I have been told that Mr. Nigro did have an explosive temper. I believe Mr. Nigro received an official admonishment that if he did not retire he would have been subject to severe disciplinary action. I believe that Ms. Gibson-

*[handwritten in left margin: James Cantone in habit of "Feelings of" Threat to Frame FDIC employees Illegal profiling !!]*

Affiant's Initials _____

Michaels had complained to FDIC about Mr. Nigro's behavior. I was Mr. Nigro's fourth level supervisor and did not personally know Mr. Nigro. I believe that Mr. Nigro is a white Caucasian male. I do not know Mr. Nigro's religion. I assume Mr. Nigro's age is over 50 since he was able to retire from the FDIC.

I have no knowledge that Mr. Nigro's race, color, gender, age and religion played any role or influenced in any manner FDIC Officials' decisions and actions about Mr. Nigro's on the job behavior. I have no knowledge of any type of favorable treatment given to Mr. Nigro by FDIC Officials due to Mr. Nigro's race, color, gender, age, and religion.

I am unaware that the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job performance. I believe that Ms. Gibson-Michaels is performing her current duties in a competent manner. I have been asked the question of whether the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job opportunities. I am unaware of any such FDIC job opportunities for Ms. Gibson-Michaels. FDIC has been in the process of becoming smaller and losing positions.

In summary, I have no knowledge of any type of discrimination by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

I have nothing further to add to my affidavit.

I have reviewed this statement, which consists of five (5) pages, and hereby solemnly swear that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this

_27th_ day of _September 2004_ (date)


James T. Lantelme


Sworn and Subscribed by _____ Barry Cohen, EEO Contract

Investigator, on _9/27/04_ (date).

## AFFIDAVIT

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**

     **I, William A. Kmetz,** hereby solemnly swear that I am employed in the position of Assistant Director, grade E-1, Security Management Section, Administration Division, Federal Deposit Insurance Corporation (FDIC), 1776 F Street, NW, Washington D.C. 20429.   My race is Caucasian, my color is white, my gender is male, and my date of birth is January 4, 1950, my religion is Roman Catholic.   My first line supervisor is Mr. Michael Rubino, Associate Director, Corporate Services Branch, Administration Division.   I have had routine FDIC training regarding the preventing, reporting and mitigating of harassment.

     I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint.  I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

     I am not sure how long I have known Ms. Gibson-Michaels.  I had seen her once or twice as a FDIC employee.  Our relationship is purely professional.  I am aware that Ms. Gibson-Michaels is an African-American female.  I do not know her age or her religion.  I have never supervised Ms. Gibson-Michaels. I have no knowledge of any prior EEO activity by Ms. Gibson-Michaels.  I learned of Ms. Gibson-Michaels's current EEO Complaint when I was interviewed on September 27, 2004.

     Regarding Accepted One, FDIC has a zero tolerance policy regarding allegations of work place violence.   I chair the FDIC Management Response Team (MRT).  The

Page 1 of 4            Affiant's Initials _____

MRT is an informal group of FDIC Officials concerned with the prevention of work place violence at FDIC. On or about April 14, 2004, I believe that I did receive a telephone call from James Lantelme of the FDIC Legal Division informing me as a MRT member and as Assistant Director- FDIC Security that a Ms. Johnson, a Legal Division employee had been allegedly threatened by Ms. Gibson-Michaels. I do not remember the specifics of my telephone call with Mr. Lantelme. After my telephone call with Mr. Lantelme, I contacted Investigator Douglas Fahey and asked him to investigative and make contact with Ms. Johnson. Mr. Fahey was a contract investigator with the Securiguard Corporation. ) Mr. Fahey was in charge of investigation. ( Mr. Fahey conducted the interviews in connection with the alleged threat investigation.

Mr. Fahey's investigation was formalized in the FDIC's Investigations Resources Information Management System (IRIMS). IRIMS is data base that contains investigative and security reports conducted by FDIC Security. I have forwarded Mr. Fahey's IRIMS report of this investigation to the Legal Administration Division

I do remember Mr. Fahey consulting with me about the use of a small electronic tape recorder which was to place in Ms. Johnson's handbag in order to secretly record a conversation between Ms. Johnson and Ms. Gibson-Michaels about the alleged threats that Ms. Gibson-Michaels had made to Ms. Johnson. Mr. Fahey indicated that Ms. Johnson had agreed to the placing of the tape recorder in her handbag in order to record her conversation with Ms. Gibson-Michaels. Mr. Fahey stated that since Ms. Johnson had agreed to the recording of her conversation with Ms. Gibson-Michaels that the recording of the conversation was a normal investigative technique. I advised Mr. Fahey to consult with FDIC Labor Relations and Mr. Lantelme regarding the use of the tape

recorder. I understand that this coordination was done, but I do not have any specific details. However, I believe that the participants agreed that since Ms. Johnson had given her permission to record her conversation with Ms. Gibson-Michaels that the use of the hidden recorder was permissible and legal.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

*False* Regarding Accepted Issue Two, I do not recall the specifics of the 2003 investigation involving an alleged threat made by Ms. Gibson-Michaels to Ms. Terry Hopkins. The investigation was assigned to Investigator Fahey. I believe the investigation was conducted in a routine manner and formalized in the FDIC IRIMS. The report for this investigation has been forwarded to FDIC Administration.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue Two constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

*Psu, Read Email to Bill Krock 9/12/02*

Regarding Accepted Issue Three, I have no recollection of any events regarding this issue. I do not know Mr. Frank Nigro. I do not recall any conversations or email

Page 3 of *5* *out*          Affiant's Initials _____

*FDIC Sent to FISD, Sorolc, FBI*

messages about Mr. Nigro's FDIC job behavior. I have no knowledge of any FDIC favorable treatment of Mr. Nigro based on his Caucasian race, white color, male gender, and such factors as his age and religion.

Mr. Fahey is no longer employed as a contract Investigator by FDIC. He is currently employed by the Federal Bureau of Investigation.

In summary, I have no knowledge of any type of discrimination or reprisal actions by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion. To the best of my knowledge Ms. Gibson-Michaels was treated as any other FDIC employee.

I have nothing further to add to my affidavit.

I have read the foregoing statement consisting of ____4____ pages, each of which I initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement is made of my free will without any threat, promise of immunity, or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to interested parties.

_____
Signature


Subscribed and sworn before me in _Washington DC_

this __8th__ day of __October__, 2004

Investigator _Barry Cohen_

Page 4 of X

Affiant's Initials _____

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **FDIC** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **FDIC** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____
Signature of Interviewer

_____
Signature of Witness (person providing statement)

Date: _10-8-04_

Place: _Washington, DC_

**FDIC**

**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500

Office of Diversity and Economic Opportunity

## NOTICE OF RIGHTS OF WITNESSES
### IN
### EEO INVESTIGATIONS

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1. To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2. To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3. To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4. To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5. To review your affidavit and make corrections or other changes _prior to_ signing the affidavit.

**I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.**

WITNESS: _William M. Kinet_          DATE: _9-27-04_

TAB E

FDIC



FDIC
FEDERAL DEPOSIT INSURANCE CORPORATION

**Incident Number: 0-0000000186**          **File Number: WASHINGTON**          **Security Level: FDIC Security**

### Incident Details

| | | | |
|---|---|---|---|
| **Category:** | Threats | **Subcategory:** | By Employee |
| **Type:** | Workplace Violence | **Loss/DamageType:** | |
| **Security Level:** | FDIC Security | **Status:** | Ref.to Management |
| **Police File:** | No | **Police File Number:** | |
| **Occurred From Date:** | 4/14/2004 | **Occurred From Time:** | 11:22:00AM |
| **Occurred To Date:** | | **Occurred To Time:** | |
| **Reported Date:** | 4/14/2004 | **Reported Time:** | 11:59:00AM |
| **Reporting Person:** | Fahey, Douglas | **Supervisor:** | |
| **Org. Rollup 1:** | | **Org. Rollup2:** | **Org. Rollup3:** |
| **Building Name:** | 1717 H St. NW | | |
| **Legal Description:** | | **Number:** | |
| **Local Phone Number:** | | | |
| **Street Address:** | | | |
| **City:** | | **State/Province:** | |
| **Country:** | | **Zip/Postal Code:** | |
| **Geo. Rollup1:** | | **Geo. Rollup2:** | **Geo. Rollup3:** |
| **Location:** | 3rd Floor | | |
| **Location Details:** | | | |
| **Incident Summary:** | Intern felt threatened by words used by employee. | | |

*(handwritten)* Feelings of Threat induced by James T. Cantelme Frame up of Yolanda Gibson Michaels on April 14, 2004.

### Incident Persons

| | | | |
|---|---|---|---|
| **Person Name:** | Gibson-Michaels, Yolanda | **Salutation:** Ms. | **Person Status:** |
| **Incident Person Type:** | Employee | **Company Employee:** Yes | **Barring Notice:** No |
| **Comments:** | | | |

### Incident Person Details          *(For more Person Details please see the Person Profile Report)*

| | | | |
|---|---|---|---|
| **Sex/Gender:** | Female | **Date of Birth:** | **Age:** |
| **Home Address:** | | | |
| **City:** | | **State/Province:** | |
| **Country:** | | **Zip/Postal Code:** | |
| **Home Phone:** | | **Business Phone:** | |
| **Clothing Type:** | | **Clothing Description:** | |
| **Feature Type:** | | **Feature Description:** | |
| **Injured:** | No | **Hospitalized:** | No |
| **Injury Type:** | | **Injury Description:** | |
| **Hospital Name:** | | **Treated By:** | |
| **First Aid:** | | **Cause:** | |
| **Work Time Lost From:** | | **Work Time Lost To:** | |

FILE NUMB╾: WASHINGTON                    Incident Number: 0-0000000186

After asking GIBSON-MICHAELS to explain some of the specific inconsistencies, THORSTEINSON stopped the interview at 12:55Hrs. and asked for my assurance that nothing from this interview would be used in any potential future criminal proceeding against GIBSON-MICHAELS. I was not able to give him that assurance and we all agreed to contact James LANTELME regarding that issue. I contacted LANTELME by telephone and put him on speakerphone. THORSTEINSON addressed this issue with LANTELME, who stated he would checked with a labor relations attorney and call back. At 13:05Hrs., LANTELME called back and while on speakerphone, said that Jimmy LAWRENCE gave an assurance that nothing from this administrative interview would be used against GIBSON-MICHAELS in any future criminal proceeding. This assurance satisfied THORSTEINSON and the interview resumed.

In all, I addressed the following eleven questions from my interview with GIBSON-MICHAELS. Reference information as to where the relevant transcript information can be found on the tape is included. KEY: JJ = Jenekia Johnson; YGM = Yolanda Gibson-Michaels.

40. *Didn't she tell you she felt very threatened by you because you said that if nothing happens to her, then things would roll over to Jayda.*
ANS: No.

Approximate tape reference information
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

*Private Bible Discussion inside a closed door Office*

Relevant Transcript:
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

DISCUSSION on QUESTION 40:
After listening to the tape, GIBSON-MICHAELS maintained her answer to the question was no, saying that JOHNSON said "believing me or not."

39. *In fact Mrs. Gibson-Michaels, Ms. Johnson told you that she felt very threatened by you didn't she?*
ANS: No. She never felt threatened by me. She said she felt threatened by her sins. I don't know what sins she was talking about.

Approximate tape reference information
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

Relevant Transcript:
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you

18

FILE NUMB___ : WASHINGTON                     ___dent Number: 0-0000000186

believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like, you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

## DISCUSSION on QUESTION 39:

After listening to the tape, GIBSON-MICHAELS initially maintained her answer was still no to this question. She first said she believed JOHNSON told her she felt very threatened yesterday "by you believing me or not" instead of "believe it or not." After review of the tape, SCHULL believed JOHNSON said "believe it or not." GIBSON-MICHAELS subsequently changed her answer to, "Yes, she told me that."

NOTE: No where on the tape does JOHNSON talk about her sins or feeling threatened by anything or anyone other than GIBSON-MICHAELS. .

*31. Did you tell Ms. Johnson that you believed Hecht's could have been threatening her for the money she owed them?*
ANS: No.

Approximate tape reference information
Tape Counter Number: 136 and 147
Time into tape: 14 minutes 28 seconds and 15 minutes, 29 seconds

Relevant Transcript (136):
**YGM:** I was thinking it could have been Hecht's. Cause sometimes people [indistinguishable] threaten people?
**JJ:** You mean Hecht's?
**YGM:** Yea, I was thinking. Maybe, I said maybe she had to pay her Hecht's? Cause I don't, Kristian was saying you owe six hundred dollars to Hecht's.

Relevant Transcript (147):
**YGM:** Okay but you know how everyone's going to look at things the way I look at things. I look at this in fact. The fact well the only thing I'm thinking well maybe you could've gotten into a situation where Hecht's was threatening you or something (indistinguishable)
**JJ:** No, cause I'm not, haven't been late on a payment and I have never, I haven't been in that situation.

## DISCUSSION on QUESTION 31:

After listening to the tape, GIBSON-MICHAELS maintained her answer to that question was still no. She said the question wasn't worded properly; that I should have used the word "situation" in my question to her.

*14. Did you suggest to Ms. Johnson that she take a $300 loan from the credit union and pay back Ms. Beard?*
ANS: No.

Approximate tape reference information

19

FILE NUMBER WASHINGTON                    Incident Number: 0-0000000186

conversation, Yolanda asked "did I think about what she said to me the day before", this was to confess to something that I did not do. I also told her that I went home and tried to think nothing of it.

During a conversation that I had with you 10 minutes later, you asked me was there any contact with Yolanda, from the last time we had spoke. I told you then, that I had just ran into her before I met with you. You asked me what was said by her, and I told you then, that all she said was "did I think about what she said yesterday and I said No". You then gave me a piece of paper which had writing on it, on how you wanted me to approach Yolanda. While you were placing the wire in my purse, you asked me to think of another way of approaching Yolanda. My way was to say hello Yolanda, I'm sorry that I lied to you, and yes I did think about what you has said to me yesterday."   (end of e-mail)

Therefore, in summary, the "lie" JOHNSON was referring to on the tape referenced her telling GIBSON-MICHAELS that she had not thought about their previous conversation, when in fact, she had thought about it.

The original tape recording and original statement by GIBSON-MICHAELS were stored as evidence in the Operations Center.

*FDIC
"USE"
illegal
wire
18 USC 119*

CONCLUSION
There is evidence to suggest that GIBSON-MICHAELS did make inappropriate comments to JOHNSON, which supports her allegations that she felt threatened by GIBSON-MICHAELS. A copy of this report, a copy of the recorded tape, and a copy of GIBSON-MICHAELS' statement were provided to LANTELME on 3 May 2004.

*Bible verse I Love you
saying I Love in life
several business
personal
inside a closed
Door office
is not a
Threat*

Bible verse inside a closed door OFFICE (Privacy) is not inappropriate. James T. Lantelme manifested introduced Feelings of Threat to Frame-up Yolanda Gibson-Michaels in Violation OF 18 U.S.C.

by Ms. Gibson-Michaels comments but by what the investigation would uncover about herself. It is understood that Ms. Johnson decided then to go to Mr. Lantelme and tell him about the conversation from her point of view before Ms. Gibson-Michaels told him about their conversation and what may be uncovered in the investigation Mr. Fahey was going to pursue. Mr Lantelme also says that statements regarding harm coming to Ms. Johnson's baby or her were clearly unprofessional statements, meant to create fear and encourage Ms. Johnson to consider withdrawing her case with Mr. Fahey. [The only way Ms. Johnson could have perceived harm would come to her or her child was if she had something to hide from god. She said herself she knew she had no worries for her or Jayda as she didn't take the money. That the nature of the conversation was biblical and spiritual, and one that Ms. Johnson herself said she has heard many times, should not provoke fear from Ms. Gibson-Michaels but from a higher power.] The entire part of that conversation was discussing a biblical verse and what the bible says, and showing that if a parent does commit a sin, that in fact, that sin can transfer to their children and their children's children for three to four generations as written as the word of god. Why the repeating of something Ms. Johnson has heard so many times before, now she viewed as fearful because it came from Ms. Gibson-Michaels is unclear and makes no sense. If she was fearful, it was fearing for her physical safety, and if that was the case, then why did Ms. Johnson continue talking and privately meeting with Ms. Gibson-Michaels after Mr. Lantelme told her on the 14th of April not to? The pattern of events that followed that conversation on April 14th and April 15th do not show that fear or threatening of any kind were an element of concern to Ms. Johnson. Mr. Lantelme also states that Ms. Gibson-Michaels provided the investigator with inaccurate information. This was not

36

PETU UNION Excerpts

intentionally done. Ms. Gibson-Michaels did not say anything she did not believe was true. She answered everything truthfully and honestly. 43 questions were asked of her. Eleven questions were addressed and six were not answered to Mr. Fahey's satisfaction. These six questions are what has been previously addressed above. Out of the six questions management is using to support the inaccurate information provided to an investigator charges, two of them were not clearly stated and she did not hear what he did. Four of them have been explained. We do not feel it is correct in saying that in not recalling a part of such a lengthy conversation it was done intentionally or to mislead the investigator. Clearly that she did not remember saying those things at all. We are asking that the proposed ten calendar day suspension not be granted as the employee was acting in a mentor capacity and no threat was issued by Ms. Gibson-Michaels to Ms. Johnson what so ever. If there had been a physical threat, the MRT team would have reacted differently in dealing with the situation. We formally are asking that these accusations be removed from the employees personnel file and an apology made to her for the irrational behavior from Mr. Lantelme and the inappropriate treatment of Mr. Fahey.

37

*FDIC/Defendants Violated* → ← *FDIC Reported to U.S. Congress & Senate*

*FDIC Violated X*  ·  *DEfendants violated*

## Table 1
### Jurisdictions With Statutes Authorizing the Interception of Wire, Oral, or Electronic Communications
### Effective During the Period January 1 Through December 31, 2004*

| Jurisdiction | Statutory Citation** | Reported Use of Wiretap in 2004 | Number of Orders Authorized in 2004 |
| --- | --- | --- | --- |
| Federal | 18:2510 - 2520 | Yes | 730 |
| Alaska | 12.37 | No | - |
| Arizona | ARS 13-3010 - 13-3018 | Yes | - |
| California | Penal Code Sections 629.50-629.98 | Yes | 10 |
| Colorado | 16-15-102 | Yes | 180 |
| Connecticut | 54-41a - 54-41t | No | - |
| Delaware | 11 Del.C.Chap.24 | No | - |
| District of Columbia | 23-541 - 23-556 | Yes | 4 |
| Florida | 934.01 - 934.10 | No | - |
| Georgia | 16-11-64 | Yes | 72 |
| Hawaii | 803-41 - 803-48 | Yes | 33 |
| Idaho | 18-6701 - 18-6710 | No | - |
| Illinois | 720 ILCS SEC.5/108B | No | - |
| Indiana | 35-33.5-3-1 | Yes | 21 |
| Iowa | 808B.1 - 808B.9 | No | - |
| Kansas | 22-2514 - 22-2516 | No | - |
| Louisiana | Act No. 121 3B No.233 15:1308(A)(2) | No | - |
| Maine | 15 M.R.S.A. Sec 709 et seq. | No | - |
| Maryland | 10-401 - 10-411 | No | - |
| Massachusetts | 272.99 | Yes | 34 |
| Minnesota | 626A.01 - 626A.21 | Yes | 23 |
| Mississippi | 41-29-501 | Yes | 1 |
| Missouri | 33-542.400 - 542.424 | Yes | 3 |
| Nebraska | 86-290 - 86-294 | No | - |
| Nevada | 179.410 - 179.515, NRS 200.620 | No | - |
| New Hampshire | 570-A:1 - A:11 | Yes | - |
| New Jersey | 2A-156A-1 - 156A-34 | Yes | 8 |
| New Mexico | 30-12-2 - 30-12-11 | Yes | 13 |
| New York | CPL Article 700 | No | 144 |
| North Carolina | N.C.G.S. 15A-286 | Yes | - |
| North Dakota | 29-29.2 | No | 347 |
| Ohio | 2933.51 - 2933.66 | No | - |
| Oklahoma | 13 O.S. 176.1 - 176.14 | Yes | 1 |
| Oregon | ORS 133.721 - 133.739 | Yes | 16 |
| Pennsylvania | 18 Pa.C.S. Sec 5701-5728 | No | - |
| Rhode Island | 12-5.1-1 - 12-5.1-16 | Yes | 32 |
| South Carolina | SC Code Section 17-30-10 et seq. | No | - |
| South Dakota | 23A - 35A | No | - |
| Tennessee | 40-6-301 - 40-6-311 | No | - |
| Texas | Crim. Proc. Sec. 18.20 | Yes | 36 |
| Utah | 77-23a-1 - 77-23a-16 | No | - |
| Virgin Islands | 5 V.I.C. Sec 4101-4107 | No | - |
| Virginia | 19.2-61 | No | - |
| Washington | 9.73 | No | - |
| West Virginia | 62-1D-11 | No | - |
| Wisconsin | 968.27 - 968.33 | Yes | 2 |
| Wyoming | 7-3-701 - 7-3-712 | No | - |

\* Pursuant to provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 2519.
\*\* Includes only those jurisdictions that enacted legislation during or before calendar year 2004.

FDIC
Ignored Law

**Gibson-Michaels, Yolanda C.**
From:       Lawrence, James R.
Sent:       Wednesday, June 02, 2004 5:33 PM
To:         Gibson-Michaels, Yolanda C.
Subject:    RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS
            INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

Thanks for the information.    I enjoyed speaking with you.

-----Original Message-----
**From:** Gibson-Michaels, Yolanda C.
**Sent:** Wednesday, June 02, 2004 5:23 PM
**To:** Lawrence, James R.
**Subject:** FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS
INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

**Subject:** RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS
INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

Additional information...

# US federal wiretapping laws as of Jan. 2000

Contents:

- CRIMES:
  - 18 USC, PART I, CHAPTER 119 - WIRE AND ELECTRONIC
    COMMUNICATIONS INTERCEPTION AND INTERCEPTION
    OF ORAL COMMUNICATIONS (includes 18 USC 2510-2522)
  - 18 USC, PART I, CHAPTER 121 - STORED WIRE AND
    ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL
    RECORDS ACCESS (incl. 18 USC 2701-2711)
- CRIMINAL PROCEDURE:
  - 18 USC, PART II, CHAPTER 205 - SEARCHES AND
    SEIZURES (incl. 18 USC 3117, "Mobile tracking devices"; non-
    wiretapping sections elided)
  - 18 USC, PART II, CHAPTER 206 - PEN REGISTERS AND
    TRAP AND TRACE DEVICES (incl. 18 USC 3121-3127)
- TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAMS
  - 47 USC, CHAPTER 9 - INTERCEPTION OF DIGITAL AND
    OTHER COMMUNICATIONS (incl. 47 USC 1001-1021; most
    CALEA provisions are in this part)

| From: | Bovenzi, Erica F. |
|---|---|
| To: | Gibson-Michaels, Yolanda C. |
| Sent: | Monday, June 21, 2004 4:57 PM |
| Subject: | Read: FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS |

Your message

| To: | Bovenzi, Erica F. |
|---|---|
| Subject: | FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS |
| Sent: | 6/9/2004 3:20 PM |

was read on 6/21/2004 4:57 PM.

1

IMAGE 10

ISA Court
on 7/14/06
Sent certified
mail to Fran
and Whichne

INDEX 12/07/05 —

[A] DUPLICATE [B]
RECORDING OF
ELECTRONIC EAVES DROP
FROM 04/15/04

SUBJECT: _____

DATE: _____

**CERTRON**

FDIC Lied to Federal Protective Service

Tapes were NOT Lost!!

Sony Corp Did not get my permission to use or approve for FDIC to use a Sony tape recorder.

Sony had no right to approve the FDIC, Douglas Farley or Jennekin Johnson the engage into illegal intercepts of my oral communications over a Bible verse.

FDIC's wrote
Description of
Illegal Intr..
of oral (.

FDIC Refused
over Original
tapes recording
by unitowed contract
W/out by order
Recorded by Laws!!

Gibson Michels supposed
from duty 5-days Based
on Bible Quote inside
a closed door office.
( Reasonable Expectation
of Privacy) residential?.

**FDIC**
Federal Deposit Insurance Corporation    *my right to an attorney*    *yet refuse*

April 21, 2004

**TO:**    Yolanda Gibson-Michaels
Information Specialist

**FROM:**    James T. Lantelme
Assistant General Counsel

*contractor*

**SUBJECT:**    Mandatory Attendance at Investigatory Meeting

Mr. Douglas Fahey, an investigator with the Division of Administration, notified you by an e-mail on Monday, April 19, 2004, of his need to meet with you for purposes of an investigative interview. Via return e-mail, you stated that "I will not subject myself to any form of investigatory interviews". Instead, you provided him with a written statement.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he has requested, and I direct you to cooperate in the interview. He is available on Friday, April 23rd at 2:00pm. I direct you to contact him to confirm the time for your appointment.

*Threat to Employee is illegal*

Failure to attend the interview and cooperate will result in disciplinary action being taken against you.

*Threat*

*Denied Due Process !!*

*1st, 2nd, 4th*
*Due process, procedural*
*Due process*
*Miranda*
*Rights*

Cc:  Douglas Fahey
William Kmetz
Robert Wooding
Carl Polvinale

**FDIC**

**Federal Deposit Insurance Corporation**

Legal Division

April 26, 2004

**TO:**      Yolanda Gibson-Michaels
             Information Specialist

**FROM:**   James T. Lantelme
             Assistant General Counsel

**SUBJECT:**   Mandatory Attendance at Investigatory Meeting

Due to an excused absence, you were unable to attend an investigative interview with Mr. Douglas Fahey, an investigator with the Division of Administration, scheduled for Friday, April 23rd at 2:00pm. Mr. Fahey has notified you by an e-mail on Friday, April 23, 2004, that he has rescheduled your interview to Wednesday, April 28th, 2004 at 9:30am at his office in the F Street building, room 1C27C.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he has requested, and I direct you to cooperate in the interview. I direct you to contact him to confirm the time for your appointment.

Failure to attend the interview and cooperate will result in disciplinary action being taken against you.

Cc:   Douglas Fahey
      William Kmetz
      Robert Wooding
      Carl Polvinale



## GOVERNMENT OF THE DISTRICT OF COLUMBIA
## METROPOLITAN POLICE DEPARTMENT
### Security Officers Management Branch

January 11, 2005

Mrs. Yolanda C. Gibson-Michaels
1717 H Street Northwest  Room H-3081
Washington, D.C.  20001

Dear Mrs. Gibson-Michaels:

This letter will confirm your conversation on December 22, 2004, with Ms. Gray, staff member of the Security Officers Management Branch.  As previously stated, researching our files Mr. Douglass Fahey is not certified or pending certification through this branch as a Private Investigator.

It should also be noted that the Security Officers Management Branch has no jurisdiction on Federal contract sites.

If you have any additional questions or concerns, please feel free to contact a staff member on (202) 671-0500.

Sincerely,

Sergeant Peter C. McGrath
Assistant Branch Manager

(2 N514-6117 (FAx)

November 9, 2005

D.C. Wire Tap Office
Washington, D.C.

Re: **Expedited FOIA Request – Wire tap on Yolanda Gibson-Michaels**

In accordance to the Freedom of Information Act (FOIA), immediately upon request, provide a copy of:

(1) The wire tap court order secured by Douglas Fahey, contract investigator hired by the Federal Deposit Insurance Corporation (FDIC); contract by Securiguard on **April 14, 2004** and **April 15, 2004** to conduct a wire tap against Yolanda C. Gibson-Michaels on April 15, 2004.

(2) Provide a copy of all wire tap request by Douglas Fahey, contractor with securiguard for years 2003, 2004, and 2005.

(3) All copies of wire tap request by Federal Deposit Insurance Corporation against Yolanda C. Gibson-Michaels on April 14, 2004 and April 15, 2004.

(4) Provide a copy of sworn (affidavit) statement of Douglas Fahey before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.

(5) Provide a copy of sworn (affidavit) statement of an Federal Deposit Insurance Corporation (FDIC) official before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.

Send request to the attention of    Yolanda Gibson-Michaels
                                    2210 Anvil Lane
                                    Temple Hills, Maryland 20748
                                    - 301) 630-5062



**U.S. Department of Justice**

Criminal Division

Office of Enforcement Operations                                    Washington, D.C. 20530

CRM-200501151P

Ms. Yolanda Gibson-Michaels                    DEC   8 2005
2210 Anvil Lane
Temple Hills, Maryland 20748

Dear Ms. Gibson-Michaels:

This is in response to your request of November 9, 2005, pursuant to the Privacy Act, for access to records concerning you and the wire tap request/order described in paragraphs 1-5 of your request.

We did not find any Criminal Division records within the scope of your request.

If you consider this response to be a denial of your request, you have a right to an administrative appeal of this determination. Department regulations provide that such appeals must be filed within sixty days of your receipt of this letter. 28 C.F.R. 16.45. Your appeal should be addressed to: Co-Director, Office of Information and Privacy, Flag Building, Suite 570, United States Department of Justice, Washington, D.C. 20530. Both the envelope and the letter should be clearly marked with the legend "FOIA Appeal." If you exercise this right and your appeal is denied, you also have the right to seek judicial review of this action in the federal judicial district (1) in which you reside, (2) in which you have your principal place of business, (3) in which the records denied are located, or (4) for the District of Columbia. If you elect to file an appeal, please include, in your letter to the Office of Information and Privacy, the Criminal Division file number that appears above your name in this letter.

Sincerely,

Thomas g. McIntyre
by KWS

Thomas J. McIntyre, Chief
Freedom of Information/Privacy Act Unit

Exhibit B

Oral Reply for Yolanda Gibson-Michaels

Notice of Proposed Ten (10) Calendar Day Suspension


I am here today to provide the oral reply for Ms. Yolanda Gibson-Michaels regarding the Notice of Proposed Ten Calendar Day Suspension. Ms. Gibson-Michaels has been a valued employee of the FDIC for the past 24 years. She is a person that is relied on in her current position and is encouraged by her managers to participate as a team leader in an unofficial capacity.


As comments in her annual appraisals state "Ms. Gibson-Michaels has served in an unofficial capacity as team leader and was solely responsible for training (5) summer interns who worked in the Legal Services Unit." **(See 9/28/99)** nomination evaluation Ltr. Edwards, "Ms. Gibson-Michaels made herself available to the summer interns assisting them with projects, answering questions and ***making decisions*** when I was not available." **(See 9/28/99)** nomination evaluation Ltr. Edwards, "She is always approachable and willing to assist anyone in need of information or co-works in need of assistance on a project. Her confident positive attitude and willingness to help makes her a valuable employee to the Unit." **(See outstanding performance rating 9/98-8/99)** Edwards, "Ms. Gibson-Michaels is always tactful, compassionate, and sensitive to the needs, feelings, and capabilities of different people in different situations. Her message is clear and convincing during oral presentations to individuals, which fosters an atmosphere of open communication." **(See outstanding Performance rating 9/00-8/01).** Edwards, "Ms. Gibson-Michaels values others ideas and viewpoints; assists others in

1

mediating disputes" (see **outstanding rating 9/00-01**). Edwards, "Ms. Gibson-Michaels has done an exemplary job in the Legal Services Liaison Group this performance year. She can always be counted on to give you **110%** effort in all that she does. She is a credit to the Legal Services Unit (LSU) 9/01-02). Polvinale. "Ms. Gibson-Michaels is a credit to the FDIC Legal Division whom she represents everyday by example" (see **performance rating 9/02-03). Polvinale.**

In this team leader position, she has working relationships with student interns and becomes a mentor to them. The interns seek her guidance, ask for her input and get direction from her on work issues as well as personal issues. She is their mentor and confidant. The topics of discussion range from work issues to personal and even spiritual discussions between them about biblical quotes and how things can apply to their daily lives based on their personal beliefs.

It was in this mentor/confidant capacity that Ms. Gibson-Michael's fills in the Legal division, that Ms. Johnson and Ms. Beard both came to her and discussed the issues involving stolen money from April 13th, 2004.

In the *Notice of Proposed Ten (10) Calendar Day Suspension* from Mr. James Lantelme, Assistant General Counsel, he states that Ms. Gibson-Michaels was counseled for conduct in the work place in August of 2003. This is not reflective of her annual appraisal as it states that "she has performed her job in the Legal Services Unit in a very professional manner during the performance year 2002/2003." Mr. Lantelme also states several times that Mr. Fahey is an "FDIC Investigator." I would like to clarify that Mr.

2

Fahey is a contractor, not an FDIC employee or investigator, but that based on the

security contract he provides FDIC with investigative expertise and services for the

corporation. Mr. Fahey points out in the initial investigation that Ms. Johnson felt

threatened for her safety and the safety of her child. Because of her physical fear for her

safety and that of her child it was decided that on April 15th, Ms. Johnson would have a

tape recorder on her person and try and find Ms. Gibson-Michaels to have a repeat

conversation from April 14th. I would like the record to show that in speaking with two

attorneys that practice law in the District of Columbia, it is against the law for anyone to

tape record a conversation without a subpoena. A phone conversation may be taped with

only one parties knowledge, but not a conversation between two people without a

subpoena being issued, however a video surveillance tape can be used without sound to

record the dealings of two people. This was not the case with this taping. There is no

subpoena.   And I wanted the official reply to reflect that. Again, I would like to

reiterate that Mr. Fahey points out in the initial investigation that Ms. Johnson felt

physically threatened for her safety and the safety of her child. The first point I would

like to address is the term being used by Ms. Johnson, Mr. Fahey and Mr. Lantelme to

describe Ms. Johnson's feelings. The word being used is "threaten". Mr. Lantelme

called Ms. Johnson on April 14th and asked her if she felt "threatened" by Ms. Gibson-

Michaels. Ms. Johnson herself never said anything like that in her discussion with Mr.

Lantelme at 11:45 that morning. Mr. Lantelme's memo to file indicates that Ms. Johnson

replied that she did. But what is meant by threatened? If he had asked her if she was

feeling insecure or upset would she have responded in the same way? The tone of Ms.

Johnson on the voice mail message recording she left Doug Fahey didn't sound like she

3

was afraid, scared or fearful of anything.  It was left in a very soft whispering voice.  As if she didn't want someone to hear what she was saying into the phone.  She didn't sound upset or stressed when leaving that message as well.  When, during the interview of April 28th, I asked Mr. Fahey to explain what the employee meant by the statement that she felt threatened, how did she describe to him the actions of Ms. Gibson-Michaels to come to the conclusion that she felt a physical threat for her well being and or that of her daughter, Mr. Fahey was not able to explain it to me saying that he could only read the alleged charges Ms. Johnson provided and what she alleged happened but had no idea why she felt that way.  On April 14th Ms. Johnson was told by James Lantelme to avoid Yolanda Gibson-Michaels and not have any contact at all with her.  As this chain of events unfolds, it is clear that Ms. Johnson did not listen to her supervisor and continued having private discussions in a closed project room with Ms. Gibson-Michaels.  These private meetings and conversations happened several times after Ms. Johnson was told not to communicate with Ms. Gibson-Michaels.  Ms. Johnson also states in the very beginning of her conversation with Ms. Gibson-Michael's on April 15th, that she lied to her the day before and wanted to know if they could talk privately.  This is where Ms. Johnson was wearing the wire and trying to record the conversation between her and Ms. Gibson-Michaels, leading her to try and incriminate herself by saying things Ms. Johnson claimed she did the previous day.  I think that it is also important to point out that Ms. Johnson isn't always an honest person and that not telling the truth is habitual with her. The dishonesty of Ms. Johnson is further supported by her being put on two Academic Probations in the Student Intern Program which happens when a students grade point average falls below a 2.0, and Ms. Johnson's failure to reveal that Mr. Lantelme's

secretary, Joanne Williams is Jeneka Johnson's aunt, a blood relative who is her supervisor; assigns work to her niece as well as reports her time and attendance or lack there of. Mr. Fahey refers in notes on April 15th that he gave her several ideas in how to approach Ms. Gibson-Michaels and Ms. Johnson said she was just going to go up to her and tell her she felt threatened yesterday and that she would like to talk about it with her. Ms. Johnson told Mr. Fahey she wanted to tell her the truth and would address it that way. He agreed with Ms. Johnson that expressing her true feelings would be the easiest way for her to succeed in beginning a dialogue. But in fact, Ms. Johnson approached Ms. Gibson-Michaels by saying "I lied". In a statement she gave Mr. Fahey on April 28th, Ms. Johnson says that in that conversation she said "I did lie to you Yolanda" and that was referring to an earlier conversation between Ms. Johnson and Ms. Gibson-Michaels that day. But the tape recording says "I lied to you yesterday and would like to talk to you." Ms. Johnson further states that it was her decision to approach Ms. Gibson-Michaels and say "Yolanda I'm sorry that I lied to you, and yes I did think about what you had said to me yesterday." But she didn't do that either. She did not reiterate to Ms. Gibson-Michaels what she was referring to in saying I lied to you, just to say the phrase and make Ms. Gibson-Michaels think that points of their discussion were untruthful from the day before.

The personal business and truthfulness of Ms. Johnson isn't what we are here to discuss, but the accusations she has made about Ms. Gibson-Michaels are. The questionable truthfulness of the intern leaves holes in her credibility. Some things don't make sense

and add up the way Ms. Johnson said they occurred. Ms. Johnson says that on April 14th

Ms. Gibson-Michael's and she had a conversation at Ms. Gibson-Michael's desk. She

said alleges that Ms. Gibson-Michaels called her at 11:22am to come to her desk to tell

her what happened the day before. Ms. Johnson goes to her desk after a moment and

begins to tell her side of the incident with the stolen money. Two other staff saw this

discussion and interaction at Ms. Gibson-Michaels desk. It was quite lengthy and there

were interruptions so Ms. Gibson-Michaels and Ms. Johnson decided to go into the

project room to talk privately. It was estimated that Ms. Johnson and Ms. Gibson-

Michaels spent about 8 minutes at her desk then moved into the project room. Ms.

Johnson says in her statement of facts dated April 14th, that she and Ms. Gibson-Michaels

discussed 11 specific topics; one topic Ms. Gibson-Michaels discussed was a story about

herself and her mistakes. I find it interesting that Ms. Johnson says she was called at

11:22am, meets with her by 11:24am, has a discussion in great detail on 11 specific

topics, and is back at her desk by 11:41 to call Mr. Lantelme and ask for a private word

with him. That allowed Ms. Johnson and Ms. Gibson-Michaels approximately 17

minutes to discuss 11 topics in great detail. Approximately 8 minutes of discussion was

at Ms. Gibson-Michaels desk so that would leave about 9 minutes in the project room of

private discussion and explanation of the incidents that occurred. I find it odd, that the

next day, when Ms. Johnson is wearing a wire, recording the conversation she is having

with Ms. Gibson-Michaels she captures approximately 40 minutes of tape, just reiterating

what was said the previous day and only parts of it were captured on tape. How can it

take 40 minutes one day to discuss the events of the previous days in a recap session, but

only 9 minutes to discuss in detail 11 topics in the project room? There seems to be a

time discrepancy involved here or possibly that not all the events outlined were discussed. Ms. Johnson says in her initial statement dated April 14th, that she told Ms. Gibson-Michaels that she was going to inform Mr. Lantelme of the stolen money incident, and Ms. Gibson-Michaels tells her not to, to leave it between the two of them and that telling Mr. Lantelme was the wrong thing to do. Ms. Gibson-Michaels was explaining to the student intern what the appropriate office policy was on something like this and that the appropriate protocol was to inform the administrative officer of the Legal Division and her immediate supervisor. That there is nothing that Mr. Fahey or Mr. Lantelme could do and there was no point in involving them in this stolen money situation. Ms. Johnson did not understand what Ms. Gibson-Michaels was explaining to her and misconstrued the statement to leave them out of it.

**Reason 1: Unprofessional and/or Inappropriate Behavior**

**Specification 1**

*Ms. Johnson, student intern, reported that on April 14, 2004, you had a conversation with her in the project room asking her questions concerning missing money.*

This statement is true and correct. There was approximately a nine minute discussion on eleven topics per Ms. Johnson's statement, 4 of the topics of conversations were clarified as discussions, and one was a story Ms. Gibson-Michaels conveyed to Ms. Johnson. It is

7

unclear how detailed these discussions were in the nine minutes of conversation.
Through the entire taped conversation there was approximately 40 minutes of
conversation just reiterating what was discussed the day before. It is not clear that Ms.
Johnson's account of events is accurate with the time frame available to have this
discussion. Ms. Gibson-Michaels does agree that a conversation did occur that day but it
was Ms. Johnson that stated her version of what happened with the missing money. Ms.
Gibson-Michaels didn't question the intern about the incident, in Ms. Johnson's own
words, "she [Ms. Gibson-Michaels] asked me to tell her my side of the story. After
telling her my side of the story she asked me to report to the project room with her". Ms.
Johnson's statement reflects Ms. Gibson-Michaels telling her a story about herself,
talking to her about the conflict in stories she and the other intern gave her and her point
of view of this situation. It is not unusual for the interns to come to Ms. Gibson-Michaels
for counseling and advice as she is a mentor to them and when asked, provides guidance
and advice to them on situations. Ms. Gibson-Michaels at this time explained to Ms.
Johnson how, not having all the facts, the versions of the story conflicted and that there
were discrepancies in them. Ms. Johnson also says that Ms. Gibson-Michaels didn't
make her feel threatened physically, but in Ms. Johnson's own words, "she says if I don't
god will punish me". I am certain that Ms. Gibson-Michaels does not have the ability to
ensure that Ms. Johnson gets punished by god.

*Ms. Johnson stated that you repeatedly told her that she took the money and that she*
*should send an email to the investigator, Mr. Fahey, claiming the money had been*
*found so that he would drop the case. Ms. Johnson said that you told her that if she*

8